UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2|19|16

UNITED STATES OF AMERICA,

     -against-

MOSHE MIRILISHVILI, et al.,

     Defendants.

_____X

S2 14 CR 810 (CM)

## DECISION ON PRETRIAL *IN LIMINE* MOTIONS

McMahon, J.:

Moses Mirilishvili, M.D. is charged with distribution of oxycodone and conspiracy to distribute oxycodone in violation of 21 U.S.C. §§ 846, 841(a) (l) and (b) (l) (C). (Superseding Indictment S2 14 CR 810 (CM)). Since the defendant is a medical doctor, to convict him of unlawfully distributing oxycodone or conspiring to do the same, the Government must prove beyond reasonable doubt that the defendant "dispensed the [oxycodone] other than for a legitimate medical purpose and not in the usual course of medical practice." Sand, Modern Federal Jury Instructions, § 56.02; *see also United States* v. *Lowe*, 14 Cr. 055 (LGS); *United States* v. *Wiseberg et al.*, 13 Cr. 794 (AT); *United States* v. *Wexler*, 03 Cr. 1150 (LAP). As a medical doctor charged with the unlawful distribution of oxycodone under 21 U.S.C. § 841, defendant may also assert a "good faith" affirmative defense that his distribution of the oxycodone was actually "in accordance with (what he reasonably believed to be) the standard of medical practice generally recognized and accepted in the United States." Sand, Modern Federal Jury Instructions § 56.19.

1

The trial of this matter is scheduled for February 29, 2016.  Both the Government and the defendant have filed motions asking the Court to rule on various trial evidentiary issues.

### The Government's Allegations

On December 11, 2014 the defendant and ten co-conspirators were charged by Indictment 14 cr. 810 (CM) with one count of conspiring to distribute oxycodone.

The Government expects that its evidence at trial will show *inter alia* that:

The charged conspiracy centered at a pain management clinic run by the defendant and located in upper Manhattan (the "Clinic"), where every day, crowds of "patients" gathered and waited for an appointment with the defendant—appointments that almost always resulted in the issuance of an identical prescription for 90 30-milligram oxycodone tablets.  While the defendant accepted a limited number of insurance plans, the vast majority of the "patients" at the Clinic paid cash – $200 handed directly to the defendant at the beginning of each "patient" visit – for an essentially guaranteed prescription for oxycodone.  In total, between October 2012 when the Clinic opened, and December 2014, the defendant wrote more than 13,000 oxycodone prescriptions, substantially all of them for 90 30-milligram tablets.  The defendant also collected millions in cash fees; at the time of his arrest, he had approximately $1.75 million in cash stored at various places in his home.

The Indictment charges that all of the "patients" who obtained oxycodone prescriptions from the defendant were not legitimate patients at all, but worked instead as part of "crews" run by Crew Chiefs, who paid people to pose as "patients" and collect prescriptions, which would then be filled and resold on the street.  In furtherance of the conspiracy, these Crew Chiefs and others who worked with them frequently created sham or fake documents required by the defendant, including fake MRI reports purporting to document injuries for which pain

2

management might be appropriate. Crew Chiefs also typically provided their "patients" with the $200 in cash that the defendant collected at the beginning each "patient" visit.

In addition to the cash fees and identical oxycodone prescriptions, the Government anticipates offering evidence about other illegitimate aspects of the defendant's practice. For example, the Government anticipates establishing at trial that the defendant took little, if any, "patient history" for each patient seen, and conducted only cursory physical examinations. The Government expects to show that the defendant never ordered diagnostic testing of his own (such as an MRI or X-ray), nor did he ever request or examine the actual scans or testing ostensibly done by others—much less the full patient files from the "referring" physicians. Instead, the defendant typically collected an MRI "report," which summarized what another physician, typically a radiologist, purported to have detected on the scan.

With respect to those MRI reports, the Government expects its evidence to establish, not only that many of these documents were fake, but that they were visibly and demonstrably so – female patients were referred to as "males" on MRI reports; fonts for the patient name and DOB were visibly different from the rest of the document (suggesting alteration of the original); and the phone numbers listed for the referring doctors or radiology labs were frequently non-existent. The same documents reveal that "patients" with home addresses near Coney Island or Far Rockaway were regularly traveling all the way to Upper Manhattan to see the defendant who did not take their State benefits but instead demanded cash payments.

The Government says that it anticipates calling at least one expert to testify at trial to the accepted standards of care for treating pain management patients, including, among other things, the need to fully evaluate and diagnose a patient and to explore alternatives to opiate pain medication like oxycodone. (Government's *In Limine* Motion at 4-6).

**Defendant's *In Limine* Motions**

Defendant moves *in limine* to preclude the following evidence: (1) the testimony of Government's proposed expert witness; (2) if the expert is permitted to testify, exclusion of certain opinions of the Government's proposed expert witness or at least an order requiring a *Dubert* hearing before admitting them; (3) improper opinion testimony from law enforcement witnesses; (4) evidence from a law enforcement database; (5) evidence about the amount of controlled substances prescribed by Dr. Mirilishvili as compared to other physicians; (6) evidence of Dr. Mirilishvili's income or the amount of money seized; (7) reputation evidence; and (8) use of aliases. (Defendant's Motion *In Limine* at 1). The defense also moves *in limine* for additional *Brady* disclosure and the production of co-conspirator statements together with an evidentiary justification for their admission. *Id.*

### *Expert Testimony of Dr. Christopher Gharibo*

The defendant seeks to exclude, in whole or in part, the anticipated testimony of the Government's expert, Dr. Christopher Gharibo. The defense argues that the Government's expert notice does not satisfy the requirements of Rule 16(a) (1) (G), and also that certain opinions to be offered by Dr. Gharibo, would not satisfy the standard set forth in Rule 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993).

In regard to the Government's compliance with Rule 16 (a) (1), the Government has represented to the Court that:

On January 15, 2016, the Government provided notice that it intended to call Dr. Christopher Gharbio to testify about "general topics," including the "legitimate practice of pain management medicine, including the use of physical therapy, surgery, non-surgical alternatives, and medications, including controlled substances," the "medically appropriate uses of oxycodone

4

and other controlled substances in the treatment of pain," and "red flags of drug abuse and diversion." The Government also said that it would ask the doctor to opine on "certain aspects of the defendant's practice and prescribing habits" including "the medical legitimacy of certain specific prescriptions written by the defendant based on, among other things, a review of patient records." (Gov't Opposition to Defendant's Motions *In Limine* at 5-6).

On January 24, 2016, the Government supplemented that notice with a transcript of Dr. Gharibo's prior testimony in a case raising similar issues, *United States* v. *Lowe*, 14 Cr. 055 (LGS). *Id.* at 6.

On February 3, 2016, the Government supplemented that notice again with a list of approximately 14 "patients" whose files Dr. Gharibo was being asked to review so that he could offer opinion testimony about them at trial. The Government should have provided the defendant with a written summary of the opinions Dr. Gharibo will offer on those files by last Monday, February 15, 2016.

The Court is satisfied that the Government has provided all the expert notice it is required to provide. The request to preclude him from testifying all together is denied.

To the extent defendant is asking the Court to preclude certain aspects of Dr. Gharibo's testimony on the ground that such testimony does not meet the standard for expert testimony under Rule 702 and *Daubert*, that motion is also denied.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

5

Fed. R. Evid. 702. As the Supreme Court stated in *Daubert*, the drafting history of Rule 702

reflects the "liberal thrust" of the Federal Rules of Evidence and their "general approach of

relaxing the traditional barriers to 'opinion testimony.'" 509 U.S. 579, 588 (1993) (citing *Beech

Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). Indeed, the Second Circuit has instructed

that, "*Daubert* reinforces the idea that there should be a presumption of admissibility of

evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). *Daubert* also, "emphasizes the

need for flexibility in assessing whether evidence is admissible . . . permit[ting] the trial judge to

weigh various considerations pertinent to the issue in question." *Id.* In determining whether to

admit or exclude expert testimony, the district court, "has broad discretion in determining what

method is appropriate for evaluating reliability under the circumstances of each case."

*Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

Both sides agree that the central issue that will determine defendant's guilt or non-guilt is

whether the defendant/doctor knowingly and intentionally distributed oxycodone outside the

usual course of professional practice, and without a legitimate medical purpose. 21 U.S.C. § 84

l(a)( 1 ); *see United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008) (holding that physicians

can be prosecuted under 21 U.S.C. § 841 only when their narcotics activities fall outside the

"usual course of professional practice" and they act knowingly and intentionally); *see also

United States v. Ignasiak*, 667 F.3d 1217, 1228 (11th Cir. 2012) (explaining that, under 21

U.S.C. § 84l(a)( 1 ) "it [is] incumbent upon the government to prove that [the doctor] dispensed

controlled substances for other than legitimate medical purposes in the usual court of

professional practice, and that he did so knowingly and intentionally").

6

The Government, of course, says that the defendant/doctor wholly abdicated his role as physician and knew he was acting as an illegal drug dealer, peddling oxycodone to all comers with cash. The defendant, not surprisingly, says the Government has gotten it all wrong, that he was merely ministering to his patients, attempting to relieve their pain the best way he knew how. To buttress those positions both the Government **and** the defendant (who has absolutely no burden to put on any evidence at trial) provided reciprocal notices of an intent to retain the services of a medical doctor who could testify about the standards for the legitimate practice of medicine in the field of pain management and on the treatment provided by the defendant on particular occasions.[1]

The use of expert testimony in this type of case is not only appropriate, but arguably indispensable. As the Supreme Court has held in *United States v. Chube*, 538 F. 3d 693, 698 (7th Cir. 2008), "it is impossible sensibly to discuss the question whether a physician was acting outside the usual course of professional practice and without a legitimate medical purpose without mentioning the usual standard of care." The Second Circuit, among other courts, has frequently stressed both the relevance and admissibility of testimony in a narcotics trial like this one, in which the defendant is a medical professional. *See, e.g., United States v. Wexler*, 522 F. 3d 194, 204 (2d Cir. 2008) ( "While failure to comply with the standard of care applicable to a medical specialty does not alone provide a basis for concluding that a physician's activities fall outside the usual course of professional practice, it is surely relevant to that determination"); *see also United States v. Feingold*, 454 F. 3d 1001, 1011 (9th Cir. 2006) (instructing "that it is

---

[1] In his motion in opposition to the Government's motion to introduce evidence about defendant's suspension from the practice of medicine, defendant explicitly acknowledges the need for an expert in this case: "The government will have an opportunity to present its view of what 'objectively' was the usual practice of pain management by physicians during the relevant time period charged in the indictment through its noticed expert witness, Dr. Gharibo." (Defendant's Opposition Brief at 11).

7

appropriate [in narcotics cases] for the jury to consider the practitioner's behavior against the benchmark of acceptable and accepted medical practice" and that "knowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a bad actor, but as a 'pusher' whose conduct is without a legitimate medical justification"). In light of these and other precedents, there is no need for a hearing to determine the scientific validity or reliability of the sort of opinion testimony Dr. Gharibo will give.

As for Dr. Gharibo's qualification to testify as an expert in pain management and the standards of practice in that field, the Government's proffer of the Dr. Gharibo's considerable training and experience, including his personal involvement in developing the standards of pain management care for one the largest and most prestigious hospitals in New York, more than meets the *Daubert* standard. To the extent the defendant seeks to challenge the rigor of Dr. Gharibo's methods or training, or the accuracy or reliability of the opinions being offered, he is of course free to do so through cross examination. *See, e.g., Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). Similarly, to the extent the defendant wishes to test or challenge the validity of any opinions offered by Dr. Gharibo on the basis of the limited number of files being reviewed, the defendant is free to do so on cross examination.

Dr. Gharibo will be permitted to testify as an expert in the field of pain management— defendant's request for a *Daubert* hearing is denied.

8

### *Law Enforcement Witnesses and "Medical Opinions"*

Next, the defendant moves to preclude "law enforcement witnesses from offering 'opinions' about case related matters, including medical findings or pain treatment." In particular, he "seek[s] to preclude law enforcement from repeating information they might have heard from medical professionals or others about the contents of medical records." (Defendant's Opposition Brief at 28-29.)  The Government has represented that it does not intend to ask its law enforcement officers to offer medical opinions or to repeat information they heard from medical professionals.

Accordingly, this aspect of the defendant's motion appears to be moot.

### *New York State Bureau of Narcotics Enforcement Records*

The Government says that it intends to offer New York State Bureau of Narcotics Enforcement ("BNE") records documenting each prescription for a controlled substance written by the defendant and filled at a New York pharmacy.   The defendant moves to preclude the Government from offering the BNA records on hearsay grounds.  The Government argues that the BNA records are admissible pursuant to Fed. R. Evid. 803(6) (the business records exception).

Assuming the Government can establish that the particular BNE documents it intends to offer are "records of regularly conducted activity" (*see* Fed. R. Evid. 803(6)), the records will be admitted.  Indeed, BNA records (and similar documents from other states) are classic business records, regularly admitted by courts in this Circuit pursuant to Fed. R. Evid. 803(6). *See, e.g.*, *United States* v. *Lowe*, 14 Cr. 055 (LGS) (admitted BNE records as business records); *United States* v. *Wiseberg et al.*, 13 Cr. 794 (AT) (admitting New Jersey State Prescription Monitoring Program ("PMP") data as business records); *see also United States* v. *Cooper*, 868 F.2d 1505,

1514 (6th Cir 1989) (no error in admitting pharmacy prescription log book as business record in
prescription drug diversion trial).

To the extent the defendant wishes to test the accuracy or significance of BNE data – for
example, by suggesting that BNE data may capture forgeries or fake prescriptions – he can do so
by cross-examining the appropriate witness.

Further regarding BNE records, defendant argues that the Government should be
precluded from offering any comparative BNE data – that is, BNE records of the defendant vis-
à-vis other prescribers in the state, data that might suggest defendant was among the most
prolific writers of oxycodone prescription in the state. This aspect of the motion is essentially
moot, as the Government has represented that it would not be offering such evidence on its direct
case. However, if defendant—through argument of counsel or otherwise—suggests that his
prescribing habits were in line with those of other doctors in the State, the Court will not
preclude the Government from introducing comparative BNE records on rebuttal.

### Evidence of Defendant's Income

Defendant moves to preclude the Government from making any reference to his income,
the financial success of clinic, or from offering evidence of the approximately $1.75 million in
cash recovered from the defendant's residence at the time of his arrest. (Defendant's Br. at 39,
41). Defendant argues that this is not a case where there is any dispute about the source of the
doctor's income: he received his income in exchange for treating patients. What is in dispute,
defendant argues, is whether he believed he was exercising medical judgment in treating the
patients or simply selling prescriptions. He argues that the total sum of income that he received
does not make one more probable than the other, since many doctors make more money
practicing medicine than they would dealing drugs on the street. (Defendant's Opp. Br. at 15-

10

16). Defendant suggests that "the circumstances under which courts have permitted evidence of income and/or financial status, such as when a defendant has substantial assets or spends extravagantly without having a known source of income, are not present here. *See, e.g., United States v. Young*, 745 F.2d 733, 763 (2d Cir. 1984)." *Id.*

The Government says that it expects its trial evidence to establish that the defendant—who lost his medical license for a period of time and remained on probation with the State through December 30, 2010—was reporting very modest earnings in the years prior to the offense conduct, reporting just $45,292 in total income in 2010 and a *loss* of approximately $5,559, in 2011. In 2012, with the opening of the Clinic that changed dramatically. During the period of the charged conspiracy, defendant allegedly drove a Mercedes and amassed $1.75 million in cash—money the defendant does not dispute came from his operation of the Clinic. (*E.g.*, Defendant's *In Limine* Brief at 41-42). The Government argues that such a sudden accumulation of wealth from the Clinic – by a doctor whose prior employment was not nearly as profitable – is plainly probative of the defendant's knowledge of the improper and illegitimate nature of the Clinic. *See, e.g.*, *United States* v. *Barnes*, 604 F.2d 121, 147 (2d Cir. 1979)("It has long been the rule that 'where a defendant is on trial for a crime in which pecuniary gain is the usual motive, evidence of the sudden acquisition of money by the defendant is admissible . . . .'") (*quoting United States* v. *Jackskion*, 102 F.2d 683, 684 (2d Cir. 1939)); *See also United States* v. *Tramunti*, 513 F.2d 1087, 1105 (2d Cir. 1975) ("[E]vidence of sudden acquisition of large amounts of money is . . . admissible to prove criminal misconduct when pecuniary gain, as here, is the basic motive.") (collecting authorities); *United States* v. *Bulgin*, 563 Fed. Appx. 843 (2d Cir. 2014) (same).

11

As for the seized cash, the Government argues that the defendant was stockpiling cash earned from the Clinic in his home wrapped in zip-locked bags – rather than depositing that money in the bank –also suggesting that the defendant knew his earnings were unlawfully obtained.

I agree with the Government's argument. The economic success of the Clinic (a clinic that the Government is alleging to be an unlawful drug distribution business)—including the means and methods defendant used to collect "fees" (cash) from his "patients" and the fact that the Government seized approximately $1.75 million in cash from the defendant's residence at the time of his arrest—is all admissible as evidence of the operation and background of the charged conspiracy. Of course, defendant, will be free to cross examine the Government witnesses about this "economic" evidence, and to argue to the jury, as he did in the present motion, that the fact that a doctor makes a lot of money and deals in cash is irrelevant to the issue the jury must decide: whether defendant believed he was exercising medical judgment when he prescribed his patients oxycodone or simply selling prescriptions.

### *Evidence of the Defendant's "Reputation"*

Defendant asks the Court to "exclude all pejorative testimony concerning his reputation or that of his clinic that seeks only to smear his character and is not based on actual proof. "Any pejorative terms suggesting the running of a 'pill mill,' being a 'drug kingpin,' or any other pejorative terms have no place in evidence at this trial." (Defendant's Br. at 43).

The Court cannot say, without hearing a particular witness' testimony or attorney argument, whether references to the Clinic as a "pill mill" or to the defendant as a "drug kingpin" would necessarily be objectionable. The admissibility of such evidence will be argued and determined at trial and in context.

12

### *The Use of Aliases*

The defendants seek to preclude the Government from eliciting testimony about the aliases of co-defendants. The Government says that it expects its evidence will establish that many of these co-conspirators were known and referred to primarily (if not exclusively) by their aliases.

The Government may elicit testimony about aliases.

### *Co-Conspirator Statements to Be Offered at Trial*

Defendant asks the Court to compel the Government to provide the defendant with a proffer of all co-conspirator statements that the Government will seek to introduce at trial.

The Government says that it plans to provide the defendant with 3500 material by February 15, 2016, which will identify the co-conspirators who will be testifying at trial, and the substance of any statement they have previously made to the Government.

Accordingly, the Court need take no action in this regard.

### *Brady Requests*

Defendant renews his motion to compel the Government to make certain disclosures, all of which it contends are compelled by *Brady* v. *Maryland*, 373 U.S. 83 (1963). The Court reminds the Government that it acts at its own peril if it interprets its *Brady* obligation too narrowly.

13

**Government's *In Limine* Motion**

The government asks that it be allowed to offer evidence regarding (1) certain tax returns defendant filed with the IRS and (2) actions taking by New York State with respect to defendant's medical privileges and medical license. The former motion is granted; the latter is denied.

### 1. Tax Returns

The Government asks that it be allowed to offer, either as direct evidence or, in the alternative, pursuant to Rule 404(b), defendant's tax returns for 2010 through 2014, which document both the state of the defendant's finances prior to the onset of the charged conduct, and his substantial under-reporting of the cash income derived from the Clinic.

Defendant accuses the Government of "doubling down" on its previous motion seeking to introduce "prejudicial" evidence about the doctor's income, by also attempting to smear the doctor as a tax cheat. Consistent with his argument in opposition to the Government's motion to introduce general evidence of defendant's income, defendant argues that "whether he reported all of his income, or only some substantial portion of it, is not a fact that makes it more probable or not that he joined this 'drug crew.'" (Defendant's Opposition Br. at 15). Defendant argues that any evidence that the doctor allegedly omitted income or recorded false expenses on his tax returns or some combination of both, has little probative value and appears to be offered for the improper purpose of showing criminal propensity." *Id.*

According to the Government, defendant's tax returns for 2012, 2013, and 2014 – that is, the years in which the Clinic was open – report a total of $1,378,112 in gross receipts, and $541,025 in profit over the course of those three years. The Government says that it believes the trial evidence will establish that the defendant reaped considerably more money from the

14

approximately 13,557 prescriptions for oxycodone (each costing a Patient $200) that he is alleged to have written over the course of the conspiracy than is reported on his tax returns. The Government argues that the fact that the defendant under-reported the cash income earned from the Clinic – and has no legitimate, reported source of income sufficient to explain the $1.75 million in cash recovered from his apartment – is properly admissible as probative of the defendant's knowing participation in unlawful activity.

The Government's motion is granted.

It is "well established that in narcotics prosecutions, a defendant's possession and expenditure of large sums of money, as well as his or her failure to file tax returns, are relevant to establish that the defendant lacked a legitimate source of income and that, in all probability, the reason for the failure to report this income is due to the defendant's participation in illegal activities." *United States* v. *Eng*, 997 F.2d 987 (2d Cir. 1993); *see also United States* v. *Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) ("The tax returns were obviously probative to refute [the] defense that the contested funds were legitimate compensation for work [the defendant] performed[.]"); *United States* v. *Falley*, 489 F.2d 33, 39 (2d Cir. 1973) (affirming admission of tax returns and noting that "proof that a defendant is living far above the means provided by his disclosed income is of great probative value in a case involving a crime where the motive is financial gain"); *see also United States* v. *Monaco*, 194 F.3d 381, 388 (2d Cir. 1999) (same).

The cases cited by the defendant fail to undermine the Government's argument since, contrary to the defendant's assertion that he "never concealed the source of his income" (Defendants Opposition Brief at 41), the Government says that it expects its evidence at trial to establish just the opposite – that is, that the defendant took steps to shield substantial portions of his cash income from the Clinic from banks and financial institutions as well as from the IRS.

15

This is a permissible basis for introducing such evidence. *See, e.g.*, *United States* v. *Young*, 745

733, 763 (2d Cir. 1984) (affirming conviction in narcotics case where defendant was found to

have access to $1.3 million and other valuables "for which no legitimate explanation existed")

(Br. at 41); *United States* v. *Chandler*, 326 F.3d 210, 215 ("The touchstone of the admissibility

inquiry is not the amount of money in the defendant's possession, *but whether the defendant's*

*failure to account for its source tends to support the government's claim that the money was*

*obtained through illegitimate means*.") (emphasis added).

## 2. **State Medical Proceedings**

The Government asks that it be allowed to offer evidence about defendant's (i) expulsion

from the New York State Medicaid Program for fraudulent billing practices in 1993, (ii) medical

license revocation in 1996 for professional misconduct and gross negligence, and (iii)

professional probation prior to regaining his license to practice medicine. (Government *In*

*Limine* Motion at 1).

### *Background of State Medical Proceedings*

According to the Government: Defendant received his medical training in the Republic

of Georgia. He received a license to practice medicine in the United States from the State of

New York in 1986. While the defendant's specialty appears to have been in anesthesia and

general medicine, his practice focused on "pain management."

In 1992, the New York State Department of Financial Services ("DFS"), which

administers the state Medicaid program, launched an investigation into the defendant's practice

based on concerns that the defendant was fraudulently billing for services he was not providing,

as well as using an unlicensed and unauthorized individual to provide medical services to

patients (services the defendant was then billing to Medicaid). In particular, the defendant's

billing records to Medicaid indicated that he was personally seeing as many as 90 patients a day, many of whom were receiving the same course of "nerve block" treatment. DFS determined that the defendant was using a second individual – someone without a medical license or any authority to treat patients – to see these patients, but was billing DFS as though he had provided the services himself. That practice was fraudulent and violated state regulations. As a result, in November 1993, DFS expelled the defendant from the Medicaid program.

In addition to expelling the defendant from the Medicaid program, DFS made a referral to the New York State Department of Health Office of Professional Medical Conduct ("OPMC"), which is responsible for the licensure of all medical doctors in the state. That referral included approximately 25 representative patient files maintained by the defendant. OPMC, with the assistance of experts in the field, examined those files and determined that the defendant had not only been fraudulently billing the Medicaid program but had been providing substandard – and in some cases grossly negligent – medical care to his patients. In particular, OPMC determined that the defendant had engaged in a practice of providing many if not all of his patients with the same form of pain medication – a treatment known as a "nerve block" which is typically administered by injection – without engaging in the sort of diagnostic or evaluative steps necessary to properly treat the patient.

The OPMC investigation included, among other things, a review of the defendant's records by outside experts, interviews of some of the patients whose treatment was reflected in those records, and ultimately an evidentiary hearing at which the defendant was present and represented by counsel and afforded an opportunity to call witnesses of his own. At the conclusion of those proceedings, the OPMC revoked the defendant's license, finding that on each of the occasions specifically studied by the State, the defendant's conduct had been

17

negligent or grossly negligent. The State further found that the defendant had failed to keep

proper records and had violated state law by engaging in the fraudulent Medicaid billing

practices described above.

As summarized by the State Peer Review Board, OPMC investigation concluded that:

The patients came to the [defendant] with symptoms of pain and/or numbness
which, in most instances, were treated by the [defendant] with nerve blocks or, in
one case a steroid treatment. The factual findings . . . for each patient concluded
that the [defendant's] records for the initial patient history were inadequate and
lacking in specified items of information essential for a history of a patient
presenting these symptoms. The [defendant] was found to have done an
inadequate or inappropriate examination for the circumstances presented. He was
also found . . . in his use of pain managing agents, [to have] addressed surface
symptoms and not the possible underlying etiology of the patient's conditions.
He was also, in many instances, found not to have performed the appropriate
follow-up to find the underlying etiology.

(Government Brief, Ex. A at 3-4).   OPMC, in consultation with its retained experts, concluded

that the defendant had too often provided pain medication in the form of a nerve block to his

patients without: (1) properly taking a patient history or engaging in a full physical examination

of the patient; (2) ordering diagnostic testing such as an X-ray, or properly reviewing existing

diagnostic testing; or (3) properly documenting a diagnosis and treatment plan, including a

justification for the pain medication being provided to the patient.   As summarized by one of the

OPMC's outside expert, Dr. Maurice Carter:

[N]ot one of the charts . . . contains any notable element of physical examination
to support the alleged diagnoses. The results of x-rays are quoted second hand
from the patient and no mention is made of having actually reviewed the x-rays,
or at the very least, of seeing the radiologist's reports. In so far as I can
determine, in not a single case, has Dr. Mirilishvili actually ordered x-rays or
other significant diagnostic imaging of his patients.

(Government Brief Exhibit B at 1).

A second expert retained by the state evaluated six patient files and concluded, in each

instance, the defendant had provided pain medication – primarily in the form of one or more pain

blocks – were neither appropriate for the patient nor properly justified by the defendant's notes of the patient visits.   Among other things, the expert noted in a report that in several instances the patient reported having been previously treated by another physician, but the defendant apparently did not inquire into the "name . . . approximate date" or that treatment or "what that treatment was." (Government Brief, Ex. C at 2, 3).   In other cases, the defendant provided high and repetitive quantities of medication without exploring alternatives.   With respect to one, for example, the expert report listed approximately fifteen dates on which the same patient received a cortisone shot within a two-month period, noting that the "[s]tandard care allows three or fewer Cortisone shots in any one year.  The charts show no evidence of evaluation of this problem once on or two shots had not improved the situation.  At no point is a neurologic exam done." *Id.* at 2.

In October and November 1995, the OPMC Hearing Committee held hearings on 13 specifications of professional misconduct lodged against the defendant, including allegations of practicing with gross negligence, practicing with negligence on more than one occasion, failure to maintain records, and the fraudulent Medicaid billing practices described above.  Dr. Gidumal testified to his findings as detailed in the report excerpted above.  The defendant also called an expert but, as noted by the Committee in its written findings, "[i]n many instances the [defendant's] own expert witness found his medical practices to be lacking.  Of particular significant was the witness' testimony that he would not have provided the same treatment as the Respondent." (Government Brief, Ex. D at 14).

On January 26, 1996, the OPMC issued a written opinion which was mailed directly to the defendant and his attorney.  That opinion included both findings of fact and conclusions, including its finding that the defendant had provided pain medication to patients without

properly diagnosing them or justifying that course of treatment. The State opinion concluded

that:

> "[The defendant's] pattern of practice was such that he did not identify clinical
> entities nor did he collect enough historical and analytical data to support a
> diagnosis. [The Defendant] only treated symptoms and never sought nor treated
> causes. The care [the Defendant] provided was inadequate and did not meet
> acceptable standards of practice."

(Govt. Ex. D at 14). The State thus revoked the defendant's medical license.

The defendant appealed that determination and, on June 7, 1996, the OPMC

Administrative Review Board affirmed the decision of the Hearing Committee.

In April 2001, the defendant sought to have his medical license reinstated. By decision

dated September 9, 2003, that application was granted, subject to a term of Probation during

which the defendant was required to work at a state-run facility and prohibited from engaging in

private or unsupervised practice. That term of probation ended on December 30, 2010, or

approximately one year before the commencement of the charged criminal conduct.

(Government Brief at 6-10)

### *The Government's Argument is Unpersuasive*

The Government argues that the State Actions and the conduct underlying them should

come in as background of the charged conspiracy or, in the alternative, pursuant to Rule 404(b)

as evidence of the defendant's knowledge and intent with respect to the conduct giving rise to the

charged conspiracy.

It is perfectly obvious that the evidence sought to be introduced is not background with

regard to the charged conspiracy. The conduct that led to the defendant's suspension from

practice was the administration of unnecessary medical treatment to real patients and the

subsequent submission of claims for unnecessary and clinically inappropriate treatment to

20

Medicaid. The present conspiracy—which took place some two decades later—involves the provision of drugs to neighborhood dealers for resale to addicts on the street. No false claims were submitted in respect of the many prescriptions that the defendant wrote (or, at least, the Government has not identified any), and while in both cases the doctor's conduct was allegedly medically unnecessary, in the long-ago (and long defunct) scheme that led to the suspension of his license, treatment was actually administered, whereas in the charged scheme the prescriptions were filled and the drugs handed over to people whose name was not on the label applied by the pharmacy.

I reject the Government's stretched-to-the-point-of-breaking argument that the State Actions provide "context" and "background" because they demonstrate that the defendant had reason to know that Medicaid would be monitoring physician behavior, which allegedly motivated him to take cash rather than accept insurance. The fair inference is that the defendant accepted cash and not insurance because he was supplying drug dealers with large quantities of drugs for which he did not intend to obtain insurance reimbursement, and the fact that Medicaid had investigated him almost two decades ago does not make that behavior any more or less likely.

I similarly reject the Government's argument that the defendant's loss of license would provide "background" to the charged conspiracy because no rational juror would conclude that a doctor recently readmitted to private practice would have so quickly have acquired so many patients from all over the City. The Government plans to show that drug dealers (Crew Chiefs) located the patients who received the allegedly illegal prescriptions; the fact that the defendant lost his license and then spent seven years after regaining it (he did regain his license in 2003) in a setting other than private practice does not make it more or less likely that patients would find

21

their way to him once he reentered private practice. The fact that the patients lived an hour or more from the defendant's clinic is indeed evidence from which the Government can argue that point.

So we turn to Rule 404(b). The Government argues that, as a result of the proceedings leading to the revocation of his medical license, the defendant was well aware that certain things were not part of the legitimate practice of medicine, including repeatedly prescribing pain medication (cortisone shots, pain blocks) as primary treatment without justifying the need for medication or properly diagnosing the underlying cause of the pain, repeatedly prescribing pain medication for patients without exploring alternative, and failing to take thorough histories or order his own diagnostic tests. Indeed, he was suspended for doing precisely those things -- none of which he did in this case. It thus argues that the fact of his suspension, as well as details about the underlying investigation, should be revealed to the jury, because they address the (1) defendant's knowledge that similarly deficient medical practice in connection with the prescription of oxycodone would not comport with the relevant standard of care and (2) his intent to break the law by prescribing highly additive narcotic substances in large quantities without following strict medical practice.

The defendant counters that the State disciplinary proceeding occurred more than 20 years ago; did not involve the provision of prescription drugs for resale on the street; was adjudicated on a less than beyond a reasonable doubt standard; and would simply lead the jury to convict the defendant because he was a "bad doctor" or because he had a propensity to skirt applicable medical standards.

The question is close. I cannot deny that some of the evidence about the doctor's prior disciplinary record -- specifically, the OPMC findings outlined in the preceding paragraph (but

22

not the facts about Medicaid fraud, which is not an issue in this case) -- has probative value if the doctor puts his knowledge of the relevant standard of care for pain management in issue. But the matter is stale and (as I discussed above) the scheme in which the defendant was involved substantially different in purpose and effect than the scheme for which he today stands indicted. The danger of unfair prejudice is very great, especially since the previous proceeding is one in which deviation from sound medical practice did not need to be proved beyond a reasonable doubt, as is the case here. Introducing details about the 1996 proceeding might well lead to a mini-trial of collateral matters. And the Government will present ample evidence on its case in chief that all licensed physicians should be aware of the relevant standard of care. That being so, I am not inclined to allow the Government to introduce this evidence on its case in chief.

Of course, Dr. Mirilishvili cannot have it both ways. If he were to assert lack of knowledge of the relevant standard of care for pain management (for example, by testifying, although he is certainly not required to do any such thing), the Court would undoubtedly permit the Government to cross examine him using the OPMC findings to impeach his testimony, notwithstanding the age of the proceeding. Having one's license suspended, and the reasons therefore, is not something a doctor is likely to forget.

February 18, 2016

Colleen McMahon, U.S.D.J.

By: ECF and Hand to the Government and Defendant

23