```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                           S2 14 Cr. 810 (CM)

MOSHE MIRILISHVILI,

              Defendant.                Trial

------------------------------x
                                        New York, N.Y.
                                        March 2, 2016
                                        9:45 a.m.


Before:

                    HON. COLLEEN McMAHON,

                                        District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
EDWARD DISKANT
BROOKE CUCINELLA
     Assistant United States Attorneys

HENRY MAZUREK
WAYNE GOSNELL
     Attorneys for Defendant


ALSO PRESENT:  MICHAEL MULLER, DEA
               ELIZABETH JOYNES, Paralegal
               MICHAEL DOMANICO, Paralegal
```

1        (Trial commenced)

2        MR. DISKANT:  Good morning, your Honor, Edward Diskant
3   and Brooke Cucinella for the government.  With us at counsel
4   table is Elizabeth Joynes, a paralegal at our office, and
5   Special Agent Michael Muller of the DEA.

6        MR. MAZUREK:  Good morning, your Honor, Henry Mazurek.
7   Also at counsel table Wayne Gosnell; our paralegal, Michael
8   Domanico; and Dr. Moishe Mirilishvili.

9        THE COURT:  Good morning, everyone.  First thing I
10  have to do is apologize.  I have a very sore throat this
11  morning.  It's a bad day to have a sore throat, but I will do
12  the best I can with what I've got.

13       We have had some late-breaking motions.  Let me get
14  some rulings on the record.

15       With respect to the BNE documents, the government
16  correctly identifies the defendant's last-second request for
17  clarification of the denial of its motion to suppress the BNE
18  records that detail all prescriptions for controlled substances
19  filled by New York pharmacists upon submission of prescription
20  forms bearing the name and physician ID number of Dr. Moishe
21  Mirilishvili as a motion for reargument.  But whether
22  reargument or clarification, the motion is denied.

23       BNE collects data on every prescription from a
24  controlled substance that is filled by a New York State
25  pharmacist.  Pharmacists are required by law to report to the

BNE the following information every time they fill a prescription for a controlled substance: The name and address of the patient, the name and license number of the prescribing doctor, the medication and dosage dispensed, and the method of payment. This compendium of information is transmitted to BNE by pharmacists. It's a business record of BNE. The BNE data is collected in the ordinary course of regularly conducted business activity of BNE and it is the BNE's regular business practice to collect and maintain the database containing this information about all prescriptions of controlled substances. Indeed BNE is required by law to collect and keep this information.

        The information contained in BNE records is itself collected and transmitted to BNE by a person with knowledge; that is, the pharmacist who filled the prescription. The pharmacist has knowledge because he knows what is written on the prescription form that causes him to fill the prescription. The information he is transmitting to the BNE is the very information that causes him to act. The pharmacist is under a legal duty to transmit accurately the information he is given by his customer, including specifically the name and license number of the prescribing doctor that is imprinted on the controlled substances prescription form, as well as the drug and the amount prescribed. He can lose his license if he does not comply with his legal duty. The BNE source of information

1  thus cannot be said to be untrustworthy.  Quite the contrary.
2  Therefore, the BNE data qualifies as a business record and is
3  admissible as an exception to the hearsay rule.
4         The defendant's insistence that there is a second
5  layer of hearsay to be considered is not persuasive and rests
6  on an incorrect characterization of the purpose for which the
7  government can offer the evidence.  When pharmacists report to
8  the BNE, they are simply telling the BNE what they did and what
9  information was given to them in order to induce them to do
10 what they did.  It is true that the information pharmacists are
11 given by their customers may not be accurate in that, for
12 example, the pharmacist may have been given a forged
13 prescription.  That has apparently occurred several times using
14 Dr. Mirilishvili's information to the knowledge of the
15 government.
16        But unless I misunderstand something, the BNE record
17 is being offered to prove and indeed can only prove that
18 pharmacists were presented with and, as a result, filled
19 prescriptions that were ostensibly written by someone named
20 Moishe Mirilishvili, who had a particular physician number, and
21 I will assume that the physician number on the BNE's report
22 about the defendant is in fact Dr. Mirilishvili's prescription
23 number.  I should say his identification number.  That is the
24 fact asserted by the BNE report, that pharmacists in New York
25 State filled a certain number of prescriptions during a certain

period of time after being presented with prescription forms that purported to come from this particular doctor. And I imagine that someone from the BNE is going to be testifying about what's required to be printed on controlled substance prescription forms.

It is important to note that BNE keeps track of the activities of pharmacists. It tracks what prescriptions are being filled and on the basis of what information. Only indirectly does it track the activities of particular physicians. Without more, the only fact that is proved by the BNE records, the filling of prescriptions for controlled substances by pharmacists who receive particular information from their customers, is actually insufficient to prove that the doctor whose name was given to the pharmacist actually wrote the prescription.

But when coupled with other evidence, the fact that the pharmacist was told that a particular doctor wrote the prescription is certainly relevant to a determination of whether the doctor did in fact write the prescription. It's just not sufficient. And here the government will not simply be relying on the BNE reports when it asks the jury to infer that Dr. Moishe Mirilishvili wrote numerous prescriptions for Oxycodone. It will also be relying on the testimony of witnesses who dealt directly with the doctor or his alleged coconspirators on a day-to-day basis. Office staff, ostensible

1  patients, drug dealers, they will testify about their
2  observation of the doctor's practices, that he performed
3  perfunctory physical examinations, or none at, all of people
4  who were plucked off the street and given obvious phony medical
5  records and $200 and sent to the office to obtain a
6  prescription for Oxycodone.  That's what the government says
7  it's going to prove.  As I understand it, the government will
8  also offer evidence that Dr. Mirilishvili only reported one
9  prescription of his to have been stolen during the period
10 encompassed by the alleged conspiracy.  I assume some evidence
11 about the law that requires doctors to report stolen
12 prescription pads.
13           Taken together, this whole bevy of evidence, and any
14 other evidence that the government may introduce, the judge of
15 course is always the last to know what the evidence is going to
16 be, the BNE records have some probative value about the
17 practices of Dr. Mirilishvili.  I admit that there is
18 circumstantial probative value.  The records are direct
19 evidence only of the activities of the pharmacists and the
20 information that, true or false, is provided to them by their
21 customers.
22           The defense is perfectly free to attack the inference
23 that the government asks the jury to draw as being unwarranted.
24 Being required to expose the weakness of the government's
25 evidence does not shift the burden of proof to the defense.

The defense can cross-examine BNE's witnesses about the inherent and obvious flaw in the proffered database. Its accuracy is only as good as the information that the pharmacists are given by their customers because the pharmacist was not present when the prescriptions were written and so cannot attest to the fact that the doctor whose name and ID number appears on the prescription form actually wrote them. The defense can also introduce evidence that there were instances in which Dr. Mirilishvili's name and physician number were misused. If the government doesn't beat the defense to it, which I rather expect will happen, it would then be for the jury to decide whether that likely happened as many as 1,000 times.

Furthermore, it should go without saying that none of this suggests that any of the Oxycodone that was handed out by these pharmacists was prescribed unnecessarily. The fact that numerous prescriptions were filled is not in and of itself proof that the drugs were prescribed unnecessarily. It only goes to the number of prescriptions that were filled at the apparent behest of Dr. Mirilishvili which, together with other evidence, such as the testimony of patients and office staff and others, will be the basis for the government to argue that the prescriptions were for drugs that were not medically necessary. I trust this clarifies matters for defense counsel. They have their exception.

2.   The testimony of Benjamin Lopez, which, as I understand it, will consist of his observations of fact about the clinic and its surroundings, is relevant and will be admitted.

3.   The Court will not be giving any preliminary instructions on the substantive law relating to the charged crimes.  Contrary to defendant's assertion, this is not a particularly complex case and I am sure the jurors will appreciate hearing the charge but once, at the conclusion of the case when the concepts on which they are being instructed will make sense in light of the evidence they have already heard.

4.   And so we come to the tape recordings of the interactions between Dr. Mirilishvili and one of the cooperating witnesses.  This is somewhat confusing to me.  If I understand correctly, the government was originally not intending to introduce any of these tapes into evidence, which to me means the government did not believe it was required to introduce the tapes in order to meet its burden of proof.  But in order to be nice to the defense, the government offered to introduce selected tapes from among the universe of conversations between the confidential source and the defendant, using the good offices of the cooperating witnesses who had served as a translator to explain the circumstances of the conversations.

1          And then defense counsel turned around and bit the

2   hand that fed it, claiming that it should be allowed to

3   introduce other tapes of other conversations, both under the

4   rule of completeness, which of course doesn't apply, and in

5   order to show Dr. Mirilishvili's state of mind at the time he

6   wrote this particular confidential source's prescriptions.

7          As far as I can tell, the government should have left

8   well enough alone and it should forget about trying to do

9   favors for the opposition.  I'm not impressed either by its

10  magnanimity or by its outrage.  My advice to the government is

11  to introduce such evidence as is necessary to prove its case

12  beyond a reasonable doubt and then rest.  Then let the defense

13  decide what to do next.

14         And sufficient unto the day, this motion is way

15  premature.  The government has no idea what information will

16  come in on the government's case that may obviate the need for

17  the defense to want to introduce any tapes or that may actually

18  assist the defense in making its argument, which, as I

19  understand it, is that the doctor's actions as recorded on the

20  tapes are indicative of his state of mind at the time he was

21  dealing with the confidential source.

22         The state of mind rule goes something like this:

23         A defendant is ordinarily precluded from offering his

24  own prior statement for the truth of the matters asserted

25  therein.  Because that out-of-court statement is hearsay.

                 However, in some instances defendants may be able to
introduce statements they made prior to trial in order to prove
what their state of mind was when they made those statements.
The exception is a narrow one.  As the late Judge Cardamone,
whose memorial will be held this very afternoon, held in <u>United
States v. Cardascia</u>, 951 F.2d 474 (2d Cir. 1991), the state of
mind exception is a specialized application of the excited
utterance and present sense impression exceptions to the
hearsay rule.  In order to decide whether a particular
statement falls within the state of mind exception, one must
look to the precise words spoken, decide whether they relate to
a then existing state of mind or to a past memory or belief
that is being offered to prove the fact remembered or believed.
The latter, of course, does not fall within the exception.

                 The statement must relate to conduct that was
occurring at the time the statement was made, not conduct that
occurred at some earlier point in time.  As Justice Cardoza put
it in <u>Shepard v. United States</u>, 290 U.S. 96, 98, the statement
must be forward looking, not backward.  And it must relate to
an act of the speaker himself, not to an act of someone other
than the speaker.

                 Like all exceptions to the hearsay rule, the state of
mind exemption relies on a presumption of trustworthiness of
the statement, which gives a particular assurance of
credibility.  Because it would be easy to fake one's state of

1  mind, this justification seems rather tenuous, certainly more

2  so than with the excited utterance.  If a declaration falls

3  within a category defined in the hearsay rules as an exception,

4  it is admissible without any preliminary finding of probable

5  credibility by the judge.  That is for the jury.

6          I have reviewed the individual statements of

7  Dr. Mirilishvili as reported on the transcripts attached in the

8  February 29 motion as Exhibits A and B.  The spoken words in

9  those transcripts don't reflect the doctor's state of mind in

10 the way that the spoken words did in cases like United States

11 v. De Maria, where the defendant said:  I thought I was coming

12 down here to get cheap cigarettes; or United States v. Harris,

13 where the defendant said to his probation officer:  I think the

14 government is trying to set me up.  As the government argues,

15 on these tapes the doctor asks questions that seek to obtain

16 knowledge from his patient, makes statements that refer to his

17 memory of past events, and makes statements that provide the

18 patient with medical information, which is reflective not so

19 much of his state of mind, but as to his state of medical

20 knowledge.

21         This is how I understand defendant's argument.  The

22 fact that Dr. Mirilishvili was obtaining medical information

23 from the person sitting in his office, that he was directing

24 the patient to stand up, sit down, flex his feet, that he was

25 asking about symptoms and improvements over time, that he was

1  making referrals to orthopedists and physical therapists, all
2  of these being verbal acts tend to demonstrate that he believed
3  the person sitting across from him was a real patient whose
4  condition needed to be evaluated and treated, i.e., that was
5  his state of mind.
6  　　　　　The defense also argues that these verbal acts give
7  rise to legal consequences, but that argument strikes me as
8  tenuous at best.  What the defense is really arguing is that
9  Dr. Mirilishvili must have believed, at the moment of the
10 office visits reflected in the tapes, that the person
11 confronting him was a real patient or else he would not have
12 asked for the films the fellow brought with him so he could
13 look at them, not have asked about his symptoms, not asked him
14 to stand up and sit down, not referred him to other medical
15 professionals, and not written any prescriptions for a bevy of
16 powerful drugs for pain, one of which was Oxycodone.
17 　　　　　It is certainly the case that the defense can bring
18 before the jury the fact that Dr. Mirilishvili examined this
19 patient during his office visits if in fact he did examine the
20 patient.  That of course is a fact.  It's not a state of mind.
21 And those facts may well come out during the government's
22 presentation of its case.  For all I know, the jury may end up
23 hearing portions of the tapes before the government rests,
24 whether the government introduces them or not.  To take but one
25 example, Mr. Correa, I think his name is, the government

1     witness who was present during the visits and who served as the

2     translator, will be on the stand.  He can be cross-examined

3     using leading questions about what happened during the visits

4     of the confidential source and if he denies that the doctor

5     examined the patient or asked him questions or made referrals.

6     The witness can be impeached with the tapes.  And via his

7     testimony the jury will learn the facts that the jury needs to

8     know, which is what happened in the interaction between the

9     defendant and the confidential source, and the defendant can

10    make its arguments to the jury and the government can't prevent

11    the tapes from being used in this way.

12              My point is simply this:  Much will play itself out

13    during the government's case in chief.  This aspect of the

14    defense motion may never need to be decided because the defense

15    cannot possibly decide what it wants to introduce until it sees

16    what is played out by the close of the government's case.  And

17    by that time the jury may already know that Dr. Mirilishvili

18    examined the confidential source in asking questions about his

19    symptoms, which is all that it would need to know for the state

20    of mind argument to be made.  In that case the government would

21    probably be on sounder ground when it argues that the only

22    purpose of playing the tapes on the defense case is to get the

23    doctor's voice before the jury without his taking the stand.

24    Again, I can't know until the moment arrives.  So the motion

25    strikes me as prematurely made, and I won't rule on it until we

1    see what comes in on the government's case.

2              The government argues that the tapes the defense
3    wishes to introduce can be precluded pursuant to Rule 403
4    because their probative value is outweighed by their
5    prejudicial value.  In this case I assume prejudice to the
6    government.  Frankly, I fail to see what prejudicial value the
7    tapes have.  Whatever it is, the prejudice doesn't outweigh
8    their probative value either to the government, which would be
9    introducing them, I assume, to approve shoddy medical practice,
10   or to the defendant to prove state of mind.  I admit that were
11   I the trier of fact, I might not find the tapes particularly
12   probative of the defendant's state of mind.  It strikes me that
13   if you're part of a pill mill the logical thing to do is to
14   pretend to examine your patients or go through the motions.
15   But I'm just guessing that the people who worked in
16   Dr. Mirilishvili's office will testify that he had a practice
17   of going through the motions and, frankly, I've read the tape
18   transcripts and there is no way to tell from the transcripts
19   whether the doctor was performing a serious examination or not.
20   Although as I read Judge Friendly's opinion in De Maria, that
21   may be a question for the jury.  If the government is really
22   worried about the matter, I'm sure it has some doctor in
23   reserve to call on Dr. Mirilishvili's patient evaluation
24   practices and so to cast doubt on any state of mind defense.  I
25   don't see Rule 403 being particularly pertinent here.  Either

1  the tapes are state of mind evidence or they are not.  And
2  because the defense does not need to decide whether it wishes
3  to introduce them now, that need not be decided now.  Let's see
4  what comes in on the government's case before we start ruling
5  on requests concerning evidence that the defense may never need
6  or wish to introduce.
7           As for the motion to quash the subpoenas to defense
8  counsel for the cooperating witness, that motion is granted.
9  This case is indistinguishable from the case before Judge Lynch
10 in <u>United States v. Arias</u> and as I see nothing to quarrel with
11 that ruling, I simply adopt it here.
12          I am told we can get jurors relatively easily.
13          MR. MAZUREK:  Judge, can I put one thing on the
14 record.
15          THE COURT:  Anything you want.
16          MR. MAZUREK:  Thank you.  Hearing the judge's ruling
17 on the issue of the examinations between the doctor and the --
18          THE COURT:  I have not made a ruling.  I have not made
19 a ruling.  I've said I wasn't going to make a ruling because
20 the motion was premature.
21          MR. MAZUREK:  I apologize.
22          THE COURT:  The only ruling you've got is that the
23 motion is premature and I'll decide it later, if we need to.
24          MR. MAZUREK:  Understood.  But given that we are going
25 to wait to decide that, I just wanted to put on the record, we

1   have asked from the government to make available to us the

2   confidential source, the person who pretended to be the patient

3   during those visits.  His name is Jose Lantigua.  We would like

4   the opportunity to at least have the chance to call him as a

5   witness, but we can't find him.  He's a confidential source and

6   the government is obviously is in the best position to make him

7   available.  I wanted to put on the record that we still reserve

8   our right to call Mr. Lantigua.

9            THE COURT:  You can call anybody you want.

10           MR. MAZUREK:  And ask the government for their

11  assistance so we could or ask them to accept the service of a

12  subpoena --

13           THE COURT:  The government is not going to accept

14  service of a subpoena on somebody and the government is not

15  required to give you any assistance.

16           MR. MAZUREK:  To provide us the real name and location

17  of this person or any ability to call him?  I would make that

18  request because do I think that he has --

19           THE COURT:  I'm sure the government will take it under

20  advisement.

21           MR. MAZUREK:  Thank you, Judge.

22           (Jury selection ensued)

23           (Adjourned to March 3, 2016, at 10:00 a.m.)

24

25