G377MIR1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          S2 14 Cr. 810 (CM)

5    MOSHE MIRILISHVILI,

6              Defendant.                  Trial

7    ------------------------------x

8                                          New York, N.Y.
                                           March 7, 2016
9                                          9:45 a.m.

10

     Before:
11
                         HON. COLLEEN McMAHON,
12
                                           District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EDWARD DISKANT
17   BROOKE CUCINELLA
          Assistant United States Attorneys
18
     HENRY MAZUREK
19   WAYNE GOSNELL
          Attorneys for Defendant
20

21
     ALSO PRESENT:  MICHAEL MULLER, DEA
22                  ELIZABETH JOYNES, Paralegal
                    MICHAEL DOMANICO, Paralegal
23

24

25

G377MIR1

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  I have a letter motion from the defense to

4    preclude as improper lay opinion testimony, certain testimony

5    from Joel Galanter, the general counsel of Aegis Laboratories

6    who is being called, acording to the government, to testify as

7    to the reasons why he made a decision to terminate the

8    defendant as a client.  The motion is denied.  The testimony is

9    relevant.

10         The individual Mr. Galanter presumably is the

11   individual who made the decision and will so testify.  He can

12   testify to the reasons.  He is not offering a lay opinion about

13   anything other than his reasons for making the decision that he

14   made, which the defense is free to undercut in

15   cross-examination about the bona fides of his reasons or the

16   accuracy of his reasons or anything else about his reasons.

17         I will tell the jury that his testimony is being

18   offered solely for the purpose of identifying why he did what

19   he did and that the document is offered in support of that

20   testimony and for no other purpose.  But it's perfectly

21   competent testimony, not lay opinion testimony.  It's not

22   admitted under Rule 702.  The defense has its objection.

23         DEPUTY COURT CLERK:  We have all the jurors now.

24         THE COURT:  We do.  Do we have a witness?

25         MR. DISKANT:  Yes, your Honor, we do.

G377MIR1

1              THE COURT:  Well, let's get that witness.

2              MR. DISKANT:  Would you like us to call the witness in

3       front of the jury or put him on the stand?

4              THE COURT:  Put him on the stand, and then you will

5       call him, to save time.

6              MR. MAZUREK:  And, judge, we are breaking early?

7              THE COURT:  We are going to go to 12:30 and then have

8       lunch until about 1:20, and then come back and then we will

9       work until 3:25.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G377MIR1                         Galanter - direct

1          (Jury present)

2          THE COURT:  Good morning, everybody.  I hope you had a

3    great weekend, and you're hopefully ready to go back to work.

4          Call your next witness, please.

5          MR. DISKANT:  Yes, your Honor.  The government calls

6    Joel Galanter.

7     JOEL GALANTER,

8         called as a witness by the government,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. DISKANT:

12   Q.  Good morning, Mr. Galanter.

13   A.  Good morning.

14   Q.  Are you currently employed?

15   A.  Yes.

16   Q.  Where are you employed?

17   A.  Aegis Sciences Corporation.

18   Q.  What is Aegis Sciences Corporation?

19   A.  It's a forensic drug testing laboratory.

20   Q.  Where is it based?

21   A.  Nashville, Tennessee.

22   Q.  What is your title at Aegis?

23   A.  I am general counsel and chief legal officer.

24   Q.  And how long have you held that job?

25   A.  I have held that job for approximately three years.

1    Q.  And prior to that time were you employed?

2    A.  Prior to that time I was working at a law firm, but I was

3    serving as outside counsel to Aegis Sciences.

4    Q.  So how long in total have you work with or for Aegis?

5    A.  About nine years, since 2007.

6    Q.  You mentioned that your current title is general counsel.

7    Can you tell us a little bit about some of your job

8    responsibilities as general counsel.

9    A.  Sure.  So, basically I oversee all legal operations of the

10   company.  So I handle board governance matters, corporate

11   matters, legal disputes, regulatory issues, contracting,

12   contract review, relationships that are involved with

13   contracting.

14   Q.  And do you have any involvement in dealing with Aegis'

15   clients, that is, the doctors or others they provide services

16   to?

17   A.  On occasion, and especially through setting up forms and

18   agreements.

19   Q.  Did you have any involvement in Aegis' relationship with a

20   doctor named Moshe Mirilishvili?

21   A.  Yes, I did.

22   Q.  Can you tell us a little bit about that involvement.

23   A.  Yes, I was initially involved in the setting up of that

24   client due to some issues with it that were unique, and I made

25   the decision to terminate the relationship after approximately

1    four months.

2    Q.   We are going to talk about both of those more in a moment.

3    Before we do so, I just want to go back to the services that

4    Aegis provides generally.

5    A.   Sure.

6    Q.   Can you tell us a bit about the sorts of testing that Aegis

7    provides.

8    A.   So we do all types of drug testing.  The company has been

9    in business since 1990.  We do forensic testing for crimes

10   examiners, workplace testing, sports drug testing for athletes

11   and universities.  We do healthcare testing as well, a few

12   different types.

13   Q.   Are you familiar with the term compliance testing?

14   A.   Yes.

15   Q.   What is compliance testing?

16   A.   We do compliance testing for things like sports programs,

17   to make sure athletes are in compliance with the rules of maybe

18   their sports leagues, but we also do compliance testing in

19   healthcare, principally for pain management doctors.

20   Q.   How many pain management doctors does Aegis provide

21   compliance testing services to?

22   A.   Approximately 2,000.

23   Q.   Are those located all over the country?

24   A.   Yes, they are.

25   Q.   What does compliance testing typically consist of for pain

1   management doctors?

2   A.  So, for pain management doctors, compliance testing is to

3   ensure -- pain management doctors typically are prescribing or

4   often are prescribing things like opiates which are controlled

5   substances and can be very addictive and, therefore, since

6   they're prescribing them, they do testing that we call

7   compliance testing, which is used to ensure that their patients

8   are taking the drugs that they are prescribing as opposed to

9   diverting them or selling them potentially, but also to ensure

10  that the patients aren't taking other drugs, either

11  pharmaceutical drugs or illicit drugs that the doctor is not

12  prescribing.

13  Q.  So just to focus there for a moment.  It sounds like there

14  are two different issues there, that is, confirming that the

15  patient is taking what they're supposed to be taking, right?

16  A.  Correct.

17  Q.  And then also confirming that the patient isn't taking

18  something else?

19  A.  Correct.

20  Q.  How does Aegis typically bill for the services that it

21  provides?

22  A.  So, in the healthcare environment that we are talking

23  about, we typically do what we call third-party billing, which

24  means that we're billing an insurance provider.  It either can

25  be the federal government Medicaid, or it can be a commercial

G377MIR1                         Galanter - direct

1   insurance provider such as Blue Cross Blue Shield.

2   Q.   Are there any patients who are paying Aegis directly out of

3   pocket?

4   A.   There are some, but it's a minority.  A small minority of

5   our patients that we see are what we call self pay patients.

6   Q.   Self pay is the term for that kind of patient?

7   A.   Yes.

8   Q.   And for a typical provider, do you have a sense of what

9   percentage of the patients are typically self pay?

10  A.   It's typically very low; I would estimate below 10 percent.

11  Q.   Now, you testified a few moments ago that you became

12  familiar with a doctor named Moshe Mirilishvili when he was

13  initiated as a client?

14  A.   Yes.

15  Q.   Can you tell us a bit about that.

16  A.   Yes.  It was I believe in April of 2014 we were initiating

17  a relationship with this particular client, and it was brought

18  to me to inquire whether or not we could open up a client

19  relationship with a physician practice that was going to be

20  exclusively self pay patients, uninsured patients.

21  Q.   Why did that come to you?

22  A.   Because we hadn't had a relationship like that previously

23  so, it was outside the norm, and the question came to me as

24  legal counsel to opine whether or not it was something we could

25  do.

1          MR. DISKANT:  Your Honor, may I approach?

2          THE COURT:  You may.

3  Q.  Mr. Galanter, if I could direct your attention to what has

4  been marked for identification purposes as Government Exhibit

5  1303.

6  A.  OK.

7  Q.  Do you recognize that document?

8  A.  Yes.

9  Q.  What is it?

10 A.  This is a new client set-up form, and this one in

11 particular is for Dr. Mirilishvili.

12 Q.  OK.  And was this document made and maintained in the

13 ordinary course of Aegis' regularly conducted business

14 activity?

15 A.  Yes.

16         MR. DISKANT:  The government offers Government Exhibit

17 1303.

18         MR. MAZUREK:  No objection.

19         THE COURT:  Admitted.

20         (Government's Exhibit 1303 received in evidence)

21         MR. DISKANT:  All right.  Actually, Ms. Joynes, if we

22 could start at the top of the document, top half or so.

23 Q.  OK.  And at the top there is a provider, that's Moshe

24 Mirilishvili?

25 A.  Correct.

1    Q.  And towards the bottom left side of the portion of the

2    document we are looking at it indicates primary profile, ala

3    carte.  Do you see that?

4    A.  Yes.

5    Q.  What does that mean?

6    A.  We have different ways that physicians can order tests from

7    us.  The physician has to decide what to order as opposed to

8    the laboratory deciding.  Laboratories are not allowed to

9    decide what to order.  And we do have various profiles where we

10   group drugs together in different ways.  We have ten or 15

11   different profiles that physicians can select from, but we also

12   offer what we call ala carte testing, which is individual

13   choice.  They can choose the drugs in any fashion that they

14   desire.

15   Q.  OK.  Just below that it indicates recording method, fax.

16   What does that mean?

17   A.  So once we test a sample in Nashville, then we have to

18   report the results back to the physician practice, and we send

19   a lab report back.  And you asked about fax.  If that is

20   selected, we would send via secure fax; we would send the

21   results to the physician that way.

22   Q.  Does Aegis offer other methods of reporting its results?

23   A.  Yes.

24   Q.  What are some of those?

25   A.  We also have web-based reporting, so a web portal could be

1    established where the results could be transmitted that way

2    through a log in.  And we can also mail results.

3            MR. DISKANT:  And if we could just zoom out on this

4    document.

5    Q.  Did this particular practitioner choose web access?

6    A.  No.

7    Q.  And then if we can go to the second page of the document.

8    And then the third page.  This is signed in April of 2014?

9    A.  Yes.

10   Q.  And you testified that that's when the relationship began?

11   A.  Yes, around that time.

12   Q.  OK.  Did Aegis in fact receive urine samples from Dr.

13   Mirilishvili's practice?

14   A.  Yes, we did.

15   Q.  Did it test those samples?

16   A.  Yes.

17   Q.  When Aegis tests samples, is any sort of a document

18   created?

19   A.  Yes.

20   Q.  What is created?

21   A.  Well, the main thing that's created is a lab report after

22   the testing, which details the results of the test.

23   Q.  And what is done with that lab report?

24   A.  It is transmitted back to the physician.

25   Q.  So if I could direct your attention to what has been marked

G377MIR1                        Galanter - direct

1    as Government Exhibit 1301.  If you can flip through those and

2    let me know, do you recognize them?

3    A.   I do.

4    Q.   What are they?

5    A.   It's a variety of lab reports for patients of Dr.

6    Mirilishvili.

7              MR. DISKANT:  Government offers Government Exhibit

8    1301.

9              MR. MAZUREK:  No objection.

10             THE COURT:  Admitted.

11             (Government's Exhibit 1301 received in evidence)

12   Q.   We are going to look at those in just a minute.  Mr.

13   Galanter, you testified that you made a decision to terminate

14   the client relationship.  I want to talk about that.  Can you

15   give us some of the reasons why you made that decision?

16   A.   Yes, there were two main reasons.  One was with respect to

17   some billing issues that we had regarding the self pay

18   uninsured patients, and the other was with respect to some lab

19   reports or lab results for groups of patient that were quite

20   unusual.

21   Q.   So let's talk about the second of those first, if we can,

22   that is the lab results were quite unusual.  Can you tell us

23   about the lab results and why Aegis viewed them as unusual?

24             MR. MAZUREK:  Objection.  Lack of foundation.

25             THE COURT:  Overruled.

1   A.  Can you repeat the question.

2   Q.  Sure.  You testified that Aegis viewed groups of the lab

3   reports as being unusual, and I was asking you if you can

4   explain to the jury why they were unusual.

5   A.  Yes.  So, from the beginning of the relationship we were

6   receiving groups of patients that were having abnormal results.

7   And that's not unusual to have in the type of testing that we

8   do, compliance testing.  All the time we will receive samples

9   from patients that are not compliant.  They may have taken an

10  elicit drug or may not be taking the doctoring that's

11  prescribed.  But in this situation we were receiving many at

12  one time, ten or 20 at a time from the initiation of the client

13  relationship that had very high results which appeared to

14  indicate pill scraping.

15  Q.  What is pill scraping?

16  A.  Pill scraping is an effort to defeat a drug test.  And the

17  way it's done is a drug such as --

18              MR. MAZUREK:  Objection.  Lack of foundation.

19              THE COURT:  Overruled.  You can cross.  You are free

20  to cross.

21  A.  So, a drug such as oxycodone which is prescribed to a

22  patient is supposed to be taken by the patient, and if the

23  patient isn't taking the drug, they may try to test positive

24  for it, which they should test positive.  They will take the

25  drug and scrape part of the drug into the urine sample or dip

1    the drug into the urine sample, among other ways of putting a

2    drug into the sample.

3              MR. DISKANT:  Ms. Joynes, if we can bring up page 4 of

4    Government Exhibit 1301, and perhaps focus in on the tests

5    requested.  That's great.

6    Q.  So, Mr. Galanter, if you can just talk us through what we

7    are looking at here.  This is a test that you guys did for a

8    particular patient of Dr. Mirilishvili's; is that right?

9    A.  Yes, it is.

10   Q.  OK.  And in the results section in the middle of the

11   document, the resulting interpretation says "compliant high"

12   and there is a number next to it.

13   A.  Correct.

14   Q.  What is that number?

15   A.  Well, the number here is 476,000 nanograms per milliliter,

16   which is the amount of oxycodone that was in the sample.

17   Q.  OK.  And next to it it says compliant-high.

18   A.  Correct.

19   Q.  Does Aegis have a threshold for results that will trigger a

20   compliant-high result?

21             MR. MAZUREK:  Objection.  Lack of foundation.

22             THE COURT:  Is this something that you do as a regular

23   part of your work, sir, looking at these kinds of documents?

24             THE WITNESS:  Looking at test results?

25             THE COURT:  Yeah.

 1          THE WITNESS:  I see them fairly often.  It's not part

 2     of my job duty to analyze them, but issues do come up with

 3     respect to testing scenarios that we test, and so on occasion I

 4     do deal with certain issues regarding test results.

 5          THE COURT:  OK, fine.  So if the doctor is not

 6     familiar with it, if he can't answer the question because he's

 7     not familiar with the answer, then tell that to the questioner.

 8     Q.  Do you know the answer, Mr. Galanter?

 9     A.  I think I have forgotten the question.

10     Q.  Sorry.  The question is what the threshold is or what the

11     cut-off is when Aegis is testing for oxycodone will indicate

12     compliant high as opposed to just compliant?

13     A.  Yes, I do know the answer to that.

14     Q.  What is that threshold?

15     A.  So we report anything that's in the top two and a half

16     percent of all results from everything that we have tested as

17     compliant high, which serves as a red flag to the physician

18     that they have an abnormally high result.  For oxycodone I

19     believe that limit is around 86, 87,000 nanograms per mill.

20     Q.  So this would be roughly five to six times that?

21     A.  Yes.

22          MR. DISKANT:  And, Ms. Joynes, if we can go to page 8

23     of this exhibit.

24     Q.  Here in the comment section it says "no metabolites

25     detected.  Are you familiar with what that means?

G377MIR1                          Galanter - direct

1    A.  Yes, I am.

2    Q.  Can you tell us what that means?

3    A.  Yes.  When a human takes a drug, their body will process it

4    and will metabolize it, and often for many drugs that creates

5    what is known as metabolites, which are similar substances,

6    that are slightly different than the parent drug.  So when we

7    test, we will also pick up metabolites for a drug that's been

8    ingested.

9    Q.  So if no metabolites have been detected, what does that

10   mean to Aegis?

11   A.  What it means is that we are testing the sample that just

12   has the parent drug on it and that the drug probably has not

13   been ingested; it's probably been scraped into the sample.

14             MR. DISKANT:  We can take that down, Ms. Joynes.

15   Q.  You mentioned that one of the issues that caused concern

16   with the lab reports was this pill scraping issue.  Were there

17   other issues with respect to the samples that you were

18   receiving from Dr. Mirilishvili's practice?

19   A.  Yes.  So, the pill scraping issues continued for a month or

20   two, but after that we began to receive groups of samples

21   together that all seemed to originate from the same source and

22   have similar results.

23   Q.  When you say the same source, you mean the same person?

24   A.  Yes.

25   Q.  So multiple samples for different people that all appeared

1   to come from one person?

2   A.  Yes.

3   Q.  If I could direct your attention to Government Exhibit

4   1302, what has been marked for identification purposes.  Do you

5   recognize the document?

6   A.  Yes, I do.

7   Q.  What is it?

8   A.  This is a report that was generated regarding a group of 20

9   or 30 samples that came in that all had similar results at the

10  same time.

11  Q.  And generated by an Aegis employee?

12  A.  Yes.

13  Q.  Why was it generated?

14  A.  Because it was highly unusual, and there were concerns

15  about having so many samples come in from the same clinic that

16  appeared to originate from the same source.

17  Q.  And this particular document, was it maintained in Aegis'

18  files?

19  A.  Yes.

20  Q.  Was it made at or near the time that the test results in

21  question were produced?

22  A.  Yes.

23  Q.  And was it maintained as part of Aegis' regularly conducted

24  business activity?

25  A.  Yes.

1          MR. DISKANT:  The government offers 1302.

2          MR. MAZUREK:  Continuing objection.

3          THE COURT:  The objection is overruled.

4          (Government's Exhibit 1302 received in evidence)

5          MR. DISKANT:  Ms. Joynes, if we can bring this up.

6   Q.  Mr. Galanter, you were saying just a moment ago that this

7   was a list of patients whose samples were deemed suspicious by

8   Aegis?

9   A.  Yes.

10  Q.  OK.  Were any steps taken to transmit this list to the

11  practitioner, that is, to Dr. Mirilishvili?

12  A.  Yes.

13  Q.  What steps were taken?

14  A.  Well, the associated lab reports would have been conveyed

15  via the regular means which is the facsimile, but this report

16  we also instructed our regional sales manager to bring this

17  list to the physician, Dr. Mirilishvili, and discuss it with

18  him.

19  Q.  OK.  And what time period did this occur?

20  A.  This was in July of 2014.

21  Q.  You mentioned just a moment ago that the lab reports

22  corresponding to these particular patients would have been

23  transmitted to the doctor as well?

24  A.  Yes, that would have been our standard practice.

25  Q.  If I can direct your attention to what has been marked for

1    identification purposes as Government Exhibit 1304.  If you

2    could just take a look at those documents.

3    A.  OK.

4    Q.  Do you recognize those?

5    A.  Yes.

6    Q.  What are they?

7    A.  These appear to be the corresponding lab reports.

8    Q.  For the names indicated on that list?

9    A.  Yes.

10           MR. DISKANT:  The government offers Government Exhibit

11   1304.

12           MR. MAZUREK:  No objection.

13           THE COURT:  Admitted.

14           (Government's Exhibit 1304 received in evidence)

15   Q.  After you directed the regional sales manager to deliver

16   that list to Dr. Mirilishvili, did he just continue to test

17   samples provided by his patients?

18   A.  Yes, we did for a period of about one more month.

19   Q.  During that additional month, did the services that Aegis

20   provided to the defendant change in any fashion?

21   A.  Some of the testing became a little bit more broad.

22   Previously we had just been testing for one drug, oxycodone, or

23   one profile, an opiate profile which includes oxycodone, but we

24   began getting requested tests for a larger profile.

25   Q.  So let's talk a little bit about that issue.  We have up on

1    the screen the first page of Government Exhibit 1304.

2              If we can zoom in, Ms. Joynes, on the tests requested

3    section.

4              It indicates that opiates were tested for?

5    A.   Correct.

6    Q.   Anything else being tested for?

7    A.   This one says specimen validity tests were done.

8    Q.   What does that mean?

9    A.   Specimen validity tests are a group of tests that are done

10   to ensure the validity of the sample, that it is human urine,

11   that it hasn't been adulterated, and that it's within normal

12   concentrations, it's not too dilute with a patient drinking too

13   much water or something like that prior to giving the sample.

14   Q.   OK.  Aside from opiates, were any other substances being

15   tested for?

16   A.   Not on this test.

17   Q.   And when the relationship began with Dr. Mirilishvili, what

18   was Dr. Mirilishvili typically asking Aegis to test for?

19   A.   The opiates.

20   Q.   Only?

21   A.   Only.

22   Q.   Is that a typical or atypical practice for the pain

23   management doctors that Aegis provides services to?

24              MR. MAZUREK:  Objection.  401.

25              THE COURT:  Objection overruled.

1   A.  It's atypical.

2   Q.  Why is it atypical?

3   A.  Because pain physicians typically test for a group of drugs

4   that they are concerned about when they are prescribing opiates

5   or similar drugs to patients.  They test for a group of

6   different types of opiates, but also similar drugs like

7   Fentanyls and benzodiazapines, but they will also test for

8   illicit drugs like heroin and cocaine.

9   Q.  Did there come a point where the defendant started testing

10  for those additional substances?

11  A.  Some of them were tested in the last month of the

12  relationship.

13  Q.  And did any of those tests done in the last month for

14  additional substances reveal that the defendant's patients were

15  taking illicit drugs?

16  A.  Some of them did, yes.

17          MR. DISKANT:  Ms. Joynes, if we did go to Government

18  Exhibit 1301, page 18 of that exhibit.

19  Q.  Mr. Galanter, what are we looking at here?

20  A.  This is a lab report for a test done on an Ira Shepard for

21  a collection that was done on July 21st of 2014, and a broader

22  profile, the 199-U profile, was tested.

23  Q.  And the patient tested positive for marijuana?

24  A.  And there was a marijuana confirmation, yes, that tested

25  positive for marijuana.

G377MIR1                    Galanter - direct

1   Q.  Were there any other illicit substances that the

2   defendant's patients tested positive for in that last month of

3   testing?

4   A.  I know that some of them tested positive for heroin as

5   well.

6   Q.  Sir, we have been talking a fair bit, Mr. Galanter, about

7   one set of concerns that you raised as a basis for terminating

8   a relationship, that is, the samples.  The other issue that you

9   had raised was the issue of self pay and insurance.  Can you

10  tell us a little bit about that.

11  A.  Yes.  So, this clinic was set up to be entirely self pay,

12  meaning that the samples that we were going to receive, the

13  patients did not have insurance, and we were thus going to bill

14  the patients.

15          Actually this was set up as prepayment.  So we had

16  different rates for billing and prepayment.  We charge less if

17  there is a payment in advance because we don't have to do the

18  collection efforts.  And this was set up as that.  But if it's

19  going to be a prepayment self pay, the patients cannot have

20  insurance, because if they do have insurance, we're required by

21  many insurers, including federal government insurers, to bill

22  them.

23  Q.  OK.  How much was the set-up prepay amount for the

24  defendant's patients?

25  A.  $50.  And that's across the board for all -- that's our

1    company policy.

2    Q.   OK.   And in the course of administering these, did you

3    determine that any of the defendant's self pay patients had

4    insurance?

5    A.   Yes, we did.   Our billing department is required before

6    they can process the invoice to check to see if there is

7    insurance.   And in doing so they determined that many of the

8    patients did have insurance.

9    Q.   Were there other concerns with respect to the method of

10   payment for these samples?

11   A.   Yes.   I mean in addition to this being unusual that they

12   were all self pay, we began to notice that we weren't receiving

13   any cash and we weren't receiving any personal checks.   All of

14   the payments were Western Union, cashiers checks, coming from

15   the same Western Union account.

16   Q.   Same Western Union account or location?

17   A.   Location.

18   Q.   Mr. Galanter, when did you make the decision to terminate

19   the relationship with the defendant?

20   A.   In August of 2014.

21   Q.   And why did you make that decision?

22   A.   Because these issues were not being addressed.   The billing

23   issue and the problem with insured patients coming across as

24   uninsured patients -- which creates problems for our billing

25   department in having to try to refund those funds -- and

1   billing insurance creates problems, that was not being

2   addressed, and we continued to receive these issues with group

3   test results.  So by August I made the decision that we had

4   concerns about the legitimacy of this practice and made the

5   determination to terminate the relationship.

6            MR. DISKANT:  Your Honor, may I have just a moment?

7            Nothing further, your Honor.

8            MR. MAZUREK:  May I inquire?

9            THE COURT:  Absolutely.

10  CROSS EXAMINATION

11  BY MR. MAZUREK:

12  Q.  Good morning, Mr. Galanter.

13  A.  Good morning.

14  Q.  My name is Henry Mazurek, and I represent Dr. Mirilishvili.

15  You had testified on direct examination that you are general

16  counsel at Aegis Science Corp., correct?

17  A.  Yes.

18  Q.  And in that position you are a lawyer, correct?

19  A.  I am.

20  Q.  You're not a doctor, right?

21  A.  I am not.  I'm a juris doctor but not a medical doctor.

22  Q.  A juris doctor but not a medical doctor.

23  A.  Yes.

24  Q.  And with respect to any issues relating to toxicology and

25  information about toxicology, you're relying on the

G377MIR1                        Galanter - cross

1   toxicologists in Aegis to help you explain matters relating to

2   toxicology, correct?

3   A.  No.

4   Q.  You're not?  You're relying on someone else or --

5   A.  No.  Over the course of my relationship with Aegis, I have

6   come to understand some aspects of toxicology.  I'm not a

7   toxicologist.  I don't have a medical degree, but I do have

8   some general understanding which I'm required to develop as

9   part of my role.

10  Q.  So you studied some on your own?

11  A.  Yes.

12  Q.  OK.

13  A.  In a sense of the word I do.  I have to read lots of

14  articles about what we do.

15  Q.  Sure.  But as a lawyer, and in terms of making decisions as

16  a lawyer for Aegis, if there are issues relating to the science

17  of the lab reports, you're not going to rely on your reading on

18  the side; you're going to rely upon the toxicologists at the

19  lab, correct?

20  A.  To some degree, yes.  I mean there are things that I

21  understand regularly or generally, but if it gets beyond my

22  knowledge -- which I feel like I know where my knowledge base

23  begins and ends -- then I certainly go to the toxicologists for

24  assistance, and I do that regularly.

25  Q.  Because they are the ones that have the expertise and

1   special training in that regard.

2   A.  Yes.

3   Q.  Now, you said that you have come all the way up from

4   Nashville, Tennessee, correct?

5   A.  Yes.

6   Q.  Aegis is a national lab that serves different medical

7   offices and testing for companies throughout the United States,

8   correct?

9   A.  Correct.

10  Q.  And in this particular instance the lab was retained by Dr.

11  Mirilishvili here in New York, right?

12  A.  Correct.

13  Q.  Now, are you aware how that relationship began?

14  A.  Generally, yes.

15  Q.  Did Dr. Mirilishvili solicit these services of Aegis?

16  A.  Are you asking if he initiated the first contact?

17  Q.  If you know.

18  A.  He did not initiate the first contact is my understanding.

19  Q.  So an Aegis service rep went to his office to offer the

20  services of Aegis to do urine testing on behalf of the doctor's

21  office?

22  A.  Yes.

23  Q.  And that's not unusual for Aegis; is that right?

24  A.  No.

25  Q.  In fact you have sales reps throughout the country that go

1    and visit different offices and tell them what kind of services

2    you guys offer and why you may be better than other labs,

3    correct?

4    A.  Exactly.

5    Q.  And one of the things that you particularly market is that

6    your lab reports are very clear in providing the results for

7    physicians, correct?

8    A.  Yes.

9    Q.  And very clear, when I say that that means that the

10   information that might be transmitted to the doctor in terms of

11   what we looked at before, concentration levels and such, are

12   clearly defined in plain language on the face of the report,

13   correct?

14   A.  Yes.

15   Q.  And that is you have different categories.  I think we

16   looked at some earlier on direct examination, compliant versus

17   high compliant or present.  Those are some of the categories

18   that would be transmitted to the doctor's office, right?

19   A.  Right.

20   Q.  And one of the reasons for having these different

21   explanations on the surface of the report rather than just a

22   number, a concentration level, is that some physicians might be

23   unfamiliar with what that number -- the concentration indicated

24   of whatever the substance is being tested -- really means,

25   correct?

1    A.  I can't really speak for physicians, but I think we try to

2    provide the interpretive guidance to assist.

3    Q.  And that interpretive guidance is the actual words that

4    mean something to everyday people, like noncompliant or

5    compliant.

6    A.  Correct.

7    Q.  Now, when your sales representative solicited Dr.

8    Mirilishvili's office, this was sometime in the spring of 2014;

9    is that about right?

10   A.  I believe so.

11   Q.  Because the relationship started I believe sometime mid or

12   late April of 2014?

13   A.  Correct, April of '14.

14   Q.  That's the time when the requests and contracts were signed

15   with the doctor.

16   A.  The client set-up form, yes.

17   Q.  Now, the particular sales rep in this case was a fellow by

18   the name of Charles Meyers, is that right, who visited the

19   doctor's office?

20   A.  Yes.

21   Q.  And do you know whether the doctor's office was just

22   opening at this point, or this was an ongoing practice that had

23   existed prior to Charles Meyers coming upon the doctor?

24   A.  I do not know.

25   Q.  Or whether you were replacing another lab that had been

1   offering services prior to Aegis?

2   A.  I do not know.

3   Q.  Now, part of your duties or what you take on in terms of

4   the services that Aegis provides includes wanting to keep

5   communications open with the medical office so that if there

6   are questions regarding any of the results that are

7   communicated from the lab to the medical office, that you are

8   available to answer those questions -- Aegis is available to

9   answer those questions.

10  A.  Are you asking if I do that or Aegis?

11  Q.  Not you specifically, but the lab toxicologist would be

12  made available to the medical office.

13  A.  Yes, we have Ph.D.s on staff or pharm Ds on staff that

14  answer questions for physicians.

15  Q.  You also were asked on direct examination about how you

16  categorized or described the relationship that Aegis had with

17  Dr. Mirilishvili's office as compliance testing, correct?

18  A.  Correct.

19  Q.  Now, you're not aware, are you, of actually any New York

20  state or federal requirements that require Dr. Mirilishvili to

21  hire a lab and do urine testing for pain management, are you?

22  A.  I know most states have various degrees of regulation that

23  encourage or require testing, but they're all over the board,

24  and I don't know specifically what New York's regulations or

25  laws require.

G377MIR1                          Galanter - cross

1   Q.  So you don't know whether actually there was a requirement

2   or whether Dr. Mirilishvili was doing this in order to better

3   his medical practice individually.

4   A.  I don't know.

5   Q.  You are not aware of any federal requirement that requires

6   pain management offices to urine test their patients to make

7   sure that they're taking the drugs.

8   A.  There is not a requirement, federal requirement, that I'm

9   aware of that requires it.

10  Q.  And in literature that Aegis develops specifically for

11  people like pain management offices, medical offices, you

12  provide the reasons why it might be a good idea for doctors to

13  use a urine testing service like yours to help monitor their

14  patient relationship and patient health, correct?

15  A.  Correct.

16  Q.  And in terms of the services that you provide for pain

17  management offices, I believe you indicated and were shown on

18  Government Exhibit 1303 that there is I guess a litany of types

19  of testing or testing packages that Aegis provides to

20  physicians.

21  A.  Correct.

22          MR. MAZUREK:  And if we could, can we put on the

23  screen Government Exhibit 1303?  I don't think we have that.

24  Great.  And if we can turn to I think the next page.  The page

25  after that, the listing.  And if we can blow up the top half of

1    that page, please.

2    Q.  This is the document, Mr. Galanter, that indicates the

3    profiles that are available, the testing packages -- at least

4    some of the testing packages that are available through Aegis

5    services, correct?

6    A.  Correct.

7    Q.  And there is a litany here of different kinds of drugs that

8    are tested based upon different profiles.  The first is

9    comprehensive profile.  The second is quantitative metabolite

10   profile.  There is a urine plus.  There is a urine plus DL.

11   And then there is also an all tests required.  Is that right?

12   A.  All tests requested, the 199, yes.

13   Q.  Yes, all tests requested.  And the reason that you have

14   these different services available is that doctors can pick and

15   choose among those that the doctor feels in their independent

16   clinical judgment that would work best for their office,

17   correct?

18   A.  Correct, for their office and their patients.

19   Q.  And in this particular instance with Dr. Mirilishvili you

20   said that initially that he requested an opiates testing,

21   right?

22   A.  Correct.

23   Q.  And the opiates testing, that would make a determination of

24   not just whether oxycodone is in a person's urine but other

25   types of opiates, correct?

G377MIR1                         Galanter - cross

A.   There are some other opiates that are included in that, but

included in that are the metabolites as well, like noroxycodone

and hydrocodone I believe are also in that profile.

Q.   So some morphine-based opiates would also come up with that

profile, correct?

A.   I'm not certain.  I'm not sure what you mean by

morphine-based opiates.

Q.   Well, you said hydrocodone.  Hydrocodone, for example, is a

morphine-based drug, correct?

A.   I'm not sure.

Q.   That goes beyond your level of toxicology.

A.   Yes, when it gets down to what types of the drugs they are.

I do know it's a similar drug, and I believe it's an opiate,

but I believe it's in the profile as well.

Q.   But you're not really sure on that?

A.   No.  I would have to look at some documents that would show

what is in that test.

Q.   OK.  Well, so, would you know whether Vicodin, for example,

would be something that comes up in the opiates testing?

A.   I do not believe Vicodin is in that.

Q.   Why would that be?

A.   I just don't recall that being one of the drugs that's in

the opiate profile.

               (Continued on next page)

G37LMIR2                          Galanter - cross

1  BY MR. MAZUREK:

2  Q.  Vicodin is just a brand name of a drug, right, it's not an

3  actual chemical analysis, right?

4  A.  I do not know.  I believe that is correct that Vicodin is a

5  brand name.

6  Q.  And Vicodin includes hydrocodone, which you just mentioned

7  is something that would, you think might have been tested in

8  the opiates analysis?

9  A.  Correct.

10  Q.  But you didn't know that Vicodin included hydrocodone, did

11  you?

12  A.  Did you say that Vicodin included hydrocodone?

13  Q.  That's one of the chemical compounds inside the brand

14  Vicodin?

15  A.  No, I'm not generally familiar.  I've heard Vicodin a lot,

16  but I don't know particularly what kind of drug it is.

17  Q.  What about Percocet, do you know Percocet?

18  A.  I heard of the drug, but I'm not certain which type of drug

19  it is.

20  Q.  So Percocet, is that a chemical in and of itself?

21  A.  A chemical in and of itself?

22  Q.  Yes, like oxycodone, for example.

23  A.  Percocet is a brand name like Vicodin.  But I'm not sure --

24  I'm sure it's a particular drug, but I'm not sure exactly which

25  one Percocet is.

1    Q.   So if the doctor's patients were taking Percocet, would

2    that have shown up in the testing that you were providing on

3    behalf of the doctor?

4    A.   I'm not certain.

5    Q.   These are things you'd have to go to a toxicologist for,

6    correct?

7    A.   No.   These are things that I could go to our drug testing

8    list and readily look it up and I do that regularly.   So that's

9    something that I would go to our documents.   We have many

10   brochures and other things that list which drugs are in which

11   profiles and it has both the drugs and the brand names.   But,

12   so I have documents that I refer to.   I would have to look at

13   that.

14   Q.   In terms of if you're wanting to know whether the opiates

15   that are being reported on the testing that was done on behalf

16   of Dr. Mirilishvili's patients, whether, for example,

17   hydrocodone was going to be something that was detected in the

18   test that was being conducted, you would go to your

19   toxicologist, correct?

20   A.   No.   I would go to our form documents that list which

21   drugs.   There are about eight to ten drugs in the opiate

22   profile and I could go to that list to get the answers to

23   what's in it.

24   Q.   Did you do that before your testimony today?

25   A.   I looked at it, but I don't recall specifically the eight

1    to ten drugs.  I believe hydrocodone is one of the drugs.

2    Q.  You don't have any problem with going to your

3    toxicologist -- your hesitancy about getting information.  You

4    would be able to speak to them or have them available to you?

5              THE COURT:  The objection is sustained.

6    Q.  Now, with respect to -- if we could put GX1303 back on the

7    screen and go to the first page.  This is the new client setup

8    form that you testified about for Dr. Mirilishvili, correct?

9    A.  Correct.

10   Q.  Now, you weren't involved in the communications with

11   Dr. Mirilishvili's office in completing this form, correct?

12   A.  No.

13   Q.  That would have been a sales representative, that would be

14   his responsibility in discussing those kinds of the services

15   and the pricing and all of the rest?

16   A.  Correct.

17   Q.  And you had testified that in the I guess one of the

18   columns on the left side of the page that the profile is called

19   a la carte, that's the opiates, what turned out to be the

20   opiates testing that was requested by the office, correct?

21   A.  Correct.

22   Q.  And that the method of reporting the results of tests would

23   be by fax, correct?

24   A.  Correct.

25   Q.  Now, there's also, if we can blow up the bottom third of

G37LMIR2                         Galanter - cross

1    the page, the block, some initials before web access.  I can't

2    quite read it.  I think it's RSMS.  Do you see that on your

3    screen, RSM's web access?

4    A.  Yes.

5    Q.  What is RSM?

6    A.  I'm not -- we typically use RSM for regional sales manager,

7    which would be Charles in this situation.  But I don't know

8    that that's how it's being used here.

9    Q.  And why don't you know that, what makes you hesitant with

10   respect to this document?

11   A.  I just haven't ever focused on that before.  Perhaps that

12   it is the regional sales manager having access to reports so

13   that the regional sales manager can look them up and if there

14   are any questions, the sales manager can discuss them as well.

15   Q.  But you're not quite sure, you're not quite sure as you

16   look at it now?

17   A.  No.  I've never had to deal with that before.

18   Q.  And on this particular sheet it says I want access for 60

19   days to this client's reports, correct?

20   A.  Correct.

21   Q.  Now, if web access was available to the sales manager, he

22   would be able to monitor and continue to discuss with the

23   doctor about anything that comes up along the way with respect

24   to the reporting that's being done on behalf of the patients?

25   A.  Yes.

G37LMIR2                         Galanter - cross

1    Q.  And that same access could be provided to the doctor's

2    office as well?

3    A.  Could you repeat that?

4    Q.  Web access, that same -- the web access for 60 days that is

5    indicated here could be available to the physician's office as

6    well, correct?

7    A.  Well, the physician can get web access.  In reading this,

8    and it does appear it says I want access for 60 days to this

9    client's reports, so I do assume that RSM means the regional

10   sales manager getting access to the reports.  So the physician

11   can get access and I know that our sales rep can get access,

12   but I didn't notice that it was on this form before.

13   Q.  Do you know whether Mr. Meyers was in contact with

14   Dr. Mirilishvili about these particular reports?

15   A.  Which particular reports?

16   Q.  The ones that are being done for Dr. Mirilishvili's office.

17   A.  Well, I don't believe he was in touch regarding all of

18   them, but I do know that he spoke with him about the group that

19   we talked about earlier.

20   Q.  OK.  Do you know whether Dr. Mirilishvili initially

21   requested to have access online to these reports through

22   Charles Meyers?

23   A.  I do not.  It's not indicated on here, but I don't know if

24   there were any other discussions about that.

25   Q.  That would be something that only Charles Meyers would

1   know?

2   A.   And the doctor perhaps.

3   Q.   Now, the reporting method here done by fax, that was one of

4   the acceptable methods that Aegis provided for the conveying of

5   reports?

6   A.   Yes.

7   Q.   And that means that they were just every day as a report

8   was completed, they would fax it to the indicated medical

9   office's fax number, right?

10  A.   To the secure fax number provided, yes.

11  Q.   When you say secure fax number, is that secure because it

12  is a known, identified medical office's fax number?  What makes

13  it secure I guess is my question.

14  A.   They are called secure fax numbers.  I don't know the IT

15  specifics behind it.  But I understand that we are required to

16  use what's known as a secure fax.  But it may just be that it's

17  a facsimile number that's provided to us.

18  Q.   And, obviously, you've never visited Dr. Mirilishvili's

19  medical office, correct?

20  A.   Correct.

21  Q.   And you don't know once the fax was received in that office

22  how it was processed, correct?

23  A.   Correct.

24  Q.   Now, you said that there came a time in the relationship

25  that the type of testing that was requested by

1     Dr. Mirilishvili's office changed, correct?

2     A.   Yes.

3     Q.   It went from the a la carte opiates type of profile to an

4     all pain requested or all tests requested format?

5     A.   Some of the requests were.

6     Q.   When you say some of the requests were, does that indicate

7     that there were specific instances where the doctor contacted

8     the lab to say for certain patients, I want different type of

9     testing done than the opiates?

10    A.   Yeah.  So the doctor will fill out what's known as a

11    requisition form in his office and complete that and then

12    submit it and it gets FedExed to Aegis and we receive that.  So

13    that's how the communication is made.  But it's my

14    understanding that the physician, Dr. Mirilishvili, on some of

15    the tests was selecting a broader profile, not just the opiate

16    testing.

17    Q.   So he's actually making a choice as to certain patients, he

18    wanted more things tested than other patients, correct?

19    A.   Yes.

20    Q.   And that more, if we can go back to the third page of

21    Government Exhibit 1303 and enlarge the middle portion and,

22    again, the area about 199, all tests requested.  See if we

23    can -- it's a little bit hard to read.  Is there a way to

24    highlight the all tests requested 199 section?

25              It says in that box -- I'll read it for you -- that

G37LMIR2                     Galanter - cross

1   for that particular test, all tests included in a certain

2   number plus D/L in addition to.  What does D/L indicate on that

3   form?

4   A.  Well, it says methamphetamine DL isomer, which is something

5   I would have to go to the toxicologist to have that explained,

6   but it's a type of methamphetamine test.

7   Q.  OK.

8   A.  I'm sorry.  I was looking at the 197.  I was up above that.

9   Q.  The 199, all tests requested, which is what we saw in one

10  of the test reports in Government Exhibit 1301, says in the

11  first line, all tests included in No. 001971 QMP plus D/L.  Do

12  you know what that refers to?

13  A.  Plus D/L?

14  Q.  Or the number.

15  A.  Yeah.  I believe so these are all additive and as it goes

16  down the list generally, it's picking up what's in the next

17  smaller profile and then adding to it.  And I think that's

18  referring to the test above where it has the methamphetamine DL

19  isomer in the 197 immediately above it.  So it's picking up

20  that test and then adding more to it.

21  Q.  OK.  So in addition to that test, it's also looking for

22  buprenorphine; is that right?

23  A.  Yes, bupe or buprenorphine.

24  Q.  Cotinine?

25  A.  Yes.

1   Q.  EIG or ETG?  I don't know what that is.

2   A.  ETG/ETS is a type of alcohol testing.

3   Q.  Synthetic cannabinoids, I guess that's for synthetic

4   marijuana types, right?

5   A.  Yes.

6   Q.  Synthetic cathinones?

7   A.  Yes.

8   Q.  Do you know what those are?

9   A.  I believe those are bath salts, which is an illicit drug.

10  Q.  Tapentadol?

11  A.  Tapentadol, I'm not certain what type of drug that is.

12  Q.  Also in that testing there's specimen validity testing done

13  as well, correct?

14  A.  Correct.

15  Q.  OK.  So when the doctor was calling to say for certain

16  patients to do the 199 testing, he's making a determination

17  that he's concerned with that patient in trying to expand the

18  test to see if there are any of these other illicit drugs that

19  the patient may be taking?

20  A.  Could you repeat that?  I'm sorry.

21  Q.  Yes.  It was a long question.  When the doctor is making a

22  specific determination on some patients to expand the testing

23  profile for opiates to all tests requested, he's making a

24  determination that he needs to know more information at least

25  for those patients, right?

1   A.   Presumably, yes.

2   Q.   And the information that he's seeking at least for those

3   patients is information relating to other illicit drugs that

4   he's maybe concerned that the patient may be taking or he wants

5   to check at least?

6   A.   There's additional -- there are illicit drugs and there are

7   also prescribed pharmaceutical drugs.  Both would be included.

8   Q.   It's a pretty comprehensive test and that's why it's called

9   all tests requested?

10   A.   It's a very comprehensive test, yes.

11   Q.   Let me ask you questions relating to pricing of these

12   tests.  This all tests requested test costs more than just an

13   opiates a la cart test, correct?

14   A.   Depends on who the payer is.

15   Q.   Let's start with if it's a self-payer, uninsured patient

16   and they have to go out of their pocket and pay for it.

17   A.   It costs the same.

18   Q.   It costs the same?

19   A.   Yes.  We are very simplistic when it comes to self-pay and

20   we have one price.

21   Q.   And that's a nationwide price, it doesn't matter what

22   you're testing or where you're testing it or where you have to

23   convey it?

24   A.   Correct.

25   Q.   But for insurance companies, third party payers, you can

1   collect more money?

2   A.   Sometimes.

3   Q.   Or you try to collect more money?  Let's put it that way.

4   We know how insurance companies work.

5   A.   Right.  Sometimes we don't get paid.  But we bill different

6   amounts and there's a variety of different payment methods that

7   they all have and there's thousands of different payers, very

8   complex.  But typically it's by drugs or groups of drugs that

9   the bill is established.

10   Q.   So just taking this case or focusing on this case with

11   respect to the opiates testing that Dr. Mirilishvili initially

12   requested generally for his practice, if there was a third

13   party payer, the amount that Aegis would get, if everything is

14   approved and the insurance provider actually pays, it's about

15   $100; is that right?

16   A.   I got confused as to which part you were asking me is $100.

17   Q.   The opiates profile.

18   A.   For an insurer?

19   Q.   Yes, for a third party payer.

20   A.   It would vary.

21   Q.   Is that an average amount or how much would you normally --

22   you've done this a million times, right, in terms of you're

23   saying that insurance was actually the preferred way that you

24   collected payment, correct?

25                MR. DISKANT:  What's the relevance of this?

G37LMIR2                        Galanter - cross

1                THE COURT:  Are you objecting on the ground of

2    relevance --

3                MR. DISKANT:  Yes.

4                THE COURT:  -- or are you asking me to answer that

5    question, which would be totally inappropriate.

6                MR. DISKANT:  It would be.  Objection, relevance, your

7    Honor.

8                THE COURT:  Could you all come over here for a moment,

9    please.

10               (At the side bar)

11               THE COURT:  Proffer.

12               MR. MAZUREK:  Yes.  Judge, one of the things that the

13   government has indicated here is that they're going to argue

14   that insurance payments are something that I guess they're

15   going to say --

16               THE COURT:  Is it lack of insurance, when all your

17   patients don't have insurance, that that's a red flag, which

18   apparently it is for these people.

19               MR. MAZUREK:  That's going to be the issue is because

20   not all of Dr. Mirilishvili's patients paid by cash.

21               THE COURT:  I don't think that's what he's saying.

22   He's saying that, what I heard him say is that a large number

23   of noninsurance patients is a red flag for this corporation.

24   That's all they're saying, OK.  He can't say anything more.  He

25   can't say anything about the industry.  He's talking about this

G37LMIR2                         Galanter - cross

 1   corporation, Aegis.  So I don't know what you're doing.

 2          MR. MAZUREK:  Because I think in following -- in

 3   subsequent witnesses, there's going to be evidence from the

 4   government's cooperators that they made a determination, the

 5   office manager and such, the drug dealers, not to seek to get

 6   insurance payments or to use insurance for this drug testing

 7   because it would create -- it could create issues.

 8          THE COURT:  He doesn't know any of that stuff.  Not

 9   with this witness.  Not with this witness.

10          MR. MAZUREK:  All I want to do is get in, if I could

11   just the cost of insurance versus cash payments.

12          THE COURT:  I don't understand the cost of insurance

13   versus cash payment.  What does that have do with the price of

14   tomatoes?  I don't understand why you're asking this witness

15   these questions.

16          MR. MAZUREK:  If in fact -- it's laying a foundation

17   for subsequent testimony.

18          THE COURT:  Not through this witness, this third party

19   witness.

20              (Continued on next page)

21

22

23

24

25

G37LMIR2                        Galanter - cross

 1              (In open court)

 2              THE COURT:  The objection is sustained.

 3    BY MR. MAZUREK:

 4    Q.  I'm going to ask, Mr. Galanter, that you look at some of

 5    the reports that were sent with respect to Dr. Mirilishvili's

 6    office's testing and if we can turn to what's already been

 7    admitted into evidence as GX209, and specifically page Bates

 8    stamped DM542.

 9    A.  Is this one of the documents in front of me?

10    Q.  No.  You have to look on the screen.

11    A.  OK.  Thank you.

12    Q.  And this is already in evidence, so I ask it be published

13    on the big screen.

14              Does this appear to be an Aegis laboratory report for

15    client Dr. Moshe Mirilishvili in the upper left-hand corner

16    under client information?

17    A.  You confused me on the last part of your question.

18    Q.  I'm just directing you to the client identified on the left

19    hand side of the screen, Dr. Moshe Mirilishvili.  Is this a lab

20    from Aegis relating to that account?

21    A.  It does not appear to be an Aegis lab report.

22    Q.  And why do you say that?

23    A.  The Aegis logo does not appear to be our logo.  It appears

24    to be a copy of our logo.  It's different.

25    Q.  It looks different?

1   A.  Yes.

2   Q.  And there's a fax line on top, do you see that, Aegis

3   Sciences Corp., May 19, 2014?

4   A.  Yes, I do.

5   Q.  Is that your typical fax header?

6   A.  I'm not familiar with our typical fax header, but I can see

7   what it says.

8   Q.  OK.  Is this -- if we could just go to the entire document

9   on the screen -- is this typically the kind of the format of an

10  Aegis laboratory report?

11  A.  For some of them, it's similar, yes.

12  Q.  When you say for some of them, what do you mean?

13  A.  Well, typically, as we discussed earlier, more drugs are

14  tested.  This appears to be -- I'm having a little bit of

15  trouble reading it.  It's a little blurry.

16  Q.  If you could blow up the middle portion.  There are four

17  columns in the middle part of the report under results and

18  interpretations -- first column being drug and/or metabolite;

19  the second, results interpretation; the third, normalized

20  result; and the fourth, comment.

21       Is that the typical format of an Aegis Services Corp.

22  report?

23  A.  Yeah, it's typical, but everything is moved around a little

24  bit from how it's -- I mean in the columns such as results

25  interpretation, I'm looking at one of the reports that we

1   produce from our office has results over the word

2   interpretation and here they're side by side.  Same with

3   normalized result.

4   Q.  So Mr. Galanter, is this the first time that you saw this

5   particular document?

6   A.  I saw it the other day.

7   Q.  During your preparation sessions with the government

8   prosecutors?

9   A.  Yes.

10  Q.  They asked you to review documents prior to your testimony,

11  correct?

12  A.  Yes.

13  Q.  And this was one of the documents in a patient file of

14  Dr. Mirilishvili's that you were asked to review?

15  A.  I don't know if it was in a patient file.

16  Q.  If we could take that blowup off the screen and go back to

17  the full report and then just enlarge top third of the page.

18  I'm sorry, down to include the clinic information, patient

19  information, and sample information.  OK.

20       The patient that's identified here is a patient by the

21  name of Barbara Kearse; do you see that in the middle column?

22  A.  I do.

23  Q.  And, again, we've identified the clinic information was

24  Dr. Moshe Mirilishvili, right?

25  A.  That's what it says.

G37LMIR2                    Galanter - cross

1   Q.  And then there's the third column, sample information,

2   which includes a lab sample ID; is that right?

3   A.  Yes.

4   Q.  And that is information that is included on a real Aegis

5   Sciences Corp. lab, correct, that information about lab sample

6   ID?

7   A.  That type of information, yes.

8   Q.  Now we can now go back to the full page.  There's also on

9   the top of the page by the header again, there's an indication

10  on the far right corner, if we could blow that up.  I'm sorry.

11  Laboratory report, next to the title laboratory report, it says

12  Ryan B. Paulsen, PhD.

13          Is that someone who is an employee at Aegis?

14  A.  Dr. Paulsen was an employee of Aegis.  I believe he was at

15  that time.

16  Q.  He was at that time?

17  A.  Yes.

18  Q.  And the results indicated on Barbara Kearse's May 14, 2014

19  report here indicates an interpretation of PRN presence; is

20  that right?

21  A.  Just to go back.  Dr. Paulsen left around that time, so I'm

22  not a hundred percent sure of when he left.

23  Q.  He was an employee, one of the PhD's at Aegis?

24  A.  He was at one time, yes.  I believe he left in probably

25  early '14, but I'm not certain exactly when he left.

1   Q.  The indication here for this patient, Barbara Kearse's

2   report on oxycodone, May 14, 2014, indicated present, right?

3   A.  Yes.

4   Q.  And that's a positive finding, correct?

5   A.  Positive as the drug was detected, yes.

6   Q.  And under the normalized result, it had a nanogram per

7   milliliter amount that was within the normal range as you

8   indicated, correct?

9   A.  Yes, it is.

10  Q.  I would like to now turn to another page in Government

11  Exhibit 209 for patient Barbara Kearse with Bates stamp No.

12  DM537.  And if we could just blow up the first half of that

13  page where the text is.

14          Now, Mr. Galanter, does this appear to be an Aegis

15  laboratory report?

16  A.  This one does appear to be an Aegis lab report.

17  Q.  And how are you identifying it as compared to the last one

18  that we looked at?

19  A.  It has our correct logo at the top left is what initially

20  caught me eye.

21  Q.  It also has apparently some additional information

22  regarding the laboratory director and of Nashville, Tennessee,

23  address in the right hand corner.  Do you see that?

24  A.  Yes, I do.  It has Dr. Dowling as the lab director.

25  Q.  Other than the header, the other information in the body of

G37LMIR2                      Galanter - cross

1     the report, does that seem fairly similar with the kinds of

2     information that we just saw on the last exhibit?

3     A.   It's similar.  There's some minor formatting differences

4     like I pointed out earlier, but it's similar.

5     Q.   When you say minor formatting differences, it would be the

6     kind of thing that you would know because you've seen literally

7     thousands of these kinds of reports, correct?

8     A.   I suppose.  I don't know how many thousands is the correct

9     number, but it probably is.

10    Q.   A large number?

11    A.   It's a large number.

12    Q.   And so for this report which is also for patient Barbara

13    Kearse, who was a patient at Dr. Mirilishvili's clinic,

14    correct?

15    A.   That's what's indicated.

16    Q.   The collected date here for the sample, right-hand column

17    towards the top, is May 23, 2014; do you see that?

18    A.   Yes, I can, that's correct.

19    Q.   And here again the results is that oxycodone was detected

20    in this patient's urine and the result interpretation was

21    compliant, correct?

22    A.   Correct.

23    Q.   Now, this also appears to have a cut off fax header on the

24    top which indicates a date, a time, and Aegis Sciences Corp.;

25    do you see that?

1   A.  Yes.

2   Q.  Which would be consistent with how you understood based on

3   the opening client documents how these reports were being

4   communicated to Dr. Mirilishvili's clinic, by fax?

5   A.  Correct.

6   Q.  Now, if we could turn to the next document, GX209, which is

7   Bates stamp DM539, and blow up again the first half of that

8   page.  And, again, this is a laboratory report that was done

9   for patient Barbara Kearse from Dr.Mirilishvili's office this

10  time in July of 2014, correct?

11  A.  That's what it says.

12  Q.  And, again, does this appear to be a report that was done

13  by Aegis out of its lab and sent to the doctor?

14  A.  Yes.  This does appear to be the general report.

15  Q.  And it also indicates compliant for oxycodone, correct?

16  A.  Yes, it does.

17  Q.  Now I'm going to ask if we can turn to Government

18  Exhibit 1301 and specifically Bates stamp number ASC743.  I

19  think this is this might be one of the documents that you were

20  asked about on direct examination, 743.

21          Now, Government Exhibit 1301 is the group of lab

22  reports that Aegis found within its files that were prepared on

23  behalf of Dr. Mirilishvili's clinics, correct?

24  A.  Yes.  We were asked I believe by your office to produce all

25  lab reports for the doctor's clinic and we were able to do so.

1   Q.  Because you maintain in your files at Aegis's files the

2   copies of reports that were generated on behalf of clients?

3   A.  Yes.  We maintain lab reports and we are able to produce

4   them by -- in any number of ways, including by clinician.

5   Q.  Now, you don't know whether these lab reports that you

6   produced on our request from Aegis were also found in

7   Dr. Mirilishvili's files, correct?

8   A.  I don't know what was in Dr. Mirilishvili's files.

9   Q.  Now, we have on the screen ASC743, which is an Aegis lab

10  report.  And this is all in color in different shades.  This

11  would be the original document that Aegis had in its files,

12  right?

13  A.  Correct.

14  Q.  And just to be clear, if this document were faxed, it

15  wouldn't have all of the different shades and colors that you

16  see here, correct?

17  A.  Typically probably not.  I believe there may be color

18  facsimile transmissions, but typically not is my understanding.

19  Q.  Now if we could blow up the sender portion of the document

20  starting with tests requested.  And this is one of those tests

21  that we talked about before, test No. 199, pain comp, all tests

22  requested, correct?

23  A.  Yes.

24  Q.  So this would be a patient that Dr. Mirilishvili would say

25  he wanted additional information on and expand the different

1   chemicals that are being tested, right?

2   A.  Yes.

3   Q.  And in this particular instance you do see that other

4   substances were identified as noncompliant, particularly

5   marijuana?

6   A.  Yes.

7   Q.  And if we could then go back to the original document and

8   just blow up the area starting with the column title "tested

9   for" and then all the results all across there.  This just

10  shows you just the litany of all the different kinds of

11  chemicals that were being tested with respect to this patient

12  for the all pain test or the all test requested?

13  A.  Correct.

14  Q.  And you had said that in your review of the files, you had

15  noticed that in some percentage of reports the doctor was

16  asking for all tests requested during the time that Aegis was

17  providing these test reports, sometime in the summer of 2014?

18  A.  I believe it was near the end, maybe the last month, some

19  of them were not -- I don't believe it was all of them, some

20  small percent, all the ones that I saw were this 199 profile.

21  Q.  OK.  Now, in GX1301, that's just a small sampling of the

22  total number of reports that Aegis provided to

23  Dr. Mirilishvili's clinic, correct?  It only includes I think

24  some 20, 25.  Correct?

25  A.  I haven't counted the number, but, yes, it's a small

1   percentage of the total.

2   Q.  Do you know approximately how many tests were conducted by

3   Aegis over the time period that Dr. Mirilishvili's clinic was

4   being serviced by Aegis?

5   A.  I believe the number is approximately a thousand.

6   Q.  If we could just look at another one of the reports that

7   are in GX1301 with Bates stamp number AS1095.  And as we -- for

8   patient Larry Ashby.

9           As we're doing that, Mr. Galanter, in your experience

10  as counsel for Aegis, it's not unusual that in providing these

11  kinds of reports for pain management clinics to see that

12  positive results for other types of drugs in a patient's urine,

13  correct?

14  A.  Correct.  That's the reason we test is to assist doctors in

15  finding noncompliant results.

16  Q.  And what the doctor does with those results, that's up to

17  the doctor's individual clinical judgment, correct?

18  A.  Yes.  There's a variety of things the doctor can do.

19  Q.  But the benefit of having these kinds of laboratory reports

20  or urine testing generally is, one, to make sure that the

21  medicine that's being prescribed to the patient is being taken,

22  correct?

23  A.  Yes.

24  Q.  And that is to make sure the oxycodone is found in the

25  urine, right, because if the patient is being prescribed

1    oxycodone?

2    A.   Right, yes, to make sure they've ingested the drug and are

3    taking it.

4    Q.   And if a patient, if there's a reason for a doctor to

5    believe there may be issues with the patient in terms of drug

6    abuse or addiction, asking for an all pain or all tests

7    requested will assist the doctor in terms of detecting that if

8    the patient is not being truthful to the doctor, correct?

9    A.   Well, any type of testing could, yes.  I mean a broader --

10   one of our profiles which are designed specifically to address

11   the needs of pain doctors are why they're offered and the

12   variety of them are offered and why presumably they're selected

13   by doctors in their judgment.

14   Q.   But I mean the whole nature of compliance testing is a

15   patient may be telling you one thing but may be doing something

16   else and that's why you're the fail safe, you're the check?

17   A.   Correct.

18   Q.   Now I think we have 1095 on the screen.  Let's do this in

19   stages.  First the top third, which gets you the clinic and

20   patient information and sample information.  This is in GX1301,

21   so this is a real Aegis report that was found in your files,

22   correct?

23   A.   OK.

24   Q.   And this is for a patient by the name of Larry Ashby,

25   correct?

1    A.   That's what it says.

2    Q.   In the sample that we're looking at of 20 some reports in

3    GX1301, this is another one where the doctor made the specific

4    request to do an all tests analysis on this particular patient,

5    correct?

6    A.   Correct.

7    Q.   And here this patient indicates compliant interpretation

8    for the drug and/or metabolites of oxycodone, correct?

9    A.   Correct.

10   Q.   There's also a present in this particular patient cotinine,

11   correct?

12   A.   Correct.

13   Q.   And that indicates -- we can just blow up the comments

14   section.  And cotinine, the indication of cotinine according to

15   the comment that's included in your test report indicates, test

16   result indicates active use of a tobacco product, correct?

17   A.   What's that it indicates.  Cotinine based on this appears

18   to be metabolite of tobacco.

19   Q.   Now if we could go back to the full page and then highlight

20   the tested for column and across the page and for this

21   particular patient that Dr. Mirilishvili asked for the all

22   tests, there is no indication of use or anything in the

23   patient's urine for any of these other compounds, correct?

24   A.   Other than the opiates and the opiate metabolites and the

25   cotinine, those are the only positives.

G37LMIR2                          Galanter - cross

1   Q.  So the opiates and the oxycodone, oxymorphone, and the

2   noroxycodone would all be indicative of the prescription that

3   presumably the patient had, correct?

4   A.  I can't see it any longer.  I think it said that oxycodone

5   was prescribed above.

6   Q.  Yes.  And the cotinine just means the person might be a

7   smoker, correct?

8   A.  Yes.

9   Q.  If the doctor is asking for this all pains test for this

10  patient, it indicates this patient was not abusing any other

11  drug, at least not the drugs that were tested for here?

12  A.  No other drugs were detected.

13  Q.  Now if we could turn to a document found in Government

14  Exhibit 208 which is already admitted into evidence and

15  specifically page No. DM493.  Do you see that document on your

16  screen, sir?

17  A.  Yes.

18  Q.  Does this document appear to be an Aegis laboratory report?

19  A.  No, it does not.

20  Q.  Does this document look similar to one that we looked on

21  earlier from Barbara Kearse?

22  A.  Yes, it does.

23  Q.  And, again, you would say, I presume, that the issue here

24  is that the letterhead looks different from the letterheads

25  that we've been looking at in GX1301?

1    A.   That and a couple other small things like that, yes.

2    Q.   The other minor things that you testified about earlier

3    about the spacing of columns and so forth?

4    A.   Yes.

5    Q.   The information conveyed in the body of the report or the

6    types of information conveyed in the body of the report,

7    however, are similar to the information that Aegis actually

8    provides in its real reports?

9    A.   Yes.

10   Q.   And this just so we complete the record here, if we could

11   blow up the top third.  Again, the client, the clinic, and

12   patient sample information, this apparently, this report

13   apparently was for a patient Joseph Gray at Dr. Mirilishvili's

14   clinic, correct?

15   A.   Joseph Gray, yes, that's the patient name.

16   Q.   And, again, the information that's provided here, lab

17   sample ID on the right-hand side of the page, the fact there's

18   a specimen type, collected, received, and reported, this is all

19   the kind of information you would find on an actual Aegis

20   laboratory report, correct?

21   A.   Correct.

22   Q.   And just for clarity's sake, lab sample ID, each specimen

23   is given a unique identifier by Aegis to identify the

24   collection sample?

25   A.   Correct.

1    Q.  And you could go back to the full page and blow up the

2    middle portion again.  And here at least for this report for

3    patient Joseph Gray it indicates present results interpretation

4    for oxycodone and/or its metabolites in a normalized result; is

5    that correct?

6    A.  Correct.

7    Q.  And that was one of the reports that the government asked

8    you to look at in your preparation for your testimony?

9    A.  I don't recall if I looked at this one.  And now that I see

10   there's two of them, I'm not sure which one I looked at.  I do

11   know I looked at a document that had this copy of our logo and

12   stuff on it but I don't recall the name, but I saw documents

13   similar to this.

14   Q.  And this document that's on the screen was not in the

15   series of documents that you produced relating to Aegis reports

16   that were done for Dr. Mirilishvili's clinics?

17   A.  Right.  This is not from our files.

18   Q.  Now, you did not have any communication directly with

19   Dr. Mirilishvili during the time that this account was open; is

20   that correct?

21   A.  Me personally, no.

22   Q.  And with respect to any information that was communicated

23   to Dr. Mirilishvili or his office, one person who would be

24   communicating with them would be Charles Meyers, the regional

25   sales rep; is that right?

1   A.  Yes.

2   Q.  Do you know if anyone else had communicated from Aegis to

3   Dr. Mirilishvili's office during the time that the account was

4   open?

5   A.  Yes.

6   Q.  And who was that?

7   A.  I believe some of our pharm Ds communicated with

8   Dr. Mirilishvili.

9   Q.  And what are pharm Ds?

10  A.  It's a type of doctor, pharmacological doctor of pharmacy.

11  They're pharmacy doctors.

12  Q.  Pharmacy doctors.  They have some training in toxicology,

13  correct?

14  A.  Yes, they do.  More than I do.

15  Q.  More than you do?

16  A.  Yes.

17  Q.  They would speak to Dr. Mirilishvili in order to assist in

18  the interpretation of some of these reports?

19  A.  My understanding is that they communicated with him about

20  some of the concerns regarding the pill scraping.

21  Q.  You testified about that on direct, the pill scraping, and

22  that is something that you learned from in your studies of your

23  reading of different aspects of toxicology; is that right?

24  A.  We have lots of marketing materials.  We have something

25  that -- we have a book that describes all aspects of our

1   testing and has chapters on how to defeat a drug test and pill

2   scraping is one of the subjects discussed in there.  It's one

3   of the reasons we test.  And I regularly have to describe to

4   regulators and other people in things that I write the reason

5   for our testing and why it's done.  So it is something I'm

6   familiar with.

7   Q.  And what you're familiar with is if there's a high

8   concentration or a big number in the column that we've looked

9   at for the results of the test, the nanograms per milliliter,

10  based on your reading and studying of this information that

11  could be an indication of pill scraping?

12  A.  Yes, a big number and/or a lack of metabolites.

13  Q.  And that's because the big number indicates that a large

14  concentration of the pill is found inside the urine sample,

15  right?

16  A.  Exactly.

17  Q.  Now, there could be other reasons for a high number or

18  level in the result on -- for a urine sample other than pill

19  scraping, correct?

20  A.  Yes.

21  Q.  For example, it could be that the person has become opiate

22  tolerant has been taking opioids for a long period of time at

23  high dosages?

24  A.  At high dosages, yes.

25  Q.  So when you indicated in your testimony here that it was

G37LMIR2                      Galanter - cross

1     based -- some of the numbers that we were looking at, the high

2     numbers could be indicative of pill scraping, that's just one

3     of the possible answers.  You can't be certain that is the case

4     here?

5     A.  I can't be certain of where the limit is, but --

6               THE COURT:  I think that's not the question.  The

7     question is you can't be certain that this number is due to

8     pill scraping.

9               THE WITNESS:  No.

10    Q.  But one thing you can be certain of is that for that high

11    number, what Aegis is going to be reporting is that the patient

12    is noncompliant, correct?

13    A.  I'm not certain that it says noncompliant.  It says what it

14    says.  It may say that they're compliant high, because the drug

15    is there but it's at such a high level it has a red flag on it

16    and it has a comment that indicates that.

17    Q.  So why would it still say compliant if it's beyond a

18    threshold of what you normally would see if the person were

19    digesting the pill and it was metabolized in the body?

20    A.  If it were metabolized in the body and metabolites are

21    there, the drug is present.  So in that sense, it's compliant

22    that it's present, but it's also flagged as very high as a red

23    flag.

24    Q.  OK.  As opposed to -- is there ever a time when Aegis would

25    report noncompliant on its test report?

G37LMIR2                          Galanter - cross

1    A.  If the drug is missing or perhaps if there were no

2    metabolites, it may say noncompliant.

3    Q.  Let's just --

4            THE COURT:  Just so I understand, compliant means

5    there's drug in the sample and therefore, presumably, in the

6    system of the person.

7            THE WITNESS:  Correct, and it's expected to be found.

8    It's prescribed and it's not just PRN.  So there's also the

9    nuance of if it's to be taken occasionally, PRN, then it may

10   not be present.  But if it's prescribed, if it's not indicated

11   PRN, it should always be in the system and if it's there, it's

12   compliant.

13           THE COURT:  OK.

14           THE WITNESS:  And if it's not there, it's not

15   compliant if it's supposed to be there.

16   Q.  So if it's not there, it's going to be indicated as

17   noncompliant because it's supposed to be there because it's

18   prescribed?

19   A.  Right.

20   Q.  That would indicate potential divergence, that is, the

21   person is not taking medicine but doing something else with it?

22   A.  That's one of the possibilities.

23   Q.  So if we could put on the screen GX1301, Bates number

24   ASC87.  A patient name is Alex B. Champion.  And this is one of

25   the Aegis documents that were produced pursuant to subpoena,

G37LMIR2                           Galanter - cross

1    correct?

2    A.   Correct.

3    Q.   And we can expand the first half of the page.  Sorry, the

4    whole half.  Thank you.

5         And here the name of the patient, Alex B. Champion,

6    correct?

7    A.   Correct.

8    Q.   For the clinic, Dr. Moshe Mirilishvili, correct?

9    A.   Right.

10   Q.   Here is an indication result interpretation of compliant

11   high, correct?

12   A.   Correct.

13   Q.   And then there's an amount under the column normalized

14   result, correct?

15   A.   Yes.

16   Q.   In this report, how would a doctor know if there were

17   metabolites found in the patient?

18   A.   Just lists tested for opiates.  The only result is for

19   oxycodone.

20   Q.   So there's no specific indication here about metabolites?

21   A.   There are no additional, right, metabolites.  And there's

22   no indication on this report as to no metabolites found.

23   Q.   All this report says is oxycodone is found and, therefore,

24   the result interpretation is compliant but it's high?

25   A.   Correct.

G37LMIR2                        Galanter - cross

1    Q.  And then under the four columns that we've paid a lot of

2    attention to today, there's also a column in smaller print,

3    tested for opiates, oxycodone, and result positive.  It's the

4    same information, correct?

5    A.  Correct.

6    Q.  That's in the columns, the four columns that we've earlier

7    been talking about, correct?

8    A.  Some of the same, yes.  It also has the threshold limit on

9    the far right.

10   Q.  Then it says normalized result, it gives a total and a

11   confirmation of the threshold, correct?

12   A.  Yes.  It has, right, the confirmation of 100 nanograms per

13   mil, which is the lower threshold for something deemed to be

14   present.

15   Q.  So for this particular lab report, just on its face it

16   would indicate that the patient is taking the drug but it's --

17   and the patient is compliant with the prescription, right?

18   A.  Correct.

19   Q.  And the normalized result just indicate it as high?

20   A.  Correct.

21   Q.  OK.  You can take that down.

22           Now, you spoke earlier about what you typically see in

23   the medical offices that do pain management when you're

24   reporting on urine tests on direct examination; do you remember

25   that?

G37LMIR2                      Galanter - cross

1    A.   Yes.

2    Q.   High compliance of detection of a prescribed medication is

3    not something that's so unusual with respect to the kinds of

4    reports that you do on behalf of different clinics, correct,

5    for pain management?

6    A.   You said high compliance of the prescribed medication?

7    Q.   Yes.

8    A.   That would be the norm.

9    Q.   It's something that you regularly see in the pain

10   management compliance tests that you give to other medical

11   offices?

12   A.   The patients are compliant.

13   Q.   High compliance?

14   A.   Did you say high compliance earlier?  I was confused as to

15   the question then.

16   Q.   You do see in the services that you provide for other pain

17   management clinics, it is not unusual that high compliance are

18   some of the results that you see for pain management clinics,

19   correct?

20   A.   Well, by its definition, high compliance is the top two and

21   a half percent.  So physicians, a normal physician should

22   expect to see that two and a half percent of the time, but

23   every physician or patient practice is going to be different.

24   Q.   Let's break that down.  When you said high compliance is

25   top two percent, it means that the level of oxycodone in the

G37LMIR2                        Galanter - cross

1  urine is at that kind of high extreme in terms of your range

2  and your toxicology range of possibilities of concentration

3  levels?

4            THE COURT:  I don't understand that question at all.

5            MR. MAZUREK:  I will rephrase.

6  Q.  The compliance high threshold that we just saw on the

7  screen for oxycodone you're saying is something that has to be

8  at whatever the range --

9            THE COURT:  Hang on a second.

10           When you set, when your company sets the threshold for

11  the line between compliance and compliant high, does it pick a

12  number and then you have observed empirically that two and a

13  half percent of the time you get a compliant high result, or

14  does it look at the results and say let's go down to where we

15  have two and a half percent from the top and we'll draw the

16  line there and that's compliant high?

17           THE WITNESS:  Yes, your Honor, it's the latter.  We

18  look at the result.  Some period of time, and I don't know if

19  it gets adjusted from time to time -- it may, probably has.

20  The results, the broad results are looked at and the top two

21  and a half percent range is called out or figured out and then

22  going forward, we call that's out as compliant high.

23           THE COURT:  Thank you.

24           MR. MAZUREK:  Thank you, Judge.

25  Q.  So I guess my questioning on this issue is that one of the

1    things that a pain management clinic is doing with respect to a

2    reason why it has these tests in the first place is to try to

3    weed out people who may be doing things and doctoring their

4    urine test, right, that's one of the things that a urine test

5    report would be able to communicate?

6    A.   Correct.

7    Q.   So it's not unusual for these kinds of pain management

8    clinics to have results like the ones that we've just been

9    talking about because sometimes patients will do things to try

10   to avoid getting a bad result so that they continue to go to

11   the clinic and get the drug?

12   A.   It's not unusual to have those results occasionally.

13   Q.   Because that's one of the things that the pain management

14   clinics are trying to weed out by getting the reports from a

15   testing facility like yours?

16   A.   Correct.  They're looking for the occasional patient that

17   may not be acting in compliance.

18   Q.   Now, and it may result in the doctor asking for different

19   kinds of test, like the all pains test or the all tests

20   requested, to try to determine if a patient is doing things

21   that they're not supposed to be doing, for example?

22   A.   Correct.  They should be managing each patient.

23          (Continued on next page)

24

25

G377MIR3                          Galanter - redirect

1    BY MR. MAZUREK:

2    Q.  Do you know the date when Aegis communicated to Dr.

3    Mirilishvili's lab that they were no longer going to continue

4    with the relationship?

5    A.  It was in mid to the latter part of August, maybe around

6    August 20th of 2014.

7    Q.  Around August 20, 2014?

8    A.  Yes.

9    Q.  Did you communicate that directly to the doctor?

10   A.  I did not.

11   Q.  Did Charles Meyers, was he the one that was given the

12   responsibility to communicate it with the office?

13   A.  I believe he would have been the one who communicated it.

14            MR. MAZUREK:  I have nothing further, your Honor.

15            MR. DISKANT:  A very brief redirect, your Honor?

16            THE COURT:  Yes.

17            MR. DISKANT:  Ms. Joynes, if we can bring up in

18   evidence Government Exhibit 209, the 17th page.

19   REDIRECT EXAMINATION

20   BY MR. DISKANT:

21   Q.  Mr. Galanter, you were asked a number of questions about

22   this document on cross-examination.  Do you remember taking a

23   look at it?

24   A.  Yes.

25   Q.  And I believe your testimony was that there were a number

1  of reasons why you did not recognize it as a legitimate Aegis

2  document.

3  A.  Correct.

4  Q.  If we can focus on the very bottom of the page, just that

5  last box down at the very bottom.  And down at the very bottom

6  line it says AGEIS -- A-G-E-I-S -- Pain Comp.  Mr. Galanter,

7  does Aegis typically misspell its own name?

8  A.  No.

9  Q.  One other question.  On cross-examination you were asked a

10  number of questions towards the end there about whether it

11  would be usual or unusual for a pain management practice to see

12  certain types of things.  Do you remember those questions?

13  A.  Yes.

14  Q.  Did you view Dr. Mirilishvili as a usual pain management

15  provider?

16        MR. MAZUREK:  Objection.

17        THE COURT:  The objection is sustained.

18  Q.  Mr. Galanter, you testified on direct examination that

19  Aegis has approximately 2,000 pain management providers that it

20  provides compliance testing to?

21  A.  Correct.

22  Q.  How many of them have you terminated the services of?

23        MR. MAZUREK:  Objection.

24        THE COURT:  Objection overruled.

25  A.  I have terminated relationships with two physicians, Dr.

G377MIR3                          Galanter - recross

1     Mirilishvili and one other.

2              MR. DISKANT:  No further questions.

3     RECROSS EXAMINATION

4     BY MR. MAZUREK:

5     Q.  Mr. Galanter, with respect to the document that we just saw

6     on the screen, GX209 that you identified as not being an Aegis

7     document --

8     A.  Yes.

9     Q.  -- you have no idea who prepared that document, do you?

10    A.  I do not.

11             MR. MAZUREK:  I have nothing further.

12             MR. DISKANT:  Nothing further.

13             THE COURT:  You may step down.

14             THE WITNESS:  Thank you, your Honor.

15             (Witness excused)

16             THE COURT:  Does anybody need a break right now?  OK,

17    five minutes.  Keep an open mind.  And we will have our next

18    witness on the stand when the jury comes back.

19             (Recess)

20             (Jury present)

21             THE COURT:  OK.  Have a seat and get comfortable and

22    call your next witness, please.

23             MR. DISKANT:  The government calls Abraham Correa.

24

25

G377MIR3                        Correa – direct

1    ABRAHAM CORREA,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. DISKANT:

6    Q.  Good morning, Mr. Correa.

7    A.  Good morning.

8    Q.  When was the last time you were arrested?

9    A.  May of 2014.

10   Q.  What were you arrested for?

11   A.  Conspiracy to distribute oxycodone.

12   Q.  And can you tell us very briefly what you did that caused

13   you to be arrested for that crime?

14   A.  I was obtaining oxycodone prescriptions and selling them to

15   an undercover.

16   Q.  Where were you obtaining the oxycodone prescriptions from?

17   A.  From Dr. Moshe's office.

18   Q.  And who is Dr. Moshe?

19   A.  The gentleman wearing the black jacket, white shirt and

20   button down shirt, blue tie.

21           THE COURT:  Indicating the defendant.

22           MR. DISKANT:  Thank you, your Honor.

23   Q.  Aside from getting prescriptions from the defendant, did

24   you have any other relationship with him?

25   A.  Yes.

1    Q.   What was that relationship?

2    A.   I was an employee.

3    Q.   We are going to talk a lot more about that, but I first

4    want to ask you some questions about yourself.  How old are

5    you?

6    A.   44.

7    Q.   Are you married?

8    A.   No.

9    Q.   Do you have any children?

10   A.   Yes.

11   Q.   How many?

12   A.   Four.

13   Q.   How old is the eldest child?

14   A.   Ten.

15   Q.   The eldest or the youngest?

16   A.   24.

17   Q.   How far did you go in school?

18   A.   11th grade.

19   Q.   Why did you stop in 11th grade?

20   A.   I began to sell drugs at that time.

21   Q.   You dropped out of school?

22   A.   Yes.

23   Q.   What sorts of drugs have you sold in your lifetime?

24   A.   Crack cocaine, cocaine, marijuana, heroin and oxycodone.

25   Q.   OK.  And focusing on the time when you dropped out of high

G377MIR3                        Correa - direct

```
 1    school, what year was that?
 2    A.  About 1989.
 3    Q.  And what kind of drugs were you selling at that time?
 4    A.  Crack cocaine.
 5    Q.  Can you tell us briefly about your involvement in crack
 6    cocaine at that point.
 7    A.  At that point I was selling about 200 vials of crack
 8    cocaine.  They were going for $10 a piece.
 9    Q.  And were you working on your own or for someone?
10    A.  I was working somebody named Carlos.
11    Q.  Did there come a point when you stopped selling crack?
12    A.  Yes.
13    Q.  When was that?
14    A.  In 1990.
15    Q.  Why did you stop at that point?
16    A.  I was arrested.
17    Q.  Did you end up being convicted or pleading guilty of
18    anything?
19    A.  Yes.
20    Q.  Were you in prison?
21    A.  Yes.
22    Q.  For how long?
23    A.  Seven months.
24    Q.  Did you have further involvement in drug trafficking after
25    you got out of prison?
```

G377MIR3                        Correa - direct

1    A.  Yes.

2    Q.  When was your next involvement?

3    A.  In 1992 I began to sell heroin.

4    Q.  And can you tell us a little bit about your involvement in

5    heroin at that time.

6    A.  I was selling about 70 to 80 bundles of heroin, which

7    consisted of $10 bags.

8    Q.  OK.  Again, were you working on your own or working for

9    someone?

10   A.  No, I was working for someone named Chickee.

11   Q.  How long did you do that?

12   A.  For a couple of months.

13   Q.  What was your next involvement in narcotics trafficking?

14   A.  In about 1996.

15   Q.  What did you do at that time?

16   A.  I was selling crack cocaine.

17   Q.  And were you doing that on your own or working for someone?

18   A.  I was working for somebody named Carlos.

19   Q.  And tell us a little bit about the work you did for Carlos.

20   A.  I was selling about 100 vials of crack that were like $2 at

21   the time.

22   Q.  Individual use vials of crack you said?

23   A.  Yes.

24   Q.  By the way, where were you doing that?

25   A.  In the Bronx.

G377MIR3                        Correa - direct

1   Q.  Was there a time when you stopped selling crack for Carlos?

2   A.  Yes.

3   Q.  Why?

4   A.  I went on my own.

5   Q.  And when you went out on your own, what were you doing?

6   A.  I was selling heroin.

7   Q.  Tell us a little bit about your involvement in selling

8   heroin on your own.

9   A.  I was selling heroin about 1996, and I sold about 80

10  bundles of heroin a day.

11  Q.  What's a bundle?

12  A.  A bundle consists of ten bags that were $10 each.

13  Q.  Did there come a time when you stopped selling these

14  bundles of heroin?

15  A.  Yes.

16  Q.  When was that?

17  A.  1999.

18  Q.  What happened at that time?

19  A.  I was arrested.

20  Q.  Did you plead guilty, or were you convicted of anything at

21  that point?

22  A.  I pleaded guilty.

23  Q.  To what?

24  A.  To possession of heroin and possession of paraphernalia.

25  Q.  Did you go to prison at that time?

1   A.  No.

2   Q.  Why not?

3   A.  I had absconded from -- I had jumped bail.

4   Q.  You started to say you absconded.  You mean fled.

5   A.  Yes.

6           THE COURT:  He didn't say he absconded; he said he

7   jumped bail.

8   Q.  Did there come a point when you were arrested again?

9   A.  Yes.

10  Q.  When was that?

11  A.  In 2003.

12  Q.  What were you arrested for at that time?

13  A.  Possession of marijuana and for the warrant for not going

14  back to court.

15  Q.  And focusing on the marijuana, did there come a point when

16  you became involved in selling marijuana?

17  A.  Yes, in 2002.

18  Q.  When you were arrested in 2003, did you end up going to

19  prison?

20  A.  Yes.

21  Q.  For how long?

22  A.  For a year.

23  Q.  After you were released from prison, at that time did you

24  have further involvement in narcotics trafficking?

25  A.  Yes.

1   Q.  What kinds of drugs did you sell?

2   A.  I was selling marijuana and a small portion of cocaine.

3   Q.  Any further drug-related arrests during that time period?

4   A.  Yes, I was arrested in 2007.

5   Q.  What were you arrested for in 2007?

6   A.  Possession of marijuana.

7   Q.  Did you plead guilty or were you convicted of that offense?

8   A.  Yes.

9   Q.  And any other drug-related arrests?

10  A.  Yes.  In 2010 I was arrested for possession of marijuana

11  and a small portion of cocaine.

12  Q.  And what was the penalty imposed as a result of that?

13  A.  I was given five years' probation.

14  Q.  When did that term of probation end?

15  A.  I'm still on probation.

16  Q.  Aside from the drug arrests we have been talking about,

17  have you been arrested for anything else in your life?

18  A.  Yes.

19  Q.  What other things have you been arrested for?

20  A.  I was a arrested in 1992 for stolen vehicle.  I was

21  arrested in 1997 for an assault.  I was arrested in 1999 for

22  fraudulent instrument.  And I was arrested January '14 for

23  criminal mischief.

24  Q.  So let's talk about each of those one by one.  Tell us a

25  bit about the stolen car.

G377MIR3                          Correa - direct

1    A.   Somebody owed me some money for some drugs, and I had took

2    their car from them.

3    Q.   And you were arrested for that?

4    A.   Yes.

5    Q.   You pled guilty for that?

6    A.   Yes.

7    Q.   Did you go to jail for it?

8    A.   No.

9    Q.   The next arrest you mentioned was an arrest for an assault?

10   A.   Yes.

11   Q.   Tell us a bit about that.

12   A.   I was intoxicated and I was in a bar, and I got into a

13   fight.

14   Q.   Was there any penalty as a result of that?

15   A.   Yes, I pled guilty to a one year probation.

16   Q.   The next one you mentioned was an arrest for possession of

17   a fraudulent instrument.

18   A.   Yes.

19   Q.   Did you end up pleading guilty to that?

20   A.   Yes.

21   Q.   What made you guilty of that crime?

22   A.   I was in possession of fake insurance on my vehicle and

23   fake license plates.

24   Q.   And was there any punishment or penalty imposed for that

25   conviction?

G377MIR3                           Correa - direct

1    A.  Yes, I was given 30 days.

2    Q.  In jail?

3    A.  Yes.

4    Q.  And then the final one you had mentioned was criminal

5    mischief in 2014.  Tell us a bit about that.

6    A.  I was in a hotel in New Jersey, and I was drunk, and I

7    punched a hole through the wall.

8    Q.  When did that occur?

9    A.  January of 2014.

10   Q.  What was the penalty for that?

11   A.  I was given a fine.

12   Q.  During your adult life, have you had any sort of lawful

13   employment?

14   A.  Yes.

15   Q.  What sorts?

16   A.  Various jobs, maintenance, painting, stores.

17   Q.  Have you ever filed tax returns?

18   A.  Yes.

19   Q.  When was the last time you filed a tax return?

20   A.  About 2008.

21   Q.  OK.  The tax returns you filed, did they disclose all of

22   your income?

23   A.  No.

24   Q.  What have they omitted?

25   A.  I didn't report the money that I was making off the drugs.

1   Q.  Do you currently have any debts?

2   A.  Yes.

3   Q.  What debts?

4   A.  Child support.

5   Q.  How much do you owe?

6   A.  About 11,000 right now.

7   Q.  You testified at the outset that your last arrest was for

8   your involvement in selling oxycodone.

9   A.  Yes.

10  Q.  When did you first become involved in selling oxycodone?

11  A.  2012.

12  Q.  And what was your involvement at that time?

13  A.  At that time I was taking patients to Dr. Moshe's office so

14  they could get a oxycodone prescription.

15  Q.  And what would you do with the prescriptions once they were

16  written?

17  A.  Once they were written, I would take the patient to the

18  pharmacy, and they would give me back the pills, and I would

19  pay them.

20  Q.  What would you do with the pills?

21  A.  Excuse me?

22  Q.  What would you do with the pills?

23  A.  And I would sell them myself.

24  Q.  Did you see Dr. Moshe as a patient yourself?

25  A.  Yes.

G377MIR3                           Correa – direct

1    Q.  Did you get a prescription in your own name?

2    A.  Yes.

3    Q.  Did you fill it?

4    A.  Yes.

5    Q.  Did you see any other doctors during that time period for

6    oxycodone prescriptions?

7    A.  Yes.

8    Q.  Who did you see?

9    A.  I saw Dr. Lucas.

10   Q.  And where is Dr. Lucas located?

11   A.  At the time he was on 103rd and Broadway.

12   Q.  How many times did you see Dr. Lucas?

13   A.  Twice.

14   Q.  Did you get a prescription from him each time?

15   A.  Yes.

16   Q.  You were arrested you said in May of 2014?

17   A.  Yes.

18   Q.  At the time you were arrested, did you make any statements

19   to law enforcement?

20   A.  Yes.

21   Q.  Why?

22   A.  I agreed to cooperate.

23   Q.  And since that time have you continued to cooperate?

24   A.  Yes.

25   Q.  What does your cooperation consist of?

1   A.  My cooperation consists of me telling the truth, meeting

2   with government agents, meeting with the government, and making

3   audio and video recordings.

4   Q.  Have you ever been paid for your cooperation?

5   A.  No.

6   Q.  Have any of your costs been covered?

7   A.  Yes.

8   Q.  What costs?

9   A.  One time the government paid for my cell phone to be paid.

10  Q.  Do you know how much that cost?

11  A.  I believe it was $152.

12  Q.  At the time of your arrest, were you held in jail, or were

13  you released on bail?

14  A.  Released on bail.

15  Q.  Do you have an understanding of why?

16  A.  Yes.

17  Q.  What is your understanding?

18  A.  I was released on bail because I agreed to cooperate with

19  the government.

20  Q.  So you were arrested in May of 2014; is that right?

21  A.  Yes.

22  Q.  Since that time have you pled guilty to any crimes?

23  A.  Yes.

24  Q.  What crimes have you pled guilty to?

25  A.  Conspiracy to distribute oxycodone, conspiracy to

1   distribute marijuana, and getting medical insurance and food

2   stamps under false pretenses.

3   Q.  We talked a little bit about the oxycodone already and the

4   marijuana already.  Can you tell us what made you guilty of

5   that third crime you just mentioned.

6   A.  I was getting medical insurance and food stamps and not

7   disclosing my income.

8   Q.  What income?

9   A.  The income from the drugs.

10  Q.  At the time of your arrest, were you charged with the

11  marijuana charge or with the insurance charge that you just

12  mentioned?

13  A.  No.

14  Q.  Do you know how the government learned of those crimes?

15  A.  I disclosed that information to the government myself.

16  Q.  When?

17  A.  When I agreed on my cooperation.

18  Q.  What is the maximum possible penalty that you face as a

19  result of the three crimes you pled guilty to?

20  A.  70 years.

21  Q.  Have you been sentenced for those crimes yet?

22  A.  Yes.  No, no.

23  Q.  OK.  At the time you pled guilty, did you have an agreement

24  with the government?

25  A.  Yes.

1    Q.  Was it an oral agreement, or was it a written agreement?

2    A.  It was a written agreement.

3    Q.  Mr. Correa, I just handed you what has been marked for

4    identification purposes as Government Exhibit 1201.  Can you

5    take a look at that.  Do you recognize that document?

6    A.  Yes.

7    Q.  What is it?

8    A.  It's my cooperation agreement.

9    Q.  With the government?

10   A.  Yes.

11   Q.  If you turn to the last page of that document, any

12   signatures appear there?

13   A.  Yes.

14   Q.  Whose signatures?

15   A.  My signature, my lawyer at the time, and the government.

16   Q.  In that agreement what do you agree to do?

17   A.  I agree to tell the truth, I agree to meet with the

18   government, I agree to meet with the agents, and I agree to

19   make audio and video recordings.

20   Q.  And what is your understanding of what the government will

21   do if you do all of the things that are required of you?

22   A.  The government in return will give me what is called a 5K

23   letter.

24   Q.  What is your understanding of what a 5K letter is?

25   A.  A 5K letter will let the judge know of my case, that I have

G377MIR3                          Correa - direct

1    cooperated truthfully, I helped the agents, I made the

2    recordings, the videos, and it will also disclose my criminal

3    history.

4    Q.  Crimes that you've committed?

5    A.  Yes.

6    Q.  You said that letter is going to be written to the judge on

7    your case?

8    A.  Yes.

9    Q.  Has the government promised you a particular sentence in

10   return for your cooperation?

11   A.  No.

12   Q.  Who decides what sentence you are going to get?

13   A.  The judge.

14   Q.  Is the government going to recommend a particular sentence?

15   A.  No.

16   Q.  What sentence do you hope to get as a result of your

17   cooperation?

18   A.  No jail time.

19   Q.  To your understanding, does the outcome of this trial have

20   any impact on what sentence you get?

21   A.  No.

22            MR. MAZUREK:  Objection.  Calls for speculation.

23            THE COURT:  The objection is overruled.

24   Q.  I'm sorry.  Can you answer?

25   A.  No.

1   Q.  To your understanding, does the outcome of this trial have

2   any impact on whether or not the government will write that 5K

3   letter?

4   A.  No.

5   Q.  What does impact whether or not the government will write

6   that letter?

7   A.  If I don't tell the truth, or I don't meet with the

8   government, and if I don't make the recordings.

9   Q.  So what happens, to your knowledge, if you are found to be

10  untruthful?

11  A.  My agreement will be terminated.

12  Q.  Could you get up to 70 years in prison?

13  A.  Yes.

14          MR. DISKANT:  Your Honor, at this time the government

15  would offer Government Exhibit 1201.

16          MR. MAZUREK:  No objection.

17          THE COURT:  Admitted.

18          (Government's Exhibit 1201 received in evidence)

19  Q.  Mr. Correa, you testified earlier that you were on

20  probation at the time of the instant offense.

21  A.  Yes.

22  Q.  Did you report the arrest to your probation officer?

23  A.  Yes.

24  Q.  What happened?

25  A.  They put an order of violation in.

G377MIR3                           Correa - direct

1   Q.  Has there been any action on that order of violation yet?

2   A.  No.

3   Q.  Do you have an understanding of why or why not?

4   A.  To my understanding, they're waiting to see the outcome of

5   this case.

6   Q.  You mentioned that you first got involved in oxycodone in

7   2012.

8   A.  Yes.

9   Q.  How did that happen?

10  A.  I had a friend of mine named Obama, and he told me about a

11  guaranteed way of making money.  He had a doctor by the name of

12  Moshe, and we were guaranteed to take patients to get oxycodone

13  prescriptions.

14  Q.  Do you know Obama by any other names?

15  A.  Raymond Williams.

16  Q.  How long have you known Obama?

17  A.  For about four or five years.

18  Q.  And in addition to giving you this information on the

19  doctor guaranteed to write prescriptions, did Obama tell you

20  anything else about what you might need?

21  A.  He also told me that I would need an MRI and a referral.

22  Q.  Why?

23  A.  Because that's what the doctor required to see a patient.

24  Q.  Did you end up seeing Dr. Moshe as a patient?

25  A.  Yes.

G377MIR3                     Correa - direct

1    Q.  How many times?

2    A.  Four times.

3    Q.  When was the first of those visits?

4    A.  September 2012.

5    Q.  And do you remember that visit?

6    A.  Yes.

7    Q.  Can you tell us what happened.

8    A.  I had my appointment.  I went in to see the doctor.  I paid

9    him $200.  In return he gave me a receipt.  He had my MRI and

10   my referral, and he told me to give him a minute while he went

11   over my paperwork.  Then he gave me a brief description on the

12   diagram of the problem I was having.  He gave me a brief

13   examination, and then he gave me a prescription for oxycodone,

14   90 tablets.

15   Q.  And you mentioned that you gave him the MRI and the

16   referral.

17   A.  Yes.

18   Q.  Where did you get those documents from?

19   A.  I bought those documents from Obama.

20   Q.  The same Obama that we were talking about just a moment

21   ago?

22   A.  Yes.

23   Q.  How much did Obama charge you for those documents?

24   A.  $500.

25              MR. DISKANT:  OK.  If we could bring up, Ms. Joynes,

G377MIR3                          Correa - direct

1    what is in evidence as Government Exhibit 205, and turn to page

2    4 of that document.  This is in evidence.

3    Q.  Mr. Correa, do you recognize this document?

4    A.  Yes.

5    Q.  What is it?

6    A.  It's my MRI.

7    Q.  The MRI you purchased from Obama?

8    A.  Yes.

9    Q.  And according to the MRI, what does it indicate is wrong

10   with you?

11   A.  I had a problem with my lower back.

12           MR. DISKANT:  And, Ms. Joynes, if we can turn to the

13   second page of this document.

14   Q.  This is part of the same, Mr. Correa?

15   A.  Yes.

16   Q.  And then page 8, Mr. Correa, do you recognize this?

17   A.  Yes.

18   Q.  What is that?

19   A.  My referral.

20   Q.  And this is again a document that you purchased from Obama?

21   A.  Yes.

22   Q.  Have you ever been to Active Life Physical Therapy?

23   A.  No.

24   Q.  Have you ever seen a Clyde L. Smith?

25   A.  No.

G377MIR3                         Correa - direct

1    Q.   And according to this document, your chief complaint was

2    chronic lower back pain?

3    A.   Yes.

4    Q.   You mentioned you provided these documents to the doctor,

5    and he then gave you some sort of a physical exam?

6    A.   Yes.

7    Q.   What did that consist of?

8    A.   It consisted of walking from one end of the room to the

9    other, bending forward, bending back, standing on my toes and

10   standing on my heels.

11   Q.   And you said that at the end of the appointment the doctor

12   gave you a prescription for oxycodone?

13   A.   Yes.

14   Q.   What was the exact prescription for?

15   A.   For oxycodone, 90 tablets, 30 milligrams.

16   Q.   Did he give you any other prescriptions?

17   A.   Yes, he gave me other prescriptions, and he gave me a

18   prescription for a cervical collar.

19   Q.   Let's go through those bit by bit.  The cervical collar, do

20   you know what a cervical collar is?

21   A.   Yes.

22   Q.   What is it?

23   A.   It's a collar that's worn around the neck.

24   Q.   During your appointment with Dr. Moshe, at any point did

25   you indicate you had a neck problem?

G377MIR3                      Correa - direct

1    A.  No.

2    Q.  Did the doctor indicate why he was giving you a cervical

3    collar?

4    A.  No.

5             MR. DISKANT:  Ms. Joynes, if we can go to page 17 of

6    this exhibit.

7    Q.  Mr. Correa, do you recognize this?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's a prescription for a cervical collar.

11   Q.  And written on that date in September of 2012?

12   A.  Yes.

13            MR. DISKANT:  Ms. Joynes, if we can go to page 19 of

14   the exhibit.

15   Q.  What is this, Mr. Correa?

16   A.  It's a prescription for oxycodone, 30 milligrams, 90

17   tablets.

18   Q.  Let's turn to page 12 of this exhibit and focus in on that

19   top half.

20            Mr. Correa, directing your attention to the top left

21   corner -- I know it's a little small -- do you recognize the

22   name there?

23   A.  Yes.

24   Q.  Who is that?

25   A.  Myself.

G377MIR3                        Correa - direct

1    Q.  OK.  And if we go over to the right side of the document,

2    it says "seen by," and there is a name there ending in MD.  Do

3    you recognize that name?

4    A.  Yes.

5    Q.  Who is that?

6    A.  Dr. Moshe.

7    Q.  OK.  Going down to the chief complaint on the left side, it

8    says "neck, left shoulder pain, discomfort, numbness and

9    tingling sensations."  Do you see that?

10   A.  Yes.

11   Q.  During the appointment, did you indicate to the doctor that

12   you had neck or left shoulder pains?

13   A.  No.

14   Q.  You mentioned that one of the first things that happened

15   during the appointment was that you paid for it?

16   A.  Yes.

17   Q.  How much did you pay?

18   A.  $200 cash.

19   Q.  And who did you make the payment to?

20   A.  Directly to Dr. Moshe.

21   Q.  You mentioned you saw the doctor four times as a patient?

22   A.  Yes.

23   Q.  When was the next time?

24   A.  I believe about 30 days later.

25   Q.  OK.  What happened during that visit?

1    A.  I went to see Dr. Moshe, I paid him $200.  He gave me a

2    brief examination, some questions, and he gave me a

3    prescription for oxycodone.

4    Q.  When you came back to see the doctor the second time, were

5    you wearing that cervical collar he had written a prescription

6    for?

7    A.  No.

8    Q.  Did the doctor ask you why you weren't?

9    A.  No.

10   Q.  Any follow-up on the cervical collar?

11   A.  No.

12   Q.  When you first saw the defendant in September of 2012,

13   where were the defendant's offices located?

14   A.  He had various offices in the Bronx.

15   Q.  Do you remember a particular location you saw him at?

16   A.  My first visit was in the Bronx on 145th Street between

17   Willis and Third.

18   Q.  Can you describe that office space for us?

19   A.  It was office space with like two or three other doctors;

20   it was real small, nice, clean, limited patients.

21   Q.  You said limited patients.  There were other patients in

22   the patient room?

23   A.  Yes.

24   Q.  Can you describe them?

25   A.  Average patients, clean cut, nice and quiet.

1          MR. DISKANT:  Ms. Joynes, if we can put up for the

2    witness only what has been marked for identification purposes

3    as Government Exhibit 7-B.

4    Q.  Mr. Correa, do you recognize that photograph?

5    A.  Yes.

6    Q.  What is it of?

7    A.  It's the office I first seen Dr. Moshe at.

8          MR. DISKANT:  The government offers 7-B.

9          MR. MAZUREK:  No objection.

10         THE COURT:  Admitted.

11         (Government's Exhibit 7-B received in evidence)

12   Q.  Now, Mr. Correa, there is a sign above the door that says

13   BRC.  Was that sign there when you first saw the defendant?

14   A.  No, at the time it had another name on the door.

15   Q.  Otherwise does the building look the way it did at the time

16   that you were there?

17   A.  Yes.

18   Q.  Did there come a point where the defendant's location

19   changed?

20   A.  Yes, he had moved to several areas in the Bronx, and then

21   he moved to 162nd Street and Amsterdam Avenue.

22   Q.  162nd Street and?

23   A.  Amsterdam Avenue.

24   Q.  Here in Manhattan?

25   A.  Yes.

G377MIR3                              Correa - direct

1    Q.  When was that?

2    A.  November of 2012.

3    Q.  And directing your attention to what is in evidence as

4    Government Exhibit 4-S, do you recognize that?

5    A.  Yes.

6    Q.  What is that?

7    A.  That is Dr. Moshe's office.

8    Q.  Did you continue to see the defendant at that location?

9    A.  Yes.

10   Q.  What did you do with the prescriptions for oxycodone that

11   the defendant was writing for you?

12   A.  I would take them to a pharmacy that I was directed to, and

13   then I would get them and sell them.

14   Q.  You said that you were directed to.  Who directed you to a

15   pharmacy?

16   A.  Dr. Moshe.

17   Q.  Which pharmacy did Dr. Moshe direct you to?

18   A.  MNS Pharmacy on 168th Street and Amsterdam Avenue.

19   Q.  OK.  When did Dr. Moshe first direct you to MNS Pharmacy?

20   A.  On my first visit in September 2012.

21   Q.  And remind us, where did that visit occur?

22   A.  In the Bronx.

23   Q.  145th Street?

24   A.  Yes.

25   Q.  And the pharmacy was on 168th Street in Manhattan?

1   A.  Yes.

2          MR. DISKANT:  Ms. Joynes, if we can show the witness

3   what has been marked for identification purposes as Government

4   Exhibit 4-F.

5   Q.  Mr. Correa, do you recognize that?

6   A.  Yes.

7   Q.  What is that?

8   A.  That is the MNS Pharmacy.

9   Q.  On 168th Street?

10  A.  Yes.

11  Q.  Is that I fair and accurate depiction of the pharmacy?

12  A.  Yes.

13         MR. DISKANT:  The government offers Government Exhibit

14  4-F.

15         MR. MAZUREK:  No objection.

16         THE COURT:  Admitted.

17         (Government's Exhibit 4-F received in evidence)

18  Q.  When you went to MNS Pharmacy to fill the prescription that

19  the defendant had written for you, how did you pay the

20  pharmacy?

21  A.  $320 cash.

22  Q.  And to your knowledge did the pharmacy accept insurance?

23  A.  No.

24         MR. DISKANT:  Ms. Joynes, if we can go back for just a

25  moment to Government Exhibit 205, the 12th page -- maybe the

1    13th actually.

2    Q.  Mr. Correa, in addition to oxycodone, did the defendant

3    write you any other prescriptions?

4    A.  Yes.

5    Q.  What did he write you prescriptions for?

6    A.  Flexeril, Neurontin and Robaxin.

7    Q.  And do you know what those drugs are?

8    A.  No.

9    Q.  Are you familiar with the term Elavil?

10   A.  Excuse me?

11   Q.  Elavil?

12   A.  Yes, I've heard of it, but I don't know what it is.

13   Q.  Did the defendant ever prescribe it for you?

14   A.  Yes.

15   Q.  When you went to the pharmacy, did you fill just the

16   oxycodone prescription or all of the prescriptions?

17   A.  All the prescriptions.

18   Q.  Why?

19   A.  That's the only way to get the oxycodone.  That's what I

20   was told by the pharmacist.

21   Q.  So the $320 that you paid, was that just for the oxycodone

22   or for all of the prescriptions?

23   A.  For all of the prescriptions.

24   Q.  By the way, Mr. Correa, we have this document up.

25        Ms. Joynes, if we can blow up the diagnosis attached

G377MIR3                    Correa - direct

1    to the assessment section.

2              Mr. Correa, it looks like the fifth line down says

3    "Opioid type dependence, continues to use."

4              Do you see that?

5    A.  Yes.

6    Q.  Do you know what the term opioid dependence means?

7    A.  Being addicted to a drug.

8    Q.  Did Mr. Moshe ever discuss with you addiction?

9    A.  No.

10   Q.  Now, you mentioned that one of the things you did in

11   addition to seeing the defendant yourself was that you sent

12   other patients in to see Dr. Moshe.

13   A.  Yes.

14   Q.  Who were these people?

15   A.  People from my neighborhood, friends, friends of friends.

16   Q.  And what was your arrangement with them?

17   A.  I would pay them to go see the doctor so they could get a

18   guaranteed oxycodone prescription, and I would pay for

19   everything.

20   Q.  How much would you pay them?

21   A.  $200.

22   Q.  OK.  You said you would pay for everything.  What were some

23   of the other things you had to pay for?

24   A.  I had to pay for the doctor visit, which was $200.  I paid

25   for the MRI, which was $500.  And I also paid $50 for urine.

G377MIR3                              Correa - direct

1    Q.   For urine?

2    A.   Yes.

3    Q.   We are going to talk more about that in a minute, but

4    sticking with the MRI and the referrals, where would you get

5    those from?

6    A.   I would buy those from Obama.

7    Q.   And how much would he charge you?

8    A.   $500.

9    Q.   OK.  And you would cover the cost of the doctor's visit?

10   A.   Yes.

11   Q.   Which was how much?

12   A.   $200.

13   Q.   Did any of your patients use insurance to pay for that

14   visit?

15   A.   No.

16   Q.   What would happen after one of your patients had an

17   appointment with the defendant?

18   A.   Once they had their appointment, I would give them the

19   money so they could pay the doctor.  They would go in the

20   office, pay him $200.  That was the first thing they needed to

21   do.  Then the doctor would give them a receipt.  He would read

22   their MRI and referral.  He would give them a brief description

23   of what their problem was according to the MRI, give them a

24   brief examination, and then write them a prescription for

25   oxycodone.

G377MIR3                          Correa - direct

1   Q.  And what would you do with the prescriptions for oxycodone?

2   A.  I would take the patients with the prescription to a

3   pharmacy that they were directed to.  And in return they would

4   give me the oxycodone tablets, and I would pay them $200.

5   Q.  And what would you do with the tablets?

6   A.  I would sell them myself.

7   Q.  And how much would you sell them for?

8   A.  All the way up to $16.

9   Q.  $16 a pill?

10  A.  Yes.

11  Q.  So for a 90 tablet prescription that would be about 1440,

12  is that right?

13  A.  Yes, it is.

14  Q.  When did you start sending patients in to see the

15  defendant?

16  A.  August of 2012.

17  Q.  OK.  Around the same time that you started going in as a

18  patient yourself?

19  A.  First I sent the patients, then I went behind them,

20  following them up.

21  Q.  Now you mentioned that you paid $50 for urine.

22  A.  Yes.

23  Q.  OK.  Were you or your patients ever required to provide a

24  urine sample?

25  A.  Yes.

G377MIR3                        Correa - direct

1    Q.  What was your understanding of why?

2    A.  My understanding was they needed to give urine so that way

3    Dr. Moshe can see if they were taking the oxycodone.

4    Q.  OK.  Were any of your patients actually taking oxycodone?

5    A.  No.

6    Q.  So what would you do?

7    A.  I would take oxycodone tablets, crush them up and insert

8    them into my own urine.  Then I would go to the office and get

9    bottles and label them with the patient's name and distribute

10   the urine to different bottles.

11   Q.  Any of your patient ever have a problem doing that for

12   their urine sample?

13   A.  No.

14   Q.  You mentioned that you saw the defendant as a patient

15   yourself for about four months?

16   A.  Yes.

17   Q.  Did there come a point when your relationship with the

18   defendant changed?

19   A.  Yes, it did.

20   Q.  Tell us a little bit about that.

21   A.  In 2012, December 26, myself, Damon Leonard and Augustine

22   Cruz were called into his office, and he had asked us if any of

23   us wanted to be hired as a security guard for him.

24   Q.  Let's go through that step by step.  You are in the office

25   on December 26, 2012?

1    A.  Yes.

2    Q.  OK.  And you mentioned two other names, Damon Leonard and

3    Augustine Cruz.

4    A.  Yes.

5    Q.  Started withing Mr. Leonard, who is Mr. Leonard?

6    A.  Mr. Leonard at one point he was a boss and then he was a

7    patient, and then he became an employee.

8    Q.  You just used the term boss.  What is a boss?

9    A.  A boss is a person like myself who gets patients and pays

10   for everything so they can get an oxycodone prescription from

11   Dr. Moshe.

12   Q.  So there were other people doing what you were doing?

13   A.  Yes.

14   Q.  And Damon Leonard was one of them?

15   A.  Yes.

16   Q.  Who is Augustine Cruz?

17   A.  He was also another boss, a patient and later on an

18   employee.

19   Q.  So the three of you were in the defendant's clinic on

20   December 26, 2012?

21   A.  Yes.

22   Q.  Did you have an appointment to see the doctor that day?

23   A.  No, I did not.

24   Q.  So why were you in the office that day?

25   A.  I was there that day because I had patients that were going

1    to see the doctor.

2    Q.  How many times -- how frequently were you in the

3    defendant's clinic in that time period, December of 2012?

4    A.  About three to four times a week.

5    Q.  So the defendant calls the three of you into his office.

6    What happens next?

7    A.  He asks us if any of us wanted to take the position to be a

8    security guard for him at his front door.

9    Q.  Did you accept the job at that point?

10   A.  No, nobody accepted the job.  The following day I returned

11   on the 27th, and the doctor called me back into the office and

12   asked me if I was interested in the position, and at that time

13   I told him yes.

14   Q.  So you're back in the office December 27?

15   A.  Yes.

16   Q.  Do you have an appointment to see the defendant as a

17   patient that day?

18   A.  No.

19   Q.  So why are you back in the office that day?

20   A.  I had patients that I was taking to see the doctor.

21   Q.  And that day you decided to accept the job?

22   A.  Yes.

23   Q.  Why did you decide to accept it?

24   A.  I figured it was an easier way to get my patients in being

25   that I was going to be there on a daily basis, plus it was

G377MIR3                        Correa - direct

1    another way of getting income.

2    Q.  So when did you start working for the defendant?

3    A.  December 28.

4    Q.  2012?

5    A.  Yes.

6    Q.  At that point were you still seeing the defendant as a

7    patient?

8    A.  Yes.

9    Q.  When was the last time you saw the defendant as a patient?

10   A.  January 10, 2013.

11   Q.  So a couple weeks after you were hired?

12   A.  Yes.

13   Q.  Can you tell us a bit about that appointment.

14   A.  I went in for a follow-up appointment.  I saw the doctor, I

15   paid him his $200.  He gave me a brief examination.  He gave me

16   my prescription for oxycodone, and then at that point he told

17   me that he can no longer see me as a patient because I was an

18   employee.

19   Q.  He couldn't see you as a patient because why?

20   A.  Because I was an employee.

21   Q.  Mr. Correa, did the defendant refer you to a different

22   doctor?

23   A.  No.

24   Q.  Did he talk to you about alternative forms of treatment?

25   A.  No.

1   Q.  How much was the defendant paying you to be his security

2   guard?

3   A.  $480 a week.

4   Q.  How long did you work for the defendant?

5   A.  For about nine months.

6   Q.  And, by the way, when you showed up to work, were you ever

7   wearing the cervical collar he gave you?

8   A.  No.

9   Q.  Did the doctor ask if your lower back pain would permit you

10  to work as a security guard?

11  A.  No, he did not.

12  Q.  Let's talk about what some of your job responsibilities

13  were as a security guard.  Can you tell us a little bit about

14  them.

15  A.  Yes, my job as a security guard was to make sure that there

16  was no crowd in front of the office.  I needed to obtain

17  patient IDs to confirm with the patient list that we had for a

18  short time.  I also needed to take his car and retrieve his car

19  to the parking lot.  And also I was an interpreter.

20  Q.  So we're going to talk about each of those.  Before we do

21  that, when you started working for the defendant, were there

22  other employees in the office?

23  A.  Yes.

24  Q.  Who were they?

25  A.  There was a receptionist by the name of Jomaris and Oneida.

G377MIR3                          Correa - direct

1    Q.  And did they work at the same time or at different times?

2    A.  Oneida began first, and then shortly after Jomaris took

3    over.

4    Q.  Took over for Oneida?

5    A.  Yes.

6    Q.  What sorts of work did Jomaris do?

7    A.  She was in charge of all the paperwork for the patients

8    that were making an appointment.

9    Q.  Did the defendant have any nurses?

10   A.  No.

11   Q.  Who was in charge at the office?

12   A.  The doctor was in charge; he was the boss.  It was his way

13   or no way.

14   Q.  So can you describe your employee/employer relationship

15   with the defendant.

16   A.  It was horrible.  I mean he was really disrespectful.  He

17   would yell and curse at us in front of all the patients.  At

18   one point we had other doctors that he was real disrespectful

19   to him.

20   Q.  You mentioned there was another doctor in the office.

21   A.  Yes.

22   Q.  Can you tell us what you observed.

23   A.  From my observation he was a doctor that would give some

24   patients directed by Dr. Moshe an exam using some pads hooked

25   up to a machine that would give them like electrical shocks.

G377MIR3                        Correa - direct

1   Q.  OK.  And how long was that doctor there for?

2   A.  Probably about four or five months, I believe.

3   Q.  Did there come a point when he left?

4   A.  Yes.

5   Q.  Why?

6   A.  The doctor had told him -- Dr. Moshe had told that doctor

7   to do something, and they got into a heated argument in the

8   middle of the waiting room in front of everybody.

9   Q.  And how did that argument end?

10  A.  The doctor had -- Dr. Moshe had told the other doctor that

11  he had to leave, that he was the boss there.

12  Q.  OK.  So let's go back to your job.  You mentioned that one

13  of your jobs was to deal with the crowds outside.

14  A.  Yes.

15  Q.  How many patients would the defendant see on a typical day

16  during the time period that you were working there?

17  A.  About 30 or 40 patients a day.

18  Q.  And how much did it cost to see the doctor during that time

19  period?

20  A.  $200 cash.

21  Q.  Did the doctor accept insurance?

22  A.  Yes, but very limited.

23  Q.  What did you mean by that?

24  A.  He had instructed Jomaris out of 40 patients he would only

25  take five to six insurances a day.

1   Q.  And the he in that sentence is the doctor?

2   A.  Yes.

3   Q.  All right.  So let's talk about your day-to-day routine

4   while you were working there.  What time would you get to the

5   office on a typical day?

6   A.  I would arrive at the office at 7:30 in the morning.

7   Q.  And can you describe for us what you would observe when you

8   got there.

9   A.  On a daily basis there would be a large crowd in front of

10  the office waiting.

11  Q.  Waiting to get in?

12  A.  Yes.

13          MR. DISKANT:  Ms. Joynes, if we can put up for the

14  witness only what have been marked for identification as

15  Government's Exhibits 4-Q and 4-R.

16  Q.  Mr. Correa, do you recognize what is depicted in this image

17  or images?

18  A.  Yes.

19  Q.  What are we looking at?

20  A.  We are looking at the front of Dr. Moshe's office with an

21  array of patients waiting in front.

22  Q.  Is this a fair and accurate depiction of what you would see

23  when you would get to the office on a typical morning?

24  A.  Yes.  Sometimes that crowd would be a little bit larger.

25          MR. DISKANT:  The government offers 4-Q and 4-R.

1          MR. MAZUREK:  No objection.

2          THE COURT:  Admitted.

3          (Government's Exhibit 4-Q and 4-R received in

4     evidence)

5          MR. DISKANT:  Let's bring up 4-Q first.

6     Q.  All right.  So, Mr. Correa, could you walk us through this.

7     What are we looking at?

8     A.  We are looking at a crowd of patients that are waiting to

9     hand in their IDs and waiting for the doctor.

10    Q.  OK.  And you said that this was typical except sometimes

11    the crowds would be even larger?  Is that what you said?

12    A.  Yes.  As the day progressed, more and more patients came.

13    Q.  If we can go to 4-R.  You said that you would get to the

14    office at about 7:30?

15    A.  Yes.

16    Q.  What time would the defendant arrive?

17    A.  About 8 o'clock.

18    Q.  And how would he arrive?

19    A.  He would arrive driving his vehicle.

20    Q.  What kind of vehicle did he drive?

21    A.  He had a C300 Mercedes Benz in white.

22    Q.  And you mentioned that one of your job responsibilities

23    involved the car?

24    A.  Yes.

25    Q.  Tell us about that.

G377MIR3                          Correa - direct

1    A.  When he arrived in the morning, I would have to park his

2    car.  Then in the afternoons, I would have to retrieve his car.

3    Q.  Where did you park his car?

4    A.  Sometimes on the street but a lot of times in a parking

5    lot.

6    Q.  When the doctor arrived first thing in the morning, would

7    you and him have any sort of a conversation?

8    A.  Yes.  He would tell me to park his car, and on my way back

9    to the office to disperse the crowd that was standing in front

10   of the office, because a lot of times neighborhood people were

11   complaining.

12   Q.  Mr. Correa, did you come to know some of these people who

13   congregated outside the clinic?

14   A.  Yes.

15   Q.  How did you get to know them?

16   A.  Some of them I came to know because some of them were the

17   bosses, so I would interact with the boss, and they would let

18   me know what patients they have for the day, and they would

19   either give me the IDs, or they would give me a list of their

20   patients.

21   Q.  Let's talk about that.  Remind us, when you use the term

22   boss, what are you referring to?

23   A.  I'm referring to individuals, they would bring their own

24   patients in so they could receive a prescription of oxycodone

25   and they would pay for everything.

1   Q.  OK.  So you said that one of the things you would talk

2   about with the bosses is they would give you IDs?

3   A.  Yes.

4   Q.  Explain that.

5   A.  They would give me IDs to let me know who their patients

6   were so that way they would be attended first.

7   Q.  And they would get in?

8   A.  Yes.

9   Q.  I want to talk a bit about some of the bosses.

10          Ms. Joynes, could we bring up what I believe is in

11  evidence as Government Exhibit 4-D.

12          Mr. Correa, do you recognize anyone in this

13  photograph?

14  A.  Yes.

15  Q.  Who is that?

16  A.  That is myself and Obama.

17  Q.  The same Obama we were talking about a few moments ago?

18  A.  Yes.

19  Q.  Is Obama a boss?

20  A.  Yes, he is.

21  Q.  How do you know that?

22  A.  Because he told me himself.  I have known him for years.

23  Q.  Sorry?

24  A.  And I know him for years.

25  Q.  What sorts of conversations would you have with Obama

1    outside the clinic on a typical day?

2    A.  On a typical day he would come in the mornings or

3    afternoon, and he would let me know that he had patients

4    coming.  He would give me their names, or he would give me

5    their IDs.  Then at other times he would come when he had a

6    problem with his patients getting their prescriptions verified,

7    and he would let me know that he would have to speak to the

8    doctor.

9    Q.  Let's talk about the second part of that.  There were times

10   when Obama came and wanted to talk to the doctor directly?

11   A.  Yes.

12   Q.  And why did Obama indicate that he needed to talk to the

13   doctor?

14   A.  Because his patients were having problems getting their

15   prescriptions verified at the pharmacy.

16   Q.  Would Obama go see the doctor?

17   A.  Yes, I would let the doctor know that he was here, and then

18   when the doctor had a chance, he would come out, and then Obama

19   and the doctor would go in the room together.

20   Q.  There were a couple of different hes in there, so I just

21   want to clarify that.  And you would let the doctor know that

22   Obama wanted to see the doctor?

23   A.  Yes.

24   Q.  And then the doctor and Obama would meet?

25   A.  Yes.

1   Q.  Where would those meetings occur?

2   A.  In Dr. Moshe's office behind closed doors.

3   Q.  How frequently would Obama come and speak to the doctor

4   privately behind closed doors?

5   A.  Maybe about two or three times a week.

6   Q.  In addition to being a boss, was Obama also a patient?

7   A.  Yes, he was.

8   Q.  How do you know that?

9   A.  Because he told me himself, and he was also the one who

10  told me how to play this game.

11  Q.  Were there other bosses other than you and Obama?

12  A.  Yes, there was.

13  Q.  Who were some of them?

14  A.  A gentleman by the name of White, a gentleman by the name

15  of Dogs, Damon, Auggie Cruz, Curtis Sanders.

16  Q.  All right.

17           THE COURT:  Tell me when we have a good moment for a

18  break.

19           MR. DISKANT:  Now is fine, your Honor.

20           THE COURT:  OK.  So we're going to take a lunch break

21  now.  We are going to try to keep it to 50 minutes, and then we

22  will come back, and we will do a two hour sprint to the end of

23  the day.

24           As I told you last week, I committed to Cardozo Law

25  School months ago.  I teach one day a year there one of their

349

G377MIR3                          Correa - direct

1    first year classes, and it's today at 4.

2            OK.  So don't discuss the case over lunch.  Keep an

3    open mind, and we will see you at 20 after one -- 25 after one.

4            (Luncheon recess)

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

350

G37LMIR4

<pre>
 1                      AFTERNOON SESSION

 2                         1:29 p.m.

 3             (Jury not present)

 4             MR. DISKANT:  Your Honor, in this next segment, we

 5   anticipate playing some recordings and offering transcripts as

 6   aids to the jury.  We distributed binders next to the seats and

 7   I have a copy for the Court as well.

 8             THE COURT:  Thank you.  Hand it up.  I'll obviously be

 9   giving them instructions about that before we have the first

10   recording.

11             MR. DISKANT:  Certainly, your Honor.  Just so the

12   Court knows, there's a mix of English and Spanish on the

13   recordings.  The transcripts are exclusively in English.

14             THE DEPUTY CLERK:  We're down a juror.

15             THE COURT:  Then we can't do anything.

16             (Pause)

17             (Continued on next page)

18

19

20

21

22

23

24

25
</pre>

1          (Jury present)

2               THE COURT:  Get comfortable.

3               Sir, you are still under oath.

4     BY MR. DISKANT:

5     Q.  Mr. Correa, before we took our lunch break, you were

6     talking about some of the other bosses that you had gotten to

7     know while working as the security guard at the clinic.

8               Do you recall that?

9     A.  Yes.

10    Q.  And remind us, the bosses are who?

11    A.  The bosses are individuals like myself who get people to be

12    as patients so they can get oxycodone prescription from

13    Dr. Moshe and they pay for all expenses.

14    Q.  OK.  And I believe that you mentioned someone named White?

15    A.  Yes.

16    Q.  And someone named Dogs?

17    A.  Yes.

18    Q.  All right.  Mr. Correa, if I can direct your attention to

19    what has been marked for identification purposes as Government

20    Exhibit 4-K.  Bring that up.

21              Mr. Correa, do you recognize that individual?

22    A.  Yes.

23    Q.  Who is that?

24    A.  Dogs.

25    Q.  Is that a fair and accurate depiction of Dogs?

1  A.  Yes, it is.

2            MR. DISKANT:  Government offers 4-K.

3            MR. MAZUREK:  No objection.

4            THE COURT:  Admitted.

5            (Government's Exhibit 4-K received in evidence)

6  Q.  Mr. Correa, can you tell where this photograph was taken?

7  A.  This is on the side of Dr. Moshe's office.

8  Q.  How frequently would you see Dogs at the clinic?

9  A.  About three or four times a week.

10 Q.  Do you have a sense of why he was there?

11 A.  Yes.

12 Q.  What was that?

13 A.  His purpose was so he could bring his patients in to get a

14 prescription for oxycodone.

15 Q.  Did you and Dogs ever have conversations?

16 A.  Yes, we did.

17 Q.  What sorts of things did you talk about?

18 A.  He would come in the morning and let me know what patients

19 he had.  He would give me their IDs or list of the names of the

20 people that he had bringing in.

21 Q.  We can bring up what is in evidence as Government

22 Exhibit 6-A.  Mr. Correa, do you recognize this individual?

23 A.  Yes.

24 Q.  Who is that?

25 A.  Mr. White.

G37LMIR4                        Correa - direct

1   Q.  And who is Mr. White?

2   A.  He is also another boss that brought patients in to the

3   doctor's office.

4   Q.  Do you know Mr. White's first name?

5   A.  Thomas.

6   Q.  And the person that I was just asking you about that you

7   know as Dogs, do you know him by any other names?

8   A.  Yes, Joseph Gray.

9         MR. DISKANT:  Let's bring up Ms. Joynes, Government

10  Exhibit 4-A, which is in evidence.

11  Q.  Mr. Correa, do you recognize any of the individuals in this

12  photograph?

13  A.  Yes.  That is myself in the blue coat and Omar Sanders.

14  Q.  So let's talk about that individual.  You're on the left

15  side in the blue coat here?

16  A.  Yes.

17  Q.  Who is Omar Sanders?

18  A.  Omar Sanders is the individual with the black hat on in the

19  middle.

20  Q.  The one with what looks like a piece of paper in his hand?

21  A.  Yes.

22  Q.  Who is Omar Sanders?

23  A.  Omar Sanders at the time was the office manager for

24  Dr. Moshe, also a boss and also a patient.

25  Q.  So in addition to being an office manager, he was also

1    bringing patients of his own in?

2    A.  Yes.

3    Q.  You said he was also a patient as well?

4    A.  Yes.

5    Q.  So he saw the doctor himself?

6    A.  Yes.

7           MR. DISKANT:  Ms. Joynes, if we can bring up for the

8    witness only what have been marked for identification purposes

9    as Government Exhibits 4-B, C, and then E.

10   Q.  Mr. Correa, do you recognize these photographs?

11   A.  Yes.

12   Q.  How do you recognize them?

13   A.  Those are some of the bosses that were going to the

14   doctor's office.

15   Q.  Are you in some of those photographs as well?

16   A.  Yes.

17   Q.  Do they fairly and accurately depict a scene out outside

18   the clinic while you were working there?

19   A.  Yes, it is.

20          MR. DISKANT:  Government offers 4-B, 4-C, and 4-E.

21          MR. MAZUREK:  No objection.

22          THE COURT:  Admitted.

23          (Government's Exhibits 4-B, 4-C, and 4-E received in

24   evidence)

25          MR. DISKANT:  If we can start, Ms. Joynes, with 4-B.

G37LMIR4                          Correa - direct

1    Q.  So, Mr. Correa, is that you in the blue jacket?

2    A.  Yes, it is.

3    Q.  OK.  And just situate us, where are you?

4    A.  In front of Dr. Moshe's office.

5    Q.  And who is the other individual on the left-hand side of

6    this photograph?

7    A.  John Love.  He was another boss and also a patient.

8    Q.  And how did you know John Love was a boss?

9    A.  I had several conversations with him about it.

10   Q.  Let's look at 4-C.  Mr. Correa, are you in this photograph?

11   A.  Yes.

12   Q.  Where are you?

13   A.  In between Damon Leonard with the brown coat and John Love

14   with the beige coat.

15   Q.  You're the black hat on towards the back of the photo?

16   A.  Yes.

17   Q.  You mentioned Damon Leonard in this photograph?

18   A.  Yes.

19   Q.  Is that the same Damon Leonard you were telling us about

20   before lunch?

21   A.  Yes, it is.

22   Q.  Who was in that meeting with you and the doctor about the

23   job?

24   A.  Yes.

25   Q.  Can you identify Mr. Leonard in this photograph?

1   A.  He's wearing a gray hat with a brown coat, holding a cell

2   phone to his face.

3   Q.  And 4-E.  Do you recognize anyone in this photograph?

4   A.  Yes.  The individual in the middle with the black hat,

5   black coat, holding a cell phone to his face, is Curtis

6   Sanders.

7   Q.  The individual facing towards the camera?

8   A.  Yes.

9   Q.  Curtis Sanders is a name who came up before our lunch

10  break.  Remind us who he is.

11  A.  He is also a boss and a patient.

12  Q.  And how did you know he was a boss?

13  A.  I had several conversations with him.

14  Q.  What kinds of conversations?

15  A.  He would come and let me know the days that he had patients

16  and the names of his patients.

17  Q.  And why would these bosses let you know that information?

18  A.  So it would make it easier for their patients to come in to

19  see the doctor.

20  Q.  So you testified that part of your job was to stand at the

21  front door to check IDs; is that right?

22  A.  Yes.

23  Q.  In that capacity, did you develop a sense of what

24  percentage of the patients coming in were working for a boss?

25  A.  Yes.

1   Q.  How did you develop that sense?

2   A.  Because when the bosses came, they would let me know whose

3   patient they was.  So on an average day, we would have anywhere

4   from 30 to 40 patients a day.  And mostly about -- if there was

5   40 patients, about 35 of them were under somebody.

6   Q.  And by under somebody, you mean working for one of the

7   bosses?

8   A.  Yes.

9   Q.  Let's talk a bit about the appointment system.  If you were

10  a new patient who wanted to schedule an appointment with the

11  defendant, could you walk into the clinic and make an

12  appointment?

13  A.  No, you could not.

14  Q.  Why not?

15  A.  Because I wouldn't let you in unless you was with a boss or

16  somebody through you.

17  Q.  How about if you wanted to call the phone and make an

18  appointment, did that work?

19  A.  No.

20  Q.  Why not?

21  A.  Most of the time the phone was either unplugged or the

22  phone just wasn't answered.

23  Q.  So if you wanted to schedule an appointment to see the

24  doctor, how would you do it?

25  A.  If I knew you through somebody else or somebody recommended

1    you, they would have to pay to get in to see the doctor.

2    Q.  And how much would it cost?

3    A.  It would cost $200.

4    Q.  And when you say pay to see the doctor, who would they have

5    to pay?

6    A.  They will have to pay me or pay the receptionist Jomaris.

7    Q.  You would charge $200 to help get them in?

8    A.  Yes.

9            MR. DISKANT:  If we can put up for the witness only

10   what has been marked as Government Exhibit 1-H.

11   Q.  Mr. Correa, do you recognize what's depicted in that

12   photograph?

13   A.  Yes.

14   Q.  How do you recognize it?

15   A.  It's called what we call the black ball list.

16   Q.  Something you saw while you were working at the clinic?

17   A.  Yes.

18   Q.  Is that a fair depiction of it?

19   A.  Yes.

20           MR. DISKANT:  Government offers 1-H.

21           MR. MAZUREK:  No objection.

22           THE COURT:  Admitted.

23           (Government's Exhibit 1-H received in evidence)

24   Q.  So, Mr. Correa, there seems to be a piece of paper and then

25   a benefits card attached to some piece of wood or to a wall.

1   Is that correct?

2   A.  Yes, there is.

3   Q.  Where is this particular sign hung?

4   A.  Behind the reception's desk, next to the computer.

5   Q.  In the defendant's office?

6   A.  Yes.

7   Q.  What is a black ball list?

8   A.  A black ball list consists of names that bosses or either

9   myself or Jomaris would put the individuals on the list and

10  they couldn't see the doctor.

11  Q.  So you or Jomaris would make the decision that these

12  patients couldn't come back?

13  A.  Yes.

14  Q.  Where was that sign hung again?

15  A.  Behind the reception's desk in the office.

16  Q.  You testified a bit before the break about the crowds that

17  would gather at the clinic every day?

18  A.  Yes.

19  Q.  Would all of the patients who had gathered on a given day

20  get to see the doctor that day?

21  A.  No, they would not.

22  Q.  Why not?

23  A.  Sometimes there would be too many, too many people at one

24  day to see the doctor, or sometimes the doctor would just cut

25  the day short.

1   Q.  What would happen under those circumstances if the

2   defendant cut the day short, for example?

3   A.  The remaining patients would have to come back the

4   following day to be seen early in the morning.

5   Q.  You mentioned that a part of your job was to check IDs at

6   the door?

7   A.  Yes.

8   Q.  What were you looking for?

9   A.  I was looking for names to match the patient list that we

10  have a short time to see if they have an appointment for that

11  date.

12  Q.  If they didn't have an appointment, what would you do?

13  A.  They wouldn't be seen that day.

14  Q.  Who told you to do that?

15  A.  Dr. Moshe told me to do that.

16  Q.  Did he indicate why he wanted you to do that?

17  A.  He wanted to make sure that the patients are on that list

18  and to make sure that nobody from law enforcement was coming

19  into the office.

20  Q.  Mr. Correa, I'm handing you what has been marked for

21  identification purposes as Government Exhibit 444.  Do you

22  recognize these documents?

23  A.  Yes.

24  Q.  What are they?

25  A.  It's a patient list for the day.

G37LMIR4                          Correa – direct

1   Q.  Are these the sorts of documents that you saw while working

2   for the defendant?

3   A.  Yes, they are.

4           MR. DISKANT:  Government offers Government

5   Exhibit 444.

6           MR. MAZUREK:  No objection.

7           THE COURT:  Admitted.

8           (Government's Exhibit 444 received in evidence)

9   Q.  So we're looking at a patient sign-in for Thursday, 18

10  April 2013?

11  A.  Yes.

12  Q.  You were working at that time?

13  A.  Yes, I was.

14  Q.  If we go over to the left side of the page, there are a

15  series of times indicated, 8:15, 8:30.  How did that work in

16  practice, did patients actually have appointment times?

17  A.  No, it was not.  It was a first come, first serve basis.

18  Q.  Were there ways of jumping the line?

19  A.  Yes, there was, if you would either pay me or pay Jomaris

20  to skip people.

21  Q.  Once inside the clinic, can you describe the scene inside?

22  A.  There would be probably about 20, 25 patients waiting in

23  the area watching television and speaking amongst each other.

24  Q.  OK.  And how about the defendant, where would be defendant

25  be?

1    A.  The defendant would be in his office.

2    Q.  You mentioned before we took our break that the majority of

3    patients were paying cash?

4    A.  Yes.

5    Q.  Who would the cash be paid to?

6    A.  Directly to Dr. Moshe.

7    Q.  Did Dr. Moshe ever have employees collect the cash for him?

8    A.  No, never.

9    Q.  Were there any problems with the doctor in collecting cash?

10   A.  Yes, sometimes there was.

11   Q.  Tell us about that.

12   A.  Sometimes patients would go in and they wouldn't have the

13   $200 to pay the doctor.  So the doctor would throw the patient

14   out his office, come out screaming and ask who brought the

15   patient, whose patient this person belongs to.

16   Q.  So when the defendant would come out screaming who brought

17   this patient, who does the patient belong to, what did you

18   understand him to mean?

19   A.  He wanted to know what boss brought this patient in without

20   their money.

21   Q.  To your understanding, was the defendant aware there was

22   bosses in the clinic?

23   A.  Yes.

24   Q.  What was the defendant's demeanor when he would come out

25   asking whose patient it was?

1    A.  He would be very upset, very disrespectful, cursing, very

2    loud.

3    Q.  Do you have an understanding of why he was upset?

4            MR. MAZUREK:  Objection.  Calls for speculation.

5            THE COURT:  The objection is sustained.

6    Q.  Were there other times when the defendant was visibly upset

7    in the office?

8    A.  Yes.

9    Q.  Can you tell us about those?

10   A.  There would be times when patients went in with their MRI

11   referral and their paperwork wasn't no good.  So instead, the

12   doctor would have to return the money because the first thing

13   you do is pay the doctor before anything.

14   Q.  He was upset because he had to return the money?

15   A.  Yes.

16   Q.  How about anything else?

17   A.  He would be upset if I left my post.  He would be upset if

18   the phones were ringing unanswered.

19   Q.  Would the doctor ever talk with you or the office staff

20   about the number of patients being seen?

21   A.  He would want a certain amount of patients as long as it

22   corresponded with the time he would be there.  But he made it

23   specific that he wanted more cash than insurance.

24   Q.  Mr. Correa, if we can bring up what's in evidence as

25   Government Exhibit 1-A.  Dr. Correa, do you recognize that

G37LMIR4                          Correa - direct

1    room?

2    A.   Yes.

3    Q.   What is that?

4    A.   It is the therapy room.

5    Q.   The physical therapy room?

6    A.   Yes.

7    Q.   Where?

8    A.   In Dr. Moshe's office.

9    Q.   While you were a patient, did you ever do physical therapy

10   at the clinic?

11   A.   No.

12   Q.   And how about your patients, the people that you were

13   bringing in to see the doctor, did any of them do physical

14   therapy in this room?

15   A.   No, never.

16   Q.   While you were working there, how much did physical therapy

17   cost?

18   A.   $100 per person.

19   Q.   Was there always a physical therapist in the office?

20   A.   No, there was not.

21   Q.   Can you tell us about that?

22   A.   Sometimes we would have a physical therapist like three or

23   four day days out of the week, or sometimes we would go without

24   one for about a month, month and a half.

25   Q.   To your understanding why would there be a month, month and

1   a half where a physical therapist wasn't there?

2   A.   Because the way the doctor spoke to the therapist in a very

3   disrespectful way, they wouldn't tolerate it so they wouldn't

4   come back to work.

5   Q.   The therapist would quit?

6   A.   Yes.

7   Q.   Did that happen once or more than once?

8   A.   More than once.

9   Q.   You mentioned part of your job was to serve as an

10  interpreter for the defendant?

11  A.   Yes.

12  Q.   What did that entail?

13  A.   If a patient did not speak English, then I would go in the

14  office and explain to the patient what the doctor was

15  describing to him.

16  Q.   What language were you typically interpreting into?

17  A.   English to Spanish.

18  Q.   Did the defendant speak any Spanish?

19  A.   Yes, a little bit.

20  Q.   Where would these patient visits that you were interpreting

21  take place?

22  A.   Inside his office.

23        MR. DISKANT:   So if we can bring up, Ms. Joynes,

24  Government Exhibit 1-C.

25  Q.   Mr. Correa, do you recognize that?

G37LMIR4                          Correa - direct

1   A.  Yes.

2   Q.  Who is that?

3   A.  That is a picture of the doctor's office.

4   Q.  This is where the defendant would see the patients?

5   A.  Yes.

6   Q.  How big is this room?

7   A.  Not big at all.  Very small.

8   Q.  How frequently would you serve as an interpreter for the

9   defendant?

10  A.  About three or four times a week.

11  Q.  So once a day or maybe a little bit less?

12  A.  Yes.

13  Q.  Do you remember a patient named Jose Lantigua?

14  A.  Yes, I do.

15  Q.  When did you first meet him?

16  A.  June of 2013.

17  Q.  And how did you come to meet him at that point?

18  A.  Jose Lantigua approached me asking me how he can get into

19  the office to get an appointment to see the doctor.

20  Q.  Was Jose Lantigua working for or under a boss at that time?

21  A.  No, he was not.

22  Q.  Did you help him get into the office?

23  A.  Yes, I did.

24  Q.  How did you help him?

25  A.  I instructed him what he needed to see the doctor and how

1   much it was going to cost for him to see the doctor.

2   Q.  What did you tell him he needed to see the doctor?

3   A.  I told him that he would need an MRI and a referral.

4   Q.  And with respect to cost, what did you tell him?

5   A.  I told him that he had to pay the doctor $200, plus he had

6   to give me something or Jomaris something to get in.

7   Q.  Did he give you something?

8   A.  Yes, he did.

9   Q.  Do you remember how much he gave you?

10  A.  No, I don't.

11  Q.  What did you typically charge in that time period to help

12  people get into the office?

13  A.  $200.

14  Q.  Now, you mentioned that you helped Mr. Lantigua get in to

15  see the defendant?

16  A.  Yes.

17  Q.  Were you present for that initial visit between

18  Mr. Lantigua and the defendant?

19  A.  Yes, I was.

20  Q.  Why were you present?

21  A.  I needed to interpret for Mr. Lantigua.

22  Q.  What language did Mr. Lantigua speak?

23  A.  Spanish.

24  Q.  And the defendant was operating primarily in English?

25  A.  Yes, he was.

G37LMIR4                           Correa - direct

1   Q.  You mentioned that this initial encounter was in June of

2   2013?

3   A.  Yes.

4   Q.  Have you since learned that that visit was recorded?

5   A.  Yes, I did.

6   Q.  Did you know it was being recorded at that time?

7   A.  No, I did not.

8   Q.  At that time had you been arrested?

9   A.  No.

10  Q.  So you were still working outside the defendant's office?

11  A.  Yes, I was.

12  Q.  Have you had a chance to review the recording of that

13  meeting?

14  A.  Yes, I have.

15  Q.  Can you tell us in general terms what happens?

16  A.  What happens is Mr. Lantigua comes in for a typical visit.

17  He hands the doctor $200.  The doctor already has an MRI and

18  referral.  The doctor tells him to give him a minute while he

19  reads over his paperwork, gives him a description of what his

20  problem was, showing him on a diagram.  Then the doctor gives

21  him a brief examination and then gives him a prescription for

22  oxycodone among other prescriptions.

23  Q.  Mr. Correa, I'm handing you a disc that has been marked as

24  Government Exhibit 1101.  Do you recognize that disc?

25  A.  Yes, I do.

1   Q.  How do you recognize it?

2   A.  Those are my initials on the disc.

3   Q.  You signed the disc?

4   A.  Yes.

5   Q.  Before signing the disc, did you review what was on it?

6   A.  Yes, I did.

7   Q.  What was on it?

8   A.  The recording of the initial visit.

9   Q.  The whole visit?

10  A.  Yes.

11  Q.  Were you able to identify the voices on the recording?

12  A.  Yes, I did.

13  Q.  Whose voices did you hear?

14  A.  Myself, Mr. Lantigua, and Dr. Moshe.

15  Q.  Does the recording generally comport with your memory of

16  that visit?

17  A.  Yes, it does.

18  Q.  Anything seem to be left out?

19  A.  No, it does not.

20          MR. DISKANT:  Your Honor, at this time the government

21  would offer Government Exhibit 1101.

22          MR. MAZUREK:  No objection, your Honor.

23          THE COURT:  Admitted.

24          (Government's Exhibit 1101 received in evidence)

25  Q.  Mr. Lantigua, in addition to reviewing the recording, have

1   you also reviewed a transcript that has been prepared of that

2   recording?

3   A.  Yes, I have.

4   Q.  I'm handing you a binder and the first tab of that binder

5   is marked 1101-T.  Ask you to take a look at that.  Do you

6   recognize that?

7   A.  Yes.

8   Q.  Is that a transcript of the recording that we have been

9   talking about?

10  A.  Yes, it is.

11  Q.  Are there some portions of the recording that occurred in

12  Spanish?

13  A.  Yes, there is.

14  Q.  On the transcript you're looking at, has the Spanish been

15  translated into English?

16  A.  Yes.

17           MR. DISKANT:  At this time, your Honor, the government

18  would seek permission to publish the transcript as an aid to

19  the jury.

20           MR. MAZUREK:  No objection, your Honor.

21           THE COURT:  OK.  So let me tell you what's going to

22  happen.  We're actually going to be I think listening to some

23  tape recordings.  And in back of your chairs are binders that

24  were placed there during lunch.  Don't open them yet.  They are

25  the transcripts, same transcripts that the witness has.

1     The transcripts were prepared to assist you in

2   listening to the tapes and especially the tapes that are in

3   Spanish.  They are not the evidence in the case.  The tapes are

4   actually the evidence in the case.  If, for example, you were

5   to hear some difference between what you thought a witness was

6   saying on the tape and the transcript, it's what you hear that

7   controls.

8        Now, there's a caveat to that.  I don't know if any of

9   you folks speak Spanish.  A few of you I think do.  The

10   translations are the evidence in that case.  If our translator

11   made a mistake, the translations are the evidence.  If we had a

12   witness who was testifying here in Spanish and we had an

13   interpreter who was giving you simultaneous interpretation,

14   what the interpreter said in English would be the evidence in

15   the case, OK.  You can't turn yourself into a witness.  We went

16   through that before.

17        So, the transcripts, you can look at them or not as

18   you're listening to the tapes.  Please don't just leaf through

19   the binder.  I will tell you when to open the binder and what

20   to open the binder to.  All right.

21        MR. DISKANT:  Thank you, your Honor.  We then ask the

22   Court to instruct the jurors to turn to the second page of the

23   first transcript in the binder.

24        THE COURT:  OK.  Page 2 of the first transcript.

25        MR. DISKANT:  Ms. Joynes, if we could begin the

G37LMIR4                        Correa - direct

1    recording at 1:05:10.  Go ahead.

2                 (Audio recording played)

3    Q.  Mr. Correa, just situate us.  The first voice we heard was

4    a voice speaking in Spanish.  Who is that?

5    A.  Myself.

6    Q.  And just to the transcript, you say in Spanish this is

7    Dr. Michael Mirilishvili at line 8, correct?

8    A.  Yes.

9    Q.  Then we hear a voice in English say, he has to pay for the

10   visit.  Whose voice is that?

11   A.  Dr. Moshe.

12   Q.  And just working off the transcript, you said you had a

13   chance to review this transcript before?

14   A.  Yes, I have.

15   Q.  Where things appear in underline on the transcript, what

16   language are they being spoken in?

17   A.  In English.

18   Q.  OK.  And where things appear not underlined, is that a

19   translation of the Spanish on the recording?

20   A.  Yes, it is.

21   Q.  OK.  So the first thing that the defendant says that we

22   just heard is he has to pay for the visit?

23   A.  Yes, he does.

24   Q.  What's happening there?

25   A.  The patient has to pay for his visit before the doctor can

1    do anything.

2              THE COURT:  No.  What was happening when that was

3    said, do you recall what was going on in the office when those

4    words were said?

5              THE WITNESS:  I don't understand the question.

6    Q.  We're only listening.  We don't have eyes in the room.

7    A.  Right.

8    Q.  So what the Court was asking is when the defendant says he

9    has to pay for the visit, do you recall what was going on at

10   that time?

11   A.  Yes.  The doctor was telling the patient Lantigua that he

12   has to pay for his visit.

13   Q.  How did Jose pay for the visit?

14   A.  $200 cash.

15             MR. DISKANT:  Can you play it.

16             (Audio recording played)

17   Q.  When the defendant says I need some time to read this

18   paper, what was going on?

19   A.  Dr. Moshe is telling the patient Lantigua that he needs to

20   read his MRI and his referral.

21             MR. DISKANT:  Ms. Joynes, can we go to 1:09:05.  And

22   for jurors who want to follow along, I believe that's on page 7

23   of the transcript at line 10.

24             (Audio recording played)

25   Q.  Mr. Correa, what is going on here?

G37LMIR4                          Correa - direct

1  A.  At this time the Doctor Moshe has already read the

2  patient's MRI and referral and the doctor is describing to him

3  on the diagram that's in the office what his problem is.

4            MR. MAZUREK:  Judge, I'm going to object under rule of

5  completeness to ask to hear the recording as it was taped.

6            THE COURT:  If you want something on the rule of

7  completeness, you can do it on cross.

8  Q.  You said he was doing something on a diagram?

9  A.  Yes.

10  Q.  And at this point in the visit, has the doctor asked the

11  patient what is wrong him?

12  A.  No, he was not.

13  Q.  Has he asked what's brought him in for that day?

14  A.  No.

15            MR. DISKANT:  Keep going.

16            (Audio recording played)

17  Q.  Mr. Correa, you heard the doctor say "for your lower back

18  pains"?

19  A.  Yes.

20  Q.  Prior to that, had Jose been asked where he was hurting?

21  A.  No, not at all.

22  Q.  Had he been asked any questions about his pain?

23  A.  No.

24            MR. DISKANT:  Keep going.

25            (Audio recording played)

1    Q.  Mr. Correa, do you recognize that question?

2    A.  Yes, I do.

3    Q.  How do you recognize it?

4    A.  Because it was part of a script of a question that were

5    asked every day to every patient.

6              MR. DISKANT:  Keep going.

7              (Audio recording played)

8    Q.  So, Mr. Correa, there's a back and forth there and the

9    doctor is asking about whether or not the CS has been to the

10   hospital?

11   A.  Yes.

12   Q.  Does the CS indicate that he's been seen at the hospital?

13             MR. MAZUREK:  Objection.

14   A.  No, he has not.

15             THE COURT:  Excuse me.  Hang on.

16             MR. MAZUREK:  The record speaks for itself, your

17   Honor.

18             THE COURT:  Correct.  The record speaks for itself.

19   What the CS says, we've heard.  OK.

20             (Audio recording played)

21   Q.  The CS in response to the question what medicine are you

22   taking says M30.  What is M30?

23             MR. MAZUREK:  Objection, lack of foundation.

24   Q.  What is your understanding of what M30 means?

25             THE COURT:  Do you know what M30 is, sir?

G37LMIR4                        Correa - direct

1              THE WITNESS:  Yes.

2              THE COURT:  What is it?

3              THE WITNESS:  It's a terminology that us drug dealers

4    use to identify oxycodone, 30 milligrams.  It's also imprinted

5    on the pills when you receive them.

6              (Audio recording played)

7              MR. DISKANT:  If we could bring back up for a minute

8    Government Exhibit 1-C.

9    Q.  Mr. Correa, the examination that we're listening to is

10   happening in this room, correct?

11   A.  Yes, it is.

12   Q.  So when the defendant says now walk for me, approximately

13   how far is Jose walking?

14   A.  About three or four steps towards the wall and then back.

15   Q.  And while conducting this examination, does the doctor ask

16   whether or not any of the things he's asking Jose to do are

17   causing pain?

18   A.  No, he does not.

19              (Audio recording played)

20   Q.  Mr. Correa, since we don't have eyes in the room, can you

21   describe for us what is happening during this last few

22   exchanges?

23   A.  The doctor is examining his legs and telling him he has

24   varicose veins.  And the doctor is telling him he needs to be

25   careful because he can catch a blood clot.

1           THE COURT:  I am very confused.  Let me stop right

2    here.  It is not appropriate for you to ask these questions if

3    all the witness is going to do is tell us what was said on the

4    tape.

5           MR. DISKANT:  Agreed, your Honor.  Maybe my question

6    was confusing.

7           THE COURT:  Sir, we don't want you to repeat what was

8    said on the tape.  What was going on in the room?  Was somebody

9    jumping up and down and clapping his hands while that was said?

10   Was somebody turning around in circles while that was said?

11   Was the doctor doing something?  Was the speaker doing

12   something?  That's what we want to know.  We don't want you to

13   repeat what the people said.

14          THE WITNESS:  OK.

15   Q.  Mr. Correa, during a typical examination, would the

16   defendant have his patients disrobe?

17          MR. MAZUREK:  Objection.  Calls for speculation as to

18   what the doctor did in a typical examination.

19          THE COURT:  Let's stick with examination.

20          Were you present for examinations of patients?

21          THE WITNESS:  Yes.

22          THE COURT:  OK.  Let's stick to the ones that you were

23   present for, all right.  We're not going to talk about typical.

24   We're going to talk about the ones that this patient was

25   present for, and let's not ask hypothetical questions.

1           On any occasion when you were present for an

2      examination, did the doctor ask the patient to disrobe?

3           THE WITNESS:  No.

4           THE COURT:  Next question.

5           MR. DISKANT:  Keep going with the recording.

6           (Audio recording played)

7      Q.  Mr. Correa, just going a few lines back you heard the

8      doctor recommend surgery?

9      A.  Yes, I did.

10     Q.  Having sat in on this patient visit, did you have an

11     understanding of what Jose was supposed to be having surgery

12     for?

13     A.  No, I did not.

14          MR. MAZUREK:  Objection, your Honor.

15          THE COURT:  He said no, he did not, so that's fine.

16     He didn't have an understanding.

17     Q.  Dr. Mirilishvili then says, I'll give you enough medication

18     to keep you comfortable?

19     A.  Yes.

20     Q.  We talked a few minutes ago about the fact that Jose said

21     he was on M30s?

22     A.  Yes.

23     Q.  During this appointment, did the defendant ever ask what

24     dosages the patient was taking?

25     A.  No, he did not.

1    Q.  Did he ever ask where he was getting the medication from?

2    A.  No, he did not.

3            MR. DISKANT:  Keep going, Ms. Joynes.

4            (Audio recording played)

5    Q.  Mr. Correa, during this appointment, does the doctor weigh

6    Jose?

7    A.  No, he did not.

8    Q.  During the appointments you were present for, did you ever

9    see the doctor weigh a patient?

10   A.  No, he did not.

11           (Audio recording played)

12   Q.  Mr. Correa, as the doctor is prescribing Elavil and

13   Neurontin, are you familiar with those drugs?

14   A.  Yes, I am.

15   Q.  How are you familiar with them?

16   A.  When I was a patient, I was given those exact medication

17   and the people that are brought in as patients were also given

18   the same medication.

19           MR. DISKANT:  Keep going, Ms. Joynes.

20           (Audio recording played)

21   Q.  Mr. Correa, in the meetings, the patient visits that you

22   were present for, how typically would you see the doctor ask

23   that question, that is, which pharmacy the patient wants to go

24   to?

25   A.  On all the visit -- on all the meetings, all the visit I

1   was in, that was always asked.

2   Q.  And were there particular pharmacies that the defendant

3   recommended?

4   A.  Yes, there was.

5   Q.  What were some of them?

6   A.  MNS Pharmacy in Manhattan, Downtown Pharmacy in Midtown

7   Manhattan, Mana Pharmacy out in Queens.

8   Q.  What was the closest pharmacy to the clinic, do you

9   remember?

10  A.  MNS Pharmacy.

11  Q.  Of the three?

12  A.  Yes.

13  Q.  Are there any Rite Aids or CVSs in the neighborhood?

14  A.  Yes, there was.

15  Q.  Which one?

16  A.  There was a Rite Aid right across the street.

17  Q.  Did you ever hear the defendant send a patient to the Rite

18  Aid?

19  A.  No, I did not.

20          (Audio recording played)

21  Q.  The defendant just appeared to say a name of a pharmacy.

22  Did you hear that?

23  A.  Yes, I did.

24  Q.  Are you familiar with that pharmacy?

25  A.  Yes, I am.

1    Q.   How are you familiar with it?

2    A.   A lot the patients that were coming there were going to

3    Mana Pharmacy, and a lot of people that I know told me that the

4    doctor directed them to that pharmacy.

5    Q.   Do you know where Mana Pharmacy is?

6    A.   Yes, I do.

7    Q.   Where is it?

8    A.   In Astoria, Queens.

9    Q.   And, by the way, just backing up a little bit, the doctor

10   had asked the patient whether or not there was insurance to

11   balance the expense?

12   A.   Yes, he did.

13   Q.   How did Jose pay for this visit?

14   A.   Jose had paid for his visit $200 cash.

15   Q.   Did you ever see patients who had insurance pay cash to the

16   defendant?

17   A.   Yes, I did.

18   Q.   How would you know they had insurance?

19   A.   Sometimes patients would come in and use their Medicaid

20   with their picture on it as an ID.

21   Q.   And then pay cash and see the defendant?

22   A.   Yes.

23              (Audio recording played)

24              MR. DISKANT:   Stop it there.

25   Q.   Mr. Correa, during that patient visit, did you observe the

1  defendant taking any sort of notes?

2  A.  Yes, I did.

3  Q.  What kind of notes did the defendant take?

4  A.  He would write some small notes on a little yellow sticky

5  paper.

6  Q.  Was that a typical or atypical practice for him in the

7  visits that you were present for?

8  A.  That was an everyday practice for every patient.

9  Q.  If we can bring up what's in evidence as Government

10  Exhibit 510 and start on page 3.

11       Mr. Correa, I just handed you the physical version of

12  the same document.  What are we looking at?

13  A.  We're looking at the patient's file, his name, date of

14  birth, and day of the visit.  And once the patient has paid,

15  the doctor will write cash on the front of the paper.

16  Q.  So that's the defendant's handwriting in the top center of

17  the document?

18  A.  Yes.

19  Q.  If you could flip that over and, Ms. Joynes, if you could

20  go to page 6.  Mr. Correa, what are we looking at here?

21  A.  We are looking at a sticky note where the doctor wrote some

22  small notes.

23  Q.  For that particular visit?

24  A.  Yes.

25  Q.  Aside from taking notes on a Post It, did you see the

1   defendant take any other sorts of notes during that particular

2   visit?

3   A.  No, I did not.

4   Q.  Did the defendant use his computer during that visit?

5   A.  Only to put in the prescription that he was prescribing.

6   Q.  Did you serve for Jose as an interpreter again?

7   A.  Yes, I did.

8   Q.  How many times?

9   A.  Two or times.

10  Q.  Have you since learned that those visits were also

11  recorded?

12  A.  Yes, I have.

13  Q.  The visit that we just listened to, approximately how long

14  was it?

15  A.  About 20 minutes.

16  Q.  The follow-up visits that you were present for, how long

17  were they?

18  A.  About five minutes, the most.

19  Q.  I'm handing you what have been marked for identification

20  purposes as Government Exhibits 1102 and 1103.  Starting with

21  1102, do you recognize that?

22  A.  Yes, I do.

23  Q.  How do you recognize it?

24  A.  It's my signature on the CD.

25  Q.  And before signing it, did you review it?

G37LMIR4                          Correa - direct

1    A.  Yes, I did.

2    Q.  What does it contain?

3    A.  It contains a recording of the follow-up visit.

4    Q.  Was that the second visit?

5    A.  Yes, it was.

6    Q.  August of 2013?

7    A.  Yes.

8    Q.  And are you able to identify the voices on that recording?

9    A.  Yes, I can.

10   Q.  Whose voices do you hear?

11   A.  Myself, Dr. Moshe, and Mr. Lantigua.

12   Q.  Does the recording comport with your memory of the visit?

13   A.  Yes, it does.

14           MR. DISKANT:  Government offers Government

15   Exhibit 1102.

16           MR. MAZUREK:  No objection, your Honor.

17           THE COURT:  Admitted.

18           (Government's Exhibit 1102 received in evidence)

19   Q.  Mr. Correa, while I'm at it, up there is a disc called

20   Government Exhibit 1103.  Do you see that?

21   A.  Yes.

22   Q.  Do you recognize that disc?

23   A.  Yes.

24   Q.  How do you recognize it?

25   A.  It has my signature on the disc.

G37LMIR4                        Correa - direct

1    Q.  Before signing it, did you review the contents of the disc?

2    A.  Yes, I did.

3    Q.  What's on it?

4    A.  The recording of the third follow-up visit.

5    Q.  Is that in September of 2013?

6    A.  Yes, it is.

7    Q.  Before signing -- excuse me, I asked that.

8            In reviewing the recording, were you able to identify

9    the voices on it?

10   A.  Yes, I do.

11   Q.  What voices did you identify?

12   A.  My voice, Dr. Moshe's, and Mr. Lantigua's.

13   Q.  Does the recording comport with your memory of the visit?

14   A.  Yes, it does.

15   Q.  Anything seem to be left out?

16   A.  No, it does not.

17           MR. DISKANT:  Government offers Government

18   Exhibit 1103.

19           MR. MAZUREK:  No objection.

20           THE COURT:  Admitted.

21           (Government's Exhibit 1103 received in evidence)

22           MR. DISKANT:  Your Honor, it's admitted?

23           THE COURT:  Yes, I did.

24           MR. DISKANT:  Thank you.

25   Q.  Mr. Correa, in addition to listening to the recordings,

G37LMIR4                    Correa - direct

1    have you reviewed transcripts that have been prepared of those

2    recordings as well?

3    A.  Yes, I have.

4    Q.  What languages are spoken on the recordings contained on

5    1102 and in 1103?

6    A.  English and Spanish.

7    Q.  And were the transcripts prepared in the same manner as the

8    transcript we were just looking at?

9    A.  Yes, they were.

10   Q.  Where the English is underlined and the Spanish is not?

11   A.  Yes.

12           MR. DISKANT:  Your Honor, at this time we ask that the

13   Court direct the jury to the second transcript which is marked

14   1102-T.

15           THE COURT:  OK.  So open to the second tab.

16           MR. DISKANT:  OK.  Ms. Joynes, you can start this

17   recording at 1:17:44.  And for those following along on the

18   transcripts, this will be the top of page 3 at line 4.

19           (Audio recording played)

20           (Continued on next page)

21

22

23

24

25

1   Q.  Mr. Correa, I know this recording is a little more faint,

2   but can you identify the voice we just heard speaking in

3   English.

4   A.  Dr. Moshe's voice.

5           (Audio recording played)

6   Q.  Mr. Correa, for the last two questions that you posed in

7   Spanish, starting with "After you take all the medication is

8   your pain at zero," are you translating those questions?

9   A.  No, I am not.

10  Q.  Why are you asking them?

11  A.  Those are questions that were part of the script.  They

12  were questions that were asked to myself and to every patient

13  that I was present for.

14  Q.  So just to be clear, you're asking the questions even

15  though the doctor hasn't?

16  A.  Yes.

17          MR. DISKANT:  Ms. Joynes, please continue.

18          (Audio recording played)

19  Q.  How long does this appointment last, Mr. Correa?

20  A.  About five minutes.

21  Q.  How does it end?

22  A.  With the patient getting a prescription for oxycodone.

23          MR. DISKANT:  Ms. Joynes, if we can bring up what is

24  in evidence as Government Exhibit 510, page 12 of that exhibit.

25  Actually let's start with 11.

1   Q.  Mr. Correa, do you recognize that?

2   A.  Yes.

3   Q.  What is it?

4   A.  It's Mr. Lantigua's patient file from August 12, 2013?

5   Q.  The date of the visit that we have been listening to?

6   A.  Yes.

7   Q.  If you can flip that over and go to the next page.  What

8   are we looking at?  There appears to be a square object on the

9   bottom right of the page?

10  A.  It's a yellow sticky with the doctor's notes on it.

11  Q.  Did you observe the defendant taking notes on that visit?

12  A.  Yes.

13  Q.  Did the defendant take any other notes during the visit?

14  A.  No.

15  Q.  If we can move to Government Exhibit 1103 and turn to the

16  third transcript in the binder.

17          While you turn to that, can we go back to 510 for just

18  a minute and look at page 14 of that exhibit.  Zoom in on the

19  top.

20          So, Mr. Correa, does this appear to be dated the same

21  date of that visit, August 12, 2013?

22  A.  Yes.

23  Q.  And it reads, "Please be advised of the side effects

24  associated with the medications prescribed described, opiate

25  and non-opiate, including the following," and it lists the

1   following:  Constipation, dizziness, light-headedness.  Did you

2   hear the defendant review any of this with the patient in that

3   visit we were just listening to?

4            MR. MAZUREK:  Objection.  The record speaks for

5   itself.

6            THE COURT:  Objection is overruled.

7   Q.  Did you hear him review this material with the patient?

8   A.  No, I did not.

9            MR. DISKANT:  If we can now go, Ms. Joynes, to

10  Government Exhibit 1103 and start at 3:20:50.

11           (Audio recording played)

12  Q.  Mr. Correa, you were present in the last meeting, correct?

13  A.  Yes, I was.

14  Q.  In the last meeting was the patient complaining of lower

15  back pain?

16           MR. MAZUREK:  Objection.

17           THE COURT:  The objection is sustained.

18           (Audio recording played)

19  Q.  Mr. Correa, had the subject of appointments to specialists

20  come up before?

21  A.  Yes, it had in the previous patient's appointment.

22  Q.  Did the patient answer these questions in the previous

23  appointment?

24           MR. MAZUREK:  Objection.  The record speaks for

25  itself.

1          THE COURT:  The objection is sustained.

2          (Audio recording played)

3   Q.  Mr. Correa, having sat through this appointment, did you

4   have an understanding of what exercises the doctor was

5   referring to?

6   A.  No, there was never any exercise instructions to the

7   patient.

8          (Audio recording played)

9   Q.  How long did that appointment last, Mr. Correa?

10  A.  About five minutes.

11  Q.  Is that typical or atypical follow-up visit based on the

12  visits that you observed?

13  A.  That's a typical time for all patients that were

14  follow-ups.

15  Q.  And the initial visit for Jose, the one that went about 20

16  minutes, was that atypical or typical visit for the visits you

17  observed?

18  A.  That was a typical time for a new patient.

19  Q.  If we can go back to Government Exhibit 510 and look at

20  pages 16 and 17.  Do you recognize that, Mr. Correa?

21  A.  Yes.

22  Q.  What is it?

23  A.  That is Mr. Lantigua's patient file.

24  Q.  For the visit that we just listened to?

25  A.  Yes.

```
 1              MR. DISKANT:  Turn to the second page of the exhibit,
 2    Ms. Joynes.
 3    Q.  Again there appears to be a square object on it.  What is
 4    that?
 5    A.  That's a sticky where the doctor wrote his little notes on.
 6    Q.  Did you observe him taking those notes?
 7    A.  Yes.
 8    Q.  Did you see him take any other notes during the visit?
 9    A.  No, he did not.
10    Q.  Mr. Correa, I want to go back to the patients that you were
11    paying to go in to see the doctor to get prescriptions.  You
12    testified before that you would meet up with them afterwards
13    and take them to a pharmacy.
14    A.  Yes, I would.
15    Q.  What were some of the pharmacies that you would go to to
16    fill the prescriptions?
17    A.  I would go to MNS Pharmacy, Downtown Pharmacy and Medicine
18    Cabinet.
19    Q.  And you talked a little bit about MNS, but tell us about
20    Downtown Pharmacy.  Where was that located?
21    A.  Downtown Pharmacy was located in Midtown, Downtown, close
22    to 17th Street.
23    Q.  And how would you pay when you picked up your prescriptions
24    there?
25    A.  Cash.
```

G377MIR5                        Correa - direct

1   Q.  To your knowledge, did they accept insurance?

2   A.  No, I do not know.

3   Q.  How did you learn of Downtown Pharmacy?

4   A.  The doctor had instructed some patients to go down there.

5   Q.  And that was the case with MNS as well, correct?

6   A.  Yes, it was.

7   Q.  You testified previously that when you started going to MNS

8   it cost $320 to fill the prescription there?

9   A.  Yes, it did.

10   Q.  Did that price ever change?

11   A.  Yes, it did.  The price had gone up all the way to 650.

12   Q.  And after the prescriptions would be filled, you would sell

13   the pills?

14   A.  Yes, I would.

15   Q.  How much would you sell the pills for?

16   A.  $16 for each pill.

17   Q.  And I think you earlier that would be about $1440?

18   A.  Yes.

19   Q.  Minus your costs?

20   A.  Yes.

21   Q.  And what were your costs with respect to each prescription?

22   A.  If you was a new patient at the beginning it would cost me

23   $500 for an MRI and a referral, $200 for the doctor, $200 for

24   the patient, and $320 for the prescription.

25   Q.  So factoring out all of those costs, what was your typical

1    profit margin for a prescription you got for sending a patient

2    in?

3    A.  About 300 to $400.

4    Q.  As MNS continued to increase its price, did you still go

5    there?

6    A.  Yes, I did.

7    Q.  Why?

8    A.  Because it was guaranteed I was going to get the

9    prescription there.

10   Q.  Did you ever have difficulty filling the defendant's

11   prescriptions?

12   A.  Yes, I had.

13   Q.  You testified before that there was a Rite Aid on the

14   block.

15   A.  Yes.

16   Q.  Did you ever fill your prescription there?

17   A.  No, I did not.

18   Q.  And circling back to MNS, was there a particular individual

19   that you dealt with there?

20   A.  Yes, there was.  I dealt with the pharmacist Mr. Joseph.

21   Q.  Did you ever see Mr. Joseph anywhere other than the

22   pharmacy?

23   A.  Yes, I have.

24   Q.  Where else did you see him?

25   A.  Mr. Joseph would come to the office about two or three

1    times a month to speak to the doctor.

2    Q.  And what would happen on those occasions?  What did you

3    observe?

4    A.  He would come to the front door, tell me who he was.  I

5    would let Dr. Moshe know that Mr. Joseph was there, and then

6    when Dr. Moshe had time, he would come out and then they would

7    go into his office and speak behind closed doors.

8    Q.  You said that happened a few times a month?

9    A.  Yes.

10   Q.  Were there other pharmacists or pharmacy owners you saw

11   come to the clinic?

12   A.  Yes.

13   Q.  Who?

14   A.  There was a gentleman by the name of Frank.  He was the

15   pharmacist at Ascan Pharmacy.

16   Q.  What was Ascan Pharmacy?

17   A.  It was a pharmacy out in Queens.

18   Q.  How frequently would you see Frank come to the clinic?

19   A.  He came about two or three times a month.

20   Q.  What would happen when he typically came?

21   A.  He would let me know who he was, I would let Dr. Moshe know

22   that he was here, and when Dr. Moshe finished with his patients

23   he would allow Mr. Frank to go inside the office, and they

24   would talk.

25   Q.  How long did you work as a security guard for the

 1   defendant?

 2   A.  For about nine months.

 3   Q.  And so if you started in the end of December, that would

 4   take us to about September 2013?

 5   A.  Yes.

 6   Q.  What happened at that time?

 7   A.  About September 2013 the clinic was robbed, and I was let

 8   go at that time, after that time.

 9   Q.  You were fired?

10   A.  Yes.

11   Q.  Did you have a conversation with the defendant about being

12   fired?

13   A.  Yes, I did.

14   Q.  What is your understanding of why you were fired?

15   A.  I arrived Monday morning, and I asked to speak to Dr.

16   Moshe.  We went into the office.  He told me that he no longer

17   needed my services.  And then I asked him if I could come back

18   to him as a patient.  He told me, no, I couldn't because I had

19   too long of a time not being a patient, but he told me that I

20   could continue to bring patients to see him.

21   Q.  What did you understand him to mean by that?

22   A.  He meant that even though --

23          MR. MAZUREK:  Objection.  Calls for speculation.

24          THE COURT:  The objection is sustained.

25   Q.  Mr. Correa, at that point when he has fired you but told

1    you you can continue to bring your patients in, did you believe

2    you had an understanding with the defendant?

3    A.  Yes, I did.

4    Q.  What was that understanding?

5    A.  The understanding was that I couldn't work for him no more,

6    but I could continue to bring patients, I could continue to get

7    some type of income.

8    Q.  And, by the way, you mentioned the robbery.  Did you

9    understand why you were fired in connection with the robbery?

10   A.  Yes, I do.

11   Q.  What was that?

12   A.  The doctor believes that I had something to do with the

13   robbery.

14   Q.  Did you have something to do with the robbery?

15   A.  No, I did not.

16   Q.  After getting fired, did you continue to bring patients

17   into the clinic?

18   A.  Yes, I did.

19   Q.  For how long?

20   A.  Up to my arrest in May 2014.

21   Q.  And what would you do with the prescriptions once you got

22   them?

23   A.  I would take patients to the pharmacy to get the

24   prescription, and then I would take them, pay my patients, and

25   then sell the pills.

1   Q.  Did you ever sell the prescriptions themselves?

2   A.  Yes, I have.

3   Q.  Who did you sell them to?

4   A.  I sold them to Jose Lantigua.

5   Q.  The same patient whose visits we were just listening to?

6   A.  Yes.

7   Q.  Now, you have already testified that you were arrested in

8   May of 2014.

9   A.  Yes, I was.

10  Q.  And that you agreed to cooperate?

11  A.  Yes, I did.

12  Q.  Did you go back to the clinic as part of that cooperation?

13  A.  Yes, I did.

14  Q.  Why?

15  A.  To make audio video recordings with the employees there.

16  Q.  And how many times did you do that?

17  A.  Several times.

18  Q.  And who did you speak to on those recordings?

19  A.  To Damon Leonard.

20  Q.  Were you able to gain access to the clinic?

21  A.  Yes.

22  Q.  Was the doctor ever there when you gained access?

23  A.  No, he was not.

24  Q.  When you went back to the clinic in those months after your

25  arrest, can you tell us what you observed?

1   A.   The operation still stood the same, large crowds, people

2   still coming in, same bosses were still there, and everybody

3   was still receiving oxycodone prescriptions.

4          MR. DISKANT:  If I could just have a moment, your

5   Honor.

6          Nothing further, your Honor.

7          MR. MAZUREK:  Your Honor, may I inquire?

8          THE COURT:  You may, sir.

9   CROSS EXAMINATION

10  BY MR. MAZUREK:

11  Q.   Good afternoon, Mr. Correa.

12  A.   Good afternoon.

13  Q.   My name is Henry Mazurek, and I represent Dr. Moshe

14  Mirilishvili.  And we have never met before, correct?

15  A.   No, we have not.

16  Q.   In fact I requested to meet with you through your attorney,

17  and you declined, correct?

18  A.   Yes, I did.

19  Q.   And on the other hand you have met at least a dozen times,

20  if not more, with the government agents and prosecutors,

21  correct?

22  A.   Yes, I have, as part of my cooperation.

23  Q.   And when you say part of your cooperation, that is to

24  prepare for your testimony here in court, correct?

25  A.   No preparation.  It's the truth of what I'm speaking.  To

G377MIR5                          Correa – cross

1   be prepared means that they're telling me what to say, and

2   that's not the case here.

3   Q.  Sir, my question was simply that the meetings you had with

4   the government prosecutor and the agents were to ask you

5   similar questions that you were asked on direct examination

6   today, correct?

7   A.  Yes.

8   Q.  So that you knew exactly the questions that you were going

9   to be asked before your testimony here today, correct?

10  A.  Yes.

11  Q.  And when you say as part of your cooperation, you were

12  arrested on or about April 30, 2014, correct?

13  A.  Excuse me.

14  Q.  You were arrested on April 30, 2014, correct?

15  A.  No.

16  Q.  You weren't?  Which date was it?

17  A.  May 2014.

18  Q.  May 1?

19  A.  May 3, I believe.

20  Q.  Are you certain?

21  A.  No, I don't remember.  It's been about two years now.

22  Q.  But on that day that you were arrested, you were arrested

23  by DEA agents and some NYPD, correct?

24  A.  Yes, I was.

25  Q.  And at that point in time you knew exactly what you were

1    going to do, didn't you, sir?

2    A.  No, I did not.  At the time I didn't know what I was being

3    arrested for.  I was told I was being held for a probation

4    violation.  Later on I found out, I was told exactly what I was

5    arrested for, once I was detained and taken downtown.

6    Q.  But my question -- I guess I will be a little more

7    specific -- was that you had a plan all along, sir, that if you

8    were ever arrested again, you were going to cooperate and give

9    information that you think would be helpful to the government,

10   right?

11   A.  No, I did not.  This is the first time in all my years of

12   dealing in narcotics that I ever testified.

13   Q.  Well, let me ask you about that.  You are a drug dealer,

14   correct?

15   A.  Yes, I was.

16   Q.  That is how you have spent most of your life since being a

17   junior in high school, correct?

18   A.  Yes.

19   Q.  And during the life of being a drug dealer you knew that

20   you were taking a lot of risk, right?

21   A.  Yes, I did.

22   Q.  And that risk was more than simply that someday you might

23   appear in a courtroom like this.  There were a number of other

24   risks, right?

25   A.  I don't understand the question.

1   Q.  Well, as a drug dealer you risk violence; is that right?

2   A.  It's possible if you're leaning to that kind of

3   environment, yes.

4   Q.  That's one of the things that could happen to a drug

5   dealer, right?

6   A.  Yes.

7   Q.  You risk being arrested, of course, correct?

8   A.  Yes, it is.

9   Q.  You risk alienating your friends and family, correct?

10  A.  Yes.

11  Q.  And you also learn how to lie, right?

12  A.  Yes.

13  Q.  You have to lie to a lot of people to be a drug dealer and

14  not get caught, right?

15  A.  Not necessarily.  There is not really no conversation in

16  drug dealing.  You get a product, and you put it in the street,

17  and somebody sells it for you.  So I did it daily really not

18  talking to anybody but your worker.

19  Q.  Did you tell your own mother that you were a drug dealer?

20  A.  No, I did not, but at times she was aware what I was doing

21  when I was first arrested in '89.

22  Q.  But you don't tell the truth to even the people you love

23  when you are a drug dealer; is that right?

24  A.  Not at all.

25  Q.  That's not the truth?

402

G377MIR5                          Correa - cross

1   A.  No, I said not at all.

2   Q.  What does that mean?

3   A.  That you don't tell them.

4   Q.  You don't tell them, right?

5   A.  No.

6   Q.  And you didn't tell Dr. Mirilishvili that you were a drug

7   dealer when he asked you whether you wanted to be a security

8   guard at his medical clinic, did you?

9   A.  If I told him I was a drug dealer?

10  Q.  Yes.

11  A.  No, I did not.

12  Q.  You didn't tell him that you were serving a probationary

13  sentence at the time for a drug crime.

14  A.  No, I did not.  And he never asked.  There wasn't an

15  interview about my history or anything.

16  Q.  But you weren't going to volunteer that information, right?

17  A.  I had nothing to hide; I'm not ashamed of my past.

18  Q.  Sorry?

19  A.  I had nothing to hide; I'm not ashamed of my past.

20  Q.  Well, were you going to volunteer the information?  If you

21  had nothing to hide, would you tell him, listen, I've got a bad

22  past, I'm on probation now, I'm trying to make a better life?

23  Did you tell him that?

24  A.  No, I did not.  My objective was to get an oxycodone

25  prescription, so nothing else really mattered at the time.

G377MIR5                         Correa - cross

1   Q.  Nothing that would interfere with that goal, correct?

2   A.  Right.

3   Q.  Of getting that prescription, right?

4   A.  Yes.

5   Q.  Because if you told him the truth at that time, you

6   probably wouldn't have gotten your oxycodone prescription,

7   right?

8   A.  Well, I was already getting oxycodone prescriptions.  The

9   only way that conversation would have came up is with the job.

10  So whether I would have took the job or not, I was still

11  getting an oxycodone prescription.

12  Q.  But if you told him the truth of who you were, you weren't

13  going to get it, were you?

14  A.  He would have never asked that.  I was a drug dealer and he

15  was the supplier, and that was it at the end of the day.

16  Q.  Let me ask you this:  On direct examination you testified

17  that you have been a drug dealer, you trafficked in marijuana,

18  right?

19  A.  Yes.

20  Q.  In crack cocaine, right?

21  A.  Yes.

22  Q.  And heroin, right?

23  A.  Yes.

24  Q.  And you diverted oxycodone prescriptions, right?

25  A.  Yes.

1   Q.  And you got arrested a number of times, right?

2   A.  Yes, I have.

3   Q.  And you got convicted at times.

4   A.  Yes, I have.

5   Q.  To this point in time the total amount of prison time you

6   have done is about a year and a few months; is that right?

7   A.  Yes.

8   Q.  And you did that just in state prison, right?

9   A.  Yes, I did.

10  Q.  And you now have -- at the time you were arrested in this

11  case in May of 2014 you had two prior drug felony convictions,

12  right?

13  A.  Yes, I did.

14  Q.  And you knew if you got a third one, you could be in a lot

15  of trouble, right?

16  A.  Probably.

17  Q.  You've heard of three strikes and you're out?

18  A.  Yes, I have heard.

19  Q.  As a drug dealer that was something that was talked about

20  or known about in the streets, right?

21  A.  Yes.  But taking the risk with the oxycodone was a much

22  safer way of getting drugs at the time.

23  Q.  It was illegal, sir, right?

24  A.  It was illegal, but it was safer.  It wasn't like I would

25  have to go out into the street to buy something.  I was getting

1    a legitimate prescription in my name, so there wouldn't be no

2    problem if law enforcement stopped me for a prescription of

3    oxycodone that was in my name.

4    Q.  A legal prescription in your name that was obtained through

5    lies to the doctor, right?

6    A.  Yes.

7    Q.  OK.  Now, when I'm talking about the three strikes and

8    you're out, you understood that if you did get caught -- even

9    though this was safer, as you call it -- that you could be

10   going to prison for a very long time, right?

11   A.  There is a possibility.  I don't really know how much time

12   I could get for oxycodone.

13   Q.  But you knew that because it would be your third felony

14   conviction for narcotics-related offenses, that you could go to

15   jail for a very long time, right?

16   A.  Yes, possible.

17   Q.  Well not just possible.  It's what you expected, right?

18   A.  No.

19   Q.  You didn't expect that if you were convicted on a third

20   felony drug conviction that you would be doing some substantial

21   time in prison?  That's not what you thought?

22   A.  I knew I was going away, but how long, I wouldn't know.

23   That wasn't the objective at the time.

24   Q.  But you knew it was going to be more than what you had done

25   in the past, a year and a few months.

G377MIR5                          Correa - cross

1    A.  Yes.

2    Q.  You knew that it could be multiple years, right?

3    A.  Probably, yes.

4    Q.  And when you were arrested this time and you heard that it

5    was the federal DEA, that was different from how your arrests

6    were in the past, right?

7    A.  Yes, it was.

8    Q.  You knew the difference between state and federal

9    officials, correct?

10   A.  Yes.

11   Q.  And you knew the difference between state and federal

12   sentences too, didn't you?

13   A.  Slightly, not too much knowledge of it.

14   Q.  Well, you talked about it with your drug buddies, right?

15   A.  No.

16   Q.  You knew other friends who were in the life who spent a lot

17   of time in prison, correct?

18   A.  No.

19   Q.  All the narcotics people that you dealt with never got

20   caught?

21   A.  Got caught but they never did a substantial amount of time.

22   Q.  Were they ever caught by the federal DEA and prosecuted

23   with federal felonies?

24   A.  No.

25   Q.  And you knew that -- this time you learned when you got

G377MIR5                        Correa - cross

1    arrested and charged in federal court you were looking at a

2    maximum sentence just for the oxycodone of up to 30 years,

3    correct?

4    A.  No, I didn't know that at the time.

5    Q.  Well, you certainly learned it quickly enough after you

6    were arrested, rated?

7    A.  Yes.

8    Q.  In fact you learned it pretty much at your first appearance

9    in court, correct?

10   A.  I can't remember back then.

11   Q.  And it wasn't long after your first appearance in court

12   that you made a determination that you would cooperate with the

13   government, right?

14   A.  Yes.

15   Q.  In fact it's what enabled you to remain on bail after you

16   made your first court appearance in this case, right?

17   A.  Could you rephrase the question?

18   Q.  The only reason you didn't immediately start going to jail

19   on May 1 at the time of your arrest and your first appearance

20   in court was because you already had a deal with the government

21   that you had agreed to try to cooperate, correct?

22   A.  I didn't know I had a deal, but I agreed to testify.

23   Q.  You agreed to testify in exchange for what you hoped would

24   be eventually the deal that you signed, correct?

25   A.  I didn't know what the deal was at the time.  I learned

G377MIR5                          Correa - cross

1    that later on.

2    Q.  Well, the deal you were looking for was a deal that would

3    keep you from going back to prison, sir, correct?

4    A.  Yes.

5    Q.  That's the deal you wanted, right?

6    A.  Yes.

7    Q.  That's the deal you still hope to get, right?

8    A.  Yes.

9    Q.  And the only reason you haven't been sentenced yet is

10   because you had to testify in this case pursuant to the

11   cooperation agreement, right?

12   A.  Yes.

13   Q.  And you know that other people have already been sentenced,

14   correct?

15   A.  I have no idea about that.

16   Q.  You haven't been following what's been going on, have you?

17   A.  Not at all.

18   Q.  When you signed your cooperation agreement, in trying to

19   get the deal that you had hoped for, that left open the

20   possibility that you would never have to spend a day in prison

21   for your three felony convictions here, right?

22   A.  I couldn't tell you.  The only person that could determine

23   that is the judge.

24   Q.  That's what you rehearsed over time with the prosecutor?

25          MR. DISKANT:  Objection.

1          THE COURT:  Overruled.

2   Q.  Is that the answer you rehearsed?  You said that before in

3   meetings that you had with the prosecutors and the agents?

4   A.  Not at all.

5   Q.  That's the first time you said that, sir?

6   A.  Yes.

7   Q.  At the time of your sentence you're hoping to get

8   probation, right?

9   A.  Yes.

10  Q.  You're not going to look to the judge and say I'm ready to

11  go to prison.  You want probation, right?

12  A.  Yes.

13  Q.  Now, on direct examination you were shown Government

14  Exhibit 1201.  Do you remember that?  That's the cooperation

15  agreement that you signed, sir?

16  A.  Yes.

17  Q.  It's dated September 19, 2014, correct?

18  A.  Yes.

19          MR. MAZUREK:  If we could put that on the screen,

20  please.

21  Q.  Now, this is a very lengthy agreement, right?  It is a

22  total of about four and a third pages single spaced, right?

23  A.  Yes.

24  Q.  And it has a lot of legal language in it, correct?

25  A.  Yes, it does.

1   Q.  And without getting into the conversations, I mean this is

2   something you reviewed with your attorney before you signed it,

3   correct?

4   A.  Yes.

5   Q.  So that you could understand what all of these many, many

6   provisions are, right?

7   A.  Yes, I did.

8   Q.  What was the most important provision in this agreement to

9   you, sir?

10  A.  What was the most important for me?

11  Q.  Yes.

12  A.  Telling the truth and meeting with the agents whenever

13  necessary and meeting with the government.

14  Q.  That was the most important thing to you?

15  A.  Yes.

16  Q.  So, if this agreement -- you didn't need this agreement to

17  do that, did you?

18  A.  Yes, I did.

19  Q.  You could have just told them the truth.

20  A.  No.

21  Q.  You couldn't?

22  A.  I needed to work with them so I could ultimately get a 5K

23  letter.

24  Q.  So, you were willing to speak the truth in exchange for

25  this agreement, which was the government would give you

1    something called a 5K letter, right?

2    A.  Yes.

3    Q.  And that 5K letter, that refers to a provision in the

4    federal sentencing law, as you understand it?

5    A.  Yes.

6    Q.  And so you were willing, as you say, to tell the truth if

7    you had the opportunity of receiving a 5K letter at the time of

8    your sentencing, correct?

9    A.  Can you repeat that question?

10   Q.  Yes.  You were willing to speak to the government if they

11   were willing to say at the end of your meeting with them, and

12   prepping with them, and doing what they wanted, that they would

13   agree to give you a 5K letter at sentencing.

14   A.  I agreed to tell the truth.  That's what my basis was on,

15   to tell the truth.

16   Q.  That's not my question, sir.  My question is:  You were

17   willing to work with the government if they were willing to

18   work with you in terms of offering potentially a 5K letter at

19   the end of your case, right?

20   A.  No, I worked with the government before I learned what a 5K

21   letter was.

22   Q.  Well, you weren't doing it -- you weren't working with the

23   government simply because you wanted just to come clean, here

24   is what happened, let's be the end of it, right?  You wanted a

25   deal, right, sir?

G377MIR5                        Correa - cross

1    A.  Yes.  Yes.

2    Q.  And so the quid pro quo, if you will, with the government

3    was that if I do tell you what you may want to know, then you

4    have to promise me something.  And that's what is embodied here

5    in this agreement, 1201, right?

6    A.  Yes.

7    Q.  That was the deal, right?

8    A.  Yes.

9    Q.  And you are a businessman, sir, right?

10   A.  No, I was just a drug dealer.

11   Q.  Well, that was your business, right?

12   A.  Yes.

13   Q.  As a drug dealer you had to deal in many, many, many

14   transactions, right?

15   A.  Yes.

16   Q.  And you wouldn't do a transaction unless it was something

17   good for you in return, right?

18   A.  Yes.

19   Q.  And that's the same with this agreement, right?

20   A.  Yes, but I still wouldn't know the outcome of this

21   agreement here.

22   Q.  Well, you're hoping that testifying today is going to get

23   you closer to your goal of no jail, right?

24   A.  Yes, but at the end of the day it's up to the judge.

25   Q.  Now, in this agreement you're aware of the maximum sentence

1  that you could face if you were convicted of the three counts

2  that you pled guilty to, right?

3  A.  Yes.

4  Q.  And you pled guilty to illegal distribution of oxycodone,

5  correct?

6  A.  Yes.

7  Q.  And illegal distribution of marijuana, correct?

8  A.  Yes.

9  Q.  And by making false statements in order to obtain Medicaid

10  and food stamps.

11  A.  Yes.

12        MR. MAZUREK:  And if we can turn to page 2 of this

13  agreement, and if we can expand the top third going down to the

14  line that starts with Counts One, Two and Three.

15  Q.  That last line there, sir, do you see that on the screen?

16  A.  Yes.

17  Q.  Counts One, Two and Three total a maximum term of 70 years'

18  imprisonment, right?

19  A.  Yes.

20  Q.  How old are you?

21  A.  44.

22  Q.  If you were sentenced to that long, you're likely not to

23  get out of prison, correct?

24  A.  Not at all.

25  Q.  Now, if we can go back to page 1, and if we can expand the

1   last paragraph on page 1 starting with "Because of the filing

2   ..."  Do you see that on your screen, sir?

3   A.  Yes.

4   Q.  It reads "Because of the filing of the prior felony

5   information" -- and you understood that to mean that you had at

6   least one other drug felony conviction prior to your arrest in

7   this case, right?

8   A.  Yes.

9   Q.  And that would increase the term of the maximum sentence

10  that you would be facing, right?

11  A.  Yes.

12  Q.  So it says here, "Counts One and Two each carry a maximum

13  term of imprisonment of 30 years."  Do you see that?

14  A.  Yes.

15  Q.  So Count One, which is the oxycodone count, that alone

16  could have you facing up to a maximum of 30 years in prison,

17  right?

18  A.  Yes.

19  Q.  Do you still think it was safe to be dealing in oxycodone

20  prescriptions?

21  A.  At the time I was only thinking about the money; I wasn't

22  thinking about the time.

23  Q.  Now, as part of the agreement in Government Exhibit 1201 we

24  can turn now to page 3, the top of the page, and here there is

25  a bunch of promises that the government is making not to

1   prosecute you further if you comply with the understandings and

2   what is required of you in the agreement.  Do you see that?

3   A.  Yes.

4   Q.  So starting the third line down with the word "Moreover,"

5   do you see that?

6   A.  Yes.

7   Q.  "If the defendant fully complies with the understandings

8   specified in this agreement, he will not be further prosecuted

9   criminally in this office for any crimes, except for criminal

10  tax violations, if any, related to your participation in" --

11  and then there is a list of it looks like six different crimes,

12  correct?

13  A.  Yes.

14  Q.  So for those six different crimes, if you comply with your

15  obligations in the agreement, the government is saying they

16  will not prosecute you any further with respect to those,

17  right?

18  A.  Yes.

19  Q.  It does say "except for criminal tax violations".  Have you

20  been told by the government whether you are going to be charged

21  with criminal tax violations?

22  A.  No, I have not.

23  Q.  You have told the government that you have not reported any

24  of your drug income since you were dealing drugs at the age of

25  17, correct?

G377MIR5                           Correa - cross

```
 1   A.  Correct.

 2   Q.  And you have not been told that you are going to face

 3   prosecution for those at this time?

 4   A.  I don't understand the question.

 5   Q.  After you told the government about your failure to report

 6   your income since you were 17, have you been told that you were

 7   going to be facing criminal tax charges?

 8   A.  No, I have not.

 9   Q.  Now, this agreement says that you're not going to be

10   further charged as a result of this agreement for, one, a

11   conspiracy to distribute oxycodone from in or around July 2012

12   up to and including in or around May 2014 as charged in Count

13   One.  Right?

14   A.  Yes.

15   Q.  And that's the conviction that you pled guilty to in this

16   court, right?

17   A.  Yes.

18   Q.  And then two is a conspiracy to distribute marijuana from

19   in or around January 2002 up to and including in or around May

20   2014, as charged in Count Two of the information, correct?

21   A.  Yes.

22   Q.  And you pled guilty to that?

23   A.  Yes.

24   Q.  To those 12 years of distributing marijuana, correct?

25   A.  Yes.
```

Q.  And, three, a scheme to obtain public benefits under false

and fraudulent pretenses from in and around January 2011 up to

and including in or around May 2014, as charged in Count Three.

Do you see that?

A.  Yes.

Q.  And that you pled guilty to?

A.  Yes.

Q.  Four, the distribution of cocaine base from in or around

October 1989 up to and including in or around 1997, for which

the statute of limitations has run and for some of which the

defendant has previously sustained a felony conviction.  Do you

see that?

A.  Yes.

Q.  So here you have pled guilty to some of that activity in

state court; is that right?

A.  Yes.

Q.  And that's the distribution of cocaine base, otherwise

known as crack cocaine?

A.  Yes.

Q.  The government is saying they're no longer going to charge

you, or you are not going to face additional criminal penalties

with respect to that, correct?

A.  Yes.

Q.  And, five, the distribution of heroin from in or around

1992 up to and including in or around 1999, for which the

1  statute of limitations has run, and for some of which the

2  defendant has previously sustained a felony conviction.  The

3  same deal here, right?  You have already pled to some of that

4  activity in state court, right?

5  A.  Yes.

6  Q.  But the federal government here is saying that you are not

7  going to face any other criminal accusations with respect to

8  that.

9  A.  Yes.

10 Q.  And finally, six, the submission of a false and fraudulent

11 application for certain public benefits, namely food stamps, in

12 or around 1994 for which the statute of limitations has run, to

13 the extent that he has disclosed such participation to this

14 office as of the date of this agreement.  This you are not

15 going to have to plead guilty to, but you are getting coverage

16 for, correct?

17 A.  Yes.

18 Q.  Now, the things that you have to do in exchange for -- to

19 get this agreement to not be further prosecuted and for the

20 government to perhaps be writing that letter to the court is

21 that you have to meet with the government.  That's one of the

22 things, right?

23 A.  Yes.

24 Q.  And you had to cooperate then in whatever way they asked of

25 you, correct?

G377MIR5                          Correa - cross

```
1    A.  Yes.
2    Q.  Now, if it is determined that you have committed any
3    additional crimes during the time of your cooperation, that
4    would be a violation of the agreement, right?
5    A.  Yes, it would.
6    Q.  Now, in order to get that 5K letter, the government also
7    has to believe that you gave full and complete and truthful
8    information, correct?
9    A.  Yes.
10   Q.  But it's the government, the prosecutors here, who will
11   make that determination with respect to whether to write that
12   5K letter, correct?
13   A.  I don't understand the question.
14   Q.  Well, for the government to write that letter that you are
15   looking for for leniency to the court, who is making the
16   determination of whether you complied with your obligations
17   under this agreement?
18   A.  The government.
19   Q.  So, it's up to the government to decide whether you have
20   given full and complete and truthful information, correct?
21   A.  Yes.
22   Q.  And only then would you get the 5K letter, right?
23   A.  As long as I don't violate what I'm supposed to do, yes.
24   Q.  So the people who want the information from you are also
25   the people who are going to decide whether to write the letter
```

1  for your leniency, correct?

2  A.  Yes.

3           MR. MAZUREK:  Your Honor, might this be a good

4  breaking point for today?

5           THE COURT:  I was just going to suggest that when you

6  are done with this letter, it would be a very good breaking

7  point.

8           MR. MAZUREK:  Thank you, your Honor.

9           THE COURT:  We are going to shift to a new topic.

10           MR. MAZUREK:  We are.

11           THE COURT:  Since we're going to break in five minutes

12  anyway, let's break now, and let's be back at 9:30 tomorrow and

13  ready to go at quarter to ten, just like you were today.

14           Don't discuss the case tonight -- discuss used in the

15  broadest sense of the term -- and keep an open mind.  We

16  haven't heard nearly everything we need to hear yet.  OK?

17           (Continued on next page)

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  OK.  See you all in the morning.  Who are

3    we going to have besides this witness tomorrow?

4              MR. MAZUREK:  Your Honor, before the witness leaves,

5    can you just give the admonition that he is on

6    cross-examination and is not supposed to speak with anybody

7    about his testimony?

8              THE COURT:  You are not to speak to the government.

9    You can talk to your lawyer at any time about anything, but you

10   certainly are not supposed to speak to anybody at the front

11   table overnight about the case.  All right?

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  Who is going to testify tomorrow?

14             MS. CUCINELLA:  Your Honor, the government expects to

15   call Dr. Gregory Lawler as well as our second cooperator.

16             THE COURT:  And you think you have about how much to

17   do with this witness?

18             MR. MAZUREK:  Probably a couple of hours.

19             THE COURT:  Couple of hours, all right.  Great.

20             (Trial adjourned to March 8, 2016 at 9:30 a.m.)

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION
 2    Examination of:                              Page
 3    JOEL GALANTER
 4    Direct By Mr. Diskant  . . . . . . . . . . . 237
 5    Cross By Mr. Mazurek . . . . . . . . . . . . 257
 6    Redirect By Mr. Diskant  . . . . . . . . . . 303
 7    Recross By Mr. Mazurek . . . . . . . . . . . 305
 8    ABRAHAM CORREA
 9    Direct By Mr. Diskant  . . . . . . . . . . . 306
10    Cross By Mr. Mazurek . . . . . . . . . . . . 398
11                        GOVERNMENT EXHIBITS
12    Exhibit No.                              Received
13     1303     . . . . . . . . . . . . . . .242
14     1301     . . . . . . . . . . . . . . .245
15     1302     . . . . . . . . . . . . . . .251
16     1304     . . . . . . . . . . . . . . .252
17     1201     . . . . . . . . . . . . . . .321
18     7-B      . . . . . . . . . . . . . . .329
19     4-F      . . . . . . . . . . . . . . .331
20     4-Q and 4-R   . . . . . . . . . . . .344
21     4-K      . . . . . . . . . . . . . . .352
22     4-B, 4-C, and 4-E   . . . . . . . . . . 354
23     1-H      . . . . . . . . . . . . . . .358
24     444      . . . . . . . . . . . . . . .361
25     1101     . . . . . . . . . . . . . . .369
```

1102    . . . . . . . . . . . . . . .384

1103    . . . . . . . . . . . . . . .385