G38LMIR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        S2 14 Cr. 810 (CM)

 5   MOSHE MIRILISHVILI,

 6              Defendant.                Trial

 7   ------------------------------x

 8                                        New York, N.Y.
                                          March 8, 2016
 9                                        10:02 a.m.

10
     Before:
11
                       HON. COLLEEN McMAHON,
12
                                          District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EDWARD DISKANT
17   BROOKE CUCINELLA
          Assistant United States Attorneys
18
     HENRY MAZUREK
19   WAYNE GOSNELL
          Attorneys for Defendant
20

21
     ALSO PRESENT:  MICHAEL MULLER, DEA
22                  ELIZABETH JOYNES, Paralegal
                    MICHAEL DOMANICO, Paralegal
23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G38LMIR1

1           (Trial resumed)

2           (Jury not present)

3           THE COURT:  True confessions.  I pulled a muscle in my

4    shoulder this morning while working out and I'm in excruciating

5    pain.  So I will try not to be too crabby but I really hurt.

6    OK.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Good morning everybody.  I'm confessing to

3    you because I'm confessing to everybody else.  I pulled a

4    muscle at the gym this morning, so I'm in a world of hurt and I

5    will try not to be too crabby today.  OK.

6              Sir, you are still under oath.

7              Counsel.

8              MR. MAZUREK:  Thank you, Judge.

9              THE COURT:  The floor is yours.

10             MR. MAZUREK:  Thank you.

11    ABRAHAM CORREA, resumed.

12   CROSS-EXAMINATION (cont'd)

13   BY MR. MAZUREK:

14   Q.  Mr. Correa, I'd like to take you back to 2012 this morning.

15   And you said I think yesterday on direct examination that you

16   were working with a fellow by the name of Ray Williams who you

17   also called Obama; isn't that right?

18   A.  I wasn't working with him.  He introduced me to the game.

19   Q.  Well, when you said he introduced you to the game, that

20   meant that you were told by Mr. Williams about how to obtain

21   prescriptions for oxycodone, is that what you're referencing?

22   A.  Yes.

23   Q.  And when you say you weren't working with him, you weren't

24   having to pay him any money for the things you were doing?

25   A.  Yes.

G38LMIR1                         Correa - cross

1    Q.   But he introduced you to how to get a patient visit with

2    pain management doctors, right?

3    A.   Yes, he did.

4    Q.   And he told you what you needed in order to fool the

5    doctor, right?

6    A.   To fool is an understatement.  To fool means he didn't know

7    what was going on at the time, which is inconclusive.

8    Q.   I don't know what you mean by inconclusive, but let me ask

9    you this.  What Mr. Williams originally told you was that you

10   needed to get an MRI and a referral, is that some of the

11   paperwork that you needed?

12   A.   Yes.  He said we needed that because that way we can get a

13   guarantee that we would get a oxycodone prescription.

14   Q.   So you needed to get that paperwork, right?

15   A.   Yes, we did.

16   Q.   And it had to look good so that the doctor would believe

17   that it was real papers, right?

18   A.   Yes.

19   Q.   And in fact, you were willing to spend a lot of money to do

20   that, $500 for each referral or MRI, right?

21   A.   Yes.

22   Q.   And that was money that would be coming out of your profits

23   from your drug business, right?

24   A.   Yes, it was.

25   Q.   And Mr. Williams also told you that when you go in to see a

G38LMIR1                    Correa - cross

1   doctor that you have to answer questions in a certain way,

2   right?

3   A.   No, because there really wasn't any question that were

4   really asked.

5   Q.   Well, you had to say that you were in pain from an injury,

6   correct?

7   A.   Negative.

8   Q.   That's not true?

9   A.   That's not.

10  Q.   Well, each and every time that you saw Dr. Mirilishvili, at

11  least in the initial patient visit, we'll start with that, you

12  would lie to the doctor and say you were in pain, correct?

13  A.   Incorrect.

14  Q.   Well, sir, the day of your arrest on May 1 of 2014 in this

15  case, you were immediately sat down and asked a bunch of

16  questions by a bunch of DEA agents and NYPD detectives, right?

17  A.   Yes, I was.

18  Q.   And that was just really shortly after you were picked up,

19  late in the afternoon on that day, right?

20  A.   Yes.

21  Q.   And at that point in time, that was in 2014, that was

22  closer in time to the events that we're talking about today,

23  two years later, right?

24  A.   Yes, it is.

25  Q.   And when you were answering those questions, you were at

G38LMIR1                    Correa - cross

1    that point in time thinking that you needed to help yourself by

2    answering the questions that are being asked, right?

3    A.   Yes.

4    Q.   So you were giving answers as truthful as you could be at

5    that point, right?

6    A.   Yes, I was.

7    Q.   And isn't it true -- and I refer now counsel and the Court

8    to 3501-22, page 2 of that report.  You were asked the question

9    about what you said to Dr. Mirilishvili in your patient visit.

10   And you said, sir, to the agents on May 1, 2014, that you would

11   lie to Dr. Mirilishvili and say you were in pain.  Isn't that

12   true?

13   A.   I can't recall what I said two years ago exactly.

14   Q.   Would you like to see it in a report, would that help to

15   refresh your recollection, sir?

16   A.   Yes.

17             MR. MAZUREK:  Your Honor, may I approach?

18             THE COURT:  You may.

19   Q.   I'm showing the witness what has been premarked for

20   identification as 3501-22.

21             THE COURT:  OK, sir, this document is not in evidence

22   and you're not to read from it to the jury.  You're just to

23   look at it and see if it jogs your memory about what you said

24   two years ago.

25             MR. MAZUREK:  Thank you, Judge.

G38LMIR1                    Correa - cross

1   Q.  I'm going to direct your attention to the last line of the

2   first paragraph.  Read that to yourself and when you're

3   finished, let me know.

4   A.  I'm done.

5   Q.  Isn't it true, sir, that the day of your arrest, May 1,

6   2014, you told the arresting agents and officers that you would

7   lie to Dr. Mirilishvili and say you were in pain?

8   A.  Yes, according to what it says on the paperwork.

9   Q.  And each and every time that you visited Dr. Mirilishvili's

10  office, the doctor would ask you questions about whether you

11  were in pain and he conducted a physical examination?

12  A.  Not that I can remember, no.

13  Q.  Well, again, on May 1, 2014, at that same debriefing with

14  the agents and the officers, isn't it true that you said to the

15  agent at that time, the day of your arrest, each and every time

16  you visited Dr. Mirilishvili, he would ask Correa pain

17  questions and conduct a physical examination?

18  A.  Not that I can remember.

19          THE COURT:  OK.

20  A.  If I did state it, I stated it because I might have not

21  been at the state of mind, being that I had just got arrested,

22  I wasn't thinking clearly.

23  Q.  You weren't thinking clearly.  But today you're thinking

24  clearly because now you have a cooperation agreement, right?

25  A.  No, because now the truth is that now I'm starting to

1    remember a lot of things.  Some things I don't remember, some

2    things I do.

3    Q.  So two years later your story changed from the story that

4    the answers you gave on the very day of your arrest on May 1,

5    2014; is that what you're saying?

6    A.  No.

7    Q.  Your story hasn't changed?

8    A.  I just don't remember everything from two years ago.

9    Q.  Sir, pick up the document in front of you again.  That's

10   not in evidence.  Don't read it out loud.  If you look at that

11   first paragraph, the sentence --

12           THE COURT:  Not the sentence because you're not going

13   to read it out loud either.

14           Sir, look at the first paragraph of that document.

15   Does it jog your memory?  You say you don't remember.  Does

16   this cause you to remember or not?

17           THE WITNESS:  Not really Judge, no.

18           THE COURT:  Fine.  Move on, please.

19           MR. MAZUREK:  Thank you, Judge.

20   Q.  On May 1, 2014, when you were arrested, sir --

21   A.  Yes.

22   Q.  -- and you were asked questions by the DEA agents and the

23   officers --

24   A.  Yes.

25   Q.  -- at that point in time, you didn't yet have your

G38LMIR1                         Correa - cross

1    cooperation agreement, right?

2    A.  No, I did not.

3    Q.  And but you were thinking about the fact that you're busted

4    now and it could be your third offense, right?

5    A.  No, not necessarily.  I wasn't thinking that at all.

6    Q.  You agreed to answer questions immediately upon your

7    arrest, right?

8    A.  I don't remember.

9    Q.  You don't remember.  You don't remember being arrested?

10   A.  Yes, I remember being arrested, but I don't remember being

11   questioned immediately.

12   Q.  You were questioned that same evening?

13   A.  I believe so.

14   Q.  And they asked you a lot of questions.  There were a lot of

15   agents in the room.  There were about six or seven agents,

16   right?

17   A.  I can't remember how many there was.

18   Q.  There was several, correct?

19   A.  Yes.

20   Q.  And they wanted to know what you were involved in and they

21   said they had a lot of evidence against you already, correct?

22   A.  Yes.

23   Q.  They told you that you were on tape, that you were recorded

24   by a confidential source, correct?

25   A.  I don't remember that conversation.

G38LMIR1                         Correa - cross

1    Q.  You learned that, right?

2    A.  Yes, I did.

3    Q.  And they told you that you could only help yourself by

4    answering questions truthfully, right?

5    A.  Yes.

6    Q.  And you answered those questions as truthfully as you could

7    at that point, right at the time you were arrested, right?

8    A.  Yes.

9    Q.  Now, I'm going to back to 2012 now, two years before your

10   arrest, again, with Mr. Williams.  He coached you on the things

11   that you needed to say during a doctor examination.  Is that

12   true?

13   A.  No, not necessarily, because he told me there wasn't really

14   no questions that were really going to be asked.  He told me

15   that the doctor would read my MRI and he would instruct me what

16   the problem I was having.

17   Q.  You've been, before you went to Dr. Mirilishvili, you've

18   been to doctor visits before, correct?

19   A.  Yes, I have.

20   Q.  You've suffered injuries in the past?

21   A.  Yes.

22   Q.  What kind of injuries?

23   A.  I had a broken hand and dislocated finger and operation for

24   my spinal cord.

25   Q.  When was the operation for your spinal cord?

G38LMIR1                          Correa - cross

1    A.  About 1985.

2    Q.  And that was a result of an accident at work at a

3    construction site?

4    A.  No.

5    Q.  What was it?

6    A.  I have no idea.  It's called scoliosis.

7    Q.  And when, in terms of going to a doctor -- and you had a

8    hernia before; is that right?

9    A.  Yes.

10   Q.  Two times?

11   A.  Yes.

12   Q.  And you also have diabetes, history of diabetes in your

13   family?

14   A.  Yes.

15   Q.  And these are the kinds of questions that a doctor would

16   typically ask in a patient examination, correct?

17   A.  Not all doctors.  I've never been asked those questions in

18   previous doctors that I went to, no.

19   Q.  But Dr. Mirilishvili asked those questions during your

20   patient exam, right?

21   A.  Vague questions, yes.

22   Q.  I'm sorry?

23   A.  Vague questions.

24          THE COURT:  He asked those questions about diabetes

25   and about family history, did he ask you those questions, yes

1    or no?

2                THE WITNESS:  Yes.

3                THE COURT:  Good.  It will go much faster, Mr. Correa,

4    if you respond to questions yes or no.  He's going to ask you

5    questions that can be answered yes or no.  He's not going to

6    ask you any other kind of questions is my prediction.

7                MR. MAZUREK:  How do you know?

8                THE COURT:  Good guess.  So if you answer the question

9    yes or no, it will all move much faster.

10               MR. MAZUREK:  Thank you, Judge.

11   Q.  Now, before you went to Dr. Mirilishvili, you were looking

12   at other doctors and were told by Mr. Williams to go to a place

13   called Astro Med, right?

14   A.  Yes.

15   Q.  That was another clinic that was located in the Bronx,

16   right?

17   A.  Yes, it was.

18   Q.  And you tried to get an appointment there to do the same

19   thing that you tried to do with Dr. Mirilishvili, which was to

20   try to get a prescription of oxycodone, right?

21   A.  No, I did not.

22   Q.  You didn't, that wasn't your purpose of going to Astro Med?

23   A.  No, I went, but I didn't get an appointment.  I didn't like

24   the atmosphere.

25   Q.  You didn't like the atmosphere.  Well, but that was what

1  you were intending to try to do when you attended that clinic,

2  right?

3  A.  Yes.

4  Q.  But you didn't get an appointment?

5  A.  No.

6  Q.  So Mr. Williams directed you to another doctor and that was

7  Dr. Mirilishvili?

8  A.  Yes.

9  Q.  And you also went later to a third doctor, a Dr. Lucas,

10  right?

11  A.  Yes, I did.

12  Q.  So there were a number of doctors, pain doctors out there

13  that you heard from different people like Mr. Williams about

14  who to try to go and get oxycodone from, right?

15  A.  Only from Mr. Williams, yes.

16  Q.  That's the only person you referred to in order to try to

17  get that information, right?

18  A.  Yes.

19  Q.  And later you learned that Mr. Williams, I think you said

20  on direct examination became friendly with Dr. Mirilishvili,

21  correct?

22  A.  Excuse me?

23  Q.  Mr. Williams was friendly with Dr. Mirilishvili, right?

24  A.  Yes, he was.

25  Q.  Because part of the game, as you call it, sir, is for

437

G38LMIR1                          Correa - cross

1   people like Mr. Williams and yourself to become friendly with a

2   doctor to see if you can do things that can help you in your

3   business, which is to obtain the scripts to sell, right?

4   A.  Yes.

5   Q.  When you went to Dr. Mirilishvili, you were able to get an

6   appointment, right?

7   A.  Yes, I was.

8   Q.  And that was in, I think we saw yesterday, in September of

9   2012, correct?

10  A.  Yes, it was.

11  Q.  And at that point in time, Dr. Mirilishvili was working at

12  a group clinic in the Bronx, right?

13  A.  Yes.

14  Q.  He wasn't in Washington Heights where you ended up working,

15  right?

16  A.  No, not yet.

17  Q.  And he was there, he was renting space along with other

18  doctors, correct?

19  A.  Yes, he was.

20  Q.  And you got the appointment by talking to his secretary, is

21  that right, Ms. Oneida Hernandez?

22  A.  No, I did not.

23  Q.  How did you get the appointment?

24  A.  Raymond Williams had made the appointment for myself.

25  Q.  So he already helped schedule the appointment for you?

G38LMIR1                        Correa - cross

1    A.  Yes.

2    Q.  And you purchased the MRI and the referral and you had that

3    with you as you went to the doctor, correct?

4    A.  Yes, I did.

5    Q.  Now, you said yesterday when you went into that patient

6    visit, the doctor read your MRI, correct?

7    A.  Yes, he did.

8    Q.  Now, the MRI indicated that you had a herniated disc; is

9    that right?

10   A.  I believe so.  I had a problem with my lower back.

11   Q.  Now, the notes of that visit, sir, however, indicate that

12   you indicated to the doctor that you had shoulder and neck

13   pain; isn't that right?

14   A.  Negative.

15   Q.  If we could put what's already admitted into evidence DX205

16   on the screen.  And as we do that, sir, you never met

17   Dr. Mirilishvili before this visit, correct?

18   A.  Before my visit?

19   Q.  Before your initial visit at the Bronx clinic in

20   September 2012?

21   A.  Before my visit I was only taking patients to see him.

22   Q.  You were already taking patients before you went yourself?

23   A.  Yes.

24   Q.  And those were patients that you obtained, you were working

25   with Ray Williams at the time?

1   A.  Yes.

2   Q.  So other people -- and how do you recruit patients, sir,

3   what's your method?

4   A.  I just offer them money to give me a service.  That was

5   all.  I explained to them what they needed to do.

6   Q.  And you explained to them you needed to provide them an MRI

7   and referral letter?

8   A.  Yes.

9   Q.  And for each one you spent $500 to do that?

10  A.  Yes.

11  Q.  And you told them they needed to explain that they had an

12  injury that was consistent with the MRI?

13  A.  No.  I told them to have a seat when they go in, pay the

14  doctor, and the doctor is going to read your MRI and then he

15  will tell you what's going on.

16  Q.  Well, you needed to let the patient know what it is that

17  was said, read the MRI, make sure you understand that if you're

18  asked if you have pain, you say you have pain, right?

19  A.  Yes.

20  Q.  Just like we listened to yesterday with Mr. Lantigua's

21  visit when he was asked where he felt the pain, was it below

22  his knee or above his knee, he said he had pain in both legs,

23  in fact, right?

24  A.  Yes.

25  Q.  That's the kind of thing you would coach your patients to

1    do, right?

2    A.  I would just tell them to read the MRI so they would know

3    exactly what the doctor might ask them.

4    Q.  Now, you had been doing that for some time before you

5    decided to try to get an oxycodone prescription for yourself?

6    A.  Yes.

7    Q.  Why didn't you go in first?

8    A.  I don't know.  I put somebody else first.

9    Q.  Now, when you went in, then you already knew what your

10   program was, right?  You had already been using it with other

11   people, right?

12   A.  Yes.

13   Q.  Now, you said to the doctor in addition to the back problem

14   that you also had a neck, shoulder pain, right?

15   A.  Negative.

16   Q.  Let's go now to 205.  Put that on the screen.  I think we

17   have a projector issue, but everyone has it on their screen.

18   OK.  So let's look at GX205 and turn to the 12 page of that

19   exhibit.

20           And, sir, because you worked with Dr. Mirilishvili for

21   about 10 months, you got to know that some of the records that

22   are kept, that were kept at his clinic were kept

23   electronically, right, on the computer?

24   A.  To my knowledge there was no records.  I never seen the

25   doctor put no records or notes inside the computer other than

1  prescription he was handing out.

2  Q.  But I mean you know you worked with Jomaris Javier and

3  Damon Leonard and what they were doing was uploading documents

4  on a computer all the time, you knew that?

5  A.  Only the oxycodone prescription and the urine analysis,

6  that's all that was being scanned, and their MRIs for the first

7  patient visit.

8  Q.  When you say being scanned, you know they were being

9  scanned and uploaded onto a system on a computer, right?

10  A.  Yes.

11  Q.  Those were where the doctor maintained some of his records,

12  the records that were uploading, right?

13  A.  Yes, but there was never no notes taken by the doctor for

14  all the visits I was in the room for or my own notes.

15  Q.  Just yesterday, sir, you testified that while you were in

16  the room interpreting for Jose Lantigua, as you called it,

17  Dr. Mirilishvili wrote down notes on what you called sticky

18  notes, right?

19  A.  Yes.

20  Q.  So you did see him take notes during a patient visit,

21  right?

22  A.  Yes, on a sticky note, but not on a computer.

23  Q.  You don't know what happened after that sticky note, how it

24  ever would get on the computer, do you?

25  A.  No, I don't.

1   Q.  OK.  I'm showing you what's been marked into evidence as

2   GX205, and if we can blow up the top third of that page.  Now,

3   the print is kind of small so please bear with me.

4          This is, you see in the upper left the patient that's

5   identified here is yourself, right, Abraham Correa?

6   A.  Yes.

7   Q.  And if you see the date of the patient visit, it's on the

8   right hand column.  It's September 6, 2012.  Do you see that?

9   A.  Yes.

10  Q.  And under the heading of chief complaint, it says neck,

11  left shoulder pain, discomfort, numbness, and tingling

12  sensations, correct?

13  A.  Yes.

14  Q.  And did you tell the doctor that you had, your injury was

15  suffered because you fell down some scaffolding stairs?

16  A.  Yes.

17  Q.  And did you tell him that you had to go to Mount Sinai

18  Hospital in the emergency room because of that?

19  A.  Yes.

20  Q.  And you lost consciousness?

21  A.  I don't recall saying consciousness.

22  Q.  You were kept in the hospital for two weeks?

23  A.  Yes.

24  Q.  And you told him all this in your initial visit, right?

25  A.  Yes.

G38LMIR1                         Correa - cross

1    Q.  And that was the source of the pain that you were feeling

2    in your back and your shoulder and your neck, right?

3    A.  No.  In my back only, not my neck or shoulder.

4    Q.  So if we look at under the subjective column on the

5    left-hand side of the page where it says neck pain, it says

6    daily, constant, sharp, shooting, burning, electrical, moderate

7    to severe neck pain.  Do you see that?

8    A.  Yes.

9    Q.  And do you remember yesterday when we were listening to the

10   recording of the Lantigua visit?

11   A.  Yes.

12   Q.  The doctor asks questions when you're in the room -- you've

13   heard them before -- about what kind of pain, is it a sharp

14   feeling or is it electrical feeling, is it something that is

15   dull or something that lasts a long time; do you remember those

16   questions?

17   A.  Yes, I did.

18   Q.  And what he's writing here is the kind of pain, the answers

19   to the questions you were asking at the patient visit, right?

20   A.  He might have asked those questions to me, but it wasn't

21   for no neck pain because I didn't have neck pain.

22   Q.  So you're saying that he just made it up?

23   A.  Yes.

24   Q.  Even though the whole point, you're saying, of this game is

25   that oh, it's he just puts down what's in the MRI and that's

G38LMIR1                          Correa - cross

1   the end of it, right, isn't that the game as you call it?

2   A.  Yes.

3   Q.  So by him putting down neck pain, that doesn't fit your

4   game, does it?

5   A.  It fit my game because I got a oxycodone prescription.

6   What he wrote afterwards, I don't know why he wrote that

7   because it's obvious in the paperwork that my MRI said I had a

8   lower back problem.  It never indicated nothing about neck or

9   shoulder.

10  Q.  Let's go, if we could go the full page again and blow up

11  the objectives column.  And do you see that on your screen,

12  sir?

13  A.  Yes.

14  Q.  And under that it says, this is a 40-year-old Spanish

15  American male patient who referred to our pain management

16  clinic by PCP, primary care physician, and is seen today as an

17  initial visit.  Right?

18  A.  Yes.

19  Q.  And it says patient with long history of neck pain.  You

20  still don't remember saying that?

21  A.  No.

22  Q.  Secondary to an accidental falling, it says here from the

23  scarf seers.  Did you tell him that you fell from scaffolding

24  stairs?

25  A.  Yes.

1   Q.  Now, Dr. Mirilishvili you knew was an immigrant from the

2   former Soviet Union, correct?

3   A.  Excuse me?

4   Q.  You knew that Dr. Mirilishvili was an immigrant from the

5   former Soviet Union, correct?

6   A.  No, I did not.

7   Q.  You never talked to him at all in your ten months working

8   there about his background?

9   A.  No.

10   Q.  His English wasn't perfect, correct?

11   A.  Correct.

12   Q.  And his written English was probably even worse, right?

13   A.  Probably.  I couldn't tell you.

14   Q.  But do you see that phrase scarf seers, that's consistent

15   with what you told him about scaffolding stairs, correct?

16   A.  Yes.

17   Q.  So you told him that, but you're saying that you never told

18   him about neck pains?

19   A.  No.  There wouldn't be no reason for me to tell him about

20   neck pain when my MRI read lower back problem.

21   Q.  You were just lying anyway, right?

22   A.  If I was going to lie, I needed to make sure my story stood

23   to what the paper said.

24   Q.  Well, you're lying about falling from scaffolding stairs.

25   And then if we go down two lines, I'm sorry, keep that on the

```
 1   screen, the same objective section.  It says that -- you see
 2   the fourth line down, following the accident, patient LOC,
 3   which may be loss of consciousness, and awaking in Mount
 4   Sinai --
 5            MR. DISKANT:  Objection to that, your Honor.
 6            THE COURT:  I'm sorry.  Are you reading from a
 7   document not in evidence?
 8            MR. MAZUREK:  It's in evidence.
 9            THE COURT:  OK.  What is the problem?
10            MR. DISKANT:  The objection is to the characterization
11   of LOC.
12            THE COURT:  Excuse me.  The objection is overruled.
13   Q.  Following the accident, patient LOC and awaking in Mount
14   Sinai Hospital where he kept two weeks for observation and
15   later on discharged from hospital following a negative
16   diagnostic test.
17            Do you see that?
18   A.  Yes.
19   Q.  And you told him that, right?
20   A.  Yes.
21   Q.  And that's why it's in the notes, right?
22   A.  Yes.
23   Q.  And that was a lie, right?
24   A.  Yes.
25   Q.  You told him that you had such a serious injury that you
```

G38LMIR1                         Correa - cross

1    were in the hospital for two weeks, right?

2    A.  Yes, because I need to make what was on my MRI look good.

3    Q.  And you had a lot of pain as a result, right?

4    A.  Yes, in my lower back.

5    Q.  This is the first time you ever met the man, right?

6    A.  Yes, face to face.

7    Q.  He didn't know anything about you?

8    A.  No.

9    Q.  This is what you told him, right?

10   A.  Yes, except for the part with the neck injury.

11   Q.  That's the only thing that you're saying now that oh,

12   that's not true, right?

13   A.  Yes.

14   Q.  The doctor just made it up?

15   A.  Yes.

16   Q.  OK.  Now if we go down to the next line, again it says

17   following, do you see that, following the discharge -- are you

18   following with me -- sixth line down, following the discharge,

19   a few days later the patient pains worsening.  Patient visiting

20   a PCP where after the evaluation referred patient for cervical

21   and LS spine MRI.  And since then placed on numerous

22   rehabilitation and pain management therapeutic regimens

23   including oxycodone.

24            Do you see that?

25   A.  Yes.

G38LMIR1                        Correa - cross

1   Q.  So you told the doctor after you got released from the

2   hospital, you went to your another doctor who evaluated you and

3   said you needed an MRI, right, that's how you got the MRI?

4   A.  I don't remember telling him that I saw another doctor

5   after I came out of the hospital.

6   Q.  Well, you came in with an MRI, sir, right?

7   A.  Yes.

8   Q.  And the MRI was from a radiology group called Open MRI of

9   Rye, Greenwich, and Greater Northeastern Radiology Associates,

10  right, or you don't remember that now?

11  A.  No.

12  Q.  Because that's just a document that you purchased off of

13  Ray Williams, right?

14  A.  Yes.

15  Q.  And when it says that on the patient notes that after the

16  evaluation by the doctors, you were referred for a cervical and

17  LS spine MRI, do you know what a cervical MRI is?

18  A.  For the neck, I believe.

19  Q.  That's right.  So did you tell the doctor that oh, you're

20  also getting a neck MRI in addition to the one that you had at

21  the time, which was the lower back MRI?

22  A.  No, I did not.

23  Q.  Again, you're saying that he just made that up, that's the

24  one part that he made up?

25  A.  Yes.

1    Q.   OK.  And you told him that you were already on oxycodone,

2    correct?

3    A.   No, I did not.

4    Q.   Well, according to the notes that you said you were

5    already -- the doctor writes that you were on numerous

6    rehabilitation and pain management therapeutic regimens

7    including oxycodone?

8    A.   No, I never said those words to him.

9    Q.   In your referral letter did it indicate an oxycodone set of

10   prescriptions?  If we can go off this page and go to page 8.

11   This is the referral letter that you purchased from Ray

12   Williams?

13   A.   Yes.

14   Q.   And it's from a place called Active Life Physical Therapy,

15   right?

16   A.   Yes.

17   Q.   And this is the doctor that you indicated referred you to

18   Dr. Mirilishvili, that's the referral letter?

19   A.   It's a referral letter, yes.

20   Q.   And do you see the recommendation of the oxycodone HCL

21   30 milligrams?

22   A.   Yes.

23   Q.   So does that refresh your recollection that you were

24   telling the doctor that oh, I've already been taking oxycodone

25   at this point in time?

G38LMIR1                    Correa - cross

1   A.  No, it does not.

2   Q.  That was part of the game, wasn't it, that you're going to

3   tell that you were already on it so the doctor would believe

4   that you could be opioid dependent and would continue to

5   prescribe it, right?

6   A.  No, because I never said that to him that I was on

7   oxycodone.

8   Q.  You never heard that before, you never told your other

9   patients to say that?

10  A.  No.

11  Q.  Yesterday when Jose Lantigua was asked the question on

12  whether he was on oxycodone, he said he was, right?

13  A.  Yes, but it has nothing to do with me.

14  Q.  You're saying that wasn't part of the game?

15  A.  Whatever Mr. Lantigua was doing, that was upon him.  That

16  had nothing to do with me.

17  Q.  I'm talking about your patients.  You would tell your

18  patients that you have a better chance of getting oxycodone if

19  in fact you told the doctor that you are already on it, right?

20  A.  No.

21  Q.  That never happened?

22  A.  No.

23  Q.  Let's go back to the 12 page of that exhibit.  And if we

24  can blow up the bottom third of the page, starting right below

25  type of reactions.  And if we could take a look at and

1  highlight the line that starts with PSH.  Do you see that?

2  Thank you.  It's very small and I apologize for the type print.

3          Do you see that, PSH:S/P scrotal hernia repair times

4  two, do you see that?  Again, this is the first time that you

5  ever met Dr. Mirilishvili, right?

6  A.  Yes.

7  Q.  He asked you questions about your prior surgical history,

8  and you told him about the two hernia surgeries that you had,

9  right?

10  A.  Yes.

11  Q.  Again, because he was conducting an examination, right?

12  A.  Because he was just asking questions.

13  Q.  That's --

14  A.  Examination was real brief.

15  Q.  But that's what a doctor does, right, asks questions about

16  your prior history, right?

17  A.  Yes.

18  Q.  And the only way he would know that about you is if you

19  told him this, right?

20  A.  Yes.

21  Q.  He's putting down in his notes what you told him, right?

22  A.  On that part, yes.

23  Q.  OK, on that part.  And you told him also in the next line,

24  family history, you see an X by DM?

25  A.  Yes.

G38LMIR1                      Correa - cross

1    Q.  Because you told him you had family history of diabetes,

2    right?

3    A.  Yes.

4    Q.  Did you tell him that?

5    A.  Yes.

6    Q.  And the next question, social history.  Did you tell him

7    you were single and had four children?

8    A.  Yes.

9    Q.  That's what's indicated there, right?

10   A.  Yes.

11   Q.  And then two lines down from that, VAS equals eight.  Do

12   you remember Dr. Mirilishvili asking you on a scale of zero to

13   ten, tell me how your pain feels?

14   A.  No, I don't remember.

15   Q.  That's something that when you started working for him and

16   you went to his office and you acted as an interpreter, that

17   was a typical question, right?  You would give a scale to

18   people and say zero to ten, tell me where do you feel pain on

19   that scale?

20   A.  Yes, he would.

21   Q.  And then if we go towards the bottom of that page, actually

22   before that, let's go two lines down where it says cervical

23   spine.  Do you see that?

24   A.  Yes.

25   Q.  And it says cervical spine, that's an X mark after MRI.  Do

G38LMIR1                          Correa - cross

```
 1   you see that?
 2   A.  Yes.
 3   Q.  And it says at the end of that line, pending, right?
 4   A.  Yes.
 5   Q.  Because you didn't have that cervical MRI with you, right?
 6   A.  I didn't need a cervical MRI.  That's not what I was there
 7   for.  I only needed that one MRI and that was it.
 8   Q.  So you didn't have a cervical MRI with you, correct?
 9   A.  No.
10   Q.  And when he said here that it was pending, that is because
11   you told him that oh, yeah, you were still going to get that
12   one too, right?
13   A.  No.
14   Q.  You never told him that?
15   A.  No.
16   Q.  He just wrote that down?
17   A.  I guess so.
18   Q.  And then if we go towards the bottom of that page, you see
19   cervical spine ROM three lines from the bottom?
20   A.  Yes.
21   Q.  And there are different indications there, floor, flexion,
22   extension, right lateral flexion, left lateral flexion, right
23   lateral rotation, and left lateral rotation.  Do you see that?
24   A.  Yes.
25   Q.  And then there are numbers by there?
```

```
1    A.  Yes.
2    Q.  And one of the things that the doctor had you do while you
3    were in the patient visit were moving parts of your body,
4    right?
5    A.  Yes.
6    Q.  And he would touch you at certain places, right?
7    A.  Not that I can remember to myself, no.
8    Q.  You don't remember him touching you in your arm, your
9    shoulder, and your lower back?
10   A.  No.
11   Q.  You've seen Dr. Mirilishvili do that quite often, right?
12   A.  To some patients.
13   Q.  He did it to Mr. Lantigua on the recording yesterday,
14   right?
15   A.  Yes.
16   Q.  He was touching his legs, right, to see his circulation,
17   correct?
18   A.  Yes.
19   Q.  You just don't have a memory of it now what you were doing
20   back in 2012, four years ago, right?
21   A.  Yes.
22   Q.  And the length of that initial patient visit with
23   Dr. Mirilishvili was about 20 to 30 minutes, correct?
24   A.  Yes, it was.
25   Q.  Also what happened at that initial patient visit was that
```

1   you were given something called controlled substances pain

2   management agreement, right, do you remember that?

3   A.  No, I do not.

4   Q.  If we could put page 15 on the screen from that same

5   exhibit and blow up the top half of the page.  Thank you.

6           This was a document that you were given at the time of

7   your initial patient visit with Dr. Mirilishvili, is it not?

8   A.  Yes.

9   Q.  It has your name handwritten on it, correct?

10  A.  Yes.

11  Q.  And there are initials along the left hand column.  That's

12  your initials?

13  A.  Yes, it is.

14  Q.  And these are things, this document you were asked to read

15  and to sign and initial after reading, correct?

16  A.  Yes.

17  Q.  And it talks about, if we go through some of them, No. 1, I

18  will take only these controlled medications and in the doses

19  prescribed by my provider.  Right?

20  A.  Yes.

21  Q.  No. 2, I will not increase, stop, or alter my dose of

22  controlled substance medication without prior approval of my

23  provider.  Right?

24  A.  Yes.

25  Q.  And I understand that increasing my dose without

1    authorization or obtaining controlled prescriptions outside of

2    Dr. Moshe Mirilishvili's clinic may result in the

3    discontinuation of all controlled substances.  Right?

4    A.  Yes.

5    Q.  And this goes on and there's a whole list of things that

6    you were advised of and it has to do with the fact that you are

7    being prescribed what's called a controlled substance, and you

8    understood what that meant, right?

9    A.  Yes.

10   Q.  And that you weren't supposed to divert it or take extra

11   dosages or go to other doctors and find other prescriptions,

12   right?

13   A.  Yes.

14   Q.  And you were told to read, and if you agreed, to initial

15   it, right?

16   A.  Yes, but I never read it.

17   Q.  But you were supposed to, right?

18   A.  Yeah, but there wasn't no need to read it.

19          THE COURT:  No.  You didn't read it.  OK.  You were

20   supposed to read it and you didn't read it.  Next question.

21          MR. MAZUREK:  Thank you, Judge.

22   Q.  Second page.  That's your signature next to the word

23   patient?

24   A.  Yes.

25   Q.  And it's dated September 6, 2012?

G38LMIR1                         Correa - cross

1    A.  Yes.

2    Q.  And that was the date of your initial patient visit,

3    correct?

4    A.  Yes.

5    Q.  And just one last thing.  If we go back to the first page

6    and if we could highlight the bottom half, blow up the bottom

7    half of the page.  Do you see No. 9 where you initial, I will

8    fill all controlled substance prescriptions at one pharmacy.

9    Do you see that?

10   A.  Yes.

11   Q.  You followed that instruction, right?

12   A.  Yes.

13   Q.  That's not filled in here because you could fill in

14   whatever pharmacy you decided to use, right?

15   A.  Yes, but I was directed to a pharmacy to go to.

16   Q.  Was it explained to you that by going, by going to one

17   pharmacy, that would enable the pharmacy to have a complete

18   picture of what medications that you were taking at the time

19   and the pharmacy would get to know you better because you were

20   taking controlled substances, right?

21   A.  No.  I wasn't explained why I was told to go there.

22   Q.  Did you ever talk to the pharmacist when you were there

23   about the importance of having your prescriptions all in one

24   place?

25   A.  No, I did not.

1    Q.  Now if we could turn to page 23 of that same exhibit.   In

2    addition to receiving the pain management agreement, you were

3    also given this document that's now on your screen, right?

4    A.  Yes.

5    Q.  And at the top of the document, it's called Rampin Medical

6    Care of the Bronx.  That was the name of the clinic where

7    Dr. Mirilishvili was in September of 2012, correct?

8    A.  Yes, it was.

9    Q.  This has your name and date of birth on it, right?

10   A.  Yes.

11   Q.  And it says you're referred to Mount Sinai Hospital, right?

12   A.  Yes.

13   Q.  For orthopedic specialist and interventional pain, right?

14   A.  Yes.

15   Q.  And it's again dated September 6, 2012, the date of your

16   first patient visit, right?

17   A.  Yes.

18   Q.  And it's Mount Sinai because that's the hospital that you

19   told the doctor that you had suffered your original injury,

20   correct?

21   A.  No.

22   Q.  Where you went after your initial injury?

23   A.  No.

24   Q.  You never told him Mount Sinai?

25   A.  He asked me what hospital I wanted to go to to see a

G38LMIR1                          Correa - cross

1   specialist.

2   Q.  That's the hospital, as we saw in the patient notes, that

3   where you said you went to the emergency room after you fell

4   off the scaffolding stairs, correct?

5   A.  Yes.

6   Q.  Now, you testified yesterday that in terms of the

7   prescriptions that you received from Dr. Mirilishvili, that you

8   always received the same prescription, right?

9   A.  Yes.

10  Q.  And that in addition to oxycodone, you were given other

11  medications to fill, including Elavil, Flexeril, and Neurontin,

12  right?

13  A.  Yes.

14  Q.  And at the time that the doctor prescribed these

15  medications, he talked to you about them, right, he explained

16  what they were for?

17  A.  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

BY MR. MAZUREK:

Q.  He explained that Elavil was an antidepressant and it was

going to assist you in -- to deal with a certain type of your

pain, correct?

A.  He said that it would -- he explained to me what it would

do to certain parts of my body, but he didn't say about no

depression or anything like that.

Q.  Well, as an interpreter later on you realized that many of

the patient visits where you were interpreting the doctor would

prescribe different kinds of medications in addition to

oxycodone, correct?

A.  Yes.

Q.  And you would interpret for him when he explained to

patients about what kinds of things this medication helps you

with, right?

A.  Yes.

Q.  And the Flexeril, for example, was going to help you with

potential muscle spasms, correct?

A.  He never said muscle spasms.  He just said it would help

you with your muscles to rebuild them.

Q.  And Neurontin was for because you have certain pain, that

you may have seizures, and it's an anticonvulsant, right?

A.  Negative, he never said anything about any seizures or

convulsions.

Q.  But he talked about it in a way that if you have nerve

1   damage then the Neurontin is going to help with you those

2   aspects of the pain.

3   A.  Negative, not that I can remember, he never said those

4   words.

5   Q.  But these are some of the same medications that we heard

6   yesterday in the recording with Mr. Lantigua, right?

7   A.  Yes.

8   Q.  And the doctor was explaining in his words what it was that

9   these medications do, correct?

10  A.  Yes.

11  Q.  And that was pretty typical, right?

12  A.  Yes, every patient received the same medication almost.

13  Q.  Well, so in your first visit, these were the four

14  medications that you were given, right, the oxycodone, Elavil,

15  Flexeril and Neurontin, right?

16  A.  Yes.

17  Q.  But you went back and saw the doctor after that, right,

18  follow-up visits?

19  A.  Yes, I did.

20  Q.  And he actually changed your medication, didn't he?

21  A.  No.

22  Q.  Well, let's turn to page 27 of Government Exhibit 205.  It

23  was pretty standard that the doctor would require people to

24  come back every month, correct?

25  A.  Yes.

1   Q.  So your first visit with him was on September 6, 2012,

2   right?

3   A.  Yes.

4   Q.  And your second visit was on October 5, 2012, right?

5   A.  Yes.

6   Q.  And we have three prescriptions that are on the screen.

7   These are the prescriptions that you were given on your second

8   visit, October 5, 2012, right?

9   A.  Yes.

10  Q.  And you had to fill all your prescriptions that you were

11  given, right?  You couldn't just take the oxycodone, run away

12  with it and not do anything else, right?

13  A.  No, the pharmacy would not allow you to do that.

14  Q.  Because you are given a group of medications, all of which

15  are supposed to try to help you with the pain that you're lying

16  about, right?

17  A.  Yes.

18  Q.  Now, on this day -- if we could blow up the top two

19  prescriptions -- on the left-hand side is the oxycodone,

20  correct?

21  A.  Yes.

22  Q.  And on the right-hand side is Flexeril which we talked

23  about that you were prescribed back in September, right?

24  A.  Yes.

25  Q.  And that's for your muscles, correct?

1   A.  Yes.

2   Q.  Now if we can blow up the bottom prescription on the page.

3   This is a prescription for something called Celebrex.  Do you

4   see that?

5   A.  Yes.

6   Q.  You weren't prescribed that at your first visit, correct?

7   A.  No.

8   Q.  So the doctor on your second visit decided to change up the

9   medication, right?

10  A.  Well, I wouldn't know if he changed up the medication,

11  because I wasn't given those prescriptions.  The only

12  prescription that was given to me by him was oxycodone.

13  Everything else was e-scripts directly to the pharmacy.

14  Q.  Well, what is on the screen is a handwritten prescription,

15  right?

16  A.  Yes.

17  Q.  Because e-scripts, as you're referring to, you're referring

18  to something that came into after Dr. Mirilishvili moved to the

19  Washington Heights location, right?

20  A.  I don't know.

21  Q.  Well, this is a written prescription.  You knew about

22  e-prescriptions are something you can put on the computer and

23  send, right?

24  A.  Yes.

25  Q.  So there would be no written prescription form, right?

1    A.   Yes.

2    Q.   There is a written prescription on October 5, 2012 for you,

3    right?

4    A.   Yes.

5    Q.   And it says Celebrex, right?

6    A.   Yes.

7    Q.   You don't remember handing this to the pharmacist along

8    with your other two prescriptions?

9    A.   No, I don't.

10   Q.   Because you didn't really care about it, because you were

11   lying about the whole thing, and you only cared about the oxy,

12   right?

13   A.   Yes.

14   Q.   But in fact this indicates that you were being given other

15   prescriptions based on the doctor's determination of what you

16   need on October 5, 2012, right?

17   A.   Yes.

18   Q.   Now, there came a time -- we talked about it yesterday --

19   that you learned the doctor was moving locations, was opening

20   up his own clinic in Washington Heights, right?

21   A.   Yes.

22   Q.   And you knew -- you were still talking to Raymond Williams

23   around this time?

24   A.   Yes.

25   Q.   And Raymond Williams you knew was helping the doctor in

1   finding a location and getting him -- helping him to set up his

2   new place?

3   A.  No.

4   Q.  Williams didn't tell you that?

5   A.  No.

6   Q.  But you knew Williams was friendly, I think you said, with

7   the doctor at that point, right?

8   A.  Yes.

9   Q.  And it was Raymond Williams who came to you and said, oh,

10  you know, I think the doctor is going to need some security at

11  his new clinic, and I think it would be a good idea for you to

12  work there, right?

13  A.  No.

14  Q.  That's not what happened?

15  A.  The doctor himself asked me if I wanted to take a security

16  job.

17  Q.  I'm sorry?

18  A.  The doctor himself asked me if I wanted to take a security

19  job.

20  Q.  But it was Raymond Williams who told you before then that

21  Mirilishvili was looking for someone to work security at his

22  office, right?

23  A.  Incorrect.

24  Q.  Well, sir, I can take you back to May 1, 2014 again.  Isn't

25  that what the told the agents on that day at the time of your

1    arrest?  And I refer counsel and the court to 3501-22, top of

2    page 3.  Isn't that what you told them?

3    A.  Not that I can recall.  And if I did tell them, it wasn't

4    correct.

5    Q.  That's another thing that you told them that was not true,

6    you're saying, when you first got arrested in May of 2014.

7    A.  Yes.

8    Q.  You testified here yesterday that you went back into a room

9    with Augustine Cruz and Damon Leonard and just at the time that

10   the doctor opened his office.  And when was that?  That was in

11   November 2012?

12   A.  Yes.

13   Q.  Damon Leonard and Augustine Cruz weren't working for the

14   doctor at that point, right?

15   A.  No.

16   Q.  So that's not what happened, is it?

17   A.  What is not what happened?

18   Q.  You and Damon Leonard and Augustine Cruz went into some

19   back room and the doctor offered all of you a position to be a

20   security guard.

21   A.  Yes, it was what happened.

22   Q.  What happened, sir, was that Raymond Williams -- that's the

23   guy who you were working with at the time -- asked you, oh, I

24   need a guy to be there, so he asked you to be the security

25   guard, and that he was going to introduce you -- that you

G387MIR2                        Correa - cross

1   wanted the job -- to the doctor, right?

2   A.   No.

3   Q.   Well, that's what you told the agents on May 1, 2014, isn't

4   it?

5   A.   It might have been, but that was incorrect at the time.

6   Q.   So you started working there at the time end of December,

7   correct?

8   A.   Yes.

9   Q.   And that's in 2012, right?

10  A.   Yes.

11  Q.   And, as you said, you were still bringing in patients, is

12  that right?

13  A.   Yes.

14  Q.   Feeding them with MRIs that you're still purchasing from

15  Raymond Williams?

16  A.   Yes.

17  Q.   So you didn't have any conversation with the doctor, hey,

18  doc, can you save me -- every time I want to bring in a patient

19  it's $500, let's just, you know, use the same MRI, or we can

20  copy one, change their names?  You never did that?

21  A.   No.

22  Q.   Instead, you went into your pocket every single time,

23  right?

24  A.   Yes.

25  Q.   Now, there came a time in June of 2013 that you were

1    introduced or a man came up to you who you later came to know

2    as Jose Lantigua, right?

3    A.  Yes.

4    Q.  And you didn't know this man before he first came up to

5    you, right?

6    A.  No, I did not.

7    Q.  Yesterday you said that almost everybody who was coming

8    into that clinic were brought by one of the bosses, right?

9    A.  Yes.

10   Q.  But here is a man who came and there was no boss around

11   him, right?

12   A.  No, not everybody there that was a patient was with a boss.

13   Q.  Not everybody was, were they?

14   A.  No.

15   Q.  In fact there were many who weren't, right?

16   A.  Yes.  But, as I said, a high percentage was people who were

17   under a boss.

18   Q.  So Mr. Lantigua -- the one person who came working for the

19   government turned out to be someone who was different, right?

20   A.  Yes.

21   Q.  And he asked you when he first approached you, he was like

22   how do I get an appointment, right?

23   A.  Yes.

24   Q.  And you told him, well, you have to pay me first, right?

25   A.  I told him that he had to pay to get in if he wanted to get

G387MIR2                    Correa - cross

1   in, yes.

2   Q.  In fact you charged him $200, right?

3   A.  Yes.

4   Q.  And you said you would be able to help him get in for that

5   $200.

6   A.  I told him for $200 he could get in, and I told him what he

7   needed.

8   Q.  The same kind of stuff, he needed as real looking paperwork

9   as he could get, right?

10  A.  Yes.

11  Q.  And he came back after that, right, that first time?

12  A.  Yes, he did.

13  Q.  In fact he came back several times, right?

14  A.  Yes.

15  Q.  And one time he came back with some paperwork, you looked

16  at it and you said that doesn't look good to me, you're not

17  going to get that passed, it's not good enough, you need to

18  come back with better.

19  A.  Yes, I did.

20  Q.  Because you knew that the kinds of things that could work,

21  they have to look real, right?

22  A.  Yes.

23  Q.  And at that point you already took his $200, right?  Right?

24  A.  No.

25  Q.  No?  It's only when he came back with better paperwork that

470

1   you took his $200?

2   A.  Yes.

3   Q.  And in fact you ended up taking another 200 from him for a

4   total of 400, correct?

5   A.  No, not that I can remember, no.

6   Q.  All right.  Well, let's -- you were paid on June 13, 2013

7   $200 from Mr. Correa; is that about right?

8   A.  No.

9   Q.  Sorry?

10  A.  No, I don't understand the question.

11  Q.  You just don't remember when it was that you first took

12  money from Mr. Correa, or how many -- I mean Mr. Lantigua.  I'm

13  sorry.

14  A.  No, I don't remember, but if I did, it was only one time.

15  Q.  OK.  Would it help to refresh your memory if I showed you

16  some documents?

17  A.  Yes.

18  Q.  I'm going to show you what has been marked for

19  identification as 3501-14 and 3501-3.

20          Your Honor, may I have continued permission to

21  approach?

22          THE COURT:  Yes.

23  Q.  I'm going to ask you to read this to yourself.  This is the

24  first document and the date:  OK?  And the date.  OK?  Does

25  that help to refresh your recollection in terms of the payment?

G387MIR2                          Correa - cross

1   A.  Yes.  But there was only one payment that was made; there

2   was never any more.

3   Q.  So you weren't paid on June 13 and on June 18?  Your memory

4   is there was only one payment?  Well, you remember, sir, that

5   he came to you multiple times, correct?

6   A.  I remember him offering one day and then he paid the

7   previous time.  That I remember.  But him making two payments,

8   I don't remember.

9   Q.  You just don't remember at this time.

10  A.  No.

11  Q.  Well, you remember after he got in he made another payment,

12  right?

13  A.  Yes.

14  Q.  $50 to you?

15  A.  Yes.

16  Q.  That was a final tip to say thanks for getting me in?

17  A.  Yes.

18  Q.  So your memory is that there were $250 and not $450?

19  A.  Yes.

20  Q.  And that Lantigua also had to pay Jomaris Javier who was

21  the medical assistant in the office, right?

22  A.  No.  He paid me, I would talk to Jomaris, and then I would

23  split the money with her.

24  Q.  So he didn't pay her an extra $100?

25  A.  Not that I know of.

G387MIR2                          Correa - cross

1    Q.   If I show you a document, might it help to refresh your

2    recollection?

3    A.   What he did with Jomaris, I wouldn't know about.

4    Q.   You wouldn't know about.

5    A.   No.

6    Q.   So it's possible that he also was paying other people in

7    the office also to help him get an appointment with the doctor.

8    A.   I can't say if that was accurate or not.  What other

9    business he conducted, I don't know of.

10   Q.   But you were aware that it was typical what was going on at

11   that point in time is that the office workers were all trying

12   to make more money by accepting bribes from patients who were

13   wanting to get a visit at the office.

14   A.   Yes.

15   Q.   And it wasn't just you.  It was also Jomaris Javier, and

16   later it was Augustine Cruz, and later it was Damon Leonard,

17   correct?

18   A.   Yes.

19   Q.   And none of you -- are you aware whether -- did you ever

20   tell the doctor that you were taking bribes from his patients

21   to get in?

22   A.   No, I did not.

23   Q.   You knew that his office visit for his time was $200 an

24   hour, right?

25   A.   Yes.

G387MIR2                         Correa - cross

1   Q.   And you were taking $200 too, right?

2   A.   Yes.

3   Q.   And that was more deception of the doctor, right?  You

4   didn't confide in him about that, right?

5   A.   I don't understand the question.

6   Q.   It was something else that you didn't tell the truth to the

7   doctor about, right?

8   A.   No.

9   Q.   Now, when Mr. Lantigua returned to the office and he had

10  better paperwork, you told him, OK, I think this is going to

11  fly.  So he was able to go see the doctor, right?

12  A.   Yes.

13  Q.   And you don't know where he got his paperwork, right?

14  A.   No, I do not.

15  Q.   But you looked at it before he got in?

16  A.   Yes.

17  Q.   And as we saw yesterday, you were acting as an interpreter

18  for his initial visits, right?

19  A.   Yes, I was.

20  Q.   And that was something that the doctor asked you to do,

21  yes?

22  A.   Yes.

23  Q.   And did you ever say, doc, I mean why are you making me go

24  through this; it doesn't matter; just write the scripts; let's

25  get on with this?

G387MIR2                        Correa - cross

1    A.  No, I did not.

2    Q.  You agreed to do it, right?

3    A.  Yeah, because the doctor's Spanish was limited, so he

4    needed assistance so the non-English speaking patients could

5    understand what was going on.

6    Q.  He needed assistance so that the Spanish speaking patients

7    could understand what it is that he was telling them during the

8    course of his doctor visits, right?

9    A.  Yes.

10   Q.  And you translated truthfully as best you could, right?

11   A.  Yes.

12   Q.  And that first visit, as we heard yesterday, the doctor

13   explained a lot of things to Mr. Lantigua, right?

14   A.  Yes, he did.

15   Q.  And that was typical, especially for an initial visit,

16   right?

17   A.  Yes, he would explain to the patient what was going on with

18   them, the pain and what the MRI said.

19   Q.  And he would take time.  I think we saw the initial visit

20   for Mr. Lantigua, it's not on a recording, but there is pauses

21   at the beginning of the recording.  And what was happening

22   during those pauses was that he was reviewing the paperwork

23   that was presented to him, right?

24   A.  At the very beginning, yes.

25   Q.  And then after he reviewed it, he started explaining things

G387MIR2                          Correa - cross

1   about the body and what he was reading on that piece of paper

2   to Mr. Lantigua the patient, right?

3   A.  Yes, he was.

4             MR. MAZUREK:  Your Honor, there is a portion of the

5   recording from yesterday that we did not hear.  I would like to

6   play it at this time.  It's Government Exhibit 1101.

7             THE COURT:  Right.  And you have to tell me what part

8   you think is necessary for the rule of completeness.

9             MR. MAZUREK:  Yes.  The government skipped over pages

10  2 through 7, and I would like to play those portions now.

11            THE COURT:  OK.  Folks, take a short break.  Don't

12  discuss the case; keep an open mind.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  OK.  Mr. Correa can leave the room.  I

3   would like -- I've got the transcript in front of me.  I assume

4   we are talking about GX 1101-T?

5          MR. MAZUREK:  Yes.

6          THE COURT:  And I'd like a page and line where you

7   intend to start and a page and line where you intend to stop.

8          MR. MAZUREK:  OK.  I would like to start on page 3,

9   line 4, Dr. Mirilishvili says, "OK, come to me, please."  And

10  if I'm correct up to line 22 of page 7.

11         THE COURT:  To where?

12         MR. MAZUREK:  Page 7, line 22, sorry.  Stopping after

13  he says "The fluid is leaking out."

14         THE COURT:  Line 21, OK.  Government?

15         MR. DISKANT:  We don't think it's necessary to

16  complete anything.  These are defendant's self-serving

17  statements about medical knowledge.  The witness has testified

18  already that the examination would begin with the defendant

19  walking over to a chart and pointing to it and explaining

20  certain things to the patient.  We skipped over it because we

21  thought it was unnecessary in an already long and difficult to

22  hear recording.

23         MR. MAZUREK:  The transcript is in evidence.  I think

24  it's relevant, and I'd like to have --

25         THE COURT:  The tape is in evidence.  The tape is in

G387MIR2                      Correa – cross

1  evidence in its entirety.  There is no reason not to play this

2  for the jury; they are entitled to listen to the entire tape.

3  The government has produced it.

4            MR. DISKANT:  That's fine, your Honor.

5            THE COURT:  OK.  I'm going to take a few minutes.

6            (Recess)

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  OK, great.  Let's get comfortable.  Have a

3     seat, everyone.  You are still under oath, Mr. Correa.

4          You may proceed.

5          MR. MAZUREK:  Your Honor, at this time I would like to

6     play what is already in evidence as Government's Exhibits 1101.

7     A certain part of that was not played on direct examination.  I

8     would ask if you could ask the jury to refer to their

9     transcripts.  I'm going to be playing a portion starting from

10    1101-T starting on page 3, line 4 and going to page 7, the end

11    of line 21.

12         THE COURT:  Go ahead.

13         MR. MAZUREK:  We are starting page 3, line 4.

14         (Audio recording played)

15    ABRAHAM CORREA, resumed.

16    CROSS-EXAMINATION (Continued)

17    BY MR. MAZUREK:

18    Q.  Mr. Correa, what we just listened to was something that you

19    were familiar with because it's something that the doctor would

20    explain to many patients that you acted as an interpreter,

21    right?

22    A.  Yes.

23    Q.  Explaining, and he is referring to a diagram that was a

24    diagram of the spine, which was hanging on the wall in the

25    examination room; is that right?

G387MIR2                          Correa - cross

1    A.  Yes.

2    Q.  And he would explain to the patients that you've

3    interpreted in order for them to understand what it is that's

4    causing their medical problems, right?

5    A.  Yes, he would explain to them, but at no time did he ask

6    them if they was in pain or what their primary problem they

7    were having.

8    Q.  Well, just a moment.  First he read the MRI, right?

9    A.  Yes.

10   Q.  And the patient is there because they are referred there,

11   according to the paperwork, for pain management, right?

12   A.  Yes.

13   Q.  And the doctor is explaining what is shown on the MRI to

14   the patient, right?

15   A.  Yes.

16   Q.  He would typically do that, right?

17   A.  Yes.

18   Q.  And then he would go on to explain, or ask the patient to

19   perform certain things in the office, in the examination room,

20   right?

21   A.  What did you mean by certain things?

22   Q.  For example, after he reads the MRI in Mr. Lantigua's

23   case -- which was an issue with a herniated disk -- he would

24   check out the gait of the person, how he is walking back and

25   forth, right?

G387MIR2                         Correa - cross

1    A.  Yes.

2    Q.  He would do certain pressure tests by having the person

3    stand on the balls of their feet, on their toes, right?

4    A.  Yes.

5    Q.  He would have them balance backward on their heels, right?

6    A.  Yes.

7    Q.  There were little stairs that were in the office.  He would

8    have them climb up on those stairs, right?

9    A.  No.  The stairs are only used so that the patient can get

10   on the examining table.

11   Q.  Well, in Mr. Lantigua's case, as we heard yesterday, he had

12   Mr. Lantigua go up and down those stairs, right?

13   A.  No.

14   Q.  Well --

15   A.  The stairs were only to get on the table.  There wasn't no

16   exam done using stairs.

17   Q.  Well, do you remember the part where what is happening in

18   the room when the doctor is holding Mr. Lantigua and he's

19   saying pull, pull, pull?  Do you remember that?

20   A.  No.

21   Q.  Do you have your transcript binder in front of you?

22   A.  Yes.

23   Q.  If you go to page 17, and on line 19, the doctor told Jose

24   Lantigua give me your hands, stand on your heels.  Do you see

25   that?

1   A.   Yes.

2   Q.   Because he was holding the patient's hands as the patient

3   was going backwards, right?

4   A.   Yes.

5   Q.   And that was in order to feel to see what kind of strength

6   or muscle pull they would have, right?

7   A.   Yes.

8   Q.   And then it continued, right?  It continued seeing how the

9   patient would go forward on their toes, right?

10  A.   Yes.

11  Q.   And yesterday we were talking about -- you were asked in

12  direct examination about he disrobed the patients.  He wouldn't

13  ask the patient to take their clothes off to do these kinds of

14  examinations, right?

15  A.   No.

16  Q.   But for Mr. Lantigua he was noticing a circulation issue

17  with the legs, the varicose veins.  Do you remember that?

18  A.   Yes.

19  Q.   He was touching Mr. Lantigua's legs to see those veins,

20  right.

21  A.   Yes.

22  Q.   And do you remember what Mr. Lantigua was wearing at the

23  time?  It was the summer; it could have been short pants.  Or

24  did he have to roll up his pants?

25  A.   I don't remember that.

1    Q.  But in order for the doctor to do that, he had to lift a

2    leg pant or somehow get to the leg itself, right?

3    A.  Yes.

4    Q.  And he did that, right?

5    A.  Not that I can remember.

6    Q.  Well, you don't remember from listening yesterday and the

7    doctor seeing the varicose veins -- can you see varicose veins

8    through a pant leg?

9    A.  No.

10   Q.  And do you remember the doctor during that visit moving his

11   leg from side to side for a range of motion test?

12   A.  No, I do not.

13   Q.  If you turn to page 19 towards the bottom.  Does that

14   refresh your memory as to what was going on at the time when

15   the doctor was saying don't scratch, he is going to have to

16   move his leg, and he is asking whether the patient feels it

17   more, less or the same?  What is he feeling?  He is feeling the

18   doctor's hands, right?  The doctor's hands are on the leg,

19   right?  That's how the exam was given.

20   A.  No, incorrect.  The doctor used an instrument to scrape the

21   sides of his legs.

22   Q.  There was an instrument.

23   A.  Yes.

24   Q.  What kind of instrument?

25   A.  I don't know what it's called, but it had like a needle on

1    the tip of it.

2    Q.   So he was using an instrument with a needle on the tip in

3    order to measure something?  Is that what it appeared to you?

4    A.   He was taking the instrument and rubbing on the side of the

5    leg.

6    Q.   You didn't mention that yesterday, did you?

7    A.   No, I wasn't asked that.

8    Q.   And he did that for both legs, correct?  He used the

9    instrument for measuring something, right?

10   A.   Yes.

11   Q.   And the issue of surgery came up during that examination,

12   correct?

13   A.   Yes.

14   Q.   And that was something that was also typical for you as an

15   interpreter for some of the doctor's patients, right?

16   A.   Yes.

17   Q.   And that's because you came to understand by acting as an

18   interpreter for the doctor that what the doctor was offering

19   here was a temporary measure, it was a correction, it was to

20   help people feel better until they corrected their underlying

21   problem, right?

22   A.   I guess so.  But at the end of the day everybody's

23   objective was just to get oxycodone prescription, and that was

24   a guaranteed thing.

25   Q.   Well, that was the objective for you --

1           THE COURT:  He can't testify to the objective.

2           MR. MAZUREK:  For him.

3    Q.  Your objective was to get oxycodone, right?

4    A.  For myself and for every patient that was there.

5    Q.  For your patients that's what you were trying to do; you

6    were trying to get oxycodone, right?

7    A.  No, I want trying, because I accomplished it.  If I took 40

8    patients in, 40 patients got oxycodone prescriptions.

9    Q.  So that's all you cared about.  That's all that you cared

10   about, right?  But you never talked to the doctor and said --

11          THE COURT:  Did he answer the question?

12   Q.  Did you answer the question?

13   A.  Yes.

14          THE COURT:  That's all you cared about, getting the

15   oxycodone prescriptions.

16          THE WITNESS:  Yes.

17   Q.  You never talked to the doctor and said all I wanted is

18   oxycodone, can we just get right to it, why do I have to

19   interpret all this stuff?  Did you ever say that?

20   A.  No, I didn't, but the doctor had to cover himself.  He

21   needed a paper trail, so in other words he would have proof.

22          MR. MAZUREK:  Objection.  Move to strike.

23          THE COURT:  The objection is overruled.

24   Q.  Mr. Correa, when you sat in and interpreted for

25   Mr. Mirilishvili, you heard him say to many patients about the

G387MIR2                        Correa - cross

1    fact I can't cure your problem.  I can make you feel better --
2    try to make you feel better and go out and function.  Right?
3    Those were the kinds of things that were said in patient
4    visits, right?
5    A.  Yes, it was.
6    Q.  And he would give referrals.  He gave you a referral for an
7    orthopedic doctor, right?
8    A.  Yes.
9    Q.  He gave a referral to Jose Lantigua, right?
10   A.  Yes.
11   Q.  And he would insist -- when you would come back for
12   follow-up visits -- what happened with that referral?  Did you
13   listen to me?  Wouldn't that be something that you would hear?
14   A.  Yeah, but that didn't occur to every patient that came in
15   that had a referral from him.
16   Q.  And didn't you tell your patients, look, you just have to
17   keep pushing him off, tell him that you're going to go see the
18   specialist, you're going to get the surgery but later?  That's
19   something you would tell them, right?
20   A.  No.
21   Q.  You wouldn't tell them that?
22   A.  Not every patient was asked the follow-up with the
23   referral.
24   Q.  Well, Mr. Lantigua was.  We saw in the recording, right?
25   A.  Yes.

G387MIR2                         Correa - cross

1   Q.  You were asked, right?

2   A.  Not that I can remember.

3   Q.  You don't remember that.

4   A.  About my referral, no.

5   Q.  You were given one, right?

6   A.  Yes, I was.

7   Q.  And you remember in Mr. Lantigua's follow-up visits the

8   doctor was asking did you get the appointment?  And

9   Mr. Lantigua would say, yes, I have an appointment two months

10  from now, right?

11          MR. DISKANT:  Objection.  The recording speaks for

12  itself.

13          THE COURT:  The objection is sustained.

14  Q.  You understood that what you were trying to do was to fool

15  the doctor, right?  That's why you were lying, why you weren't

16  telling the truth.

17  A.  I wasn't fooling anybody.  He knew what was going on to an

18  extent.

19  Q.  To an extent?

20  A.  Later on, as I continued to work there, he brought it to my

21  attention where I could no longer work, but he wanted me to

22  continue providing patients so he could have more people.

23  Q.  But let me ask you this:  You knew that if you brought in

24  good paperwork and the patient answered the questions that the

25  doctor asked about their injuries that were shown on the

1   paperwork, that this was a pain management clinic, and he had a

2   certain way of prescribing, and so there was a good chance that

3   you were going to be able to get your oxycodone, right?  That's

4   what you knew.

5   A.   There was a guaranteed chance.  I never seen nobody walk

6   out of there in nine months that I worked there without an

7   oxycodone prescription.

8   Q.   Because that's the kind of prescription that a pain doctor

9   gives -- this pain doctor believed in.

10           THE COURT:  You're getting argumentative.  Stop

11   arguing with the witness.

12           MR. MAZUREK:  I will withdraw, your Honor.

13   Q.   What happened when you were working there was that

14   everything that you did was to lie to the doctor through you or

15   your patients, right?

16   A.   I don't understand the question.

17   Q.   Well, let me ask it this way.  You knew that no patient of

18   Dr. Mirilishvili was receiving a prescription without a

19   physical examination, right?

20   A.   Yes.

21   Q.   And you knew that no patient was going to receive any

22   prescriptions unless they had documentation from referral

23   sources, correct?

24   A.   Yes, he needed to make sure that his --

25   Q.   Yes or no, sir?

G387MIR2                          Correa - cross

1    A.  Yes.

2            THE COURT:  Yes.  Thank you.  Next question.

3    Q.  And you knew that the patient had to indicate that they

4    were suffering on that zero to ten scale of pain, correct?

5    A.  Yes, but that was only after --

6            THE COURT:  Yes.  End of the answer.

7    A.  Yes.

8    Q.  And you also knew -- you also knew that he had to do other

9    things, because the doctor took other measures to try to make

10   sure that the patient was doing what he was supposed to do in

11   terms of taking the medication, right?

12           MR. DISKANT:  Objection as vague and confusing.

13           THE COURT:  I don't even understand it.

14           MR. MAZUREK:  I will be more specific.

15   Q.  The doctor required urine tests, right?

16   A.  Yes.

17   Q.  And the patients for follow-up visits had to give urine

18   sample and have a report produced, right?

19   A.  Yes.

20   Q.  And you understood that you and the other office workers

21   would falsify those lab reports, right?

22   A.  I couldn't say what other office workers were doing.  I can

23   only speak for myself.

24   Q.  Well, you knew, sir, that you were falsifying urine

25   samples, right?

G387MIR2                              Correa - cross

1   A.  Yes.

2   Q.  And that you were also sometimes paying the office workers,

3   Damon Leonard or Jomaris Javier, just to submit a false report

4   for you.

5   A.  They -- yes.

6   Q.  In other words, you didn't have to give a sample at all;

7   they would just produce the report, right?

8   A.  Right.  But that was only towards the ending.

9   Q.  Towards the ending of your time at the office?

10  A.  Yes.

11  Q.  And that was something that Augustine Cruz was doing?

12  A.  Yes.

13  Q.  He would have a thumb drive where he would keep all of

14  these false reports that he would make and put into the system?

15  A.  No, that was directly on the computer system.

16  Q.  Well, he kept things on a thumb drive so that it wasn't on

17  the computer system, so he could just --

18  A.  No, it was actually on the computer.

19  Q.  Well, you knew about this thumb drive he kept, right?

20  A.  No.

21  Q.  I'll come back to that.  But the concept was, just so I

22  have it clear, is that what Augustine Cruz and the other office

23  workers would do sometimes, they would just take money in

24  exchange for providing a false report that oxycodone was in the

25  patient's urine.

G387MIR2                              Correa - cross

```
1    A.  Yes.

2    Q.  And you would pay them $50 for each report like that,

3    correct?

4    A.  Yes.

5    Q.  Now, in addition in the office the doctor had a technician

6    working -- another you said at first another doctor who was

7    doing nerve conduction tests; is that right?

8    A.  Yes.

9    Q.  Sorry?

10   A.  Yes.

11   Q.  And that was provided for the patients who had nerve

12   damage, correct -- reported nerve damage?

13              MR. DISKANT:  Objection.  Foundation.

14   A.  I have no idea.

15              THE COURT:  The objection is sustained.

16   Q.  Well, you were aware that there was another diagnostic room

17   in the office where the nerve doctor worked out of, correct?

18   A.  Yes.

19   Q.  And saw patients there, correct?

20   A.  Yes, only after they saw Dr. Moshe.

21   Q.  And Dr. Moshe would refer patients to him, correct?

22   A.  Yes.

23   Q.  And you also know that within the office in Washington

24   Heights there is a physical therapy room set up, correct?

25   A.  Yes.
```

1    Q.   And that patients would be referred or have the option to

2    do the physical therapy in the office, correct?

3    A.   Yes, they had an option.

4    Q.   And that would cost them $100 per month for four visits,

5    correct?

6    A.   Excuse me?

7    Q.   That would cost them $100 for up to four visits per month.

8    A.   No.

9    Q.   Weekly visits.

10   A.   No, that was $100 per visit.

11   Q.   Sorry?

12   A.   $100 per visit.  Each visit was $100.

13   Q.   It was $300 total for a one month visit:  $200 to see the

14   doctor, and then an extra $100 if they decided to take physical

15   therapy, correct?

16   A.   If you was taking physical therapy, you had to pay $100

17   each time you did physical therapy.  So if you went five times

18   a week, you had to pay $100 each time.

19   Q.   You said your patients never even did physical therapy.

20   A.   No.

21   Q.   So you just knew that because that was something that you

22   learned along the way?

23   A.   That's what the doctor required; that's what the doctor

24   told us.

25   Q.   $100 for each visit.

1    A.  Yes.

2    Q.  And there are some patients who were using insurance?

3    A.  I couldn't tell you that, because I didn't handle the

4    physical therapy.

5    Q.  OK.  And you knew that -- I mean there were different

6    physical therapists during the course of the two years that the

7    doctor was there, right?

8    A.  From the time I was there, there were various different

9    physical therapists.

10   Q.  And he obtained them through a service called Oasis, right?

11           MR. DISKANT:  Objection.  Foundation.

12           THE COURT:  Objection sustained.

13   Q.  Do you know how the doctor obtained the physical therapists

14   for his office?

15   A.  No, I do not.

16   Q.  Now, when you said you had your own patients, there are

17   certain people that you were directing and then buying their

18   scripts off of them, correct?

19   A.  Yes.

20   Q.  And when you said yesterday all your patients used cash,

21   that wasn't true, was it?

22   A.  To pay the doctor, yes.

23   Q.  Did you ever hear of a patient named Tawanda Ester?

24   A.  Yes.

25   Q.  She paid the doctor through Metro Plus, which is her

G387MIR2                          Correa - cross

1   insurance plan.

2              MR. DISKANT:  Is there a question?

3              THE COURT:  I don't know.

4   Q.  Isn't that right?

5   A.  Not that I can remember, no.

6   Q.  How about Angel Hernandez, do you remember him?

7   A.  Yes.

8   Q.  Was that one of your so-called patients?

9   A.  Yes.

10  Q.  He also paid through his Medicaid, correct?

11  A.  Not to see the doctor, no, not that I can remember.

12  Q.  Not that you can remember.

13  A.  No.

14  Q.  It's possible that these patients were doing things that

15  you didn't know?

16  A.  No.

17  Q.  For example, attending physical therapy?

18  A.  No.

19  Q.  You said your patients never attended physical therapy,

20  right?

21  A.  I never paid for no physical therapy, so, no, not through

22  me if they did.

23  Q.  Well, did you know that Tawanda Ester and Angel Hernandez

24  both attended multiple sessions of physical therapy?

25  A.  No, I do not.

G387MIR2                        Correa - cross

1   Q.  They didn't go to physical therapy because you told them,

2   right?

3   A.  No.

4   Q.  They went to physical therapy because they needed it,

5   right?

6              MR. DISKANT:  Objection.

7              THE COURT:  The objection is sustained.

8   Q.  And did you know that your so-called patient Tawanda Ester

9   also had nerve conduction and EMG tests done, nerve tests done

10  by the doctor, other doctor in the office?

11  A.  No, not that I can remember, no.

12  Q.  And did you know that your so-called patient Angel

13  Hernandez also had those extensive tests done, nerve conduction

14  and EMG?

15  A.  No.  I don't believe that to be true.

16  Q.  Well, I'm going to show you what has been premarked for

17  identification as DM 606 and 607.  And I flagged some of these.

18  I'm going to ask you to look at those.

19             MR. DISKANT:  Your Honor, may we approach on this?

20             THE COURT:  Pardon?

21             MR. DISKANT:  May we approach?

22             THE COURT:  He is showing him a document, it's not in

23  evidence, and he is asking him if it refreshes his recollection

24  about something.  There is no reason to approach.

25             MR. MAZUREK:  Your Honor, I'm going to ask to move it

G387MIR2                        Correa - cross

1   into evidence.

2              THE COURT:  Well, you're going to offer it, not move

3   it.  And I doubt that I will allow you to do that at this

4   moment, so...

5              MR. MAZUREK:  I would ask that it be subject to

6   connection.

7              THE COURT:  No.  You can offer it for refreshment of

8   recollection, otherwise move on.

9   Q.  Do you see those documents in front of you?  And I'm going

10  to ask you to look at those areas that I flagged in both of

11  those documents with respect to those two patients.

12             THE COURT:  The question is:  Does that jog your

13  memory about whether those patients received certain kinds of

14  treatments?

15             THE WITNESS:  No.

16             THE COURT:  It does not.  Move on, please.

17  Q.  Yesterday on direct examination you also testified about

18  the fact that you used a certain pharmacy and were directed to

19  this pharmacy, correct?

20  A.  Yes.

21  Q.  Now, based on your experience in the office, and the fact

22  that you acted as an interpreter for a number of visits, you

23  knew that Dr. Mirilishvili didn't tell patients which pharmacy

24  that they had to use; that he asked them a question do you have

25  a pharmacy, where would you like to go, correct?

1            MR. DISKANT:  Objection.  Compound question.

2            THE COURT:  Well, could you rephrase the question.

3            MR. MAZUREK:  Yes, I will take that in steps.

4    Q.  When you were acting as an interpreter for the doctor and

5    patients would come in, he would ask them do you have a

6    preferred pharmacy that you like to go to?

7    A.  He would ask them what pharmacy they wanted to go to, yes.

8    Q.  And you also know from the answers over time that there

9    were many, many pharmacies that patients went to, right?

10   A.  I couldn't tell what you pharmacies patient went to, only

11   the ones that I knew about, and the ones that the doctor

12   directed a lot of patients to go to.

13   Q.  You testified yesterday that you were interpreting four,

14   five times per week; is that right?

15   A.  Yes.

16   Q.  For ten months of time, right?

17   A.  Yes.

18   Q.  And you heard many, many times what pharmacies that

19   patients are answering the doctor, correct?

20   A.  Sometimes, not all the time.

21   Q.  Well, you knew from your experience in the office that

22   there were literally dozens and dozens of pharmacies that were

23   used over the course of time, right?

24   A.  Not that I know about, no.

25   Q.  In fact didn't you testify yesterday that Jomaris Javier --

1   she was the medical assistant in the office -- she would unplug

2   the phones sometimes?

3           MR. DISKANT:  Objection to testimony.

4           THE COURT:  The objection is sustained.

5   Q.  Did you know that Jomaris Javier would unplug the phone in

6   the office sometimes?

7   A.  Yes.

8   Q.  And that's because there were too many pharmacies and

9   doctors calling, and she didn't want to talk to them?  Is that

10  what you understood?

11  A.  I don't know why she unplugged the phone.  I wouldn't know

12  that.

13  Q.  And some of these pharmacies that you heard about during

14  the time you were there were CVS, Walgreens, Rite Aid, Duane

15  Reade; isn't that true?

16  A.  Incorrect.

17  Q.  You never heard people saying that?

18  A.  No.

19  Q.  In ten months that you were there?

20  A.  No.

21  Q.  And there were pharmacies throughout Manhattan.  Did you

22  hear the pharmacies East Harlem Pharmacy, First Health, Buy

23  Rite?  Did you hear those?

24  A.  No.

25  Q.  Did you hear of Leren Drugs?

G387MIR2                          Correa - cross

1    A.   No.

2    Q.   Did you hear New York Health First Pharmacy?

3    A.   No.

4    Q.   New York Pharmacy?

5    A.   No.

6    Q.   NYC Pharmacy?

7    A.   No.

8    Q.   Never heard of them in ten months.

9    A.   No.

10   Q.   Do you know something called the PMP?  You have heard of

11   that?

12   A.   Yes.

13   Q.   That was a New York State database for prescription

14   monitoring, right?

15   A.   Yes.

16   Q.   And you knew that the doctor checked it or had the office

17   staff check it for purposes of determining whether patients

18   were using other doctors for purposes of obtaining controlled

19   substance prescription?

20   A.   Yes.  Jomaris was in charge of that.

21   Q.   And you know that the doctor ended up firing Jomaris,

22   right?

23   A.   I don't know about that.  I wasn't working at that time.

24   Q.   Well, you later learned about it, right?  You were still

25   hanging around the office?

G387MIR2                           Correa - cross

1    A.  Yes.

2    Q.  You would come at night to talk to Damon Leonard, the

3    office manager?

4    A.  No.

5    Q.  No, you wouldn't come by anymore after you were fired?

6    A.  I would come on there the days my patients had

7    appointments, in the morning.

8    Q.  And at that point in time you would talk to Damon Leonard

9    and Jomaris, right?

10   A.  Yes.

11   Q.  And one day when you showed up and Jomaris wasn't there

12   anymore, you learned that she was fired, right?

13   A.  Yes.

14   Q.  Because she was messing with that PMP, right?

15   A.  I have no idea.

16   Q.  You have no idea.

17   A.  Yes.

18   Q.  You never discussed that with any of the workers.

19   A.  Not that I can remember, no.

20   Q.  Well, there came a time where you actually wore a body wire

21   for the government, right?

22   A.  Yes.

23   Q.  And that was in September of 2014, correct?

24   A.  Yes.

25   Q.  And you talked about it on the recording with Damon

G387MIR2                        Correa - cross

1    Leonard; isn't that right?

2    A.  Not that I can remember.

3    Q.  If I show you a document, might it help to refresh your

4    recollection, sir?

5    A.  Yes.

6    Q.  I am going to show what you has been premarked for

7    identification as DM 602, and I will refer you to a specific

8    page; I refer you to page 4.  If you take a look, read that

9    section, please, on page 4, the top, the top about three

10   paragraphs, and when you're done, let me know.

11   A.  OK.

12   Q.  Does that refresh your recollection, sir, that you in fact

13   discussed with Damon Leonard the problems that Jomaris had with

14   respect to PMP?

15   A.  I don't know if I'm supposed to discuss what's in there.

16   Q.  I'm sorry?

17   A.  You're saying Jomaris, but the one speaking here is Damon.

18   Q.  I'm asking does that conversation that you had with Damon

19   refresh your memory that you talked about it, about the fact

20   that Jomaris was fired because she was screwing up putting in

21   the names in the PMP so that the doctor would not get the --

22           THE COURT:  Does it jog your memory that you had that

23   conversation with Mr. Leonard about that subject?

24           THE WITNESS:  Yes.  But what's here --

25           THE COURT:  We don't want to know what's there.  Just

G387MIR2                          Correa - cross

1   talking about the subject.

2   Q.  You knew about the subject, right?

3   A.  Yes.

4   Q.  And you knew that there was a pharmacist.  Did you ever

5   hear of a guy by the name Frank Fetta?

6   A.  Yes.

7   Q.  And he would come to the office, and he would tell the

8   doctor, explain the issues with the PMP?

9               MR. DISKANT:  Objection.

10              THE COURT:  Excuse me?

11              MR. DISKANT:  Objection.  Hearsay.

12              THE COURT:  For the fact that it was said?  No.

13   Q.  Do you remember that happening?

14   A.  I don't know what the doctor and Frank spoke about.  They

15   spoke behind closed doors.

16              THE COURT:  Let's move on.

17   Q.  But you knew that the doctor took an action when he found

18   out that an employee, Jomaris Javier, was doing something

19   incorrectly with respect to putting in the PMP records, right?

20   You knew about that.

21   A.  No, I do not.

22   Q.  You never knew it even though you talked about it.

23   A.  No.

24   Q.  And you knew that after Jomaris Javier was fired, that she

25   was rehired by the doctor just shortly before you had that

G387MIR2                          Correa - cross

1    conversation with Damon Leonard on July 10, right?

2    A.  I knew she was rehired.  When she was rehired, I don't

3    know.

4    Q.  You knew she was being rehired because she just had a baby,

5    and she didn't have any money, and the doctor decided to rehire

6    her.

7               THE COURT:  The objection is sustained.

8               Ladies and gentlemen, I remind you that all of these

9    long wordy questions by a lawyer that assume a lot of facts

10   that are not in evidence are not in fact evidence.  OK?

11   They're not evidence of anything.

12   Q.  Well, Mr. Correa, you knew the reason that Jomaris --

13              THE COURT:  Did you know why she was rehired?

14              THE WITNESS:  No.

15              THE COURT:  Fine.  Move on.

16   Q.  You just discussed it at length with Damon Leonard, didn't

17   you?

18              THE COURT:  Now you're arguing with the witness.

19   Argue to the jury; don't argue with the witness.

20   Q.  Isn't it true that when you were taped, when you were

21   recorded, when you were recording Damon Leonard, these are the

22   things that were discussed?  Isn't that true?

23   A.  I knew at the time when he told me, yes, but other than

24   that I don't know what actually happened.  He could have told

25   me anything.

G387MIR2                           Correa - cross

1   Q.  But you discussed it with him, right?

2   A.  Yes.

3   Q.  And what he did tell you was that Jomaris Javier was

4   rehired by the doctor at some point in that summer, right?

5   A.  Yes.

6   Q.  And then she screwed up by lying to him again, right?

7   A.  Yes.

8   Q.  You learned that, right?  I'm sorry?

9   A.  Yes.

10  Q.  Because she snuck back into his office; did you hear that?

11  A.  No, I did not know about that.

12  Q.  Well, when you were wired, when you were wired for the

13  government in July of 2014, going back to the office and

14  talking to Damon Leonard, that's what he told you, right?

15          THE COURT:  What Damon Leonard told him is hearsay.

16  OK?  So especially because you're trying to get it in for the

17  truth of the matter asserted.  So let's move on to something

18  that this witness is competent to testify about.

19          MR. MAZUREK:  Yes, Judge.

20  Q.  Well, you're competent to testify about the reason you were

21  fired, right, sir?

22  A.  Yes.

23  Q.  You were fired shortly after September 23, 2013, right?

24  A.  Yes.

25  Q.  And you were fired because on September 23, 2013 there was

G387MIR2                          Correa - cross

1   a robbery in the office, correct?

2   A.  Yes, that's my understanding.

3   Q.  It was an armed robbery, right?

4   A.  Yes.

5   Q.  Where there was a gun involved that you saw on that day,

6   right?

7   A.  Yes.

8   Q.  And, by the way, you were supposed to be standing outside

9   of the office.  That's where you normally worked, right?

10  A.  No.

11  Q.  You're security for the office?

12  A.  Yes.

13  Q.  Sometimes you would be inside the door, is that what you're

14  saying, and sometimes outside the door?

15  A.  All the time inside the door.  The only time outside is

16  when there were lots of crowds outside.

17  Q.  Then you were always inside the door?

18  A.  Yes.

19  Q.  When you say only when there are large crowds, so you were

20  mostly inside the door, right?

21  A.  Yes.

22  Q.  Because there weren't large crowds all the time.

23  A.  All the time.

24  Q.  OK.  But on that particular day it just so happened that

25  robbers were able to come in with guns and rob the place,

G387MIR2                         Correa - cross

1    right?

2    A.  Yes.

3    Q.  And there were no people outside gathering around to see

4    who they were, right?

5    A.  No.

6    Q.  The street was clear, right?

7    A.  I couldn't tell you how the street was.  I was inside.

8    Q.  Now, ultimately the doctor believed that it was an inside

9    job, right?

10              MR. DISKANT:  Objection.

11              THE COURT:  The objection is sustained.

12   Q.  Well, when you were called into the office afterward, the

13   doctor asked you lots of questions about your knowledge of this

14   robbery, right?

15   A.  No.

16   Q.  He just told you you were fired?

17   A.  He told somebody else I was fired, and then I went to speak

18   to the doctor.

19   Q.  And the reason you learned that you were fired is because

20   the doctor had belief that this was an inside job, right?

21   A.  No, not that I know of.  I was never directly told that by

22   the doctor.

23   Q.  You never were told that?

24   A.  Not by the doctor, no, or anybody.

25   Q.  So why did you think you were fired?

1   A.  I asked the doctor that.  He just told me that I was fired.

2   He said that he didn't need me no more because he was going to

3   put security surveillance on the door and put an electronic

4   buzzer and that he didn't need my services no more.

5   Q.  And this was right after the robbery, right?

6   A.  About two or three weeks after, yes.

7   Q.  Two or three weeks after the robbery; is that now your

8   testimony?

9   A.  Yes.  Excuse me?

10  Q.  Your testimony is you weren't fired until two or three

11  weeks after?

12  A.  Yes.

13  Q.  Sir, you testified yesterday that it was the Monday after

14  the robbery that you came into the office to talk to the

15  doctor, right?

16  A.  No.

17              (Continued on next page)

18

19

20

21

22

23

24

25

G38LMIR3                        Correa - cross

1   Q.  You don't remember that.  You remember talking to the NYPD

2   about the robbery?

3   A.  Yes.

4   Q.  And you told them that there were two male subjects, that

5   only two people were involved, correct?

6   A.  Yes.

7   Q.  You knew there were three, right?

8   A.  No.  I later found out there was three, but I didn't see

9   that.  When the gentleman first came in, he pointed a gun in my

10  face and directed me to walk to the back.

11  Q.  There came a time, wasn't there, when you were selling

12  pills, oxycodone pills, to Jose Lantigua, right?

13  A.  Yes.

14  Q.  And in selling those pills, you didn't know that Jose

15  Lantigua was wired at the time, correct?

16  A.  No.

17  Q.  He was acting as a confidential source, thus we learned

18  about yesterday, right?

19  A.  Yes.

20  Q.  And that when you were selling pills to him, that was

21  later, that was sometime at the end of 2013, November 2013,

22  into January of 2014, right?

23  A.  Yes.

24  Q.  And at that point in time, you told Jose Lantigua that the

25  reason that you were fired was because you and other office

1  workers set up a robbery of Dr. Mirilishvili; isn't that true?

2  A.  Incorrect.  I never spoke about that to him.

3  Q.  Well, if I show you a report, might it help refresh your

4  recollection?

5  A.  Yes.

6  Q.  Showing you what's been premarked for identification as

7  3501-10.  And I'm going to ask you to read the paragraph

8  numbered four.  Isn't it true, sir --

9            THE COURT:  The question is --

10  Q.  Does that refresh your recollection?

11            THE COURT:  Which, by the way, he didn't say he needed

12  refreshing because he didn't say he didn't recall, but the

13  government didn't choose to note that fact.

14  A.  No.

15  Q.  I'm sorry, that doesn't refresh your recollection --

16  A.  No.

17            THE COURT:  It does not.

18  Q.  -- of what you told Mr. Lantigua?

19            THE COURT:  Let's move on.

20  Q.  And in November 2013, you were selling pills to

21  Mr. Lantigua, right?

22  A.  I believe so.  I can't be accurate with the time, but --

23  Q.  I'm sorry?

24  A.  I said I don't remember the exact date, but I was.

25  Q.  You remember selling pills to him on multiple occasions,

G38LMIR3                    Correa - cross

1    right?

2    A.  Yes.

3    Q.  You received thousands of dollars from Mr. Lantigua?

4    A.  Yes.

5    Q.  You would meet him at different places in the Bronx to sell

6    them, right?

7    A.  Yes.

8    Q.  You would meet him at a laundromat, right?

9    A.  Yes.

10   Q.  At a pizzeria?

11   A.  Yes.

12   Q.  And you would have conversations with him?

13   A.  Yes.

14   Q.  And later you learned some of those conversations were

15   recorded?

16   A.  Yes.

17   Q.  And one of the things you testified to yesterday about, one

18   of the things you testified yesterday about was bringing in

19   patients and sometimes the doctor would discharge them, get rid

20   of them, right, because they didn't have good paperwork, right?

21             MR. DISKANT:  Objection.

22             THE COURT:  I'm sorry?

23             MR. DISKANT:  Objection.

24             THE COURT:  Ground?

25             MR. DISKANT:  Multiple part question.

1              MR. MAZUREK:  I'll rephrase, your Honor.

2    Q.   There came a time when you were working with the doctor,

3    you would see that the doctor would discharge patients, no

4    longer treat them because he found out there was a problem,

5    right?

6              THE COURT:  Did there come a time that you became

7    aware that the doctor would cut off patients, stop seeing them?

8              THE WITNESS:  Yes.

9              THE COURT:  OK.  Now, did you know why that happened?

10             THE WITNESS:  No.

11   Q.   You saw it happen, right?

12   A.   Yes.

13   Q.   It happened to some of your patients?

14   A.   Yes.  They were a patient for too long, the doctor would

15   get rid of them.

16   Q.   Now you know what the answer is --

17             MR. DISKANT:  Objection.

18   Q.   -- of why patients were discharged, do you know or not?

19   A.   Of my patient, yes.  Of others, I don't.

20   Q.   For your patients, your testimony is that oh, because they

21   were being seen for too long?

22   A.   Yes.  That's what the doctor told them.

23   Q.   You were only there ten months, right?

24   A.   Yes.

25   Q.   And there are patients that you know were seen for longer

G38LMIR3                    Correa - cross

1   than ten months at a time, right?

2   A.  I have no idea how long the patient were there.

3   Q.  Did any of your patients stay for more than ten months?

4   A.  There's a possibility, yes.

5   Q.  You were not in the room with the doctor when he's talking

6   to your so-called patients, right?

7   A.  No.

8   Q.  Now, did there come a time where you were trying to get

9   patients in, back in to see the doctor after they had been

10  discharged?

11  A.  No.

12  Q.  Did you ever know of occasions where the doctor would say

13  that because he checked the phone number on the MRI or

14  referral --

15          THE COURT:  The objection is sustained.

16  Q.  Did you ever know --

17          THE COURT:  By the way, while it's nice to see the

18  government stand, I would appreciate it if you would put a word

19  on the record.

20          MR. DISKANT:  Yes, your Honor.

21  Q.  Did there come a time when you knew that Dr. Mirilishvili

22  was checking, verifying MRIs or referrals?

23  A.  In my ten months of working there, I can only recall him

24  checking maybe about eight or nine of all the time that I was

25  there.  And when he did check them, he would come out screaming

1    why nobody checked, whose patient this person belongs to.

2    Q.  My question is did you know while you were working there

3    that Dr. Mirilishvili would check or verify MRI or referrals?

4           THE COURT:  Do you know if, do you know if he checked

5    and verified MRI and referrals?

6           THE WITNESS:  Yes.

7           THE COURT:  Do you know if.  OK.  Did he or did he not

8    do that?

9           THE WITNESS:  Yes, he did.

10          THE COURT:  He did that.  Next question.

11   Q.  And would he -- do you know if he then would inform the

12   office personnel not to give an appointment to that patient

13   again?

14          THE COURT:  Did you ever hear him tell someone, don't

15   give Joe Blow an appointment anymore?

16          THE WITNESS:  No.

17   Q.  Well, when you were interviewed on May 1, 2014 to the DEA

18   agents at the time of your arrest, isn't it true -- and I refer

19   the government to page 2 of 3501-22 -- that you told the agents

20   then on May 1, '14, that Dr. Mirilishvili would inform the

21   office personnel not to give an appointment again to those

22   patients; isn't that what you said then?

23          THE COURT:  To what patients?  There's a foundation

24   missing here.

25          MR. MAZUREK:  OK.

G38LMIR3                         Correa - cross

1   Q.  Isn't it true that you told the agents that once in a

2   while, Dr. Mirilishvili would actually call the phone number on

3   the MRI provided by a patient and if he determined the MRI to

4   be fraudulent, he would not write a prescription for the

5   patient.  In addition, he would inform the office personnel not

6   to give an appointment again to this patient.

7           Isn't that what you told them?

8   A.  Yes, I did tell them that.  But they were --

9           THE COURT:  Yes, you did tell them that.  That's the

10  end of the answer.

11  Q.  Now, did you also know that the office personnel routinely

12  ignored Dr. Mirilishvili's request and rescheduled the patient

13  anyway?

14  A.  Yes.

15  Q.  And was that, sir, because it was easy to fool the doctor

16  and have the patient return because of the volume of patients

17  that he saw?

18  A.  I don't know if he was being fooled, but they just gave new

19  appointments out.

20  Q.  Isn't it true on May 1, 2014, that's what you told the

21  agents, that it was easy to fool the doctor and have the

22  patient return because of the volume of patients

23  Dr. Mirilishvili saw?

24  A.  If I used the word fool, it was wrong word to use at the

25  time.

1          THE COURT:  The question isn't whether it was the

2     right word or the wrong word.  The question is did you say that

3     to the agent?

4          THE WITNESS:  Yes.

5          THE COURT:  Thank you.

6          MR. MAZUREK:  Thank you, Judge.

7     Q.  Now, did you know also that in bringing patients back,

8     sometimes the office staff would change the name of the patient

9     in order to fool the doctor, did you know that?

10    A.  I don't understand the question.

11    Q.  Did you know that in the circumstance that we just talked

12    about, when a patient that the doctor kicked out, the office

13    staff would change the name of the patient sometimes to get the

14    patient back in, did you know about that?

15    A.  No, not for those circumstances, no.

16    Q.  Did you know multiple names were being used for the same

17    patient?

18    A.  Some patients would come in posing as other patients.

19    Q.  You talked yesterday about a number of patients that you

20    directed to the office.  How many patients did you have, about

21    ten or so, is that about right?

22    A.  Yes.

23    Q.  And you knew other people who were bringing in about ten

24    patients during the course of time that you worked there?

25    A.  Yes.

G38LMIR3                         Correa - cross

Q.  And how many of these bosses did you know?

A.  Probably like four or five.

Q.  Four or five.  And let's say that they each had about ten,
that would be about 50 patients, and you, let's say 60
patients.  Is that fair?

A.  Yes.

Q.  And the number of patients that you also testified about
yesterday that Dr. Mirilishvili was seeing at the time were
about 30 to 40 a day?

A.  Yes.

Q.  Five days a week; is that right?

A.  Yes.

Q.  That's about 150 patients a week; is that fair?

A.  Yes.

Q.  And he worked maybe 50 out of 52 weeks; is that also fair?

A.  Excuse me?

Q.  He took maybe two weeks vacation during the year, right,
the time that you were there?

A.  Not that I can remember.  I believe he took a one-week
vacation when I was there.  That was about it.

Q.  He would come to the office mostly every day, right?

A.  Yes.

Q.  About 8 o'clock in the morning and leave sometime between
five and six at night?

A.  Yes.

1    Q.  So he had an average you're saying 150 patients a week, and

2    if we say 50 weeks, that's about 7500 patient visits a year,

3    right?

4    A.  Yes.

5    Q.  You knew he had literally thousands of patients, right,

6    during the time that you were there?

7    A.  Yes.

8    Q.  And the patients that you were aware of from other bosses,

9    as you call them, and yourself total to be about 60, 70

10   patients?

11   A.  I couldn't give you an exact number, but there was a lot of

12   patients there.

13   Q.  Talking about the patients with the bosses that you

14   testified about.

15   A.  Yes.  I couldn't tell you exactly the number of patients

16   they had.  I wasn't counting them.

17   Q.  But there are about ten, maybe 20, at most?

18   A.  That might be accurate.  I'm not sure.

19   Q.  The price that you were getting on the street for your

20   pills is about $1,800 per prescription or 18 points, as you

21   call it?

22   A.  Sixteen.

23   Q.  Sixteen?

24   A.  Yes.

25   Q.  Do you remember discussing with Damon Leonard getting or

1  trying to get Damon Leonard and you were talking about 18 or

2  1850?

3  A.  Yes.

4  Q.  Per script?

5  A.  Yes.

6  Q.  And that would be for 90 pills?

7  A.  Yes.

8  Q.  Are you familiar with a concept called overrides?

9  A.  Yes.

10  Q.  You've heard that term before used in the office?

11  A.  Yes.

12  Q.  And that was a term that you learned was that when

13  patient's urine tests came back in a bad way or not positive,

14  people in the office staff would falsify the report, right?

15  A.  Yes.

16  Q.  And you learned that there came a time when the doctor

17  changed labs; is that right?

18  A.  Yes.

19  Q.  And do you know whether at that point in time that

20  overrides could continue to happen?

21  A.  Not that I'm aware of.  I don't remember.

22  Q.  You don't remember?

23  A.  No.

24  Q.  Did you know there came a time where there was a new lab,

25  the doctor was requiring that the labs would go directly into

G38LMIR3                          Correa - cross

 1    the computer system?

 2              MR. DISKANT:  Objection.

 3              THE COURT:  The objection is sustained.

 4    Q.  Do you remember having discussions when you were wearing a

 5    body wire for the government with Damon Leonard on the subject

 6    of overrides?

 7              MR. DISKANT:  Objection, eliciting hearsay.

 8              THE COURT:  The objection is sustained.

 9    Q.  For your own patients, you were still trying to get

10    patients into the office when you were going back after you got

11    fired, right?

12    A.  Yes.

13    Q.  And you also needed to have those patients pass urine

14    tests, right?

15    A.  Yes.

16    Q.  So you needed either to give specimens to -- urine

17    specimens to the office staff in order to have a positive test,

18    right?

19    A.  Yes.

20    Q.  Or you just had to pay the office staff for the override,

21    right?

22    A.  Yes.

23    Q.  Did there come a point in time when you couldn't do that

24    anymore?

25    A.  Not to my recollection, no.

G38LMIR3                        Correa - cross

1   Q.  Did you have any patients, your patients continue to go to

2   the office after April or May of 2014?

3   A.  No.

4   Q.  But you wanted them, right, you wanted to have patients

5   there?

6   A.  No.  At that time I was already arrested.

7   Q.  Before you got arrested, sir?

8   A.  Yes.

9   Q.  And you were dealing with in the spring of 2014 with Jose

10  Lantigua selling scripts or pills?

11  A.  Of the spring of 2014?

12  Q.  Yes.  March, about March of 2014.

13  A.  I believe so, yes.

14  Q.  And you were telling him that your patients were getting

15  kicked out of Dr. Mirilishvili's office, right?

16  A.  Yes.

17  Q.  And you were going to another doctor, right, because

18  Dr. Mirilishvili was being too difficult?

19  A.  Well, I went to a different doctor for myself.

20  Q.  And that was a Dr. Lucas?

21  A.  Yes.

22  Q.  But you told Jose Lantigua that all your patients, the

23  patients, you couldn't get any patients in to Dr. Mirilishvili

24  anymore, right?

25  A.  At that time I still had some but not a lot.  Maybe three

1    or four, if that.

2    Q.  My question though is did you tell him that your

3    connections were getting kicked out because they were waiting

4    too long to fill their prescriptions and then the doctor can

5    check that on the PMP and will kick out a patient because of

6    that?

7    A.  I don't recall that conversation.  When the doctor had the

8    PMP, the patient was going to several different doctors, then

9    he would kick them out, or if they were there for too long.

10   Q.  If I show you a report, might it refresh your recollection?

11   A.  Yes.

12   Q.  Referring the government to 3501-16, specifically page 2.

13   I highlighted a portion for you to read.  Read to yourself.

14            Does that report help refresh your recollection, sir?

15   A.  Yes.

16   Q.  And so isn't it true that you learned that Dr. Mirilishvili

17   was receiving a paper with the patient's information and date

18   of birth and that information informs the doctor if the

19   patients are seeing other doctors, right?

20   A.  Yes.

21   Q.  That if a patient waits two weeks to fill the

22   prescription --

23            MR. DISKANT:  Objection.

24            THE COURT:  The objection is sustained.

25   Q.  And you also knew at that time that patients were being

G38LMIR3                       Correa - cross

1    kicked out because they weren't filling their prescriptions

2    within a period of time, right?  That's according to those

3    reports.

4              THE COURT:  Objection is sustained.

5    Q.  You knew that for your own patients that they were being

6    kicked out, right?

7    A.  I knew they were being kicked out because of the PMP.

8    Because of the prescription not filled, I never had that

9    problem that I can remember.

10   Q.  Isn't that true, isn't it true that's what you said to Jose

11   Lantigua on March 13 of 2014, yes or no?

12   A.  I don't remember.

13   Q.  You don't remember?

14   A.  No.

15   Q.  And this report doesn't refresh that recollection?  No?

16   A.  This conversation would have been talking about the PMP.

17             THE COURT:  The question is does looking at this

18   report jog your memory that you told Mr. Lantigua that your

19   patients weren't filling the prescriptions within a particular

20   period of time, does it jog your memory that you said that to

21   Mr. Lantigua?

22             THE WITNESS:  No.

23             THE COURT:  It does not.  Next question.

24   Q.  Do you remember with respect to the paying for urine, urine

25   tests for your patients or other patients, that the office

G38LMIR3                         Correa - cross

1   staff was only taking cash at a certain point?

2   A.   Yes.

3   Q.   Even if the patient had insurance?

4   A.   I never dealt with insurance.  I wouldn't know.

5   Q.   Well, we saw earlier you had at least two patients, right,

6   Ms. Ester and Mr. Hernandez, who used insurance; isn't that

7   true?

8          MR. DISKANT:  Objection.  Misstates the record and the

9   answers given.

10          THE COURT:  Ask a different question, please.

11   Q.   Do you know that in the office, as part of the game that

12   you were playing was that you weren't accepting, the office

13   decided -- the office staff decided not to accept insurance

14   because it could be a problem down the road for the patient to

15   obtain the prescription at the pharmacy; did you know that?

16          THE COURT:  What do you mean did you know that?

17          Folks, I need you to leave, OK, to solve a problem.

18   Don't discuss the case.  Keep an open mind.

19          It's not lunch time.  Lunch time is at 1 o'clock.

20          You need to step down, sir.  Leave the room.

21          (Continued on next page)

22

23

24

25

 1                (Jury not present)

 2                (Witness not present)

 3           THE COURT:  There are so many basic errors of evidence

 4      being made here that I can barely stand it.

 5           MR. MAZUREK:  Judge, if I can, my questions are based

 6      on actual recordings.

 7           THE COURT:  Here's the deal.  You say isn't it a fact

 8      that and assert.  It's how you ask the question, all right.

 9      I'll give you a little lesson.  Isn't it a fact that and assert

10      whatever is in the recording.  He says yes or no.  If he said

11      something else in the recording, you impeach him with the

12      recording.  You don't refresh his recollection.  You offer to

13      impeach him with his prior inconsistent statement.

14           MR. MAZUREK:  I understand.

15           THE COURT:  If on the other hand he says I don't

16      recall, you can show him the recordings and then you can ask

17      him if it refreshes his recollection.  The problem is you don't

18      ask questions that start isn't it a fact that.  You ask a

19      question in a manner that simply assumes a fact that's not in

20      evidence, which is improper form.

21           MR. MAZUREK:  It's cross-examination.

22           THE COURT:  It's cross-examination.  Isn't it a fact

23      that.  You still can't assume facts not in evidence in your

24      question.

25           MR. MAZUREK:  I will do that.  It's just a leading

G38LMIR3                    Correa - cross

1  question based --

2         THE COURT:  You can ask a leading question, but you

3  still have to ask the leading question in proper form.  Isn't

4  it a fact that your mother beat your father is a leading

5  question, but it's a leading question in a proper form.

6         Meanwhile, if the government is going to object,

7  objection.  Objection.  Not silence, not waving your hand.

8  Objection.  Get up.  Assert the ground.  It's driving me crazy,

9  people.  And not because my shoulder hurts.  Because this is

10  like this is law school 101.

11         MR. MAZUREK:  And the one issue is, your Honor, there

12  are so many recordings and I'm trying to do this in a time

13  efficient way.

14         THE COURT:  I don't care if you take five days to do

15  it.  But take an assertion from a recording that you want him

16  to confirm and say isn't it a fact that boom.  Didn't you say

17  to Mr. Lantigua that.  He says no.  You say then I'd like to

18  impeach you with this.

19         MR. MAZUREK:  May I play the recording?

20         THE COURT:  You may, absolutely.  Of course you may.

21  To impeach him with a prior inconsistent statement, absolutely.

22         MR. DISKANT:  We do not disagree with that, your

23  Honor.  I just want to point out we have had at considerable

24  expense transcripts prepared of the actual recordings.

25         THE COURT:  It doesn't make any difference.  It's his

1  call.  If he wants to have the jury sit here while you cue up

2  recordings so that they can hear this man's voice saying

3  something that he denies saying, not something he says he

4  doesn't recall, but something that he denies saying, he can do

5  it.  He's allowed.  Just like you would.

6         MR. DISKANT:  Absolutely, your Honor.  I was only

7  going to suggest it might help to refresh the witness with the

8  transcript of the recording.

9         THE COURT:  Excuse me.  Forget about refreshing.  I'm

10  talking about impeaching.  If the witness says I didn't say

11  that, he can be impeached with a prior inconsistent statement.

12  It is not appropriate to refresh his recollection unless he

13  says I don't recall, and the government has let this slide

14  repeatedly.  I'm not trying the case for you.  Sorry.  But

15  unless he says I don't recall, it's not proper to show him

16  something to refresh his recollection.  If he says no, the

17  answer is no, not I don't recall.

18         And if, counsel, there is an inconsistency between

19  what he said no and what you know because of a tape, counsel,

20  then impeach him.  Don't try to refresh his recollection.

21  There's a difference between the two.

22         MR. MAZUREK:  I understand.

23         (Recess)

24         THE COURT:  Really, Mr. Mazurek, didn't you say to

25  Jose Lantigua that the sky is blue?  You know what the words

G38LMIR3                         Correa - cross

1    are.  You've got the transcript in front of you.  Didn't you

2    say that to Jose Lantigua?  He doesn't know.  Let's go to the

3    videotape.  Let's play it.  Let's do it.

4                MR. MAZUREK:  Logistically --

5                THE COURT:  I can't help you with the logistical

6    problem.  You should have the tapes cued up, ready to go.

7                MR. MAZUREK:  I don't want to bore the jury either

8    with all of them.

9                THE COURT:  All I can say is you knew this is what you

10   were going to do this morning.  The tapes should be cued up and

11   ready to go.

12               We can go about 15 more minutes and then I have a

13   criminal matter I have to do before lunch.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  OK.  Case on trial continued.  The parties

3    are present.  The jurors are present.

4              And, sir, you're still under oath.

5              Mr. Mazurek.

6              MR. MAZUREK:  Thank you, Judge.

7    BY MR. MAZUREK:

8    Q.  Mr. Correa, isn't it a fact that you learned that there

9    were places, MRI facilities that were issuing real reports in

10   their system on behalf of different patients?

11   A.  No.

12   Q.  Did you ever hear of a place called Madison MRI?

13   A.  I've heard of it because patients came in with MRIs from

14   there.

15   Q.  Isn't it a fact that Damon Leonard sent you to Madison MRI

16   on Madison -- between Madison and Fifth on 122nd Street?

17   A.  You say that he sent me there?  No, I never went there.

18   Q.  Well, my question is not whether you ever went there.  Did

19   he ever send you there because -- in order to get an MRI for

20   about $40; is that right?

21   A.  I don't remember that.

22   Q.  And that -- isn't it a fact that there was a person there

23   who could put it into the system so that it would be

24   legitimate?

25             MR. DISKANT:  Objection.  The witness has testified he

1   doesn't remember.

2              THE COURT:  And he decided to move on to a different

3   question, which is his perfect right.

4              Answer the question.

5   Q.  Isn't it a fact that you knew there was a person at that

6   Madison MRI who would take $40, put in a patient's name, and it

7   would be legit in their system?

8   A.  No, I don't remember.

9   Q.  You were trying to get patients, in the time that you were

10  no longer in the office, you were still trying to get patients,

11  right?

12  A.  Yes.

13  Q.  And in doing that, you were trying to find people to help

14  you get more MRIs and referral letters to fool the doctor,

15  right?

16  A.  No.  At that time I wasn't putting in new patients.

17  Q.  You weren't putting in any new patients?

18  A.  No.

19  Q.  OK.  Well, there came a time when after your arrest that

20  you were wired and went in to Damon Leonard and tried to get

21  information from him, right?

22  A.  Yes.

23  Q.  In your capacity of then cooperating, right?

24  A.  Yes.

25  Q.  By the way, you never decided to wear a wire against

1   Dr. Mirilishvili, you never did that, you were never asked to

2   do that?

3           THE COURT:  Well, that's two different questions.

4   Q.  You were never asked to do that?

5   A.  Not that I can remember, no.

6   Q.  But when you went in and wore a wire with Damon Leonard,

7   you were obtaining information at that point, right?

8   A.  Yes.

9   Q.  And you obtained the information about the fact that

10  Madison MRI was being used for purposes of putting real MRIs

11  into their systems, right?

12  A.  Not that I can recall that conversation, no.  We had

13  several conversations, but I can't recall that.

14          MR. MAZUREK:  Your Honor, may I approach?

15          THE COURT:  You may.

16  Q.  I'm showing you what's been premarked for identification as

17  DM603 and I'm turning to page 16, actually bottom of 15 to the

18  middle of 16.  Start here, read to yourself through here.  Let

19  me know when you're done, sir.

20          MR. DISKANT:  Your Honor, anything Mr. Leonard would

21  have said would be hearsay.

22          MR. MAZUREK:  I'm asking to refresh his recollection.

23          MR. DISKANT:  About something Mr. Leonard said.

24          THE COURT:  So what?

25          MR. DISKANT:  It's hearsay.  Objection.

1          THE COURT:  Excuse me.  He's asking him to refresh his

2    recollection about something which is not in evidence.  What

3    Mr. Leonard said is not in evidence and asking him to refresh

4    his recollection will not put it in evidence.  He's right.

5    What Mr. Leonard would say is probably hearsay, but no one is

6    trying to put anything that Mr. Leonard said into evidence yet.

7          OK, ladies and gentlemen.

8    Q.  So, Mr. Correa, now that you had a chance to read that,

9    does that refresh your recollection that you were being

10   directed by Mr. Leonard --

11   A.  Yes.

12   Q.  -- to go to Madison MRI?

13   A.  Yes.

14   Q.  And the reason you -- he was doing that is because he

15   thought that you were still trying to bring in new patients,

16   right?

17   A.  Yes.  That was his understanding, yes.

18   Q.  Because that's what you led him to believe because you were

19   wired for the government at the time, right?

20   A.  Yes.

21   Q.  And you learned that the office staff was using a place

22   called Madison MRI to get real MRIs, right?

23   A.  I don't know what they were doing at the office.  That was

24   just a way of him trying to help me.

25   Q.  Trying to help you to get new patients in the office at the

1  time, right?

2  A.  Yes.

3  Q.  And did you know this person named Heidi who was there?

4  A.  No.

5  Q.  You didn't know anyone by the name of Heidi?

6  A.  No.

7  Q.  Did you ask about whether Heidi was one of the women who

8  was working there?

9  A.  No.

10 Q.  You didn't ask Damon Leonard --

11      THE COURT:  He just answered the question.  He said

12 no.  There's no need to ask it again.

13      MR. MAZUREK:  Your Honor, I'm going to ask to play a

14 clip of the recording.

15      THE COURT:  Fine.

16      MR. MAZUREK:  And specifically at 42:11, which I think

17 is number -- one second, your Honor.

18      (Audio recording played)

19      THE COURT:  You can strike that, ladies and gentlemen.

20 They played the wrong thing.

21      MR. MAZUREK:  Sorry.  We're going to try to cue it up

22 one more time.

23      (Audio recording played)

24 Q.  So, Mr. Correa, you were asking whether Heidi worked there,

25 right?

1   A.  Yes, I was.

2   Q.  Who were you referring to?

3   A.  I have no idea.

4   Q.  It was your question though, right?

5   A.  Yes.

6   Q.  Are you trying to protect somebody?

7   A.  Negative.

8   Q.  After you learned this information about the MRI on

9   Madison, did you go and investigate whether you could get an

10  MRI there?

11  A.  No.

12  Q.  In your capacity then as a cooperator for the government,

13  isn't it a fact that you learned that the doctor was putting in

14  place a way for a urine lab to get the report directly to the

15  doctor?

16          MR. DISKANT:  Objection, assumes fact not in evidence.

17          THE COURT:  The objection is sustained.  Wrong.

18  Objection is overruled.  Just answer the question.

19  A.  Can you repeat the question?

20  Q.  Yes.

21          THE COURT:  Did you learn that the doctor was trying

22  to put in place a system to get urine analysis reports sent

23  directly to him?

24          THE WITNESS:  Yes.

25  Q.  And that upset the operations at the office to be able to

1    do the overrides that we talked about, right?

2    A.  I have no idea about that.  I wasn't working at the office

3    at that time.

4    Q.  But you were wired, sir, for the government to get

5    information, right?

6    A.  Yes.

7    Q.  And it's something that you learned at that time, right?

8    A.  I don't know.

9    Q.  You don't know.

10        THE COURT:  Look, if he didn't learn it from the

11   doctor, it's hearsay, so let's move on.  You can certainly ask

12   him if the doctor told him that.

13   Q.  Now, when you were working at the office and you said you

14   had your own patients, you were never collecting your patient's

15   scripts in the office, right?

16   A.  No.

17   Q.  You do that outside the office, right?

18   A.  The patient would get their own scripts and then we would

19   go together to a pharmacy.

20   Q.  So you never did any of your business in the office, your

21   drug business, right?

22   A.  No.

23   Q.  You were collecting money from patients while you were

24   working at the office in order to accept the bribe to get an

25   appointment maybe two, three persons a day?

1    A.  Yes.

2    Q.  About $200 each?

3    A.  For new patient, yes.

4    Q.  So you were making four, $600 a day just on that, right?

5    A.  Yes.

6    Q.  And you're getting that approximately five days a week?

7    A.  No, not every day, no.

8    Q.  Were you bringing home, in addition to the salary that you

9    were being paid, an extra couple thousand dollars a week?

10   A.  Probably a thousand, not more than that.

11   Q.  About a thousand dollars a week?

12   A.  Probably.

13   Q.  In addition to the fact that you were selling pills on the

14   street, right?

15   A.  Yes.

16   Q.  And making anywhere from 16 to $1,800 per prescription,

17   right?

18   A.  No.

19   Q.  Wasn't that how much you were getting?

20   A.  That's how much I was getting when I sold it, but I had to

21   take out whatever costs I was providing.  So at the end, I

22   would probably stay with like $300.

23   Q.  I'm just asking in terms of the dollars that you were

24   taking in at the time for selling, it was between 16 and

25   $1,800, right?

1    A.  No.  1400.

2    Q.  You said you were getting 18 points in the past, right?

3    A.  No.  Sixteen.

4    Q.  When you were wired with Damon Leonard, you were talking

5    about getting up to 1850 points, right?

6    A.  That was a conversation so we -- so I could do business

7    with him.  At that time I didn't know what the numbers were on

8    the street.

9    Q.  You heard they were 18, right, from Damon Leonard?

10   A.  Yes.

11           THE COURT:  OK.  I need to stop this now because I

12   have to conference another matter and then I have a lunch

13   meeting, OK.  So we'll start again at 2 o'clock.  Don't discuss

14   the case.  Keep an open mind.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Sir, yesterday's order continues in force.

3    You can't talk to the government at lunch break.

4              Ms. Cucinella, it does you no good to make a face.  If

5    there's something you need to call to my attention, if you

6    think that something that Mr. Leonard said is being offered for

7    the truth of the matter asserted, which frankly I can't tell in

8    the context of this case.  Frequently whether something is

9    being offered just because it was a part of a conversation or

10   if it's being offered for the truth of the matter asserted -- I

11   don't think there's much of an issue about what the street

12   price is on oxycodone pills in this case.  It's not what the

13   case is about.  But if there's something that you think is

14   objectionable, please don't make a face.  Get up and say

15   objection.  OK?

16             MS. CUCINELLA:  Understood, your Honor.  I apologize.

17             THE COURT:  Thank you.  I need to deal with this other

18   case.

19             (Luncheon recess)

20             (Continued on next page)

21

22

23

24

25

G38LMIR3                         Correa – cross

1                    A F T E R N O O N  S E S S I O N

2                              2:15 p.m.

3          (Jury not present)

4          THE COURT:  I apologize.  I have a preliminary

5    injunction hearing at 4:30, which it's largely going to be

6    conducted by phone, so we won't necessarily stop at 4:30, but I

7    do have something at the end of the day.  OK, let's do it.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  OK.  Has everyone had a good lunch?  I'm

3     sorry.  It was entirely my fault that we got delayed here.

4          Mr. Correa, you're still under oath.

5          You're up.

6          MR. MAZUREK:  Thank you, Judge.

7     ABRAHAM CORREA, resumed.

8     CROSS EXAMINATION (Continued)

9     BY MR. MAZUREK:

10    Q.  Mr. Correa, when you were working at Dr. Mirilishvili's

11    clinic as a security guard, you knew that Jomaris Javier was

12    the office manager at the time, right?

13    A.  No, she was just a receptionist.

14    Q.  Receptionist?  Is that what you would call her?  She was at

15    the front desk?

16    A.  Yes.

17    Q.  You know she had some training as a medical assistant?

18    A.  I believe so; I'm not sure.

19    Q.  Did you ever see her certification on the wall up in the

20    doctor's office?

21    A.  Yes.

22    Q.  You knew that she was altering MRI reports so that the

23    doctor would see patients in hopes of her getting some type of

24    payment from the patients, right?

25    A.  No.

1   Q.  You didn't know that?

2   A.  No.

3            THE COURT:  No, no.  It's --

4   Q.  Well, isn't it true that on May 1, 2014 -- and I refer the

5   government again to the report 3501-22, page 3 -- that on May

6   1, 2014, when you were answering questions of the DEA agents

7   and the police --

8            THE COURT:  Did you ever tell the DEA agents that?

9   Did you ever tell the DEA agents that she was altering reports?

10  Did you ever tell them that?  Yes or no.

11           THE WITNESS:  No.

12           THE COURT:  OK.  Now.

13  Q.  So, isn't it true that on that date you stated the

14  following:  Correa stated that he had seen her -- meaning

15  Javier -- alter MRI reports so that the doctor would see the

16  patients in hopes of her getting some type of payment from the

17  patients?

18           THE COURT:  Did you say that to a DEA agent?

19           THE WITNESS:  No, not that I can remember.

20           THE COURT:  You did not.  OK, thank you.

21  Q.  Would a report refresh your recollection?

22           THE COURT:  His recollection doesn't need to be

23  refreshed; he said he didn't say it.

24           Come here a second.

25           (Continued on next page)

G387MIR4                          Correa - cross

1              (At the side bar)

2              THE COURT:  They have to produce the agent for you.

3    You can completely impeach.

4              MR. MAZUREK:  He said at the end of his answer I don't

5    remember.

6              THE COURT:  I didn't hear that.  I apologize if that's

7    true.  I didn't hear that, but just do the impeachment --

8              MR. MAZUREK:  -- with the agent.

9              THE COURT:  You know.

10             MR. MAZUREK:  Yes, I know.  I just thought I did hear.

11             THE COURT:  I missed it.  My bad.  I missed it.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. MAZUREK:

3    Q.  Sir, isn't it a fact that while you worked at the clinic,

4    that Dr. Mirilishvili relied on Javier to furnish him with a

5    copy of the PMP printout?

6    A.  Yes.

7    Q.  And that Dr. Mirilishvili would get rid of any patients

8    that Dr. Mirilishvili would suspect were filling prescriptions

9    in New York and in other states at the same time from other

10   doctors?

11   A.  Yes.

12   Q.  And while you were working there there was another office

13   worker by the name of Augustine Cruz also working in the

14   office?

15   A.  Yes.

16   Q.  But the doctor eventually fired him as well; is that right?

17   A.  Yes.

18   Q.  And isn't it a fact that Augustine Cruz would also make

19   fake MRI reports?

20   A.  Yes.

21   Q.  And he would charge $200 per report?

22   A.  I don't know how much he was charging at the time.

23   Q.  Does that sound about right?

24   A.  Probably, yes.

25   Q.  And he would do this outside of the office and keep these

1    reports on a thumb drive.

2    A.  Yes.

3    Q.  And isn't it a fact that he did this so that there would be

4    no evidence on the computer system at the office?

5    A.  He never did MRIs at the office.

6    Q.  Now, sir, you never told Dr. Mirilishvili the whole time

7    you knew him that you were a convicted drug dealer, right?

8    A.  No.

9    Q.  You never told him you were buying fake MRIs, did you?

10   A.  No.

11   Q.  You never told him you were accepting bribes from patients

12   to get an appointment.

13   A.  No.

14   Q.  You never told him any of these things, because you were

15   afraid if you did, he would report you to the police; isn't

16   that true?

17   A.  No.

18            MR. MAZUREK:  I have nothing further, your Honor.

19            MR. DISKANT:  Briefly, your Honor.

20            THE COURT:  You may redirect.

21   REDIRECT EXAMINATION

22   BY MR. DISKANT:

23   Q.  Mr. Correa, you were asked some questions there at the end

24   about a woman named Jomaris Javier?

25   A.  Yes.

1   Q.  You testified that she was a receptionist in the office?

2   A.  Yes.

3   Q.  Did you observe Ms. Javier accept money from patients?

4   A.  Yes.

5   Q.  What sorts of things would she accept money from patients

6   for?

7   A.  She would accept money for overrides, she would accept

8   money for patients who were new and for patients who wanted TO

9   get skipped in the line.

10  Q.  By override, you are referring to that practice of

11  overriding the urinalysis report that you talked about in

12  cross-examination.

13  A.  Yes.

14  Q.  During cross-examination Mr. Mazurek asked you some

15  questions about your prior meetings with law enforcement

16  agents.  Do you remember those questions?

17  A.  Yes.

18  Q.  And he showed you some documents or reports of those.  Do

19  you recall that as well?

20  A.  Yes.

21  Q.  Did you write those reports?

22  A.  No, I did not.

23  Q.  Prior to defense counsel showing you those reports today,

24  had you ever seen them before?

25  A.  No, I have not.

1    Q.  Defense counsel asked you some questions about Government

2    Exhibit 205.

3            Ms. Joynes, if we could bring up page 12 of that

4    exhibit.

5            Mr. Correa, do you recall being asked about this

6    document on cross-examination?

7    A.  Yes.

8    Q.  And you recall being asked questions about whether or not

9    you had told the doctor about neck pain; do you recall that?

10   A.  Yes, I do.

11   Q.  Did the doctor give you a prescription for a cervical

12   collar during this appointment?

13   A.  Yes.

14   Q.  And did you have an understanding of what the cervical

15   collar was for?

16   A.  Yes, it was a device to be worn around my neck.

17   Q.  When you were working for the doctor, did you ever wear

18   your cervical collar?

19   A.  No.

20   Q.  Did the doctor ever ask you whether or not your neck pain

21   was affected by your work?

22           MR. MAZUREK:  Objection.  Asked and answered.

23           THE COURT:  Overruled.

24   A.  No.

25           MR. DISKANT:  And, by the way, Ms. Joynes, if we can

1   just zoom in on the top of this document.

2   Q.  Mr. Correa, you testified -- and the document reflects --

3   that your first appointment with the doctor was on 9/26 of

4   2012.  Do you see that on the top right corner of the document?

5   A.  Yes.

6   Q.  And you see just a couple lines below that it says

7   electronically signed by Moshe Mirilishvili, and it has a date?

8   A.  Yes.

9   Q.  Is that September 28, 2012?

10  A.  Yes.

11  Q.  Fair to say three weeks or so after the appointment?

12  A.  Yes.

13  Q.  OK.  Mr. Mazurek asked you on cross-examination about the

14  hundreds of patients the defendant would see each week.  Do you

15  recall those questions?

16  A.  Yes.

17  Q.  Fair to say the defendant would have seen hundreds of

18  patients between your visit with him on the 6th and when this

19  document was written on the 28th?

20  A.  Yes.

21          MR. DISKANT:  Your Honor, may I have just a moment?

22          Nothing further.

23          THE COURT:  Anything else?

24          MR. MAZUREK:  Very briefly.

25

1    RECROSS EXAMINATION

2    BY MR. MAZUREK:

3    Q.  On redirect the prosecutor just asked you about the reports

4    that I was showing you.  When you were -- withdrawn.

5            You have met with the government and agents

6    approximately 20 or so times since the time of your

7    cooperation, correct?

8    A.  I can't be specific.

9    Q.  More or less, sir?

10   A.  Ten, 15 times probably.

11   Q.  Ten or 15 times.  You never met with me, right?

12   A.  No.

13   Q.  And with respect to those reports, when you were meeting

14   with the government for ten or 15 times, were there agents in

15   the room or people in the room taking notes, sir, as you were

16   giving the answer?

17   A.  Yes.

18   Q.  You were just asked on redirect about Government Exhibit

19   205 and the fact that there was an electronic signature on the

20   document three weeks later.  Do you remember that?

21   A.  Yes.

22   Q.  The information that was contained in that report said that

23   you had hernia surgery two times, right?

24   A.  Yes.

25   Q.  That was accurate, right?

1    A.  Yes.

2    Q.  And that was the first time you ever met Dr. Mirilishvili

3    in your life, right?

4    A.  Yes.

5    Q.  And you also indicated that you had a family history of

6    diabetes, right?

7    A.  Yes.

8    Q.  And that was indicated on that report, right?

9    A.  Yes.

10   Q.  And those things were told by you to Dr. Mirilishvili on

11   September 6, 2012, right?

12   A.  Yes, it was.

13   Q.  Just like you told him you fell down scaffolding stairs

14   that required you to be hospitalized for two weeks, right?

15   A.  Yes.

16           MR. MAZUREK:  Nothing further.

17           THE COURT:  Anything?

18           MR. DISKANT:  No, your Honor.  Thank you.

19           THE COURT:  Thank you, sir.  You may step down.

20           (Witness excused)

21           THE COURT:  Call your next witness, please.

22           MS. CUCINELLA:  The government calls Dr. Gregory

23   Lawler.

24    GREGORY LAWLER,

25       called as a witness by the government,

1      having been duly sworn, testified as follows:

2   DIRECT EXAMINATION

3   BY MS. CUCINELLA:

4   Q.  Good afternoon, Dr. Lawler.  What is your occupation?

5   A.  Radiologist.

6   Q.  What does it mean to be a radiologist?

7   A.  A physician who interprets imaging studies of the body.

8   Q.  Did you go to medical school?

9   A.  Yes.

10  Q.  Where did you go to medical school?

11  A.  New York Medical College, Valhalla.

12  Q.  When did you graduate from medical school?

13  A.  1991.

14  Q.  What kind of training did you get after medical school?

15  A.  Residency and fellowship.  The first year I did a year of

16  surgery internship.  After that I switched into radiology.

17  After that I did a neuroradiology fellowship at the University

18  of Iowa.

19  Q.  Where do you currently work?

20  A.  I have my own LLC, but I work out of an office for Radnet.

21  Q.  And that's for a company called Radnet?

22  A.  Correct.

23  Q.  Is working for Radnet a new development?

24  A.  Yes.

25  Q.  How so?

1  A.  Radnet acquired Doshi Diagnostic Imaging recently.

2  Q.  What is Doshi Diagnostic Imaging?

3  A.  It's an imaging services company based in New York City

4  that has multiple offices throughout the boroughs.

5  Q.  For how long have you worked at Doshi Diagnostic?

6  A.  Well, I started August 2010 as an independent contractor,

7  and then I switched over to being an employee in October of

8  2014.

9  Q.  The entire time you worked there, have your duties and

10  responsibilities maintained the same?

11  A.  Yes.

12  Q.  And what are some of those duties and responsibilities as a

13  radiologist at Doshi?

14  A.  Interpreting imaging studies of the body including the

15  brain, spine, head and neck.  We do various types of studies,

16  MRI, CAT scan, x-ray, ultrasound, tomography.  We also do

17  procedures, minor procedures there.  I also supervise any

18  imaging that is done, especially MRI and CAT scan.  I have to

19  observe if there is any reactions to IV contrast, and treat

20  that if there is something that happens.

21          I interact with the technologists, the management and

22  the front desk people to make sure that things go smoothly.  I

23  speak with doctors that are referring patients, to either ask

24  questions about the patient or give them the results directly

25  if it's an important result.

G387MIR4                        Lawler - direct

1    Q.  Just going back to your background for a moment.  After

2    your fellowship before you started at Doshi, had you worked

3    with other imaging groups?

4    A.  Yes.

5    Q.  Approximately how many?

6    A.  Approximately six.

7    Q.  And since you started working with those six imaging groups

8    through the current time, approximately how many imaging

9    studies have you reviewed?

10   A.  Hundreds of thousands.  Approximately 15 to 20,000 per

11   year.

12   Q.  And for how many years?

13   A.  19.  That's not including fellowship or residency.  That's

14   just working.  So, before that I did residency and fellowship

15   and medical school, so many, many thousands more.

16   Q.  Dr. Lawler, can you explain for the jury how a patient ends

17   up at an imaging services center like Doshi?

18   A.  So the patient will be referred by a physician who is the

19   treating physician.  They will see the patient, examine the

20   patient, take a history and physical.  They may do some blood

21   tests or other testing, and then they feel it might be

22   appropriate to do a certain imaging study, and then they would

23   refer that patient to get the imaging study at a various office

24   center, radiology center.  They give a patient a referral form

25   which is essentially a prescription for the study.  They would

1    fill out all of the information at the top of the form,

2    including the patient's name, date of birth, the history --

3    pertinent history -- the exam that's ordered, their

4    information.  Typically there is authorization by insurance for

5    that study; the authorization information is there.  If there

6    is any blood lab values that are pertinent, they will put that

7    in.  Then they will sign the form, authenticate it and give

8    that to the patient.

9    Q.  And that's information that's then transmitted to Doshi?

10   A.  Yes, so typically the patient will -- either the doctor's

11   office or the patient will schedule the exam at the center.  So

12   they might call ahead, or they might show up.  Most people will

13   call ahead and get a scheduled appointment.

14   Q.  And what happens during a patient's appointment at Doshi?

15   A.  So, they will present themselves to the front desk when

16   they come in and get checked in.  They will show ID.  They will

17   give the front desk person the form, the referral form.  They

18   will put their information into the system if it does not

19   exist.  If it does exist, they will pull it up with their date

20   of birth, name, their chart number.  They will make sure that

21   the insurance is correct, that it's approved, that the patient

22   has a copay, whether it's $10 or whatever; they will pay that.

23   Then once that is all set, they will give them a bunch of forms

24   to fill out, including HIPAA forms that have to be signed,

25   information about the study, about their history, pertinent to

G387MIR4                          Lawler - direct

1    that study, why they're there essentially.

2    Q.  Just stopping you for a second.  You mentioned a copay.

3    Does Doshi see insurance patients and self pay patients?

4    A.  Yes.

5    Q.  Do you know how much an MRI costs for a self pay patient?

6    A.  It depends.  It's rare that a person would come in and self

7    pay.  It's extremely rare.  Typically what happens is the

8    person, the patient, will speak to the manager, and they will

9    try to come up with a number.  They base it off of the rates

10   that are typical for let's say Medicare or Medicaid, and they

11   try to help the patient, especially if they don't have much

12   money, so they can get the study done.  So I don't really get

13   involved with that, but I know it's very unusual for that to

14   happen.

15   Q.  As a radiologist, are you involved in administering

16   diagnostic studies?  Say, for example, an MRI.

17   A.  Well, there is a radiology technologist who is certified,

18   went to school, who will typically administer the test under my

19   supervision.  So I will be there physically reading studies,

20   but the tech will be doing the MRI while I'm reading other

21   studies.

22        If there is a question about the images or how to do

23   it, if they see something during the exam that looks

24   suspicious, they will ask me to look at it.  I will add more

25   images or contrast, which is IV contrast.  So I'm there working

1   as they're doing their thing.

2   Q.   And then do you actually read the images that are created?

3   A.   Yes.

4   Q.   And do you then create a report?

5   A.   Yes.

6   Q.   What kind of information is contained in your typical

7   report?

8   A.   Well, just so you know how it works, the images that are

9   acquired -- let's say it's an MRI -- the study will be

10  finished, they will close out the exam, the images will go to

11  the system which is called PACS.  Can I get some water?

12        So, once the study is finished, the images will go to

13  the computer system which is called PACS.  Those images will be

14  on a work station which I can access and read.  And there is

15  multiple monitors.  But essentially what I see is the patient's

16  name, their date of birth, the medical record number and the

17  study that was done in a list.  And I will click on that, it

18  will come up on the other monitors.  I will look at the images,

19  interpret the images.  In an MRI there are many hundreds and

20  hundreds of images, depending on what kind of study is done.

21  And then I will dictate the report into a dictation microphone.

22  Q.   And what kind of information goes into that report?

23  A.   Well, you mean the actual report, the physical report?

24  Q.   Yes.

25  A.   OK.  So, there is a typical format that we use at Doshi,

now Radnet.  But at the top there is a header that says Doshi

Diagnostic Imaging; it has a logo.  Below that there, the top

right, there is the ordering physician's information, including

their name, their address, their phone number, fax number.

Below that is the location at Doshi where the study was done.

So let's say it might be at a certain location like Fordham or

Washington Heights or Pelham Bay or somewhere in Brooklyn.  It

will say that.  It will have that information and then the

phone number of that center.

        So, on the left, top left, will have the patient's

information, their name, the date of birth, their medical

record number for Doshi that we have internally, the date of

service which is the date of the exam, their gender.  I don't

have one in front of me, but there is also identifying

information for the patient.  Then that's the top.

        Then below that in bold is the actual imaging study

that was done.  Let's say it's an MRI of the lumbar spine,

that's usually bolded.  Below that there is a typical format

that we utilize that has different fields that are populated or

have to be followed as we dictate.  So, below that --

Q.  Do all Doshi reports follow the same format?

A.  Yes.

Q.  On those reports, does it ever list a referral for, say,

pain management?

A.  No.

G387MIR4                         Lawler - direct

Q.  In all of the reports you have ever created, have you ever

listed a referral for pain management?

A.  No.

Q.  In all of the reports that you have ever created at Doshi,

have you ever listed a recommendation for a type of medicine?

A.  No.

Q.  Have you ever listed that a patient should be prescribed

oxycodone?

A.  No.

Q.  After the report is written or generated, where does it go?

A.  Once it's dictated, it goes back to me, and then I

proofread it and electronically sign it.  Then from there it

will be sent to the ordering physician.

Q.  When you say the ordering physician, that's the doctor that

originally referred the patient for the MRI?

A.  Yes.

Q.  How is the report transmitted to that referring physician?

A.  There is a couple of ways that it can be done.  Typically

most doctors will have it faxed and auto faxed, so that once

it's signed electronically, it will be automatically faxed to

that number that the doctor has at their office.  Some will use

the Internet to be able to view images and the reports via a

secured website.  They can only view their own patient's

information, their studies and reports, and nobody else's.

Q.  Do the reports ever get handed out to patients?

G387MIR4                        Lawler - direct

1   A.  Extremely rarely, extremely rarely.

2            MS. CUCINELLA:  Your Honor, at this time and without

3   objection from the defendant, we would like to offer

4   Government's Exhibits 553, 554, 555 and 556, subject to

5   connection.

6            MR. GOSNELL:  No objection, your Honor.

7            THE COURT:  Thank you.

8            (Government's Exhibits 553, 554, 555 and 556 received

9   in evidence)

10            MS. CUCINELLA:  May I approach?

11  Q.  Dr. Lawler, I'm handing you folders that contain some

12  documents.  I'm going to first direct your attention to what

13  has been marked as Government Exhibit 554, and I'm going to ask

14  that you turn to page 5 of that exhibit.

15            Your Honor, may we ask to publish to the jury?

16            THE COURT:  Yes.

17            MS. CUCINELLA:  Ms. Joynes, if you could pull up page

18  5.

19  Q.  Dr. Lawler, have you seen this document before?

20  A.  Hold on.

21  Q.  It should also be on the small screen in front of you, and

22  I believe you should have the hard copy.

23  A.  Oh, OK.  Sorry.  Yes.

24  Q.  Have you seen this document before?

25  A.  Yes.

G387MIR4                         Lawler - direct

1    Q.   When did you see it?

2    A.   When I spoke with you last week, and then I looked at it

3    again today.

4    Q.   Does this resemble a Doshi MRI report?

5    A.   Somewhat.

6    Q.   Can you tell us how it's like a Doshi report and how it's

7    not like a Doshi report?

8    A.   Yes.  So at the top -- can I point?  No?  Just say?  Do you

9    have like a pointer?

10   Q.   I think if you describe it, the jurors have it on their

11   screen, so they should be able to follow along.  If it becomes

12   an issue, we will figure it out then.

13   A.   OK.  So, at the top it says Doshi Diagnostic Imaging

14   Services.  There is a lot of little dots around it when you

15   look at the actual document, and that's suspicious to me.

16            MR. GOSNELL:  Objection.

17            THE COURT:  Overruled.

18   A.   Above that to the left there is a very faint Doshi logo,

19   which is extremely hard to see and not typical.

20   Q.   What else?

21   A.   So then going down the top right you have the doctor's name

22   and address and number, phone number.  Something that is not

23   there is the fax number which is always there so that reports

24   can go to the doctor.

25   Q.   That's something that would always be in a Doshi report?

G387MIR4                       Lawler - direct

1    A.  Yes.

2    Q.  What else?

3    A.  So below that it says location Fordham.  That's misspelled,

4    just F-o-r-d-a-m.  It should be F-o-r-d-h-a-m.  So that's

5    suspicious right off the bat.

6         OK.  Moving on to the patient, top left, it says RE

7    and then colon.  So the RE and colon look OK to me, look

8    similar, however, the patient's name is in different font.  It

9    looks like it has been literally cut and pasted in.  There is a

10   line below it.

11        On all Doshi reports the names are bolded and the last

12   name is first and then a comma and then a space, and a

13   patient's first name.  So in this case it has the patient's

14   first name and then the last name, which is totally incorrect.

15        Also, if you look at the chart number, it says chart

16   number colon 0679.  If you look at it really closely, the zero

17   has been kind of clipped at the top, and it looks like the name

18   when it was pasted in covered a bit of the top of the zero.

19   Q.  Turning to the body of the MRI?

20   A.  I'm not done yet.

21   Q.  Apologies.

22   A.  There is a lot more.  OK, so patient's phone number it says

23   NA.  That's very unusual to not have a phone number.

24        The next thing is the date of birth, it says DOB.

25   That looks authentic, however, the date of birth is a

G387MIR4                          Lawler - direct

1    completely different font, and it looks like it's been pasted

2    in; there is a line below it.

3           Also of note it says the patient is a male.  So, I

4    don't know Lanique Brown, but I assume Lanique is a female

5    name.

6           MR. GOSNELL:  Objection.

7           THE COURT:  Objection is overruled.

8    A.   The date of service is 5/6/14.

9           Then going to the body it says exam, MRI scan of

10   lumbar spine.  That looks OK to me.  Clinical data, back pain.

11   Then the technique looks to be OK; it looks like a Doshi

12   report.  Prior studies is OK.  Findings, the type looks

13   similar; it's the same as a Doshi.

14          And then it comes to the impression, which is at the

15   bottom.  So, the actual type looks OK, but right below that

16   there is typically a space, at least one.  And here there is

17   something that I have never seen before in other reports that's

18   been inserted, and that says recommendation:  Referral to pain

19   management.

20          Below that is the physician who read the study, the

21   radiologist, Mark Armstrong, and it says he is board certified

22   in diagnostic radiology and neuroradiology which is the same

23   credentials I have.

24          It does say the document is electronically signed at

25   the bottom left, however, it always would say when that was

G387MIR4                         Lawler - direct

1    signed, the date and the time.  And that's missing.

2    Q.  Dr. Lawler, how many pages are there in Government Exhibit

3    554?

4    A.  Six.

5    Q.  And did you review all six of those pages before you

6    testified today?

7    A.  Most of them.  I don't know if I checked all of them, but

8    most of them, yes.

9              MS. CUCINELLA:  Ms. Joynes is it possible to put

10   another one of those pages up against Lanique Brown's?

11   Q.  Looking at the one for Rozell McDonald, and consistent with

12   the other pages in 554, are those essentially copies of the

13   same MRI?

14             MR. GOSNELL:  Objection.

15   A.  They are --

16             THE COURT:  Hang on.  Hang on.  Ground?

17             MR. GOSNELL:  Speculation.

18             THE COURT:  Overruled.

19   A.  Just give me one second.  Ask the question again.

20             MS. CUCINELLA:  We need the judge to rule first.

21             THE COURT:  I did.

22             MS. CUCINELLA:  I didn't hear you.

23             THE COURT:  I said the objection is overruled.

24   Q.  Go ahead and answer.  My mistake.

25   A.  OK.  So can you ask that again, please.

1    Q.   Sure.  Do the documents in 554, each of the individual

2    pages, appear to be copies of the same MRI?

3    A.   The body of the report is exactly the same on all of these.

4    Q.   And the patient names are different?

5    A.   There are several differences which I can go over, but the

6    patients' names are different.

7    Q.   Can we now turn to Government Exhibit 553, which should be

8    another folder that you have up there.

9           Ms. Joynes if you can just pull up the first page,

10   please.  Thank you.

11          Looking at the first page of Government Exhibit 553,

12   have you seen this document before?

13   A.   Yes.

14   Q.   Does it resemble an MRI report from Doshi Diagnostic

15   services?

16   A.   Somewhat.

17   Q.   What are some of the differences between this and a

18   legitimate Doshi Diagnostic report?

19   A.   OK.  So like the last reports, if you look at the top it

20   says Doshi Diagnostic Imaging Services.  There is a very faint

21   Doshi logo and little specs or flecks around it, which is

22   concerning.

23          The doctor's name on the top right is there.  Again

24   there is a phone number but no fax number.  The location is

25   Pelham Bay, which is actually where I work, however, it's

 1    signed by a doctor that doesn't work for Doshi, Dr. Harvey

 2    Lefkowitz.  They also misspelled diplomate in the American

 3    Board of radiology.  I don't know if this guy is board

 4    certified, but they misspelled that.

 5         If you look at the name of the patient, it says Guy

 6    Green.  So they got part of it right in that they put last name

 7    first and then a comma before the first name, however, the font

 8    is completely different and wrong.

 9         The chart number is 044754.  They did get the sex

10    right, and the date of service is 6/18/14.

11         Now then they go into indication.  First of all the

12    problem -- one of the problems here is that the exam is always

13    at the top, below that line.  So, they inserted indication

14    above exam, and that never happens.  And it doesn't say

15    indications; it says history.

16         Then the next field will say exam.  Then the history,

17    technique, which is not here.  It doesn't say technique at all.

18    And then it goes into the prior studies, which is not here as a

19    field.  And then it will say findings colon, and that's not

20    here either.  OK?

21         So then they have a body of a report -- which has

22    Doshi font -- and an impression.  After that there it says

23    sincerely, and we don't sign it that way at all.

24         And then there is this hopefully a doctor, legitimate

25    doctor, that has his name on the bottom.  I don't know this

G387MIR4                      Lawler - direct

1    doctor at all from Doshi.  And diplomate is spelled

2    incorrectly.  And then it has HL/rs, which is typical for the

3    name of the initials of the doctor that wrote the report and

4    then the transcriptionist.  However, again it's missing the

5    date and time it was electronically signed, and it does not say

6    it was electronically signed at all.

7    Q.  I'm going to ask you, Dr. Lawler, how many pages are there

8    in Government Exhibit 553?

9    A.  Three.

10   Q.  Looking at those three pages --

11           Ms. Joynes, if you can put up the second page, because

12   I don't think we can put all three up on the screen --

13           Do those pages, do they appear to be copies of each

14   other with respect to the substance of the report?

15   A.  The body of the report is exactly the same in all three.

16   Q.  I'm now going to direct your attention to Government

17   Exhibit 555.

18           Ms. Joynes, if you can pull up the first page, and can

19   you put the second page side by side.

20           Dr. Lawler, does this resemble a Doshi Diagnostic MRI

21   report?

22   A.  No.

23   Q.  How is it different?

24   A.  So, starting at the top.

25   Q.  Page 1.

1   A.  Of page 1, on the left there, it says Doshi Diagnostic

2   Imaging Services.  That to me looks like it's been pasted onto

3   this page literally.

4   Q.  Does Doshi Diagnostic, do they make pain management

5   referrals?

6   A.  No, ever, ever.

7   Q.  And how many documents, two-page documents are in

8   Government Exhibit 555?

9   A.  Nine.

10  Q.  And are they all somewhat the same?  Are the bodies of them

11  the same?

12  A.  So, if you look at both pages, they refer to the same

13  patient, so they go together, so it's like one kind of quote

14  document unquote.

15          So the first page says pain management referral.  So

16  we never, ever -- I have never seen this form ever, and we

17  never ever generate a report like this.

18  Q.  Why don't Doshi make referrals?

19  A.  We're not the treating doctor, so it's inappropriate

20  medically to do this.  And this doctor does not even work for

21  Doshi.

22  Q.  And Government Exhibit 555, does it include what appear to

23  be almost exact copies of those two pages for multiple

24  patients?

25  A.  One second.  There are some differences, but I can get into

1   that if you want.  It's up to you.

2   Q.  What types of differences do you see just generally?

3   A.  OK.  In general, first of all, the pain management referral

4   sheet is similar.  OK?  And if you look at the actual wording

5   after indication, it has the same wording.  OK?

6          OK.  One thing that's very concerning to me is that it

7   says patient ID, and we don't even use that at Doshi.  And then

8   it has a totally unauthentic medical record number.  It says

9   SIG8245066.  And that doesn't -- I have never seen that before.

10  The numbers are too many.  And we never use letters in the

11  record number.  And we don't say patient ID.

12  Q.  So this is not a legitimate Doshi document?

13  A.  Completely fabricated, totally.

14  Q.  I'm going to direct your attention now to Government

15  Exhibit 556.

16          Ms. Joynes, if you can put the first two pages up.

17          Can you just look at the first two pages, Dr. Lawler.

18  Are these legitimate Doshi documents?

19  A.  No, absolutely not.

20  Q.  How do you know?

21  A.  Many, many, many things on these two pages, many things.

22  Q.  Why don't you walk us through a couple of them.

23  A.  OK.  Well, the first thing is these don't exist in the

24  Doshi system at all.

25  Q.  What do you mean by that?

1   A.  I mean they did a really nice new logo for Doshi which

2   doesn't exist.  I mean it's a great job; it looks like a third

3   grader might have done it, pasted it literally.

4   Q.  What else?

5   A.  So that's very creative.

6         OK.  So on the left page it says MRI lumbar spine

7   without contrast.  And above that it has the patient's name and

8   medical record and chart number.  Excuse me.  So that font for

9   the patient is completely incorrect, as is the chart number.

10        Also, there is no last name and then a comma and then

11   the first name, so that's totally incorrect.

12        Now, what appears to have happened is that this report

13   looks like it has been run through the copying machine many,

14   many, many times to me.  And actually this page is the second

15   page of a full MRI report, so you don't even have the rest of

16   the report beginning with all the other things I spoke about

17   and then finally the impression here.  But you're missing half

18   the report essentially for an MRI report for an MRI of the

19   lumbar spine -- radiology report.

20            (Continued on next page)

21

22

23

24

25

G38LMIR5                          Lawler - direct

1    BY MS. CUCINELLA:

2    Q.  So for any valid MRI radiology report this is incomplete?

3    A.  Absolutely.

4    Q.  What about the second page?

5    A.  Well, hold on.

6    Q.  Sorry.

7    A.  Hold on.  So at the bottom it has my name, which is

8    beautiful.  Can I get some more water?  Which is very

9    concerning because this is not my report and it's my name and

10   it says -- has my credentials and my reputation and it has

11   somebody else's signature there.  So that upset me to say the

12   least.

13          The next page says MRI referral form and this does not

14   exist.  This is not a Doshi form.  First of all, again, the top

15   logo and the whole thing is completely fabricated.  Then we

16   don't even have an MRI referral form like this.

17          Now, what they did, apparently, is they got an MRI

18   screening form --

19          MR. GOSNELL:  Objection, your Honor.

20          THE COURT:  The objection is sustained.

21          THE WITNESS:  OK.

22          THE COURT:  The objection is sustained.  You should

23   stop talking.

24          THE WITNESS:  Don't say anything.

25          THE COURT:  Right.

1           Ask your next question, please.

2   Q.  What about the second page makes clear to you that this is

3   not a Doshi document?

4   A.  So MRI referral form does not exist.  The body of this

5   piece of paper is actually, if you read it, is an MRI safety

6   screening questionnaire to make sure that the study can be done

7   safely, that there's no pacemaker in particular, stimulators,

8   other metal in the body that might cause artifact or cause

9   issues with the MRI.  The MRI is an extremely powerful magnet

10  and it has to be done safely.

11  Q.  Is there anything about this document that conveys

12  medically important information to a treating physician?

13  A.  No.

14  Q.  Directing your attention to the additional pages in

15  Government Exhibit 556, do they all look substantially similar

16  to these two pages?

17          Apologies.  Do you have more to say on this one?

18  A.  Oh, yeah.  So if you look at the first page, it says

19  female, Anastasia M. Ezekia.  And then on this page which goes

20  with this, it says Anastasia Ezek.  So I don't know if the

21  patient is female or first name or what.  That's very

22  different.  The date of birth appears to have been inserted

23  there.  My name is there and I never, ever signed or filled out

24  any of these forms.

25  Q.  Does your name appear on the other documents in Government

1    Exhibit 556 as well?

2    A.  Yes, unfortunately.

3    Q.  Dr. Lawler, in the other radiology firms that you've worked

4    at, have you ever issued a pain management referral?

5    A.  No.

6            MS. CUCINELLA:  Nothing further.

7            MR. GOSNELL:  May I inquire, your Honor?

8            THE COURT:  You may.

9            MR. GOSNELL:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. GOSNELL:

12   Q.  Good afternoon, Dr. Lawler.  My name is Wayne Gosnell.  I

13   represent Dr. Mirilishvili.

14           You and I have never met before, right?

15   A.  No.

16   Q.  And you never met Dr. Mirilishvili before?

17   A.  No.

18   Q.  I want to go back --

19           THE COURT:  You need to say that, so you can't just

20   nod.

21           THE WITNESS:  I said no.

22           THE COURT:  I'm sorry.  I didn't hear it.

23   Q.  So on direct examination, you talked about the purposes of

24   an MRI scan, right, the purpose of doing an MRI imaging?

25   A.  The purpose --

1           THE COURT:  Do you remember testifying about the

2      purpose of doing MRI imaging a few minutes ago?

3           THE WITNESS:  I just want to be clear about what

4      you're asking.

5           THE COURT:  He's asking if a few minutes ago you

6      testified generally about why people do MRIs.

7           THE WITNESS:  Generally, yes.

8           THE COURT:  Great.  Fine.

9      Q.  And an MRI scan or an MRI image is a detailed image of a

10     person's organs, tissues, and bones.

11          THE COURT:  Is that correct?

12     Q.  In very general terms.

13     A.  Very general, very general.

14     Q.  It's a diagnostic tool for physicians.

15          THE COURT:  Ask questions.  Don't make a statement.

16     Q.  Is it a diagnostic tool for a physician?

17     A.  For the patient.

18     Q.  And it's the image and the report is something that you

19     expect a doctor to rely upon?

20     A.  Yes.

21     Q.  In determining a course of treatment for a patient?

22     A.  No.

23     Q.  In what way do you expect a doctor to rely upon an MRI

24     report or scan?

25     A.  For diagnosis.

1  Q.  To diagnose a problem with the patient that the patient is

2  experiencing?

3  A.  For a medical diagnosis.

4  Q.  So, for example, if -- one of the things that you could use

5  an MRI report to diagnose would be the cause of a spinal

6  injury?

7  A.  Say that again?

8  Q.  One of the things, one of the medical conditions that you

9  could use an MRI report to diagnose would be the cause of a

10  spinal injury?

11          THE COURT:  Can you use an MRI to figure out what

12  caused a spinal injury?

13          THE WITNESS:  No.

14          THE COURT:  Right.

15  Q.  Can you use an MRI to determine whether there is a spinal

16  injury?

17  A.  Yes.

18  Q.  Such as disk herniation, disk bulges, things like that?

19  A.  Very generally.

20  Q.  And you testified on direct examination that over your

21  entire medical career, you viewed hundreds of thousands of

22  diagnostic images?

23  A.  Yes.

24  Q.  Fair to say that you have a specialty in that?

25  A.  I'm board certified in that.

1   Q.  That means you have additional training, additional

2   experience than doctors who are not board certified in

3   radiology?

4   A.  It's more than that.

5   Q.  What else goes into being board certified in radiology?

6   A.  Well, first you have to graduate medical school.  Then you

7   do an internship.  Then you do a residency.  Then you do a

8   fellowship, possibly, as I did, which is in neuroradiology.

9   Q.  What is neuroradiology?

10  A.  It's image guided procedures of the brain and spine and

11  head and neck as well.

12  Q.  Throughout all of those things you've gotten to there, you

13  were reviewing images of MRIs, CAT scans, things like that.

14  Your residency, fellowship, during each of those times, you

15  were reviewing those types of diagnostic images?

16  A.  Yes, depending on during residency and fellowship, it was

17  under the teaching and supervision of a staff physician or

18  professor.

19  Q.  And what else goes into being board certified in radiology?

20  A.  Well, after you meet the requirements from residency and

21  fellowship perspective, you have to take a written and an oral

22  exam and to be certified.  And to maintain that had you must

23  continue medical education with many credits, including the

24  area of your field.  And it's very specific, but there's a lot

25  of requirements to maintain that certification.

 1  Q.  And one of those requirements is reviewing diagnostic

 2  images and creating reports of your findings from those images?

 3  A.  No.

 4  Q.  You do that on a regular basis though?

 5  A.  I just said no.  You didn't listen.

 6  Q.  Do you do those things on a regular basis?

 7  A.  Do what?

 8  Q.  Review diagnostic images and create reports or approve

 9  reports?

10  A.  Yes.

11  Q.  Now, you said that Doshi Diagnostic has recently been

12  acquired by another company?

13  A.  It was bought, yeah.

14  Q.  When it was just -- before that, it was located, they had

15  clinics that were located in New York?

16  A.  Yes.

17  Q.  And in New Jersey?

18  A.  In the past, yes.  That was before my time so I'm not real

19  familiar with where.  Those offices were sold previously.

20  Q.  There had been clinics in New Jersey?

21  A.  That's my understanding.

22  Q.  And there had been clinics in Florida?

23  A.  Yes.  That's a separate entity though.

24  Q.  OK.  And there are, there are currently about 700 employees

25  at Doshi?

G38LMIR5                        Lawler - cross

1    A.  I have no idea.

2    Q.  About 60 doctors?

3    A.  There's actually zero employees at Doshi.

4    Q.  Before it was acquired, there was about 700 employees?

5    A.  I have no idea.

6    Q.  About 60 doctors?

7    A.  No.

8    Q.  More or less?

9    A.  Less.

10   Q.  And about several hundred technicians who were creating the

11   images?

12   A.  I don't think it was that many.  They're not technicians,

13   by the way.

14   Q.  What are they?

15   A.  Technologists.

16   Q.  Technologists, OK.  Would you say that Doshi Diagnostic

17   would run, as a company wide, would run more or less than a

18   million images a year?

19   A.  No.

20   Q.  Would it be more or less?

21   A.  A lot more.  Images?

22   Q.  Images.

23   A.  Depends what you mean by images.

24   Q.  Well, MRI imaging.

25   A.  Well, each MRI has -- can have thousands of images.

1    Q.  OK.

2    A.  CAT scan can have hundreds of images.

3    Q.  So certainly Doshi wide runs more than a million a year?

4    A.  A million what?

5    Q.  A million images per year.

6    A.  Studies or images?

7    Q.  Images.

8    A.  No.  Wrong.

9    Q.  OK.  Now, you said that you create these or you approve

10   these MRI reports, and we saw some examples that the government

11   marked as exhibits that you were testifying about.

12   A.  Yes.

13   Q.  In order to create an MRI report, you have to either look

14   at the image or review the image, correct?

15   A.  Yes.

16   Q.  And then you prepare the report and you put down your

17   findings in the report?

18   A.  There's more than that.

19   Q.  That's part of what you do is you put down your findings in

20   the report, your interpretation of the scan?

21   A.  Yes.

22   Q.  And you said that you dictate your findings for the

23   reports?

24   A.  Yes.

25   Q.  And you use, because you've done hundreds of thousands of

1    these, you use pretty standard language?

2    A.  I wouldn't say that.

3    Q.  If you were describing a disk herniation, if you had a new

4    report and you were describing disk herniation, that wouldn't

5    be the first time you had done that?

6    A.  No.

7    Q.  And you would use generally the same type of language in

8    describing a disk herniation other than perhaps the location of

9    the disk herniation?

10   A.  I wouldn't say it like that.

11   Q.  OK.  Can we bring up Government Exhibit 554, the first

12   page, please.  This is -- you testified about this exhibit.

13   I'll wait until you have it in front of you.

14   A.  OK.

15   Q.  OK.  You testified about this exhibit on direct

16   examination?

17   A.  Yes.

18   Q.  You testified that in large part this appeared legitimate

19   to you?

20   A.  No.

21   Q.  Did you tell -- you met with Ms. Cucinella and special

22   agents on March 4?

23   A.  Yes.

24   Q.  Did you tell them that that report appeared legitimate?

25   A.  On its face.  It looks better than the other illegitimate

1    reports.

2    Q.  Did you tell them that it appeared legitimate, yes or no?

3    A.  Somewhat.

4    Q.  And, again, you've seen how many Doshi reports in your

5    lifetime?

6    A.  Say that again?

7    Q.  How many Doshi Diagnostic reports have you seen in your

8    lifetime?

9    A.  Many thousands.

10   Q.  More than 10,000?

11   A.  Yeah.

12   Q.  More than a hundred thousand?

13   A.  Yeah.

14           THE COURT:  Oh, please.

15   Q.  Let me draw your attention, if we could bring up Government

16   Exhibit 556, the first page of that as well.

17   A.  This is a different exhibit?

18   Q.  This is.  I'm sorry.

19   A.  OK.

20   Q.  I just want to draw your attention to the upper right hand

21   corner, the signature that's there.  Are you familiar with that

22   signature?

23   A.  No.

24   Q.  The document that you have in front of you, is the

25   signature actually written in blue ink?

G38LMIR5                    Lawler - cross

1   A.   Correct.

2   Q.   And it has a name and a date and it's all in blue ink,

3   correct?

4   A.   Yes.

5   Q.   You testified on direct examination that when a patient

6   comes in to Doshi Diagnostic, one of the first things they do

7   is they meet with the front desk?

8   A.   Say that again?

9   Q.   One of the first things a patient does when they go into

10  Doshi Diagnostic or was Doshi Diagnostic is they meet with

11  somebody at the front desk?

12  A.   They'll check in at the front desk.

13  Q.   They provide paperwork to the front desk, the front desk

14  provides paperwork to them?

15  A.   And ID.

16  Q.   And ID.  And you expect that the front desk is going to do

17  whatever the front desk does with respect to that patient,

18  correct?

19  A.   I don't know what that means.

20  Q.   What does the front desk do with respect to a patient that

21  comes in for an initial visit to Doshi Diagnostic?

22  A.   So they'll greet the patient.

23  Q.   You expect them to do that?

24  A.   I would hope.  As long as they're a real patient.

25  Q.   OK.  If they're not a real patient --

1    A.  Like a ghost --

2                THE COURT:  Can we just go through the procedure so we

3    can bring this to a conclusion more rapidly.  I don't want you

4    to fight with him.

5                THE WITNESS:  I don't either.

6                THE COURT:  Great.

7                What happens?  I'm a patient.  What's going to happen

8    when I show up at Doshi Diagnostic?

9                THE WITNESS:  So you'll check in.  You'll present the

10   form, the referral form that's signed by the doctor that's

11   authentic.  It will be verified by the staff.  They'll check

12   you in.  They'll check your insurance, make sure everything is

13   correct.  They'll give you forms to fill out, including

14   signature HIPAA forms which are required, questionnaires, which

15   is what I went over before.

16               Then they will sit and wait for the technologist to

17   call them in and then they'll be with the technologist who will

18   also go over additional information to verify and get

19   additional information about the study that's being done, why

20   it's being done, other prior studies that were done on this

21   patient, for example, let's say it's a right lumbar spine, it's

22   very important who the doctor is.  And then they will hopefully

23   begin the exam.

24   Q.  At the end of all of that process, once you've generated a

25   report, you said that the report would typically be sent back

1    to the referring physician?

2    A.   Yes.

3    Q.   And it can be done in a number of ways.  It can be done by

4    fax, it could be done over the internet, right?

5    A.   You have to be more specific about that.

6    Q.   Doshi Diagnostic will send the MRI report back to the

7    referring physician?

8    A.   Directly.

9    Q.   They will send it back by either a fax?

10   A.   Yes.

11   Q.   That's one way?

12   A.   Yes.

13   Q.   Or they will send it, they will provide access to the

14   physician over the internet over a secure internet line?

15   A.   Secure.  They have to have an account and that patient must

16   be their patient only.

17   Q.   They're not given assess to all of Doshi's files, only to

18   the specific patient?

19   A.   Only their patients.

20   Q.   And once the MRI report goes to the referring physician,

21   you don't know what happens with the MRI report at that point,

22   do you, because you're not there?

23          THE COURT:  The question is you don't know what

24   happens to the report; is that correct?

25          THE WITNESS:  Depends on what you mean by that.

1    Q.  Do you have any control over what happens with the physical

2    MRI report once it goes to the referring physician?

3    A.  No.

4    Q.  And you mentioned HIPAA laws.  You're aware that a patient

5    under the law is permitted to get their medical record?

6    A.  Yes.

7    Q.  They are permitted to walk into Doshi Diagnostic and if

8    they have a patient record, they can request it, and you are

9    required to give it to them?

10   A.  Under certain conditions.

11   Q.  If they ask for it?

12   A.  No.

13   Q.  Under the law, you're required to give a medical report to

14   a patient if they request it, yes or no?

15   A.  That's not all of it.  They have to verify that they're a

16   patient.  They -- I'm not done.  They have to show --

17              THE COURT:  Please wait.

18              Finish your answer.

19              THE WITNESS:  You're not letting me finish and I don't

20   like it.

21              THE COURT:  Please.  I don't need your commentary and

22   I don't like the way you're behaving and this is my courtroom

23   and I make the rules here.  Answer his question.

24              THE WITNESS:  So what was the question?

25   Q.  If a patient, a real patient comes into Doshi Diagnostic

G38LMIR5                          Lawler - cross

1    and had previously been seen by Doshi Diagnostic and had a

2    medical record at Doshi Diagnostic and they requested that they

3    be provided with their medical record, under the law you're

4    required to give that to them, yes or no?

5    A.  After they meet certain conditions.

6    Q.  You're required to give it to them though?

7              THE COURT:  Don't fight with him.  He said yes if they

8    meet certain conditions.  Do you want to get into what the

9    conditions are?  Fine.  I don't think that's necessary in this

10   case, but be my guest.

11             MR. GOSNELL:  It's not, your Honor.  Nothing further.

12             THE WITNESS:  Thank you.

13             MS. CUCINELLA:  No questions, your Honor.

14             THE COURT:  You may go.

15             THE WITNESS:  Sorry to upset you.  But it's my name

16   too.

17             THE COURT:  Shh.  Out.

18             THE WITNESS:  Thank you.

19             THE COURT:  Thank you very much, Doctor.

20             (Witness excused)

21             THE COURT:  Call your next witness.

22             MS. CUCINELLA:  The government calls Damon Leonard.

23    DAMON LEONARD,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

1                THE COURT:  Spell Leonard.

2                THE WITNESS:  L-E-O-N-A-R-D.

3                THE COURT:  You may inquire.

4     DIRECT EXAMINATION

5     BY MS. CUCINELLA:

6     Q.  Good afternoon, Mr. Leonard.

7     A.  Good afternoon.

8     Q.  How old are you?

9     A.  Thirty-eight.

10    Q.  Are you married?

11    A.  Yes.

12    Q.  For how long have you been with your wife?

13    A.  Twenty-one years.

14    Q.  Do you have any children?

15    A.  Yes.

16    Q.  How many?

17    A.  Three.

18    Q.  How old are they?

19    A.  Eighteen, 13, 12.

20    Q.  Mr. Leonard, do you know an individual named Dr. Moshe

21    Mirilishvili?

22    A.  Yes.

23    Q.  What do you know him as?

24    A.  A doctor.

25    Q.  Did you work for him?

1   A.  Yes.

2   Q.  Were you also his patient?

3   A.  Yes.

4   Q.  Do you see Dr. Mirilishvili in the courtroom today?

5   A.  Yes.

6   Q.  Can you describe what he's wearing?

7           MR. MAZUREK:  Your Honor, we would stipulate.

8           THE COURT:  Which table is he sitting at?

9           THE WITNESS:  The second table.

10          THE COURT:  The second table.  And there are four

11  people at that table.  Which one is he?

12          THE WITNESS:  The first man to the right.

13          THE COURT:  Indicating the defendant.  Thank you.

14  Q.  Mr. Leonard, did there come a time when you were arrested

15  in connection with your work at Dr. Mirilishvili's office?

16  A.  Yes.

17  Q.  When was that?

18  A.  December 2014.

19  Q.  Why were you arrested?

20  A.  For conspiracy.

21  Q.  At the time of your arrest did you gave a postarrest

22  statement?

23  A.  Yes.

24  Q.  Were you truthful in that statement?

25  A.  No.

1          MR. MAZUREK:  Objection.

2          THE COURT:  The objection is overruled.

3     Q.  You may answer.

4     A.  No.

5     Q.  After your arrest, did there come a time when you decided

6     to cooperate with the government?

7     A.  Yes.

8     Q.  Did you decide to cooperate right away?

9     A.  No.

10    Q.  Why did you ultimately decide to cooperate?

11    A.  Because I didn't want to go to jail.

12    Q.  Why else?

13    A.  Because I wanted to take responsibility for the acts that I

14    did.

15    Q.  As part of your cooperation, did you plead guilty to a

16    crime in this case?

17    A.  Yes.

18    Q.  Was that pursuant to a cooperation agreement?

19    A.  Can you explain that again?  I don't understand the

20    question.

21    Q.  When you pled guilty, before you pled guilty, did you sign

22    what's called a cooperation agreement?

23    A.  Yes.

24    Q.  A document is going to come up on your screen and it's

25    what's been marked for identification as Government

1   Exhibit 1202.  Do you see it?

2   A.  Yes.

3   Q.  Do you recognize this document?

4   A.  Yes.

5          MS. CUCINELLA:  Ms. Joynes, if you can turn to the

6   last page.

7   Q.  What is that document, is that your cooperation agreement?

8   A.  Yes.

9   Q.  Now you're looking at the last page.  Are there signatures

10  there?

11  A.  Yes.

12  Q.  Whose are they?

13  A.  Mines, my lawyer.

14  Q.  Are there also signatures of the members of the prosecution

15  team on there?

16  A.  Yes.

17         MS. CUCINELLA:  The government offers Exhibit 1202.

18         MR. MAZUREK:  No objection.

19         THE COURT:  Admitted.

20         (Government's Exhibit 1202 received in evidence)

21  Q.  Mr. Leonard, what crime did you plead guilty to?

22  A.  One count conspiracy to -- one count of conspiracy to

23  distribute oxycodone.

24  Q.  Do you know what the maximum jail sentence that you could

25  receive is?

G38LMIR5                          Leonard - direct

1    A.  Twenty years.

2    Q.  Is there a mandatory minimum associated with that crime?

3    A.  No.

4    Q.  You identified before Government Exhibit 1202 which is your

5    cooperation agreement.  Do you understand what your obligations

6    are under that agreement?

7    A.  Yes.

8    Q.  What are they?

9    A.  To tell the truth, be truthful, and to meet with, to meet

10   with -- oh, God, to meet -- sorry.

11   Q.  It's OK.  Do you want some water?  There's a pitcher.

12           THE COURT:  Jim, could you please.

13   A.  It's OK.  It's OK.  To meet with the district attorney.

14   Q.  OK.  And if you honor those obligations, what do you expect

15   will happen?

16   A.  What I -- I'm expecting is to get probation.

17   Q.  Is that what you're hoping for?

18   A.  Yes.

19   Q.  Have any promises been made to you about what sentence you

20   will receive?

21   A.  No.

22   Q.  Do you know who ultimately will decide your sentence?

23   A.  Yes.

24   Q.  Who?

25   A.  The judge.

1   Q.  Mr. Leonard, as part of your cooperation did you also have

2   to disclose to the government all of your prior crimes?

3   A.  Yes.

4   Q.  Did you do that?

5   A.  Yes.

6   Q.  Did you include crimes, both crimes that you were arrested

7   for and crimes for which you were never arrested?

8   A.  Yes.

9   Q.  Mr. Leonard, were you involved in a phone card scam when

10  you were younger?

11  A.  Yes.

12  Q.  Can you tell the jury what that was about?

13  A.  I was a young kid in college, me and my friend, we stole a

14  young lady's phone card and we used it.

15  Q.  Were you ever arrested for that?

16  A.  No.

17  Q.  Were you arrested in connection with having a knife on you?

18  A.  Yes.

19  Q.  When did that happen?  Approximately is fine.

20  A.  I think two thousand -- I'm not sure.  I forgot.

21  Q.  Was it recently or was it a long time ago?

22  A.  This is a long time ago.

23  Q.  What were the circumstances that led to you being arrested

24  with a knife on you?

25  A.  I don't understand.

1   Q.  Why were you arrested, what happened?

2   A.  Because I had a pocket knife on me and I didn't have my ID.

3   Q.  And where were you when you were arrested?

4   A.  With my family on 125th Street in the train station.

5   Q.  Why did you have a knife on you?

6   A.  Because I used it for work.

7   Q.  Have you also been arrested in connection with driving

8   without a license?

9   A.  Yes.

10  Q.  Has that happened more than once?

11  A.  Yes.

12  Q.  Mr. Leonard, was there a time when you fell behind in child

13  support?

14  A.  Yes.

15  Q.  You testified earlier that you have three children; is that

16  right?

17  A.  Yes.

18  Q.  Are all three children with your wife?

19  A.  No.

20  Q.  Is your youngest child with another woman?

21  A.  Yes.

22  Q.  And was there a time that you paid child support for your

23  youngest child?

24  A.  Yes.

25  Q.  Did you fall behind?

G38LMIR5                         Leonard - direct

1    A.  Yes.

2    Q.  Sitting here today, have you caught up?

3    A.  Yes.

4    Q.  Do you now have custody of that child?

5    A.  Yes, for the last three years.

6    Q.  Mr. Leonard, before this arrest have you ever been arrested

7    for selling drugs?

8    A.  No.

9    Q.  Have you in fact ever sold drugs before your involvement in

10   this conspiracy?

11   A.  No.

12   Q.  Let's go back to the beginning of this conspiracy.

13   Mr. Leonard, when did you first meet Dr. Mirilishvili?

14   A.  In the fall of 2012.

15   Q.  How did you meet him?

16   A.  Through a mutual friend.

17   Q.  What was that friend's name?

18   A.  John Coleman.

19   Q.  Drawing your attention to the fall of 2012, were you

20   working then?

21   A.  No.

22   Q.  For how long had you been out of work?

23   A.  One year.

24   Q.  Were you collecting unemployment?

25   A.  Yes.

1  Q.  Prior to that year that you were out of work, did you

2  typically have a job?

3  A.  Odd jobs.

4  Q.  Before that year that you were out of work, did you have

5  jobs?

6  A.  Yes.

7  Q.  What types of jobs did you typically hold?

8  A.  Maintenance and forklifting jobs.

9  Q.  OK.  Turning back to the fall of 2012, did there come a

10 time when you began to work for Mr. Coleman?

11 A.  Yes.

12 Q.  What were you doing for him?

13 A.  My job was to escort patients to 162nd Street and Amsterdam

14 at the doctor's clinic.

15 Q.  Did Mr. Coleman ask you to do this?

16 A.  Yes.

17 Q.  And you said it was you were bringing patients to a clinic

18 on 162nd Street?

19 A.  Yes.

20 Q.  What was supposed to happen when the patients got to the

21 clinic on 162nd Street?

22 A.  I was supposed to meet with them and give them the money so

23 they can see the doctor.

24 Q.  How often did you do this?

25 A.  Every day.

G38LMIR5                          Leonard - direct

1    Q.   How many patients, approximately, did you take to the

2    clinic or did you meet at the clinic every day?

3    A.   It varied.   Three, five.

4    Q.   And you did this five days a week?

5    A.   Yes.

6    Q.   Were these patients, did you consider them to be

7    Mr. Coleman's patients?

8    A.   Yes.

9    Q.   Do you know how Mr. Coleman found his patients?

10   A.   No.

11   Q.   Can you describe them physically?

12   A.   Yes.   Some were drug addicts.   Some were alcoholics.   Some

13   were homeless people.

14   Q.   Did they smell?

15   A.   Yes.

16   Q.   Did Mr. Coleman ever tell them that they had to clean up

17   before seeing the doctor?

18              MR. MAZUREK:   Objection, leading.

19              THE COURT:   The objection is sustained.   I'm afraid

20   you cannot ask leading questions of this witness.

21              MS. CUCINELLA:   Apologies.

22   Q.   Can you describe physically some of these patients to the

23   jury?

24   A.   Some patients would come in with bloodshot eyes, red eyes,

25   smelling like -- reeking of booze.   Some were very dirty.

1    Q.  Let's go back to your role.  You testified that you would

2    meet these individuals at Dr. Mirilishvili's clinic; is that

3    right?

4    A.  Yes.

5    Q.  Can you explain to the jury what would happen after you

6    arrived at the clinic?

7    A.  After I would arrive, I would be inside the clinic.  I

8    would wait for a patient to come and when they did come, they

9    would meet up with me and I give them the money and I tell them

10   to sit down and wait for your name to be called.

11   Q.  Where would you wait for the patients?

12   A.  In the waiting area.

13           MS. CUCINELLA:  Ms. Joynes, can you please bring up

14   what's already in evidence as Government Exhibit 1-E and 1-F.

15   You can put them side by side.

16   Q.  Mr. Leonard, do you recognize what's in these pictures?

17   A.  Yes.

18   Q.  What is it?

19   A.  The waiting area.

20   Q.  Is this where you would wait for patients?

21   A.  Yes.

22   Q.  Can you show the jury where you would wait for patients

23   during this time period?

24   A.  On the left picture, I would wait between the room to the

25   back and the physical therapist room.

1    Q.  About how big is that room, that waiting area?

2    A.  Where I stood at or the whole office?

3    Q.  How big is the whole room?

4    A.  Maybe -- I'm not sure.  I'm not sure how big is the room.

5    Q.  How long would you spend in this area each day?

6    A.  It varied.  Sometimes five hours, sometimes the whole day.

7    Q.  When your patients or when Mr. Coleman's patients would

8    arrive, would you meet them in the clinic or outside the

9    clinic?

10   A.  In the clinic.

11   Q.  Were there other people doing what you were doing?

12   A.  Yes.

13   Q.  Approximately how many?

14   A.  Not sure.

15   Q.  While you were waiting for the patients, did there ever

16   come a time where you saw Dr. Mirilishvili?

17   A.  Yes.

18   Q.  Did you speak with him?

19   A.  Only when he spoke to me.

20   Q.  When he spoke to you what would he say?

21   A.  Good morning.

22   Q.  Did he ever say anything else to you?

23   A.  Yes.

24   Q.  What was that?

25   A.  That he seen me hanging out every day, why am I hanging

1   out, why am I hanging out at the office.  I didn't really have

2   no response to that.

3   Q.  Did you in fact respond to him?

4   A.  Yes.

5   Q.  What did you say?

6   A.  I just told him I'm hanging out.

7   Q.  Did he respond to you when you said that?

8   A.  No.

9           MS. CUCINELLA:  Ms. Joynes, you can take that down.

10  Q.  Mr. Leonard, how much would John Coleman pay you to do

11  this?

12  A.  The agreement was supposed to be $100 a day.

13  Q.  How much did you actually get paid?

14  A.  It varied.  Some day it is would be $100.  Some days it

15  would be $50.  Some days I didn't get nothing.

16  Q.  Your only -- and what was your only responsibility at this

17  time?

18  A.  At that time was to transport patients to

19  Dr. Mirilishvili's office.

20  Q.  Did they need anything when they were meeting with the

21  doctor at this point?

22  A.  MRI.

23  Q.  Were you involved in providing those?

24  A.  No.

25  Q.  Who was?

596

1   A.  Mr. Coleman.

2   Q.  Were you ever involved in taking patients to a pharmacy?

3   A.  Not at the beginning.

4   Q.  Did there come a time when you started doing that?

5   A.  Yes.

6   Q.  Tell the jury about that.

7   A.  During the end of the day, if everything, all the patients

8   went and Mr. Coleman, I would call him and let him know what

9   else he want me to do, he tell me to meet him and I go ride

10  around to different pharmacies.

11  Q.  And why would you take them to pharmacies?

12  A.  So they could pick up their prescriptions.

13  Q.  Their prescriptions for what?

14  A.  Oxycodone.

15  Q.  Mr. Leonard, while you were working for Mr. Coleman, did

16  there come a time when you began receiving oxycodone

17  prescriptions from Dr. Mirilishvili?

18  A.  Yes.

19  Q.  How did that start?

20  A.  Mr. Coleman told me that I could make more money.

21          MR. MAZUREK:  Objection, hearsay.

22          THE COURT:  I'm sorry.  Objection?

23          MR. MAZUREK:  Objection, hearsay.

24          THE COURT:  No.  For the fact that it was said.

25  Q.  You may answer the question.

1   A.  Mr. Coleman, he told me that I could make more money.  And

2   I asked him how.  He said by going to see the doctor yourself.

3   Q.  Did Mr. Coleman tell you how much more money you could

4   make?

5   A.  About $300.

6   Q.  So did you decide to take him up on the offer?

7   A.  Yes.

8   Q.  What happened next?

9        THE COURT:  Also explains why he took an action.  Not

10  hearsay.

11       MR. MAZUREK:  Judge.

12       THE COURT:  I just want the record to be clear.

13       MR. MAZUREK:  I understand.  Can I ask for a bathroom

14  break?  Don't deny me that, please.

15       THE COURT:  Yes.  Yes.  Absolutely.  We are going to

16  take a bathroom break.

17       Don't discuss the case.  Keep an open mind.

18       (Recess)

19       THE COURT:  OK.  You may have a seat.

20       You're still under oath.

21       Please continue.

22  Q.  Mr. Leonard, before the break you testified that there came

23  a time when you went in to see Dr. Mirilishvili as a patient;

24  is that right?

25  A.  Yes.

1   Q.  Did Mr. Coleman prepare you for this?

2   A.  Yes.

3   Q.  How did he prepare you?

4   A.  He gave me an MRI, told me to read the MRI and to do

5   exactly what the MRI tells me to do.

6   Q.  We're going to break that down but before we do that, I'm

7   going to have Ms. Joynes pull up, please, on the screen, on

8   your screen what's been marked for identification as Government

9   Exhibit 557.

10          Do you recognize this document?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's an MRI.

14  Q.  Is that the MRI that you just referenced in your testimony?

15  A.  Yes.

16          MS. CUCINELLA:  Government offers 557.

17          MR. MAZUREK:  No objection.

18          THE COURT:  Admitted.

19          (Government's Exhibit 557 received in evidence)

20          MS. CUCINELLA:  Ms. Joynes, will you publish that to

21  the jury, please.

22  Q.  Is there a second page of this document?  Do you recognize

23  the second page as well?

24  A.  Yes.

25  Q.  And was that also part of the paperwork that Mr. Coleman

1   provided to you?

2   A.  Yes.

3   Q.  Did you pay him for this?

4   A.  No.

5   Q.  How else did Mr. Coleman prepare you to go into the clinic?

6   A.  He told me, he told me what to say to the doctor.

7   Q.  What do you mean when you say that?

8   A.  He told me if the doctor ask me if I have -- if I'm

9   allergic to any medicine, tell him Percocets.

10  Q.  What else?

11  A.  And to walk in there with a limp.

12  Q.  You referenced earlier that he also told you to read your

13  MRI; is that right?

14  A.  Yes.

15  Q.  What did you understand that to mean?

16  A.  Basically just read the MRI and do exactly what it tell you

17  to do so you familiarize yourself with the paperwork.

18  Q.  Do you recall approximately when you first went into the

19  clinic as a patient?

20  A.  Yes.

21  Q.  When was that?

22  A.  November 2012.

23  Q.  When you first went in as a patient, approximately how much

24  time had you spent in the clinic prior to that first

25  appointment?

1    A.  Three hours.

2    Q.  That's the day of the appointment?

3    A.  Yes.

4    Q.  Had you been there on previous days in your other role?

5    A.  Yes.

6    Q.  I'd like you to walk the jury through what happened on the

7    day of your first appointment starting with the time when you

8    first arrived at the clinic all the way through, and I may ask

9    you some questions as you go through.

10   A.  OK.  I got in a cab, proceed to go up to the clinic.  When

11   I got there, I gave the receptionist my ID.  My MRI was already

12   there already.  And she told me to sit down and wait for your

13   name to be called.

14   Q.  And approximately how long did you wait for your name to be

15   called?

16   A.  About three hours.

17   Q.  What happened after your name was called?

18   A.  The doctor came out, took the paperwork off the counter and

19   he called my name.  And when he called my name I got up, I

20   walked in gingerly to the doctor, said good morning, and

21   proceeded into his office.

22   Q.  Mr. Leonard or Ms. Joynes, will you please pull up

23   Government Exhibit 1-C which is already in evidence.

24         Mr. Leonard, do you recognize what's in Government

25   Exhibit 1-C?

G38LMIR5                          Leonard - direct

1   A.  Yes.

2   Q.  What is it?

3   A.  That's the doctor's office.

4   Q.  Is that where you followed the doctor into the day of your

5   first appointment?

6   A.  Yes.

7   Q.  What happened after you got into the doctor's office?

8   A.  The first thing is you -- the first thing you do is take

9   care of the money situation.

10  Q.  And I want to be clear.  I want to know exactly what you

11  did on this appointment.

12  A.  The first thing I did is when I went in, took my coat off,

13  and I put the money on the table.

14  Q.  What did the doctor do when you put the money on the table?

15  A.  He checked the money.

16  Q.  What do you mean when you say he checked it?

17  A.  He checked it with a counterfeit pen.

18  Q.  And where did he do that?

19  A.  In his office.

20  Q.  And the table that you put the money on, is that shown in

21  Government Exhibit 1-C?

22  A.  Yes.

23  Q.  During this time did he acknowledge that he had seen you in

24  the clinic before?

25  A.  Yes.

1   Q.  What did he do or say?

2   A.  He just told me he seen me here every day, what I'm doing

3   every day.  I just told him I'm just hanging out.  That's all.

4   Q.  Did the doctor take your vitals?

5   A.  No.

6   Q.  What happens next?

7   A.  He asked me what I was here for.  I told him for lower back

8   pain.

9   Q.  What else did you say?  Did you tell him that you had an

10  injury?

11  A.  I told him -- he asked me how did this injury occur.  I

12  told him playing basketball.

13  Q.  Did he ask you any questions?

14  A.  Yes.

15  Q.  What kinds of questions did he ask you?

16  A.  He asked me where did it hurt.  I told him my lower back.

17  He asked me, he asked me to stand up, to stand on my tippy

18  toes.  Can I lean back, lean forward, step back to the door and

19  walk to him.

20  Q.  What happened after that?

21  A.  Sat down on the bed.  He checked my knee with a little

22  hammer and he asked me did the pain shoot down to my feet.

23  Q.  Did you respond?

24  A.  Yes.

25  Q.  What did you say?

1    A.  I told him no.

2    Q.  During this exam did you act like you were in pain?

3    A.  Yes.

4    Q.  What happened then?

5    A.  I got up off the bed.  He took me to the back wall.  He

6    showed me a picture of a skeleton and showed me my lower back,

7    my disk, and showed me exactly where the pain was coming from.

8    Q.  What happened after that?

9    A.  He told me, he told me to sit down and he told me -- he

10   told me a few things to help, to help with this pain.

11   Q.  What did he tell you?

12   A.  He told me that he's going to give me a few medicines that

13   will help, starting with muscle relaxers.  He also told me what

14   to do to help my back, to sleep on the floor, sleep on the

15   couch, also to think about taking physical therapy.

16   Q.  You mentioned that he was going to give you muscle

17   relaxers.  Were there any other medicines he was going to give

18   you?

19   A.  Yes, oxycodone.

20   Q.  Did he ask you if you had ever taken oxycodone before?

21   A.  No.

22   Q.  Had you ever taken oxycodone before?

23   A.  No.

24   Q.  Sitting here today, have you ever taken oxycodone?

25   A.  No.

G387MIR6                          Leonard - direct

1    BY MS. CUCINELLA:

2    Q.  Did you discuss with the doctor where you would get your

3    prescription filled?

4    A.  Yes.

5    Q.  Tell me how that conversation went.

6    A.  When the visit was over, he asked me what pharmacy I would

7    like to go to, and I told him I wanted to go to MNS.

8    Q.  Why did you say that?

9    A.  Because that was the closest pharmacy.

10   Q.  What happened next?

11   A.  After that, he told me to step out, and see the young lady

12   waiting at the reception.

13   Q.  Before he ended the appointment, did the doctor give you a

14   referral?

15   A.  Yes, he also gave me a referral to the hospital of my

16   choice.

17   Q.  I'm going to ask Ms. Joynes to put up on your screen what

18   has been marked for identification as Government Exhibit 558.

19   Mr. Leonard, do you recognize this document?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a referral.

23   Q.  Is that the referral you received on the date of your first

24   appointment?

25   A.  Yes.

1        MS. CUCINELLA:  The government offers 558.

2        MR. MAZUREK:  No objection.

3        THE COURT:  Admitted.

4        (Government's Exhibit 558 received in evidence)

5   Q.  This is the referral that you got that day?

6   A.  Yes.

7   Q.  After you left the doctor's office, what happened, just his

8   physical office, where did you walk to?

9   A.  I didn't go anywhere; I just stood inside the waiting area.

10  Q.  Why did you wait in the waiting area?

11  A.  Because there were other patients that I had to wait for.

12  Q.  How long did your visit with the doctor last?

13  A.  Around 20 minutes, 25 minutes.

14  Q.  Did you get your prescriptions from the doctor or from

15  someone else?

16  A.  From the receptionist.

17  Q.  Did the receptionist tell you anything when you got the

18  prescriptions?

19  A.  Yes, she gave me my next appointment date, and on the

20  bottom it lets you know ten days before each visit you have to

21  drop off urine.

22  Q.  Did you fill your prescription that same day?

23  A.  No.

24  Q.  Why not?

25  A.  Because I couldn't; the pharmacy wouldn't take it.

G387MIR6                          Leonard - direct

1   Q.  Did you ever get it filled?

2   A.  Yes.

3   Q.  Where did you go to get it filled?

4   A.  Pennsylvania.

5   Q.  And why were you in Pennsylvania?

6   A.  It was the holidays, Thanksgiving.

7   Q.  Did you fill the prescription using your own money?

8   A.  Yes.

9   Q.  Did you fill all the prescriptions that the doctor gave

10  you?

11  A.  Yes.

12  Q.  And why did you fill all of them?

13  A.  Because the pharmacy wouldn't do it without the rest of the

14  prescriptions.

15  Q.  What did you do?  When you said you filled all the

16  prescriptions, did that include the prescription for oxycodone?

17  A.  Yes.

18  Q.  What did you do with the oxycodone you received from that

19  prescription?

20  A.  I sold it to Mr. Coleman.

21  Q.  How much did you sell it for?

22  A.  $300.

23  Q.  That same day you testified earlier that you waited around

24  in the office after; is that right?

25  A.  Yes.

1  Q.  The following day, did you go back to Dr. Mirilishvili's

2  office?

3  A.  Yes.

4  Q.  Did you see him that next day?

5  A.  Yes.

6  Q.  What if anything did the doctor say when he saw you?

7  A.  He said to me, he says how you doing?  He says did you get

8  your medicine?  I told him yes.

9  Q.  Where were you standing when he saw you?

10 A.  Right next -- right between the physical therapist room and

11 the entrance to the back.

12 Q.  You just mentioned the physical therapist room.

13 A.  Yes.

14 Q.  Was there a room with physical therapy equipment in the

15 office when you were bringing Mr. Coleman's patients?

16 A.  No.

17 Q.  There was no equipment in that room?

18 A.  No.

19 Q.  When you saw Dr. Mirilishvili the day after your

20 appointment, were you acting like you were in pain?

21 A.  No.

22 Q.  How long did you spend in the office the day after your

23 initial appointment?

24 A.  About a few hours.

25 Q.  Did you go back the day after that?

G387MIR6                        Leonard - direct

1   A.  Yes.

2   Q.  And the day after that?

3   A.  Yes.

4   Q.  Did you continue to go back on a daily basis?

5   A.  Yes.

6   Q.  And would the doctor acknowledge you when he saw you?

7   A.  Yes.

8   Q.  After 30 days passed, did you go back for a follow-up

9   visit?

10  A.  Yes.

11  Q.  What did you do before going back in for a follow-up visit?

12  A.  I had to submit my urine.

13  Q.  Tell the jury how you did that.

14  A.  I received a urine from Mr. Coleman, and I was told to take

15  it to the clinic.

16  Q.  When you say you received urine from Mr. Coleman, what

17  specifically did you get from him?

18  A.  Urine inside -- at the time it was a urine specimen cup.

19  Q.  And what did you do after you received the urine from

20  Mr. Coleman?

21  A.  Took it to the clinic.

22  Q.  You dropped it off there?

23  A.  Yes.

24  Q.  And where did you put it when you dropped it off?

25  A.  In the refrigerator.

G387MIR6                          Leonard - direct

1   Q.  Did you try to hide the fact that you were dropping off

2   urine?

3   A.  No.

4   Q.  Do you know how Mr. Coleman got that urine?

5   A.  No.

6   Q.  Did you have to pay for it?

7   A.  No.

8   Q.  When you dropped off the urine, were there other people

9   dropping off urine?

10  A.  Yes.

11  Q.  Let's go back to the follow-up visit.  Approximately how

12  long after you dropped off your urine did you go into the

13  clinic for a follow-up visit?

14  A.  Ten days after.

15  Q.  Tell the jury about -- before we get to the specifics of

16  the visit, Mr. Leonard, did you have insurance at that time?

17  A.  Yes.

18  Q.  Did you use insurance for these visits?

19  A.  No.

20  Q.  Tell the jury about your follow-up visit with Dr.

21  Mirilishvili from the time you arrived at the clinic.  Start

22  there.

23  A.  When I arrived at the clinic, I gave my ID.  My ID was

24  checked through the files for the urine to see if my urine is

25  back, and it was back.  Then they told me to sit down and do

1   the paperwork.

2   Q.  Approximately how long did you wait?

3   A.  About three hours again.

4   Q.  What happened after your name was called?

5   A.  I went into the doctor's office, put my jacket down, put my

6   money on the table.  The money was checked.

7   Q.  And when you say the money was checked, what happened?

8   A.  It was checked with a counterfeit pen.

9   Q.  What happened after that?

10  A.  I sat down.  He asked me how I was feeling, was I taking

11  the medicine.  I told him yes.  He asked me on a scale of one

12  to ten how is my pain.  I told him about a six.

13  Q.  What if anything did the doctor say about having seen you

14  before in the office?

15  A.  Can you repeat that again?  I don't understand.

16  Q.  What, if anything, did the doctor say to you about having

17  seen you in the office?

18  A.  He just told me like he seen me all the time, why I'm

19  there, and that was it.  He also just said that he was seeing

20  me too much.  That's all he really said to me.

21  Q.  What happened after you told the doctor that your pain was

22  about a six?

23  A.  He told me to get up and to repeat, to stand up on my

24  heels, my tippy toes.

25          MS. CUCINELLA:  With the court's permission, may

1   Mr. Leonard step down from the witness stand and show the jury

2   what he did for the doctor?

3          THE COURT:  Yes.

4   Q.  Mr. Leonard, do you mind showing the jury what you did at

5   the doctor's request.

6   A.  Initially what you do is he will tell you to stand up on

7   your tippy toes as much as you can, so I stand up as much as I

8   can.  And he would tell me to lean back on my heels.  I lean

9   back.  He asked me to bend over.  I bend over as much as I can.

10  And I will let him know there is the problem right there.  He

11  says stand up.

12  Q.  Did you act like you were in pain?

13  A.  Yes.

14  Q.  Can you show the jury exactly what you did to show the

15  doctor you were in pain.

16  A.  When I got to a certain extent, I just acted like I was in

17  pain.  I would tell him it's bothering me right there; I

18  couldn't go no more.

19  Q.  Did you behave differently during this exam than you did

20  during the original exam?

21  A.  Yes.

22  Q.  How was it different?

23  A.  This time the medicine is supposed to be working, so it was

24  like, OK, now the pain should be reduced, so I didn't go -- I

25  didn't have as much pain, didn't experience as much pain as the

1   first time.

2   Q.  Can you show the jury what you did during the initial exam

3   to show you had more pain?

4   A.  The first exam I just acted like I couldn't walk.  I walked

5   real gingerly.  The second visit I walked a little bit better

6   than I walked the first time.

7   Q.  Did you behave differently when you bent over for the

8   doctor?

9   A.  Yes.

10  Q.  Show the jury what you did during the first exam when you

11  were purportedly in more pain or pretending to be in more pain?

12  A.  The first initial visit I went down about this far, I

13  couldn't go no more.  The next one I went down a little bit

14  further.  And that was it.

15          THE COURT:  OK, have a seat.

16  Q.  Mr. Leonard, what happened after the doctor conducted that

17  exam?

18  A.  He told me that he will continue my medicine.

19  Q.  What happened next?

20  A.  He told me to wait outside.

21  Q.  Approximately how long did that appointment last?

22  A.  About 15 minutes, ten minutes.

23  Q.  Did you in fact receive prescriptions?

24  A.  Yes.

25  Q.  Do you recall what they were for?

G387MIR6                          Leonard - direct

1    A.  Three muscle relaxers and oxycodone.

2    Q.  And did you fill the prescriptions right away?

3    A.  Yes.

4    Q.  Do you recall where you filled them?

5    A.  In New Jersey.

6    Q.  Why did you go to New Jersey to fill them?

7    A.  Because it was told to me that it was cheaper.

8    Q.  What did you do with the pills -- sorry.  Who told you that

9    it was cheaper?

10   A.  Mr. Coleman.

11   Q.  What did you do with the pills after you filled the

12   prescription?

13   A.  I sold them to Mr. Coleman.

14   Q.  The day after that visit, did you go back to Dr.

15   Mirilishvili's clinic?

16   A.  Yes.

17   Q.  Did you walk with a limp?

18   A.  No.

19   Q.  Did you see the doctor?

20   A.  Yes.

21   Q.  Did he acknowledge you?

22   A.  Yes.

23   Q.  Did you continue to follow the same pattern of going back

24   to the clinic on a daily basis?

25   A.  Yes.

1    Q.  Did you continue to see him for follow-up visits

2    approximately every 30 days?

3    A.  Yes.

4          THE COURT:  Do you know how to ask a nonleading

5    question?

6          MS. CUCINELLA:  Just trying to move it along, your

7    Honor.

8          THE COURT:  Don't move it along.  Ask questions in the

9    proper form.

10   Q.  During your follow-up visits, Mr. Leonard, did Dr.

11   Mirilishvili ask you any questions about any therapy you were

12   receiving?

13   A.  Yes.

14   Q.  What did he ask you?

15   A.  He just told me was I going to my physical therapist, and I

16   told him, yes, I was.  I told him I was going to the YMCA.

17   Q.  What did you tell him you were doing at the YMCA?

18   A.  Walking in the pool, hydrotherapy.

19   Q.  Approximately how many times did you go back for follow-up

20   appointments with the doctor?

21   A.  Altogether about five.

22   Q.  Did anything change about those appointments?

23   A.  Yes.

24   Q.  What changed?

25   A.  He stopped taking my money.

1   Q.  Approximately when did that happen?

2   A.  The third visit.

3   Q.  Do you have an understanding of why he stopped taking your

4   money?

5   A.  No.

6   Q.  Tell the jury what would happen during those visits.

7   A.  Just when I would go to pay for the visit, he would tell me

8   no.  He just said no, and he would just stamp my receipt and

9   that was it, and just talked to me and asked me how I'm doing,

10  is the medicine working.  And that was pretty much it.

11  Q.  During this time period when you were getting prescriptions

12  from Dr. Mirilishvili, were you also getting prescriptions from

13  another doctor?

14  A.  Yes.

15  Q.  Who?

16  A.  Doctor Terdiman.

17  Q.  Where was that clinic?

18  A.  In the Bronx, Freeman, Freeman Street.

19  Q.  Approximately how many times did you see that doctor?

20  A.  Like two times.

21  Q.  What did you do?  Did you get oxycodone prescriptions each

22  time you saw that doctor?

23  A.  Yes.

24  Q.  What did you do with those prescriptions?

25  A.  Sold it to Mr. Coleman.

1    Q.   Did there come a time when the doctor cut you off and told

2    you he would no longer give you oxycodone prescriptions?

3              MR. MAZUREK:   Objection.   Leading.

4              THE COURT:   The objection is sustained.

5    Q.   Did there come a time when the doctor told you -- did there

6    come a time when you saw the doctor and he wouldn't give you a

7    prescription?

8    A.   Yes.

9    Q.   What happened?

10   A.   Well, the last time when my name was called, I went inside

11   with the doctor, and he told me that he would no longer see me,

12   that I didn't need the medicine, and that was that.

13   Q.   To the best of your recollection, what specifically did the

14   doctor say to you, and what did you say in response?

15   A.   Well, he told me, he just told me that I didn't need the

16   medicine, that I wasn't fooling anybody, I'm not taking the

17   medicine, so there is no need for him to continue seeing me.

18   And the fact that he asked me if I was a cop, I told him no.

19   Q.   What happened next?

20   A.   Also he told me that I can still hang out in the clinic,

21   just don't make no noise, help out around the office.   He

22   couldn't pay me because he already had his full staff already.

23   And that was it.   I just told him I had no problems

24   volunteering.

25   Q.   Did he write you a prescription?

1    A.  No.

2    Q.  Did you try and get him to write you a prescription?

3    A.  I tried.

4    Q.  Were you upset?

5    A.  No.

6    Q.  What happened after that?

7    A.  I proceeded back out to the waiting area.

8    Q.  Did you continue to come to the clinic?

9    A.  Yes.

10   Q.  For what purpose?

11   A.  For John Coleman's patients, to help out with John

12   Coleman's patients.

13   Q.  The same job you were doing before?

14   A.  Yes.

15   Q.  Did your relationship with the doctor change over this

16   period of time?

17   A.  Yes.

18   Q.  How did it change?

19   A.  I started volunteering more around the office.  He would

20   see that.  And that was it.

21   Q.  Did the doctor pay you?

22   A.  No.

23   Q.  Would you run errands for him?

24   A.  When I was asked to.

25   Q.  What types of errands would you run?

G387MIR6                              Leonard - direct

1    A.   Sometimes the fax machine will be out of ink, and I would

2    volunteer to run to the Staples.   Sometimes there would be

3    toiletries or whatever things needed to be done and they needed

4    for the office, and I would get that.

5    Q.   How long did this go on for?

6    A.   About four months.

7    Q.   During this period, did Dr. Mirilishvili hire anyone new to

8    work in the office?

9    A.   Yes.

10   Q.   Who did he hire?

11   A.   Mr. Correa and Mr. Cruz.

12   Q.   I am showing you --

13          Ms. Joynes if we can pull up what I believe is already

14   in evidence Government Exhibit 4-D.

15          Do you recognize who is in this picture?

16   A.   Yes.

17   Q.   Who is it?

18   A.   Mr. Correa and Ray Williams.

19   Q.   Did you know Mr. Correa by another name?

20   A.   Buck.

21   Q.   And do you know his full government name?

22   A.   No.

23   Q.   Do you know what the doctor referred to him as?

24   A.   Yes.

25   Q.   What was that?

1   A.   Abraham.

2   Q.   Other than Mr. Correa, did the doctor hire anyone else

3   during this time period?

4   A.   No.

5   Q.   Do you have an understanding of what Buck was hired to do?

6   A.   At that time it was security.

7   Q.   What do you mean when you say security?

8   A.   He was just hired to watch the door and to park his car

9   every day.

10  Q.   His car, whose car do you mean?

11  A.   The doctor's car.

12  Q.   Did any nurses work in the office during this time period?

13  A.   No.

14  Q.   As you were standing in the lobby during this time period,

15  were you able to see how many patients came in and out?

16  A.   Yes.

17  Q.   Do you have an understanding of approximately how many

18  patients the doctor would see in a day?

19  A.   During that time about 40.

20          MS. CUCINELLA:   You can take that down, Ms. Joynes.

21  Thank you.

22  Q.   Mr. Leonard, did there come a time when Dr. Mirilishvili's

23  clinic was robbed?

24  A.   Yes.

25  Q.   Did that happen twice?

1    A.   Yes.

2    Q.   Let's talk about the first time.  Approximately when was

3    that?

4    A.   September.

5    Q.   Do you recall what year?

6    A.   2013.

7    Q.   Were you in the office at the time that the office was

8    robbed?

9    A.   Yes.

10   Q.   Why were you there?

11   A.   Waiting for patients to get finished.  Also I was

12   volunteering at the time, so ...

13   Q.   What happened?

14   A.   It just happened fast.  Three guys just barged into the

15   door, and they told us to get against the wall, put our hands

16   up.

17   Q.   Who else was there that day?

18   A.   Buck, Jomaris and Mr. Cruz.

19   Q.   Were you able to see how the robbers got into the clinic?

20   A.   They came in through the front door.

21   Q.   Is that door typically locked?

22   A.   Yes.

23   Q.   Do you know how they got in?

24   A.   The door was open that day.

25   Q.   Did any of the robbers have guns?

1  A.  I couldn't see if they had guns.

2  Q.  What happened after they came in the clinic?

3  A.  They told us to go to the back.  They took the doctor in

4  his office, and whatever else they did to him, I don't know.

5  They had the door closed.

6  Q.  Could you hear inside the office?

7  A.  Yes.

8  Q.  Did they take anything?

9  A.  To my knowledge, yes.

10  Q.  What did they take?

11  A.  They took money, and they took his prescription pad.

12  Q.  Did you observe the doctor react to the robbery?

13  A.  After the robbery?  Yes.

14  Q.  Before we get to that, was anyone hurt during the robbery?

15  A.  No.

16  Q.  Let's go back to the doctor's reaction.  What did you

17  observe?

18  A.  He was upset.

19  Q.  How could you tell?

20  A.  Because he lashed out at Buck.

21  Q.  What did he say?

22  A.  Well, he took Buck in his office, and he told him he

23  doesn't understand how these people got in the office, that's

24  his fucking job that the office is secure.

25  Q.  Mr. Leonard, are you swearing because that's what you

622

1    overheard?

2    A.  Yes.

3    Q.  Did you hear the doctor say anything else about the

4    robbery?

5    A.  No.

6    Q.  After that robbery, what happened?

7    A.  The robbers left, and the police came.

8    Q.  Did the doctor make any changes around the office?

9    A.  Yes.

10   Q.  What changes were made?

11   A.  Buck was fired; I was hired.

12   Q.  Mr. Leonard, let's talk about the fact that you were hired.

13   How did that happen?

14   A.  The robbery was I think a Thursday or a Friday, and then

15   the staff was told that they were going to work on Saturday by

16   the doctor, and Jomaris Javier told me that the doctor wanted

17   me to come in also on Saturday.

18   Q.  Did you go in on Saturday?

19   A.  Yes.

20   Q.  What happened next?

21   A.  Shortly when I got -- shortly when I arrived at the office,

22   my job and Jomaris' job was to look for a security company to

23   come in and install cameras, change the locks on the door.

24   Q.  What happened after that?

25   A.  The only thing that they did was they just installed locks

1   on the door.

2   Q.  Did you have a conversation with the doctor?

3   A.  Yes, after the day was over.

4   Q.  What was that conversation?

5   A.  Jomaris, Ms. Javier told me that the doctor wanted to speak

6   to me.  I proceeded into his office.  He told me to sit down.

7   I sat down.  He told me that he wanted to hire me and how much

8   I was going to get paid weekly.

9   Q.  Did you ask the doctor to hire you?

10  A.  No.

11  Q.  Did he tell you why he wanted to hire you?

12  A.  No, not really, no.

13  Q.  How did you respond when he said he wanted to hire you?

14  A.  I just told him thank you.  I didn't respond no different.

15  I just told him thank you.

16  Q.  What specific -- did the doctor say anything about what

17  your role would be at the office?

18  A.  Yes.

19  Q.  What did he say?

20  A.  To make sure that the office was cleaned after each day, to

21  runny errands and to help secure the office.

22  Q.  Did he say anything about wanting you to work with Jomaris?

23  A.  Yes.

24  Q.  What did he say?

25  A.  He also told me, he says I want you to sit back there with

G387MIR6                    Leonard - direct

1    Jomaris and learn everything.

2    Q.  Did he tell you how you have to dress to come into the

3    office?

4    A.  He also told me like I have to -- he also told me I have to

5    wear a shirt and a tie every day.

6    Q.  Did he tell you why?

7    A.  To make the office look more presentable and myself look

8    more presentable.

9    Q.  Did he tell you how much he would pay you?

10   A.  Yes.

11   Q.  What did he tell you?

12   A.  He told me 450 a week.

13   Q.  Did he ask you whether you had any medical training?

14   A.  No.

15   Q.  Did he ask you what kind of job you had held before?

16   A.  Yes.

17   Q.  What did you tell him?

18   A.  I just told him maintenance, and that was it.

19   Q.  Did he ask if you would be willing to take classes?

20   A.  No.

21   Q.  Did you tell him that you were going to make the office

22   more legitimate?

23           MR. MAZUREK:  Objection.  Leading.

24           THE COURT:  Objection sustained.  What did you say to

25   him?

G387MIR6                          Leonard - direct

1    Q.  What if anything did you say to him, Mr. Leonard?

2    A.  I didn't say nothing.

3    Q.  Did there come a time when the individual you knew as Buck

4    got fired?

5    A.  Yes.

6    Q.  Did you hear this conversation between the doctor and Buck?

7           MR. MAZUREK:  Judge, asked and answered.

8           THE COURT:  Overruled.

9    Q.  You may answer.

10   A.  Yes, that was the next week, Monday morning, when the

11   doctor arrived to the clinic.

12   Q.  What did you hear?

13   A.  He asked Buck why was he here.  And he told him that he was

14   fired.  And Buck didn't understand why he was fired, because

15   initially he never got the memo from Jomaris Javier that he was

16   fired.

17          MR. MAZUREK:  Objection.  Calls for speculation.

18          THE COURT:  Objection sustained.

19          He was told he was fired.  Next question.

20   Q.  Did you hear anything else as part of that conversation?

21   A.  To give up the keys.

22   Q.  Anything else?

23   A.  Also now this time in the office now, inside the clinic, in

24   the doctor's office he told Buck, Buck asked him if I'm not

25   going to be employed anymore, can I still come back as a

G387MIR6                         Leonard – direct

1    patient.  He told him yeah.

2              MS. CUCINELLA:  Your Honor, we are moving on to a new

3    topic.  I don't know if you want to go much past 4:30.

4              THE COURT:  I have a preliminary injunction hearing

5    that I have to do this afternoon probably about 4:45.  Rather

6    than get into a new topic -- how much more do you have with

7    this witness?

8              MS. CUCINELLA:  About an hour.

9              THE COURT:  Better we should stop now.  Tomorrow

10   morning 9:45.  Don't discuss the case; keep an open mind.

11   Thank you.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

G387MIR6                           Leonard - direct

 1            (Jury not present)

 2            THE COURT:  OK, so we will see you tomorrow.

 3            THE WITNESS:  Thank you.

 4            MR. MAZUREK:  Can we know the line-up for tomorrow?

 5            THE COURT:  I would like to know what the line-up is.

 6            MS. CUCINELLA:  Mr. Leonard is probably an hour or an

 7    hour and a half with him.  Then we are have Tim Dewey from the

 8    Bureau of Narcotics Enforcement.  Then we have an individual

 9    from Practice Fusion, which is the record-keeping system that

10    the doctor had.  Those two individuals have to go tomorrow

11    because they are both in from out of town.  And then after that

12    we have Detective Beers and a paralegal from our office, and

13    then our expert, and then Adrian Castro.

14            THE COURT:  OK.  So, I'm happy to interrupt this

15    witness and do the two people who are coming in from out of

16    town.  I'm happy to finish this witness and then do the two

17    people who are coming in from out of town as suits your

18    pleasure.

19            MS. CUCINELLA:  Thank you.  We will talk with defense

20    counsel.  Thank you.

21            THE COURT:  Great.

22            (Trial adjourned to March 9, 2016 at 9:30 a.m.)

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

ABRAHAM CORREA

Cross By Mr. Mazurek . . . . . . . . . . . . 426

Redirect By Mr. Diskant  . . . . . . . . . . 542

Recross By Mr. Mazurek . . . . . . . . . . . 546

GREGORY LAWLER

Direct By Ms. Cucinella  . . . . . . . . . . 548

Cross By Mr. Gosnell . . . . . . . . . . . . 569

DAMON LEONARD

Direct By Ms. Cucinella  . . . . . . . . . . 583

GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 553, 554, 555 and 556   . . . . . . . . . . 556

 1202    . . . . . . . . . . . . . . . .586

 557   . . . . . . . . . . . . . . . . .598

 558   . . . . . . . . . . . . . . . . .605