```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          S2 14 Cr. 810 (CM)

 5   MOSHE MIRILISHVILI,

 6              Defendant.                  Trial

 7   ------------------------------x

 8                                    New York, N.Y.
                                      March 14, 2016
 9                                    10:25 a.m.

10

     Before:
11
                          HON. COLLEEN McMAHON,
12
                                         District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     EDWARD DISKANT
17   BROOKE CUCINELLA
          Assistant United States Attorneys
18
     HENRY MAZUREK
19   WAYNE GOSNELL
          Attorneys for Defendant
20

21
     ALSO PRESENT:  MICHAEL MULLER, DEA
22                  ELIZABETH JOYNES, Paralegal
                    MICHAEL DOMANICO, Paralegal
23

24

25
```

1      (Trial resumed; jury not present)

2      THE DEPUTY CLERK:  The jurors are not present.  We are

3  missing one juror.

4      THE COURT:  We are missing one juror.  We are missing

5  Mr. Lambert, juror number 9.  We called.  I assume he is stuck

6  in the subway somewhere because we are not getting any response

7  to our repeated calls.  I'll start worrying about what to do

8  about this around 11:00.

9      Meanwhile, just to make a record, I go to White Plains

10  for a day to deal with stuff up there.  You guys flood my

11  mailbox.  I didn't see it until this morning at 9:30.  Thank

12  you so much.  It will take me some time to get through all of

13  this.

14      But I did see a mistrial motion and that motion is

15  denied for substantially the reasons outlined by the government

16  in its response.  There is a lot of whoop dee do about the

17  conscious avoidance charge, that we are going to talk about the

18  jury charge when we talk about the jury charge.

19      I see that the defense has renewed its motion to admit

20  those tapes.  That's denied for substantially the reasons

21  articulated in the government's letter in opposition, and the

22  defense has its exception.

23      Then there is another letter I have to look at about a

24  witness, and then there is another letter I have to look at

25  about something else.  But since Mr. Lambert isn't here yet, I

1    guess I have time to read those letters.

2              Let me get set up here.

3              Let me go and read some more of your letters.

4              (Recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury not present)

2    THE COURT:  OK, folks.  Have a seat.  It's 11 o'clock.

3  We have called Juror 9, Mr. Lemberg repeatedly.  We are getting

4  no answer.  This whole trial was scheduled around having a

5  witness testify today.  I changed a trial at some inconvenience

6  to myself to do that.  Mr. Lemberg, like all of the other

7  jurors, was instructed that if there was any problem, if he was

8  going to be late, if he had an issue that came up, he was to

9  call Mr. O'Neil.  There was no effort made to call Mr. O'Neil.

10  We have checked downstairs; he is not downstairs.  It is my

11  inclination to dismiss him and continue this trial with an

12  alternate.

13    MR. DISKANT:  Your Honor, the government has no

14  objection to that.

15    MR. MAZUREK:  Judge, the only concern we have is that

16  noticing the composition of the jury, there are only four men,

17  and this would reduce it to three.  We would prefer --

18    THE COURT:  I don't pick them; you pick them.

19    MR. MAZUREK:  I know.

20    THE COURT:  You might prefer it.  The question is what

21  am I supposed to do?  The juror isn't here.  I waited an hour

22  and a half.  I told them to be here at 9:30, and it's certainly

23  an hour and 20 minutes since our 9:45 start time.  We haven't

24  heard from this juror.  We have gone on the MTA website, and

25  there isn't any indication that there is any problem.  He is

1  not responding to phone calls.  Jim has left probably a half

2  dozen messages for him.

3          DEPUTY COURT CLERK:  Try him one more time, Judge?

4          THE COURT:  Try him one more time.  Try him here with

5  the parties.

6          (Pause)

7          THE COURT:  That's what we have been hearing for the

8  last hour and 15 minutes that we have been calling him.  I will

9  wait ten more minutes, but at that point I've got four

10  alternates; I have plenty of people.  You participated in

11  selecting them all.  I have a full jury room.  We are wasting

12  the jury's time.  We have a witness for whom we adjourned the

13  trial.  He is I assume here or about to be here.  So, I will

14  see you at 11:15.

15          MR. MAZUREK:  I just want to raise the other issue

16  with respect to the other defense witnesses, the two patients

17  that the government wrote their letter about.

18          THE COURT:  We can talk about that.

19          MR. MAZUREK:  The issue I raise now is only because

20  one of those witnesses informed me that she has an obligation

21  to take care of her grandchildren at 2 p.m., so I may have to

22  take her --

23          THE COURT:  You will not call a witness until the

24  government's case is in.

25          MR. MAZUREK:  No, no, I think -- but I may want to

1    call her before the expert so that I can get her out.

2          THE COURT:  That's all right.

3          You know the government is going to cross-examine

4    these witnesses.  The government sent you a letter saying so.

5    I have no control over how long that cross-examination will

6    take.

7          MR. MAZUREK:  I understand, but I didn't know if you

8    were going to take any other steps based on the government.

9          THE COURT:  I think I will exercise my discretion not

10   to exercise discretion.  It seems to me the better part of

11   valor in this case.

12          MR. MAZUREK:  Thank you.

13          THE COURT:  After all, the Second Circuit said I could

14   do that.

15          (Recess)

16          (Time noted 11:18, jury not present)

17          THE COURT:  OK.  We need to get going with this trial.

18   It is obvious that Juror 9 is not here, has not been here, is

19   over an hour and a half late, has not communicated with the

20   court, has not responded to repeated messages left by

21   Mr. O'Neil, has not checked in with the jury room, so it is the

22   intention of the court to discharge him and to substitute for

23   him --

24          DEPUTY COURT CLERK:  Let me try one last thing.

25          THE COURT:  Fine.

1    (Pause)

2    DEPUTY COURT CLERK:  Sorry, Judge.  Nothing.

3    THE COURT:  And he has not called my chambers.  I'm

4  always sorry to have to do this, but we need to finish this

5  trial, and I have 15 timely jurors who have been sitting back

6  there for over an hour and a half.  We are in the middle of a

7  witness, and it's time for us to move on.  So I'm going to

8  discharge that juror.  Who is the next alternate, please?  The

9  first alternate is Ms. Montalvo, and she will be seated as

10  Juror 9.

11    (Continued on next page)

```
 1              (Jury present)

 2              THE COURT:  OK.  Ms. Montalvo, why don't you move up

 3    into the seat in front of you, because you are now Juror 9.

 4    OK.  And we are going to continue with the trial.  Thank you

 5    all for your patience.  Good morning.  I hope you had a great

 6    weekend.  We are going to have a busy week.

 7              OK.  You, sir, are still under oath.  I believe we are

 8    on cross.

 9     ADRIAN CASTRO, resumed.

10    CROSS EXAMINATION

11    BY MR. GOSNELL:

12    Q.  Good morning, Mr. Castro.

13    A.  Good morning.

14    Q.  You were an analyst in this case, correct?

15    A.  Correct.

16    Q.  And part of your responsibilities as an analyst are to

17    obtain records and to analyze what they show, correct?

18    A.  Correct.

19    Q.  And part of that responsibility is also creating charts.

20    A.  Yes.

21    Q.  And you were the one who chooses what is contained within

22    the chart, correct?

23    A.  As an investigative team we select what is put on the

24    summary charts.

25    Q.  As a team you come to a decision about what you are going
```

1    to put on the chart and what you are not going to put on the

2    chart, correct?

3    A.   Correct.

4    Q.   Now, one of the types of records that you analyzed in this

5    case are what is called BNE records?

6    A.   Yes.

7    Q.   Those are records of prescriptions for controlled

8    substances here in New York.

9    A.   Correct.

10   Q.   They don't show prescriptions, for example, for Neurontin.

11   A.   Correct.  It's only for controlled substances.

12   Q.   So it also doesn't show for Elavil, Flexeril or any of the

13   other nonopioid medications, correct?

14   A.   Correct.

15   Q.   And as far as you know, there is no central database like

16   the BNE for those other types of prescriptions, correct?

17   A.   Correct.

18   Q.   So in order for you to show what types of nonopioid

19   prescriptions Dr. Mirilishvili had written during the same time

20   period, you would have to obtain records from each of the

21   pharmacies that's reflected in the BNE records, correct?

22   A.   Correct.

23   Q.   And you didn't do that here.

24   A.   No.

25   Q.   So that doesn't appear on the chart.

 1    A.  Correct.

 2    Q.  You are aware, of course, that Dr. Mirilishvili prescribed

 3    a combination of medications in addition to oxycodone, correct?

 4    A.  Yes.

 5    Q.  Now, the BNE records also contain the list of pharmacies

 6    where the prescriptions were filled.

 7    A.  Correct.

 8    Q.  And it includes the address and the telephone number for

 9    each of those pharmacies as it was when it was filled?

10    A.  Yes.

11    Q.  Somewhere in the neighborhood of 600 different pharmacies

12    in total?

13    A.  Correct.

14    Q.  You didn't compare all of those telephone numbers for those

15    pharmacies to the telephone records of Dr. Mirilishvili's

16    cellular phone or home phone, did you?

17    A.  No.

18    Q.  And you didn't compare any of those numbers to the phone

19    number associated with the medical clinic itself, did you?

20    A.  No.

21    Q.  So those don't appear -- none of those appear on any of the

22    charts that you have.

23    A.  Correct.

24    Q.  And turning to the phone records, the phone records that

25    you obtained, the call detail records, or the call records,

 1    those only pertain to Dr. Mirilishvili's cellular telephone and

 2    his home telephone, correct?

 3    A.  Correct.

 4    Q.  You didn't look at the telephone records of the medical

 5    clinic, correct?

 6    A.  Correct.

 7    Q.  And you indicated through your charts that a telephone

 8    number belonging to Raymond Williams contacted Dr.

 9    Mirilishvili's home?

10    A.  Correct.

11    Q.  And the cellular phone?

12    A.  Correct.

13    Q.  And there is also a phone call from Tasheen Davis' cellular

14    phone to Dr. Mirilishvili's home telephone number?

15    A.  Correct.

16    Q.  And that call lasted a total of eight seconds?

17    A.  Yes.

18    Q.  Now, you got her phone number from the Practice Fusion

19    files, the patient files.

20    A.  Correct.

21    Q.  Now, you are aware that there were approximately 3500

22    different patients in those patient files.

23    A.  I'm not aware of the number.

24    Q.  Several thousand though.

25    A.  Sure.

1   Q.  OK.  Did you compare all of the telephone numbers that are

2   contained within the Practice Fusion files to the cellular

3   records of Dr. Mirilishvili's -- sorry -- the toll phone

4   records of Dr. Mirilishvili's cellular phone?

5   A.  No.

6   Q.  Or his home phone?

7   A.  No.

8   Q.  And again you didn't compare any of those records to the

9   records, the telephone records, associated with the medical

10  clinic.

11  A.  No.

12  Q.  You also obtained tax records in this case?

13  A.  Yes.

14  Q.  And you prepared a chart that included an estimated income?

15  A.  Correct.

16  Q.  You prepared that chart based solely on the tax returns and

17  the Medicaid documents in this case, correct?

18  A.  That was part of the chart.

19  Q.  OK.  And that was based on the tax returns, the Medicaid

20  documents and nothing else, correct?

21  A.  They make up part of the chart, correct.

22  Q.  And so in preparing the chart and in coming to those

23  numbers, you didn't review any accounting records of the

24  medical practice, correct?

25  A.  Correct.

1   Q.  And you didn't receive any backup materials for the tax

2   returns and analyze those, did you?

3   A.  No.

4           MR. GOSNELL:  Just one moment, your Honor.

5           Nothing further, your Honor.

6           THE COURT:  Any redirect?

7           MR. DISKANT:  No, your Honor.  Thank you.

8           THE COURT:  That was quick.

9           (Witness excused)

10          MS. CUCINELLA:  The government calls Molly Rosen.

11   MOLLY ROSEN,

12       called as a witness by the government,

13       having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MS. CUCINELLA:

16   Q.  Good morning, Ms. Rosen.

17   A.  Good morning.

18   Q.  Where do you work?

19   A.  I work at the U.S. attorney's office for the Southern

20   District of New York.

21   Q.  What do you do?

22   A.  I'm a paralegal.

23   Q.  What are some of the duties and responsibilities of a

24   paralegal at the U.S. attorney's office?

25   A.  I assist attorneys with various tasks.

1    Q.   Did there come a time when you were asked to review and

2    organize certain data in connection with this trial?

3    A.   Yes.

4    Q.   Where did that data come from?

5    A.   It came from a medical database by the name of Practice

6    Fusion.

7    Q.   And as part of the database from Practice Fusion, did you

8    have access to the entire activity feed from Dr. Mirilishvili's

9    account at Practice Fusion?

10   A.   I did.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. CUCINELLA:  Your Honor, we have a stipulation at

2     this time.

3          THE COURT:  Let me have the stipulation.

4          MS. CUCINELLA:  One moment.

5          THE COURT:  It is hereby stipulated by and between the

6     usual suspects that if called to testify, a custodian of

7     records from Practice Fusion, Inc. would testify that:

8     Government Exhibit 300, including all parts and subdivisions

9     thereof, are true and correct copies of records obtained from

10    Practice Fusion regarding data maintained by Practice Fusion in

11    the account opened and maintained by Moishe Mirilishvili, the

12    defendant; that the original records were made at or near the

13    time by or from information transmitted by an employee of

14    Practice Fusion with knowledge of the matters set forth in the

15    records; that they were kept in the ordinary course of Practice

16    Fusion's regularly conducted business activity; and that it was

17    the regular practice of Practice Fusion to make the records.

18    It is further stipulated and agreed that this stipulation,

19    Government Exhibit 1005, may be and hereby is received into

20    evidence at this trial.

21          (Government Exhibit 1005 received in evidence)

22          MS. CUCINELLA:  The government also offers Government

23    Exhibit 300.

24          MR. GOSNELL:  No objection.

25          THE COURT:  Admitted.

1          (Government Exhibit 300 received in evidence)

2    Q.  Ms. Rosen, you just testified that you had access to the

3    entire activity feed from Dr. Mirilishvili's account, is that

4    right?

5    A.  Yes.

6    Q.  Do you recall when that activity feed began?

7    A.  March 2011.

8    Q.  And from the date that the activity feed began until the

9    date of the defendant's arrest, do you know approximately how

10   many new patients Dr. Mirilishvili started a file on?

11   A.  Approximately 3600.

12   Q.  Let's break that number down.  When you look at the

13   activity feed from January 1 of 2012 through the end of

14   September of 2012, what was the number of new patients

15   Dr. Mirilishvili entered into the system?

16   A.  Approximately 700.

17   Q.  When I say Dr. Mirilishvili, it would be Dr. Mirilishvili

18   or someone from his staff, is that fair?

19   A.  Correct.

20   Q.  Breaking that time period down again, from approximately

21   October 1, 2012 through December of 2014, approximately how

22   many new patient files were started in the Practice Fusion?

23   A.  Approximately 2300.

24   Q.  Ms. Rosen, were there SOAP notes for all of these patients?

25          MR. GOSNELL:  Objection.

1      THE COURT:  Ground.

2      MR. GOSNELL:  Foundation.  She is asking whether they

3  are SOAP notes as opposed to the activity feed.

4      MS. CUCINELLA:  I'll rephrase the question.

5      THE COURT:  Thank you very much.

6  Q.  Based on your review of the activity feed, were there

7  entries reflecting the doctor working on SOAP notes for every

8  single one of these patients?

9  A.  There were not.

10  Q.  Sitting here today, can you say for how many patients there

11  were SOAP notes?

12  A.  I cannot.

13  Q.  Ms. Rosen, were you able to sort that activity feed by

14  patient?

15  A.  I was.

16  Q.  I am going to show you what's been marked for

17  identification as Government Exhibit 301 through 325,

18  Government Exhibit 28, Government Exhibit 29, and Government

19  Exhibit 332.  Are you familiar with these exhibits?

20  A.  I am.

21  Q.  Let's start with Government Exhibit 332.  What is that?

22  A.  332 is a list of patients for which I extracted activity

23  feed entries on.

24  Q.  And then turning to Government Exhibits 301 through 325,

25  Government Exhibit 328 and 329, what are those?

1   A.  Those are the extractions of information from the activity

2   feed per patient.

3   Q.  And did you participate in the production of those charts

4   that show that activity feed data?

5   A.  I did.

6   Q.  And you participated in the production of to index?

7   A.  I did.

8   Q.  Are the charts based on information from Government Exhibit

9   300?

10  A.  They are.

11  Q.  Do they fairly and accurately summarize some of the

12  information from Government Exhibit 300?

13  A.  They do.

14          MS. CUCINELLA:  The government offers Government

15  Exhibits 301 through 325, 328, 329, and 332.

16          MR. GOSNELL:  No objection.

17          THE COURT:  Admitted.

18          (Government Exhibits 301 through 325, 328, 329, and

19  332 received in evidence)

20  Q.  Ms. Rosen, turning to the charts for 301 through 325, 328,

21  and 329, do those charts include all of the activity data

22  contained in the database prior to the defendant's arrest for

23  each of those patients?

24  A.  They do.

25  Q.  Let's walk through a couple of examples.  Let's turn first

1    to Jose Lantigua, whose chart is at Government Exhibit 310.  I

2    believe his folder should be at the beginning of your folder.

3            MS. CUCINELLA:  Ms. Joynes, if you could also display

4    that for the jury.

5    Q.  Ms. Rosen, when was the first time that Dr. Mirilishvili

6    wrote prescriptions for Mr. Lantigua, according to the activity

7    feed on Practice Fusion?

8    A.  June 27, 2013.

9    Q.  Based on your review of this activity feed chart for

10   Mr. Lantigua, what other activity is reflected for that

11   patient?

12   A.  There are prescriptions added, documents uploaded,

13   documents signed, and that's it.

14   Q.  Are there any diagnoses entered?

15   A.  There are -- not that I can see.

16   Q.  You mentioned that there are prescriptions listed.  Are

17   there any prescriptions for oxycodone listed?

18   A.  Not that I can see.

19   Q.  Are there any SOAP notes that were entered by the doctor

20   for this patient?

21   A.  No.

22   Q.  You can set that aside.

23           Let's turn to Larry Ashby, Government Exhibit 302.

24   When was the first time that Dr. Mirilishvili wrote

25   prescriptions for Mr. Ashby?

1  A.  May 27, 2014.

2  Q.  What kind of activity is reflected for Mr. Ashby on the

3  activity feed?

4  A.  There are prescriptions added, documents uploaded,

5  documents signed.

6  Q.  Are there any diagnoses entered for Mr. Ashby?

7  A.  Not that I can see.

8  Q.  You mentioned that there are prescriptions listed.  Are

9  there any prescriptions for oxycodone listed?

10  A.  Not that I know of.

11  Q.  Are there any SOAP notes for Mr. Ashby?

12  A.  There are.

13  Q.  There are?  Are they entered by Dr. Mirilishvili?

14  A.  Not by Dr. Mirilishvili.

15          THE COURT:  I'm sorry.  I can't understand what you

16  are saying.

17          THE WITNESS:  Sorry.

18          THE COURT:  Move the microphone back a little bit.

19          THE WITNESS:  Is that better?

20          THE COURT:  Yes.  You're reverberating.

21  A.  There are no SOAP notes by Dr. Mirilishvili.

22  Q.  Let's turn to Government Exhibit 325, the activity feed for

23  Damon Leonard.  When was the first time that Dr. Mirilishvili

24  wrote prescriptions for Mr. Leonard, according to the activity

25  feed on Practice Fusion?

1   A.  November 15, 2012.

2   Q.  Are there any diagnoses entered?

3   A.  Not that I can see.

4   Q.  You mentioned prescriptions.  Are there any prescriptions

5   for oxycodone listed?

6   A.  No.

7   Q.  And through the time period from November 2012 through

8   December 2014, were there any SOAP notes filled out for

9   Mr. Leonard?

10  A.  There were none.

11  Q.  Let's turn now to Government Exhibit 318, the activity feed

12  for Tasheen Davis.  When was the first time that

13  Dr. Mirilishvili wrote prescriptions for Tasheen Davis, based

14  on the activity in Practice Fusion?

15  A.  February 12, 2013.

16  Q.  Does Ms. Davis' activity feed reflect diagnoses and SOAP

17  notes?

18  A.  It does.

19  Q.  What is the date that Dr. Mirilishvili first entered a SOAP

20  note or a diagnosis for Ms. Davis?

21  A.  October 18, 2013.

22         MS. CUCINELLA:  Ms. Joynes, if you can turn to that

23  page.  Thank you.

24  Q.  The first time that SOAP note is entered on October 18, at

25  approximately what time is that at.

1   A.   Approximately 23:14.

2   Q.   23:14, is that in universal time?

3   A.   That is.

4   Q.   What do you understand universal time to mean?

5   A.   Universal time is four hours ahead of Eastern Standard

6   Time.

7   Q.   Can you tell substantively what the doctor entered on

8   October 18 of 2013?

9   A.   I cannot.

10  Q.   Now, looking at the activity feed and looking at the rest

11  of the activity on October 18, can you tell if Dr. Mirilishvili

12  entered multiple diagnoses and SOAP notes for multiple patient

13  visits for Ms. Davis at that time?

14  A.   I can.

15        MS. CUCINELLA:   Ms. Joynes, if you can put up page 6

16  and I believe it would be page 5 side to side.

17  Q.   Ms. Rosen, can you tell for what dates of service

18  Dr. Mirilishvili entered SOAP notes?

19  A.   Sure.   SOAP notes were entered for dates of service on

20  October 18, 2013, on February 12, 2013, on April 5, 2013, on

21  May 3, 2013, I think are all of them.

22  Q.   I think if you keep looking --

23  A.   It's on page 4 as well.

24        MS. CUCINELLA:   If we can put up the next page.

25  Q.   There are additional patient appointments for which

1   Dr. Mirilishvili enters SOAP notes during this same session in

2   Practice Fusion?

3   A.  Also, on June 7, 2013 and July 11, 2013.

4   Q.  Is there also one for October 8, 2013?

5   A.  And October 8, 2013.

6   Q.  Based on your review of the activity feed, does he appear

7   to enter all of this information in one sitting?

8   A.  He does.

9   Q.  And that's approximately six months after Ms. Davis' first

10  visit?

11  A.  Correct.

12  Q.  Before October 18, 2013, there are no SOAP notes in her

13  file, is that right?

14  A.  Correct.

15          MS. CUCINELLA:  One moment.  Nothing further.

16          THE COURT:  Sir.

17          MR. GOSNELL:  Thank you, your Honor.

18  CROSS-EXAMINATION

19  BY MR. GOSNELL:

20  Q.  Good morning, Ms. Rosen.

21  A.  Good morning.

22  Q.  We are going to go back to Government Exhibit 310.  Do you

23  have that in front of you?  It should be the activity feed for

24  Mr. Lantigua.

25  A.  I do, yes.

1   Q.  You're aware that the activity feed reflects certain

2   entries that include things like signing documents or signing

3   SOAP notes?

4   A.  Correct.

5   Q.  And your understanding is, once a document or a SOAP note

6   or whatever it is has been signed that it cannot be changed

7   ever again?

8   A.  Correct.

9   Q.  You said on direct examination that with Mr. Lantigua --

10              MR. GOSNELL:  If we can go to page 4, please.  Blow up

11   the bottom part.  The middle part, I guess.

12   Q.  -- that there were prescriptions that were inserted and

13   sent on June 27 of 2013?

14   A.  Correct.

15   Q.  Those would include sending ePrescriptions for Neurontin,

16   Elavil and Robaxin, correct?

17   A.  Do you mind repeating that?

18   Q.  Sure.  It includes entries that ePrescriptions were sent

19   for Neurontin, Elavil, and Robaxin?

20   A.  Correct.

21   Q.  And it does not include any entry for ePrescriptions for

22   oxycodone?

23   A.  Correct.

24              MR. GOSNELL:  Can we bring up Government Exhibit 210,

25   and go to page 7.

G2EMMIR3                    Roberts - Cross

1   Q.  Now, have you ever seen this document before?

2   A.  I have not.

3   Q.  Would you accept that this is a document that was uploaded

4   to Practice Fusion that is contained in Jose Lantigua's file?

5   A.  I don't know.

6          MR. GOSNELL:  Can we just highlight the upper

7   left-hand portion there.

8   Q.  Do you know whether or not those are diagnoses codes?

9   A.  I don't.

10         MR. GOSNELL:  Can we go back to 310, page 3.  Blow up

11  the bottom third.

12  Q.  Going back to the activity feed on June 27, 2013, the

13  bottom portion there, it includes entries that four documents

14  were uploaded for Mr. Lantigua, is that correct?

15  A.  Correct.

16  Q.  They were uploaded by Jomaris Javier, a different user than

17  Dr. Mirilishvili?

18  A.  Correct.

19  Q.  The entries right above that, June 28 at 032, which would

20  be I guess four or five hours back, that Dr. Mirilishvili

21  signed those documents and made them permanent, correct?

22  A.  Correct.

23  Q.  If the documents that were signed had a diagnosis code on

24  them, there would in fact be a diagnoses as of June 27 or 28

25  that just isn't reflected on the activity feed?

 1   A.  I don't know.

 2              MR. GOSNELL:  Can you go to Government Exhibit 301.

 3   Go to the last page.

 4   Q.  Do you have 301 in front of you?  It is up to you whether

 5   you can use the one on the screen or the one in the paper file,

 6   whichever you prefer.  This is the activity feed for Nydia

 7   Adams?

 8   A.  Correct.

 9   Q.  The first line there, I guess the bottommost line is Oneida

10   Hernandez inserted Nydia Adams as a new patient?

11   A.  Correct.

12   Q.  That's the line that you're looking at on the activity feed

13   when a new patient is entered, correct?

14   A.  Correct.

15   Q.  This particular patient began, at least their file began on

16   December 3 of 2012?

17   A.  I don't know specifically.

18   Q.  According to the activity feed?

19   A.  According to the activity feed, a new patient was added.

20              MR. GOSNELL:  Can we go to page 14 of the document,

21   the entry around February 27.

22   Q.  These are entries reflecting SOAP notes by people other

23   than Dr. Mirilishvili, is that correct?

24   A.  Correct.

25   Q.  Theda Maskarino?

 1   A.  Correct.

 2   Q.  You don't have any personal knowledge as to who that

 3   individual is?

 4   A.  No.

 5            MR. GOSNELL:  If we can go to page 11, just blow up

 6   the area around June 25.

 7   Q.  Same questions.  These are SOAP notes by people other than

 8   Dr. Mirilishvili?

 9   A.  Correct.

10   Q.  You don't know who they are?

11   A.  I do not.

12   Q.  In your review of these activity feeds there were several

13   instances of SOAP notes that were entered into the system by

14   people other than Dr. Mirilishvili, correct?

15   A.  Correct.

16   Q.  Let's go now to Government Exhibit 318.  If we could go to

17   page 8.  This is the activity feed relating to Tasheen Davis,

18   correct?

19   A.  Correct.

20            MR. GOSNELL:  If we can blow up the middle part.  We

21   will start with that.

22   Q.  This was February 13 of 2013, the activity feed, right?

23   A.  Correct.

24   Q.  And this is when you said on direct examination that this

25   was one of the first set of prescriptions were entered into the

G2EMMIR3                    Rosato - Cross

```
 1   activity feed?

 2   A.  Correct.

 3   Q.  And it also reflects in this blown-up portion that Oneida

 4   Hernandez or that user uploaded several new documents for

 5   Tasheen Davis, correct?

 6   A.  Correct.

 7        MR. GOSNELL:  If we can blow up the activity feed for

 8   the top of the page, February 14.

 9   Q.  That's the activity feed for the 14th of February, the

10   following day?

11   A.  Correct.

12   Q.  And it indicates that Dr. Mirilishvili signed all of those

13   documents, making them permanent?

14   A.  He signed those documents, yes.

15   Q.  Throughout her file, throughout her activity feed you saw

16   the same types of entries where there would be documents

17   uploaded on the same day that prescriptions were issued and

18   either that day or the day after those documents would be

19   signed by Dr. Mirilishvili?

20   A.  There were instances, yeah.

21   Q.  Let's go to page 6.

22        MR. GOSNELL:  Blow up the top half.

23   Q.  This is the activity feed for October 8.  This is the last

24   time where she received prescriptions, is that correct?

25   A.  I don't know about the last time.
```

1 Q.  It indicates in the very bottom portion that there were

2 several ePrescriptions that were sent?

3 A.  There were.

4 Q.  It indicates that there were several documents that were

5 uploaded?

6 A.  Correct.

7 Q.  And those same documents that were signed, correct?

8 A.  Correct.

9 MR. GOSNELL:  Your Honor, I have nothing further.

10 MS. CUCINELLA:  No redirect.

11 THE COURT:  Thank you.  You may step down.

12 MR. GOSNELL:  Your Honor, may I have one more.

13 THE COURT:  Back.

14 MR. GOSNELL:  I'm sorry.

15 Could we put Government Exhibit 304 on the screen.

16 Q.  I'm sorry.  Just a very couple of questions here.  This is

17 the activity feed for Alex Brian Champion?

18 A.  Correct.

19 Q.  Just the top portion here.  In addition to the other users

20 that we saw who would upload documents or would create SOAP

21 notes, on here there are also activity feeds relating to Damon

22 Leonard uploading the documents, correct?

23 A.  Correct.

24 Q.  That's not something that's unique to this particular

25 activity feed; that's something that you saw across various

1    activity feeds, correct?

2    A.   Correct.

3        MR. GOSNELL:  Nothing further for real this time, your

4    Honor.

5        THE COURT:  Anything else?

6        MS. CUCINELLA:  Nothing from the government.

7        THE COURT:  I you may step down.  Thank you.

8        (Witness excused)

9        MR. DISKANT:  Your Honor, with the Court's permission

10   we would like to substitute a new version of the stipulation

11   that you may recall on Thursday had a typographical error in

12   it.  That is Government 1004 which has been signed by the

13   parties.

14       THE COURT:  That's fine, as long as I don't have to

15   read anything.

16       MR. DISKANT:  You do not.

17       Your Honor the government rests.

18       THE COURT:  Ladies and gentlemen, the government rests

19   are magic words.  That means we have heard from all of the

20   witnesses that the government intends to call and has

21   introduced all of the evidence it intends to introduce from

22   which it will argue to you that it has met its burden of

23   overcoming the presumption of innocence beyond a reasonable

24   doubt.

25       I now, as I told you, have to have a chat with the

1    lawyers outside your presence, so I am going to excuse you for

2    a few minutes.

3         Don't discuss the case.  Keep an open mind.  We will

4    find out what the defendant wants to do.

5         (Jury not present)

6         THE COURT:  Does anyone have anything to say?

7         MR. MAZUREK:  Yes, your Honor.

8         THE COURT:  I figured you did.

9         MR. MAZUREK:  Thank you.  Under Rule 29, we move for a

10   judgment of acquittal on grounds that the government has failed

11   to meet its burden, even in the light most favorable to the

12   government.

13        Specifically, with respect to Counts Two and Three,

14   your Honor, which are the substantive distribution counts, the

15   government's evidence with respect to the people who were

16   dispensed with prescriptions on two dates -- Count Two is

17   January 10, 2013; Count Three is October 28, 2014 -- for some

18   of those individuals there has been absolutely no evidence

19   introduced in the case.

20        With respect to others, the only evidence is that

21   their patient file has been reviewed by the government expert

22   and there has been very little with respect to any of those

23   individual's particular files other than the general opinions

24   that were offered by Dr. Gharibo who at times indicated

25   throughout his testimony that while the medical judgment may

1    have not been what he would have done, there was evidence that

2    it met a level of care by a doctor as opposed to a drug dealer.

3           The only other piece of evidence with respect to

4    either of those substantive counts had to do with Count Two and

5    that is the testimony of Abraham Correa, who received a

6    prescription on January 10, 2013.  However, he indicated in his

7    testimony that in his patient visits with the doctor he always

8    indicated that he was experiencing pain.  He lied to the doctor

9    about his condition and, therefore, again, I don't think that's

10   sufficient evidence beyond a reasonable doubt to indicate or to

11   meet the government's burden, which is that Dr. Mirilishvili

12   intentionally, willfully distributed oxycodone, a controlled

13   substance, outside the usual practice and without legitimate

14   medical judgment.

15          THE COURT:  The government.  I would like you to

16   explain Counts Two and Three to me so that I can quite

17   understand in the way that I assume you would explain it to the

18   jury.

19          MR. DISKANT:  Certainly, your Honor.  Counts Two and

20   Three are both meant to indicate representative dates during

21   different ranges of the conspiracy, both of which the jury has

22   heard fairly significant testimony about.

23          With respect to January 10, 2013, not only has the

24   jury heard from Abraham Correa, who told the jury that at the

25   point that he received that oxycodone prescription he was

1    already working for the defendant, and he testified --

2              THE COURT:  He got a prescription on that date.

3              MR. DISKANT:  He did, your Honor.  He testified to the

4    circumstances surrounding that visit.  He testified to what the

5    office looked like at that time.

6              THE COURT:  I'll confess, I thought Counts Two and

7    Three were about Mr. Correa's prescription in one count and --

8    I'm sorry, the other guy's name?

9              MR. DISKANT:  Damon Leonard.

10             THE COURT:  Damon Leonard in the other count.  That's

11   what I thought they were about.

12             MR. DISKANT:  That's exactly right.

13             THE COURT:  I am not wrong about that.

14             MR. DISKANT:  You are not wrong.  The second date was

15   a time when Damon Leonard was working in the office --

16             THE COURT:  We are talking about Damon Leonard's

17   prescription that was issued on that date.

18             MR. DISKANT:  No, we are not.  Damon Leonard did not

19   receive a prescription on that date.  However, he did testify

20   to what was going on in the office during that time period, and

21   the government has presented evidence of representative

22   patients.

23             THE COURT:  Count Two is Correa and that's about

24   Correa's prescription.

25             MR. DISKANT:  Correct, your Honor.

1    THE COURT:  Count Three is what went on on a

2    particular day as attested to by Mr. Leonard, but the

3    prescriptions involved were the prescriptions that were issued

4    to other patients on that day.

5        MR. DISKANT:  That's correct, your Honor.  And we have

6    offered evidence.

7        THE COURT:  I think that has to be very, very clearly

8    explained.

9        MR. DISKANT:  Absolutely, your Honor.  And in

10   furtherance of that, to highlight one example, the jury has now

11   heard a fair bit of testimony and evidence about a particular

12   patient by the name of Larry Ashby whose MRI report we would

13   submit is patently fraudulent on its face.  It refers to him by

14   multiple different names and different genders.  We have had an

15   expert testify about the quality of care provided to Mr. Ashby

16   or the lack thereof.  We have also offered and will continue to

17   argue, based on that, evidence with respect to the SOAP notes;

18   that is, the patient files that were created by the defendant

19   for that particular patient.

20       We also offered a summary chart of all of the

21   prescriptions written by the defendant on both of those dates

22   indicating, for example, that on October 28, 2014, the

23   defendant wrote 33 identical oxycodone prescriptions all for 90

24   30-milligram tablets.  On January 10, 2013, the subject to

25   Count Two, he wrote 18 identical 90 --

 1              THE COURT:  If I'm thinking like a trial lawyer, which

 2     I do occasionally, and if I'm thinking as a juror, which I try

 3     to do a lot more, Count Two, forgetting about anything else he

 4     did that day, Count Two is about the prescription that was

 5     written for Abraham Correa, a representative patient, in

 6     quotes.  Count Three is about a representative day.

 7              MR. DISKANT:  Correct.

 8              THE COURT:  The motion is denied.  There is ample

 9     evidence to take all three counts to the jury.

10              I need to read a little bit more.  Obviously, the

11     defense was given a redacted copy of the government's letter,

12     which is perfectly appropriate because why should they tell the

13     defense what their cross-examination was going to be.  That

14     wouldn't be appropriate.

15              I've now had an opportunity to read again, it had been

16     a while, and more closely the Valdez case.  The facts are a

17     little different.  It's the case that involved the arrest

18     warrant where the witness was literally was going to be

19     arrested as soon as he finished testifying and hanging himself.

20     And the Second Circuit was not uncritical of Judge Lowe.  It

21     did in the end say that she was in a tight spot.  It said she

22     had to make a quick call, as I do here, that she had balanced

23     the defendant's rights against the rights of the witness.  And

24     she knew what the witness didn't know, which was that the

25     sheriff was right outside the door of the courtroom and was

  1    going to arrest the witness as soon as he was off the stand.

  2           I don't understand from the government that to be the

  3    case.  There was also in _Valdez_ the intriguing fact that the

  4    individual who was basically an unindicted coconspirator had

  5    been told that he might subject himself to arrest.  I am not

  6    sure by whom.

  7           The attorney for the defense stated that the witness

  8    had actually been affirmatively advised to hire an attorney,

  9    which I'm not sure if that's a fact that you all have -- they

 10    are shaking their heads at the back table.  I didn't think that

 11    that was likely something that Dr. Mirilishvili -- that was a

 12    detail that I had forgotten about the _Valdez_ case.

 13           Could I read a couple of other cases before I decide

 14    whether I am going to say anything to this witness, even of a

 15    general nature, like what was said in _Garza-Gonzalez_.

 16           MR. MAZUREK:  Judge, my only concern is one of the

 17    patient witnesses, Ms. Medina, she has informed me --

 18           THE COURT:  She might have child care obligations next

 19    week that would be very, very, very much interfered with if she

 20    were to be indicted on the basis of things that the government

 21    is going to ask her about.  I appreciate the problem, and we

 22    will postpone lunch.  We will make lunch late.  We are in a bad

 23    position because of the juror who didn't show up for an hour

 24    and a half and we waited and waited and waited.

 25           I need to take another 15 minutes with this issue,

1    please.  I really do.  I'll be right back.

2         (Recess)

3         THE COURT:  Mr. Mazurek, did I interrupt you or did

4    you finish your motion?  Mr. O'Neil keeps me on the straight

5    and narrow and he's very solicitous of lawyers' rights.

6         MR. MAZUREK:  I could have continued, but I think I

7    made a sufficient record.

8         THE COURT:  Fine.  Great.

9         I've gone back and read the Garza-Gonzalez case, which

10   was Judge Kaplan's case, and Valdez again with a real eye to

11   what was disturbing or what was important to Judge Leisure who

12   had a second case in Valdez, the perjury case.  It was

13   predicated on the testimony from the first trial where Judge

14   Lowe had given no warning.  And obviously you don't have to

15   warn somebody about rights in connection with perjury.

16        Without tipping the government's hand, the government

17   certainly has some very potentially incriminating things that

18   they want to examine these ladies about.  And I think that I

19   just need to bring them in one at a time, obviously outside the

20   presence of the jury, and say to them literally the very words

21   that were used by Judge Kaplan in the Garza-Gonzalez case

22   because the Second Circuit has said those words are not

23   intimidating.  And the words are:  Taking the witness stand

24   sometimes has personal implications for people, legal

25   implications, and it might be useful for you to have those

1    rights explained to you by a qualified attorney before you make

2    any decision about testifying if you want to do that.

3           MR. MAZUREK:  Your Honor, we take exception to that,

4    obviously, because we do believe that it is intimidating to the

5    witness and will be a coercive for them not to testify at this

6    trial.

7           THE COURT:  I understand that and you have your

8    exception and that's why I'm reading the words from a case in

9    which the Second Circuit said that it was not intimidating for

10   a judge who do that.

11          The first lady who is here, the lady who has child

12   care obligations.

13          MR. MAZUREK:  Ms. Medina.

14          THE COURT:  Why don't we bring Ms. Medina in.

15          Hello Ms. Medina.  Come up and have a seat.  I am

16   Judge McMahon.  How are you.

17          MS. MEDINA:  Fine.

18          THE COURT:  I just wanted to say, before we bring the

19   jury in, that you are here.  I take it no subpoena has issued.

20          MR. MAZUREK:  She is under subpoena.

21          THE COURT:  She is under subpoena.

22          MR. MAZUREK:  Yes.

23          THE COURT:  You are here.  You've got a subpoena

24   asking you to come to court, right, piece of paper?

25          MS. MEDINA:  Yes.

 1              THE COURT:  Before you testify I want to tell you that

 2     taking the witness stand and testifying sometimes has personal

 3     implications, legal implications for a person and it might be

 4     useful for you to have a lawyer explain what those implications

 5     are and what your rights are before you make a decision about

 6     what you want to do here.  I'll give you that opportunity if

 7     you want it.

 8              MS. MEDINA:  I have to testify if I want?  Is there an

 9     implication if I say no?  Do I have to testify?

10              THE COURT:  You have a subpoena.  You'll have to

11     testify.  But there may be some legal implications of that for

12     you and if you'd like to talk to a lawyer about what those are,

13     we can.

14              MS. MEDINA:  Before I testify?

15              THE COURT:  Before you testify, yes.

16              MS. MEDINA:  I have to do it right now, the lawyer,

17     what the implication is about it?

18              THE COURT:  Yes.

19              MS. MEDINA:  I have to see the lawyer first then.

20              THE COURT:  We are going to get CJA counsel.  Good.

21     Fine.  You can take the lady off the stand.

22              MR. MAZUREK:  Bring another one in?

23              THE COURT:  Is the other lady here?

24              MR. MAZUREK:  Yes.

25              THE COURT:  Sure.  This is --

 1          MR. GOSNELL:  Ms. Torres.

 2          THE COURT:  Ms. Torres, come on up.

 3          Hi, Ms. Torres.  I'm Judge McMahon.  Have a seat.

 4     You've got a piece of paper, a subpoena asking to you come to

 5     testify, yes.  Is that right?

 6          MS. TORRES:  Yes.

 7          THE COURT:  I just want you to know that taking the

 8     witness stand sometimes has personal legal implications for

 9     someone and it might be useful for you to have those rights

10     explained to you by a lawyer before you say anything on the

11     witness stand.  If that's what you want to do, I'll give you a

12     chance to do that.

13          MS. TORRES:  Yes, I do.

14          THE COURT:  Yes, you do.

15          MS. TORRES:  Yes, I do.

16          THE COURT:  Fine.  We will see you later.  Thank you.

17          Mr. Patel, hello.

18          THE DEPUTY CLERK:  Give your appearance.

19          MR. PATEL:  Jeffrey Patel.  I'm the duty CJA attorney.

20          THE COURT:  Mr. Patel, we have two witnesses, one of

21     whom I need you to speak to, who have been subpoenaed by the

22     defense.  The government has sent me a letter indicating that

23     it will, adamantly will, be cross-examining them about matters

24     that are potentially incriminating.  I have given each lady an

25     opportunity, if she wants to, to consult with counsel about the

1    implications of testifying, and each lady has asked if she

2    could see the lawyer.  Ms. Medina was the first lady.

3    Mr. Patel is going to be talking to Ms. Medina.

4            MR. PATEL:  Are they here?

5            THE COURT:  They are both here.  You may wish to chat

6    with defense counsel.  You may wish to chat with the

7    government.  You may chat with whoever you would like to chat

8    with before you chat with your new client.

9            MR. PATEL:  Are there any known conflicts between the

10   two witnesses that present any concern?

11           THE COURT:  You are going to do one witness.  We are

12   going to find someone else.  I don't know that there are any

13   conflicts between the witnesses, but I don't know enough --

14           MR. DISKANT:  From the government's perspective, there

15   is no conflict as long as they are being spoken with

16   separately.

17           MR. MAZUREK:  I'm not aware of any conflicts.

18           THE DEPUTY CLERK:  In the meantime, he will speak to

19   one.

20           THE COURT:  We will look for someone else.  We have a

21   representation from both sides that they are not aware of any

22   conflicts.  Can we start by telling Mr. Patel where Ms. Medina

23   is.

24           MR. MAZUREK:  Yes, I can do that.

25           THE COURT:  Fine.  Great.  All right.  Thank you.

1          MR. MAZUREK:  I think.

2          MR. PATEL:  Can I see the letter the government sent.

3     Was it to the Court or was it to everybody?

4          MR. MAZUREK:  To the Court.

5          THE COURT:  There is a redacted letter that everyone

6     has seen.  The letter has been filed under seal.  What is the

7     government's pleasure here?

8          MR. DISKANT:  I'm happy to speak with Mr. Patel.  I

9     prefer not to share the letter.

10          THE COURT:  I understand.  I think you should speak to

11     Mr. Patel and I think we should go off the record.

12          (Continued on next page)

1          (Jury not present)

2          THE COURT:  Counsel for one of the witnesses is

3    present.  Thank you so much, Mr. Patel.  He has spoken to

4    counsel?  And Mr. Mazurek?

5          MR. MAZUREK:  I have been advised that Ms. Medina is

6    still willing to testify.

7          THE COURT:  OK.  In that case we need to do that

8    before lunch.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Ladies and gentlemen, the time when the

3    government rests and the defense is making its final decisions

4    about what to do and not to do, it's a very fraught time in a

5    trial.  OK?  And it no doubt seems to you that you just wasted

6    some time.  You didn't.  Trust me.  But we did need to take a

7    little time out of your presence, and it took a little longer

8    than I thought.  I'm sorry.  But we have to get this witness on

9    and off the stand I think so she can go take care of her

10   grandchildren.  So, forgive me for postponing your lunch.

11   Does the defense wish to put on a case?

12   MR. MAZUREK:  We do, your Honor.

13   THE COURT:  Mr. Mazurek has indicated that the defense

14   is going to call some witnesses or introduce other kinds of

15   evidence.  Remember that the defendant is not thereby assuming

16   the burden of proof.  He is not assuming the burden of proof.

17   The government still has the job to overcome the presumption of

18   innocence by a preponderance of the -- what am I saying --

19   beyond a reasonable doubt.  What did I say?  I should never say

20   those words.  Beyond a reasonable doubt.  And it is very

21   important you remember that there are a lot of reasons why a

22   defense team would choose to put evidence in front of you, but

23   one of them is not so that the defendant can prove that he is

24   innocent.  He has no burden to prove that he is innocent.

25   Would you call your witness.

1    MR. MAZUREK:  Thank you, your Honor.  The defense

2    calls Ms. Altagracia Medina.

3    ALTAGRACIA MEDINA,

4        called as a witness by the defendant,

5        having been duly sworn, testified as follows:

6            THE COURT:  You need it talk into the microphone.  OK?

7    Thank you.

8            MR. MAZUREK:  Your Honor, may I inquire?

9            THE COURT:  You may.

10   DIRECT EXAMINATION

11   BY MR. MAZUREK:

12   Q.  Good afternoon, Ms. Medina.

13   A.  Good afternoon.

14           THE COURT:  Ms. Medina, speak very loudly, OK?

15           THE WITNESS:  Good afternoon.

16   Q.  And keep the microphone close to you if you can.

17   A.  OK.

18   Q.  Ms. Medina, where do you live?

19   A.  I live 2374 University Avenue, apartment 42, Bronx, New

20   York.

21   Q.  And are you retired?

22   A.  Yes.

23   Q.  What did you do before you retired?

24   A.  Teaching.

25   Q.  Where did you teach?

1   A.  Kindergarten.

2   Q.  Was that in New York City?

3   A.  Yes.

4   Q.  How old are you?

5   A.  77.

6   Q.  Were you at some point about four years ago a patient of

7   Dr. Mirilishvili?

8   A.  Yes, sir.

9   Q.  Why did you go to Dr. Mirilishvili?

10  A.  Because at that time I had a knee replacement, and I was

11  supposed to have an operation on the other knee, but I refused.

12  I refused to have the operation, the new one, because the first

13  one was painful, and I don't want to go through that again.

14  Q.  And how did you hear of the doctor?

15  A.  A relative took me there.

16  Q.  I'm sorry?

17  A.  My daughter took me to the doctor.

18  Q.  Where was he located the first time -- his office located

19  the first time that you went to him?

20  A.  If I remember it was in the Bronx, but after that he moved

21  to Manhattan.

22  Q.  And was that approximately in 2012?  Is that correct?  More

23  or less four years ago?

24  A.  Yes.

25  Q.  And why were you going to a pain management doctor?

1  A.  I did not want to go to the hospital again.  I didn't want

2  to have an operation.  It was painful.  I can't walk.  The

3  right knee was painful.  And it's still, but I'm trying to

4  survive.  Too much.  Painful.

5  Q.  I'm going to ask you some questions now about your patient

6  visit with Dr. Mirilishvili, and we will start the first time

7  you went there.  Can you describe what the office looked like

8  in the Bronx when you went to visit him?

9  A.  It was a little crowded because I find out there was more

10  than one office there, I think.

11  Q.  Were there other doctors in that office?

12  A.  Another doctor.

13  Q.  OK.  And when you went to see Dr. Mirilishvili, did you pay

14  by insurance or cash?

15  A.  I paid cash.

16  Q.  Why is that?

17  A.  Because I found out he didn't take my insurance.

18  Q.  What insurance did you have?

19  A.  Aetna.

20  Q.  So, why did you decide to pay the doctor rather than find

21  another doctor that took your insurance?

22  A.  Because my daughter told me it was a good doctor.  She was

23  very sick, and she saw me suffering with the pain.

24  Q.  When you went to see the doctor for the first time, can you

25  tell us a little bit about how that visit went and what

1  happened inside the doctor room.

2  A.  At the beginning, the first office, it was a lot of persons

3  like I told you, and in the other office as far as I know, my

4  experience, when I went there it was quiet, not -- the time I

5  went there there was --

6  Q.  I'm sorry, but let's take this one at a time.  I'm asking

7  initially when you went to the office in the Bronx for the

8  first time, describe the patient visit when you were in the

9  office with the doctor.  What did he do?  What did he do during

10  your patient visit?

11  A.  What did he do?  We was in his office, and when we entered

12  into the office he examined me like a regular doctor, and asked

13  me questions, asked for the paper for the hospital.

14  Q.  Did you give him anything?

15  A.  Yes, I gave it to him.

16  Q.  What was it?

17  A.  It's a paper from the hospital like the paper, the history

18  what happened to me, what they did to me.  I can't find those

19  papers.  I don't know what happened, what they did in the

20  office.  I don't know; I can't find it.

21  Q.  So after you gave the doctor your paperwork from the

22  hospital, what happened next?

23  A.  He examined me.  He told me to walk, to bend down.  He

24  examined the knee, both, because I was feeling pain in the one

25  with the operation.  And he did everything like the doctor used

1    to do in order to examine you.

2    Q.  Did he ask you any questions relating to your past

3    surgeries?

4           MR. DISKANT:  Objection.

5    A.  Yes, he asked me --

6           THE COURT:  Ground?

7           MR. DISKANT:  Hearsay.

8           THE COURT:  The objection is sustained.

9    A.  He asked me --

10          THE COURT:  No, no, don't answer.

11          MR. MAZUREK:  Your Honor, I would ask under 803(4) for

12   medical diagnosis and treatment.

13          THE COURT:  Well, you know, I'll let it in.

14   Q.  So, Ms. Medina the question is did he ask you any questions

15   about your past surgeries?

16   A.  He asked about the surgery, and he asked me for the paper,

17   like I told you.  He asked me what happened, why did I get the

18   operation, and I explained to him.

19   Q.  Did you explain to him about any medications that you had

20   taken in the past?

21   A.  He find out because in the paper from the other place, I

22   had to go to rehab, they have a list of medicine I was taking

23   including codeine, something like that.

24   Q.  You mentioned rehab.  What rehab were you talking about?

25   A.  It was in the nursing home; I was there for one month.

1    Q.  And that was after your knee operation?

2    A.  Yes.

3    Q.  You talked about some of the things that the doctor made

4    you do while you were in the examination room with him.  Can

5    you explain a little bit more of that, the kinds of things that

6    he looked at.

7    A.  The day that I went for the first time he told me to move

8    the knee, to walk, to bend down.  And he touched my knee, both.

9    He examined them and he asked me when I move if I feel pain in

10   the knee, in the right and in the left one.  Especially the

11   right one was more problem at that time than the left, because

12   the left was already operated.  Well, the right one, sometimes

13   I can't move, I can't walk, I have to get up at night because

14   of pain, because the two bones were crushing too much.

15   Q.  And approximately how long was your visit, if you remember

16   back then?

17   A.  I went there like three or four times as far as I can

18   remember.

19   Q.  I'm just asking for the first time how long was that visit?

20   A.  Like one or two months later?

21   Q.  No, I'm sorry.  I'm asking when you were inside the room in

22   the doctor's office, approximately how long were you there?

23   A.  How long I been there before he take me?

24   Q.  No.  Did it last 30 minutes?  When you are inside the

25   office of the doctor, was it --

G2E7MIR4                    Medina - direct

1   A.  Exactly I don't remember how long but it wasn't too long,

2   because when I went there, let's see, like one hour, one hour I

3   was waiting.

4   Q.  How long you were waiting.  But I'm talking about once you

5   got in to see the doctor and he examined you, do you know how

6   long you were -- can you remember how long it was?

7   A.  Inside the office with him?

8   Q.  Yes, in the office with him.

9   A.  Like half an hour.

10  Q.  Half an hour?

11  A.  While he was --

12           THE COURT:  OK, half an hour.

13           THE WITNESS:  Half an hour.

14           THE COURT:  That's fine.  Next question.

15  Q.  And after he did the physical examination of your knees --

16  and he focused on your knees at that time; is that right?

17  A.  Yes.

18  Q.  Did he take information from you relating to your family

19  medical history, any information about the medications or

20  things that you've done, your medical history in the past?

21  A.  Yes.

22  Q.  Did you tell him anything relating to the other kinds of

23  issues that you had, any other medical issues that you had?

24  A.  Yes.  He asked me for everything.  He asked me what kind of

25  medicine I'm taking, and I show him the list of the

 1   prescriptions that I have, the pills that I'm taking at that

 2   time.

 3   Q.   OK.   And what other medical issues were you experiencing at

 4   the time?   Did you have any other issues that required you to

 5   take other medication?

 6   A.   Because like I have blood pressure, I have diabetic and

 7   cholesterol.

 8   Q.   And did you explain that to the doctor?

 9   A.   Yeah, I explained it to him.

10   Q.   Did the doctor explain to you anything about what he

11   thought you needed to help you with the pain?

12   A.   Say that again.

13   Q.   Did the doctor then after he examined you explain whether

14   he is going to put you on medicine or anything?

15   A.   Yes, he explained to me.

16   Q.   And what did he explain?

17            MR. DISKANT:   Same objection, your Honor.

18            MR. MAZUREK:   Again for medical diagnosis.

19            THE COURT:   Overruled.   Overruled.

20   A.   He explained to me that those medicines has like -- if I

21   take -- those medicines I can be drowsy or nauseous or

22   something like that, side effects.

23   Q.   So he prescribed you medication, oxycodone and a muscle

24   relaxant?

25   A.   Yes, yes.

1   Q.  And he explained what effects those drugs might have on

2   you?

3   A.  Yeah.

4   Q.  And did he prescribe anything else for you other than

5   medication?

6   A.  Yes, something for the muscles, and he prescribed something

7   for the knee from the surgical supply.

8   Q.  What kind of thing?

9   A.  Something that you have to put around the knee.

10  Q.  A knee brace?

11  A.  Yes.

12  Q.  Is that something you didn't have before that?  Did you

13  have a knee brace?

14  A.  Yes, I still have it.

15  Q.  But did you have a knee brace going into that visit, or is

16  that something he gave you?

17  A.  No, he prescribed it.

18  Q.  Now, after that first visit, did you go back to see the

19  doctor again?

20  A.  Yes, like one or two months.  I don't remember exactly.

21  Q.  Approximately how many times did you see the doctor in

22  total?

23  A.  Like three times.  Three times, more or less, three times,

24  as far as I remember.

25  Q.  Did you eventually go in one of your office visits to a

1    different location other than the Bronx?

2    A.   Other than the Bronx?

3    Q.   Yes.

4    A.   Yes.

5    Q.   And where was that?

6    A.   I don't remember exactly.

7    Q.   Was it in Manhattan?

8    A.   In the Bronx.

9    Q.   No, I'm sorry.  After the visits that you went to in the

10   Bronx -- I think you said before the doctor changed his office

11   location, is that right?  He moved.

12   A.   After the Bronx he was in Manhattan.

13   Q.   OK.  And approximately where in Manhattan; do you remember?

14   A.   It's 167th or something like that.  167th.

15   Q.   Washington Heights?

16   A.   Washington Heights, yes.

17   Q.   And in the follow-up visits that you had with the doctor,

18   if you could just generally describe the kinds of things that

19   he did or asked you during those later visits.

20   A.   At the 167th, the second visit?

21   Q.   Yes.

22   A.   He referred me to the hospital for -- to take, what do you

23   call it, like a kind of rehab over there in the hospital.

24   Q.   For physical therapy?

25   A.   For physical therapy.  But I didn't go.

1   Q.  Why didn't you go?

2   A.  I don't know.  I was lazy maybe.  But I exercised at home.

3   I did it at home.  But I didn't go; I didn't go to the

4   hospital.

5   Q.  Did you explain that to him?

6   A.  No.

7   Q.  No?

8   A.  He didn't know.

9   Q.  He didn't know.

10  A.  No.

11  Q.  And what else happened in those later visits?  Did the

12  doctor ask you about the medication and whether you were taking

13  the medication, whether it was helping?

14  A.  Yeah, he asked me.  He asked me.

15          MR. DISKANT:  Objection.

16  A.  He asked me how would I feel.  I know as soon as I take the

17  medicine I feel better, but I took like the one month ago

18  there.  I took the medicine, but I took it in my way.  Instead

19  of taking it twice, sometimes I take twice in the day, but

20  another day I take one, because I know how I feel because it's

21  strong medicine for me, you know.  And I didn't tell him that I

22  didn't take it.  But I used to take it the way he said, but I

23  feel better because the pain went down.

24  Q.  OK.  So you sometimes didn't take it twice a day as he told

25  you.

1    A.  No, no.

2    Q.  OK.  Now, did there come a time when you stopped going for

3    a while to the doctor and then went sometime later again?

4    A.  Yes.

5    Q.  Explain that.

6    A.  Because I was taking the medicine my way, not in the way

7    that the doctor said, because, you know, I was taking it easy.

8    When the medicine finished I went back there, I went back to

9    see him.

10   Q.  So did you skip some months?

11   A.  Yeah, I skipped, because I know it was strong for me.  He

12   didn't know it was strong, but you know your body, you know how

13   you feel when you take some medicine.

14   Q.  But you never told the doctor.

15   A.  No, no.

16   Q.  Why didn't you?

17   A.  Like the same way I didn't go again to the hospital for the

18   rehab, and I didn't go back for the other operation, I refused.

19   I wanted to take my medicine and not go for another operation.

20   Q.  The last time you saw the doctor it says was in May of

21   2013, and there was six months between your next to last and

22   your last visit.  Why did you go back six months later?

23   A.  Because I feel pain.  I still feel pain.  I still have my

24   pain.  I didn't have the operation; I still feel pain.  I feel

25   pain on my body, but I tried another medicine out of the

1   counter to see what's going on, but I know that I need it.

2   Q.  So you went back.

3   A.  Yeah.  I still need it but I want to take it easy.

4   Q.  And why did you stop going to the doctor?  Why did you stop

5   going after May?

6   A.  Like, I said, I was taking it little by little.  My body

7   tell me what I need.  It's me.  And I was taking a little bit.

8   When I don't have it, I went back to see him.  He didn't know

9   what I was doing.

10  Q.  And how much did you pay for each of the visits to the

11  doctor?

12  A.  How much I pay?  250.

13  Q.  250 each time, each visit?

14  A.  Yes.

15  Q.  And that money -- I mean was that a lot of money for you at

16  the time?

17  A.  No.  It was a lot of money, but I used the money to go to

18  the casino and to go see the doctor.

19  Q.  So it's the casino or medicine?

20  A.  I spend money at the casino.  It's not enough to pay for my

21  pills.

22  Q.  And how did you pay for the medication?

23  A.  Cash.

24  Q.  I mean at the pharmacy.  Did you use your insurance at the

25  pharmacy?

1   A.  I think the insurance paid for the medicine.

2          MR. MAZUREK:  I have nothing further, your Honor.

3          THE COURT:  OK, you may cross.

4   CROSS EXAMINATION

5   BY MR. DISKANT:

6   Q.  Hi, Ms. Medina.  How are you?

7   A.  Hi.

8   Q.  Sorry to hear about your knee.  When was the surgery?

9   A.  2006.

10  Q.  So about ten years ago?

11  A.  Yes.

12  Q.  And when you had the surgery, did the doctor who performed

13  the surgery give you any medication for the pain?

14  A.  Yes.

15  Q.  Do you remember what medication you got?

16  A.  It was strong medicine.

17  Q.  As strong as the oxycodone?

18  A.  It was strong, yeah.  And at night I cried for the

19  medicine, they have to give it to me almost before the time.

20  That's why I don't want to have the surgery again.  That's the

21  reason why I don't want to go to the hospital again.

22  Q.  OK.  So fast forward seven or eight years.  You said that

23  your daughter is the one who told you about Dr. Mirilishvili?

24  A.  Yes.

25  Q.  And what is your daughter's name?

1   A.  Myra Ravelo.

2   Q.  Was she also seeing the doctor?

3   A.  She had an operation already, two operations already.

4   Q.  I'm sorry, that wasn't quite the question.

5   A.  Right now --

6           THE COURT:  No, wait.  The question is:  Was your

7   daughter seeing the doctor?  Was she a patient too?

8           THE WITNESS:  She was a patient, yeah.

9   Q.  So she was also getting an oxycodone prescription?

10  A.  Yeah.

11  Q.  Now, I believe you said on direct examination that the

12  medication that Dr. Mirilishvili was giving you was too much;

13  you didn't need it all.  Is that right?

14  A.  At the beginning it wasn't too much.  I used to take it.

15  But after that myself tell me that I won't take everything

16  twice.  I used to take one and then one.  That's when I took it

17  apart, a few days, like one day one, another day another, you

18  know, not to take it twice.  But at the beginning, yes.

19          MR. DISKANT:  Ms. Joynes, if we can bring up

20  Government Exhibit 220, page 2.  Focus up on the top.

21  Q.  Ms. Medina, can you see that up on your screen?

22  A.  What?

23  Q.  Can you see what's up on your screen?

24          THE COURT:  Here, look at this.

25  Q.  OK.  So it looks like the first time you saw the doctor was

1    in September of 2012.  Does that sound right?

2    A.  Let me get my glasses.  One moment.  Give me a minute.

3    Q.  So it looks like your first appointment with the doctor was

4    in September?

5    A.  September 12.

6    Q.  And you saw him a couple times in November?  Does that

7    sound right?

8    A.  November 12 and November 29.

9            THE COURT:  Do you remember seeing him a few times

10   around like Thanksgiving, in November of 2012?  Do you

11   remember?

12           THE WITNESS:  No, I don't have a memory, but I went

13   there, but maybe I didn't see him, or I had to come back, I

14   don't know for what, for the test -- for the test maybe.

15   Q.  Well, let me ask you a slightly different question.  On

16   those first few visits that you did see the doctor and that he

17   wrote you these prescriptions, what did you do with the pills

18   that you didn't take?

19   A.  I took it.

20   Q.  You took all of them?

21   A.  Sure.

22   Q.  Just you took them in your way; is that what you said?

23   A.  I took it.  I took them.  I took them, but what I didn't

24   take was twice.  I took it.  The first month I remember I took

25   it, and after that I took it then like a daily, you know.

 1              THE COURT:  Let me see if I understand.  The first

 2    month --

 3              THE WITNESS:  -- I took it.

 4              THE COURT:  -- you took two pills a day like the

 5    doctor said.

 6              THE WITNESS:  Um-hum.

 7              THE COURT:  After that you thought it was too much?

 8              THE WITNESS:  By myself.

 9              THE COURT:  You yourself.

10              THE WITNESS:  Yes.

11              THE COURT:  So you took it once a day.

12              THE WITNESS:  Yes.

13    Q.  And then Mr. Mazurek asked you about the gap, it's about

14    six months between your third visit and your last visit.  Do

15    you remember that?  Yes?

16    A.  I remember that -- I looked over here at the screen.  I

17    stopped going there, but I feel pain.  I still feel pain.

18    Q.  So, Ms. Medina, between the November visit and the May

19    visit you actually saw another doctor for oxycodone

20    prescriptions, didn't you?

21    A.  Oh, I went to take some kind of pills, some kind of

22    medicine out of the counter.  I tried to do something to help

23    me.

24    Q.  Well, Ms. Medina, you saw a doctor named Robert Terdiman in

25    the Bronx in April of 2013, didn't you?  It's not going to be

```
 1    on your monitor; it's just a question.  You saw a Dr. Robert
 2    Terdiman in April of 2013; isn't that right?
 3    A.  That's right.  I started going there because I stopped
 4    going to see Dr. Moshe.
 5    Q.  And that doctor actually wrote you more oxycodone pills,
 6    didn't he?
 7    A.  At that time, yes.
 8    Q.  And he was also cash?
 9    A.  Yes.  My insurance it's not --
10            THE COURT:  Yes.  Is he cash?  You paid him cash?
11            THE WITNESS:  Cash, cash.
12            THE COURT:  Fine, that's all you have to say.
13    Q.  And then you went back to see Dr. Moshe in May?
14    A.  Yes, because I find out it's too far for me to go over
15    there.
16            MR. DISKANT:  May I have just a moment, your Honor?
17    Q.  And, by the way, was it your daughter who directed you to
18    Dr. Terdiman as well?
19    A.  No.
20    Q.  You found out about him on your own?
21    A.  No, she didn't know that I --
22            THE COURT:  No.  How did you find out about Dr.
23    Terdiman?
24            THE WITNESS:  I don't remember exactly.  I have to
25    tell you the truth, I don't remember.
```

1          MR. DISKANT:  OK, thank you.

2          MR. MAZUREK:  Nothing further.

3          THE COURT:  Nothing.  Ma'am, I hear you have to do

4    some babysitting.  Go.

5          THE WITNESS:  Thank you very much.

6          THE COURT:  OK.  You guys have lunch.  We will see you

7    at 2:30.  Don't discuss the case.  Keep an open mind.

8          (Luncheon recess)

9          (Continued on next page)

 1                          AFTERNOON SESSION

 2                              2:30 p.m.

 3              MR. MAZUREK:  Your Honor, there is one issue I would

 4    like to raise before beginning the next witness.  It has to do

 5    with this witness apparently has a prior felony conviction

 6    dating back to 1991 in New York County for distribution of

 7    narcotics.  Under 609(b) it's more than 10 years old and I'm

 8    not aware of any facts that make its value, its probative value

 9    greater to outweigh the prejudicial nature of that 25 or

10    26-year-old conviction.

11              THE COURT:  Government.

12              MR. DISKANT:  She is not aware of the facts because he

13    hasn't asked the witness.  We have no access to the witness.

14    We have no idea what the conviction is for.  What I told

15    Mr. Mazurek is I don't intend to specifically ask about the

16    facts of that conviction, but I feel, consistent with the

17    evidence of what was happening with this particular doctor,

18    that I do have a good-faith basis for asking about her prior

19    involvement in narcotics trafficking and her prior involvement

20    in illicit substances and whether or not the defendant asked

21    her about those issues.

22              THE COURT:  I agree.  He is not asking her about a

23    prior conviction.  He is asking about a prior bad act.  And he

24    may ask for that.

25              MR. MAZUREK:  Shall I bring her in?

 1          THE COURT:  You shall.  And we shall bring the jurors

 2     in.

 3          It is very kind of you to wait, but I had to send the

 4     jurors to lunch.

 5          (Jury present)

 6          THE COURT:  Call your next witness, please.

 7          MR. MAZUREK:  Thank you, your Honor.  The defense

 8     calls Ms. Anna Torres.

 9      ANNA TORRES,

10         called as a witness by the Defendant,

11         having been duly sworn, testified as follows:

12     DIRECT EXAMINATION

13     BY MR. MAZUREK:

14     Q.  Good afternoon, Ms. Torres.

15     A.  Good afternoon.

16     Q.  Can you tell the jury where you live.

17     A.  350 East 137th, apartment 11E, Bronx, New York, 10454.

18     Q.  How long have you lived there?

19     A.  30 years, 35.

20     Q.  Are you employed?

21     A.  Yes.

22     Q.  Where are you employed?

23     A.  In Kid City children's clothing store.

24     Q.  Where is that?

25     A.  Brooklyn.

1    Q.  Were you ever a patient of Dr. Moishe Mirilishvili?

2    A.  Yes, I was.

3    Q.  Approximately when?

4    A.  December of '13.

5    Q.  For how long a period of time did you see him?

6    A.  Fifteen months.

7    Q.  And why did you see Dr. Mirilishvili?

8    A.  For pain management.

9    Q.  Can you describe what your issues were back at that time?

10   A.  I have pain in my right knee, I have carpal tunnel in my

11   left hand, and in my lower back.

12   Q.  Prior to seeing Dr. Mirilishvili, have you had any surgical

13   procedures?

14   A.  Yes.

15   Q.  What were they?

16   A.  I had knee surgery, I have three screws in my knee, I had

17   carpal tunnel surgery, and I had injections in my back.

18   Q.  And those at that point in time, at the end of 2012 into

19   2013, you believe were causing you pain?

20   A.  Yes.

21   Q.  Did you have a primary care doctor at that time?

22   A.  Yes, I did.

23   Q.  Who was that?

24   A.  Winifred Egbuna.

25   Q.  Where did you see Dr. Egbuna?

 1   A.   In Belvis Medical Center.

 2   Q.   Where is that located?

 3   A.   142 and St. Ann's.

 4   Q.   Is that in the Bronx?

 5   A.   Yes.

 6   Q.   Did you obtain a referral for pain management from

 7   Dr. Egbuna?

 8   A.   Yes, I did.

 9   Q.   Approximately when was that?

10   A.   I don't remember.

11         MR. MAZUREK:  If we can put on the screen Government

12   Exhibit 224, which is already admitted into evidence.

13   Specifically the Bates number is DM1543.  That's the top half

14   of the page, the printed part of the page.

15   Q.   Do you see the document on the screen, ma'am?

16   A.   Excuse me.

17   Q.   Do you see the document?  Is it your screen?

18   A.   Yes.

19   Q.   If you could look at on the left-hand side about halfway

20   down do you see the words ordered by?  Do you see that, the

21   left-hand column.

22         MR. MAZUREK:  If we could highlight it.

23   A.   Yes.

24   Q.   You see that?

25   A.   Yes.

1    Q.   Is that your doctor, your primary care physician doctor?

2    A.   Yes, it is.

3    Q.   To the right of that there is a date of October 19, 2012.

4    Is that approximately when you remember getting a referral from

5    your family doctor?

6    A.   Yes.

7              MR. MAZUREK:   If we could highlight three lines below

8    the ordered by which starts with referred to.

9    Q.   And this is a referral to a pain clinic, correct?

10   A.   Yes.

11   Q.   This doesn't refer you to a specific doctor; it's just to a

12   pain clinic, right?

13   A.   Yes.

14   Q.   How did you learn about Dr. Mirilishvili?

15   A.   I was at the clinic, at this clinic and there was people

16   there.  You start conversating with the people and we were

17   talking about each other pain.  And one of them told me, I know

18   of this good doctor, he's a pain management doctor.  She gave

19   me his name, his number, and I called him.  And he said, you

20   have to have a referral.  So I got the referral and I called

21   him and he gave me an appointment and I went to see him.

22   Q.   At this time, in October 2012, prior to this, had you

23   received any kind of pain intervention before October?

24   A.   Medication?

25   Q.   No.  Did you go to the hospital?

1   A.  Yes.

2   Q.  What happened at hospital?

3   A.  I got the injections in my back.

4   Q.  This was a spinal injection?

5   A.  Yes.

6   Q.  To control the pain?

7   A.  Yes.

8   Q.  Did it help your pain at that point in time?

9   A.  Not really.  I mean, when they gave it to me it last like

10  one or two months.  Then the pain is right back.

11  Q.  That's when you went to your primary care physician?

12  A.  Yes.

13  Q.  Do you recall whether the first time that you met with

14  Dr. Mirilishvili was in December of 2012?

15  A.  Yes.

16  Q.  I am going to ask you about that initial visit.  Do you

17  remember where his office was located?

18  A.  In 168th.  That's where I get off the of the train, 168th

19  and Amsterdam.

20  Q.  That's in Manhattan?

21  A.  Yes.

22  Q.  When you went there, did you bring any paperwork with you?

23  A.  Yes.  I brought paperwork and my history, my records.

24  Q.  Your records showing what?  Do you remember?

25  A.  My x-rays for my knees, for my hands, for my lower back.

1   Q.  Now, did you have insurance at the time?

2   A.  Excuse me?

3   Q.  Did you have insurance at the time?

4   A.  Yes.

5   Q.  What kind of insurance?

6   A.  Medicaid Metro Plus.

7   Q.  Did you use that insurance as Dr. Mirilishvili's office?

8   A.  Yes, I did.

9   Q.  When you met with him, I am going to ask you a little bit

10  about how that visit went.

11  A.  Yes.

12  Q.  Can you describe for us when you went inside his office

13  exactly what happened.

14  A.  I went in, he introduced himself, I introduced myself.  He

15  asked me what am I here for and I was like, I would like to see

16  you for pain.  And he started asking me questions.  What's

17  wrong with you.  So I started showing him everything.  I got

18  pain in my knee, my leg, my back, you know, and he started

19  examining me.

20  Q.  Can you tell us or describe for the jury how he examined

21  you?

22  A.  I had to bend down, go side to side, put my arms up, do

23  like squats down, see how far I could go down.

24  Q.  Did he physically touch you?

25  A.  Yes.  Spinal.  My knee.  He touched my knee.  He measured

 1    it.

 2    Q.  Did he use an instrument in doing that, some kind of

 3    medical instrument?

 4    A.  Yeah.  That little thing that hits you in the bone and he

 5    tightened with the thing to measure it to see how swollen it

 6    is.

 7    Q.  In the examination room was there a bed?

 8    A.  Yes.

 9    Q.  And where were you in the room?  Did you have to move

10    around?  Were you on the bed?  Explain that.

11    A.  The first time, I was on the bed.  He moved my leg up and

12    down.

13    Q.  Did you have to walk around the room at all?

14    A.  Yes.  Walked back and forth.

15    Q.  During that visit did he review your x-ray and MRI reports

16    that you brought with you?

17    A.  Yes, he did.

18    Q.  Did he explain any of those to you?

19    A.  Yes, he did.

20    Q.  Did he give an explanation as to what he thought the issues

21    are with respect to your pain?

22    A.  He said my weight, standing a lot, putting all the pressure

23    on it.

24    Q.  And did he explain how the issues on the MRI may have

25    affected you feeling pain?

 1   A.  No.

 2   Q.  You don't remember that?

 3   A.  No, I don't remember.

 4   Q.  Did he ask you questions regarding your past medical

 5   history?

 6   A.  Yes.

 7           MR. MAZUREK:  If we could put on the screen again

 8   Government Exhibit 224; specifically, the page marked DM1527.

 9   If we can expand the objective portion of that note.

10   Q.  Ms. Torres, I am just going to ask you to look at the

11   second line under the title objective.

12           MR. MAZUREK:  If we could highlight that line,

13   starting with, patient with.

14   Q.  Do you see that on your screen?  You see that on your

15   screen, ma'am?

16   A.  Yes.

17   Q.  The second line starts with the words:  Patient with long

18   H/O type 2DM.  At the time did you have type 2 diabetes?

19   A.  Yes.

20   Q.  Did you tell the doctor that?

21   A.  Yes.

22   Q.  OA.  Were you diagnosed at some point prior to going to

23   Dr. Mirilishvili with osteoarthritis?

24   A.  Yes.

25   Q.  I'm sorry?

 1   A.  Yes.

 2   Q.  Did you tell the doctor that?

 3   A.  Yes.

 4   Q.  At the time that you went to the initial visit to

 5   Dr. Mirilishvili, had you been diagnosed with

 6   hypercholesterolemia, high cholesterol?

 7   A.  Yes.

 8   Q.  Did you tell the doctor that?

 9   A.  Yes.

10   Q.  Prior to that time of meeting with Dr. Mirilishvili, did

11   you have chronic hand, lower back, and bilateral knee pains?

12   A.  Yes.

13   Q.  Did you tell the doctor that?

14   A.  Yes.

15   Q.  It says here:  Secondary to accidental falling.  The knee

16   fracture that you had, how did you sustain that?

17   A.  I fell.

18   Q.  And when did you have that knee surgery, approximately?

19   A.  1996.

20   Q.  That was many years before you went to Dr. Mirilishvili,

21   right?

22   A.  Yes.

23   Q.  When did you have the carpal tunnel surgery in your hands?

24   A.  I don't remember.

25   Q.  Was it before or after the surgery for your knee fracture?

1   A.  After.

2   Q.  And the injection that you had in your spine, that was just

3   a couple of months before you saw Dr. Mirilishvili for the

4   first time?

5   A.  Yes.

6           MR. MAZUREK:  If we could turn to the next page of

7   that exhibit.  If we can expand the portion of the page right

8   under allergy on the top third.

9   Q.  I am going to direct you to the last line that's been

10  expanded on your page, on your screen.  It says:  PSH.  Do you

11  see that it's the last line?

12  A.  Yes.

13  Q.  It starts PSH and it has the letters S/P.  It says:

14  Cholecystectomy.  You see that?

15  A.  Yes.

16  Q.  Prior to going to Dr. Mirilishvili, had you had your gall

17  bladder removed?

18  A.  Yes.

19  Q.  Did you tell the doctor that?

20  A.  Yes.

21  Q.  Prior to the time that you went to Dr. Mirilishvili, did

22  you have a tubal ligation?

23  A.  Yes.

24  Q.  Did you tell Dr. Mirilishvili that?

25  A.  Yes.

1   Q.  And then it says:  S/P left media nerve entrapment release.

2   Prior to the time that you went to Dr. Mirilishvili, I think

3   you testified you had nerve repair in one of your hands.  Is it

4   your left hand?

5   A.  Yes, my left hand.

6   Q.  You told that to Dr. Mirilishvili?

7   A.  Yes.

8   Q.  And you also had surgery putting screws in your right knee,

9   correct?

10   A.  Yes.

11   Q.  And you told Dr. Mirilishvili that?

12   A.  Yes.

13   Q.  It's sort of cut off on your screen, but you also had

14   spinal radio frequency ablation.  That was the nerve injection

15   at Lincoln Hospital, correct?

16   A.  Yes.

17   Q.  You told Dr. Mirilishvili that?

18   A.  Yes.

19   Q.  In that first visit were you prescribed medication?

20   A.  Yes.

21   Q.  Do you remember the kinds of medication you were

22   prescribed?

23   A.  Yes.

24   Q.  What was it?

25   A.  Oxycodone.

1    Q.  Was there additional medication with the oxycodone?

2    A.  Yes.  Elavil, Celebrex, and one for your heartburn.  I

3    don't remember the name of that one.

4    Q.  Was there also something called Neurontin?  Do you remember

5    that?

6    A.  Yes.

7    Q.  When the doctor prescribed this medication at the time,

8    back in 2012, did he explain the reasons he is prescribing all

9    the different medications?

10   A.  Yes.

11   Q.  You filled all of the medications after you left the

12   doctor's office?

13   A.  Yes.

14   Q.  Everything that he prescribed by prescription?

15   A.  Yes.

16   Q.  Did the doctor talk to you about potential side effects of

17   the medication?

18   A.  Yes.

19          MR. MAZUREK:  If we could turn now to the next page of

20   this exhibit at DM19540, which is the controlled substances

21   pain management agreement.

22   Q.  You see this on your screen, Ms. Torres?

23   A.  Yes.

24   Q.  Is this an agreement that you went over and initialed at

25   your first visit at the doctor's?

 1  A.  Yes.

 2  Q.  If we can turn to the next page.  Is that your signature?

 3  A.  Yes.

 4  Q.  And did you also get a referral by the doctor at your first

 5  patient visit?

 6  A.  I don't understand.

 7  Q.  If we could turn to page DM1554 in the same exhibit.  Do

 8  you remember getting this form?

 9  A.  Yes.

10  Q.  And this is a referral out for interventional pain

11  management and hydrotherapy, is that correct?

12  A.  Yes.

13  Q.  Did you use this referral at some point?

14  A.  No.

15  Q.  Why not?

16  A.  Because my insurance got cut off when I went there.  I

17  didn't even go there.

18  Q.  You didn't go.  This referral was for New York

19  Presbyterian, but you decided you didn't want to go back to the

20  hospital?

21  A.  I didn't go at all to that one.  Then he started therapy in

22  his office.

23  Q.  What kind of therapy did you start in his office?

24  A.  Physical therapy.

25  Q.  What pharmacy did you use for purposes of filling the

1    prescriptions?

2    A.   Friendly Pharmacy.

3    Q.   Why did you choose that pharmacy?

4    A.   That's my pharmacy where I always take all my

5    prescriptions.

6    Q.   Is that a local pharmacy to where you live?

7    A.   Yes.

8    Q.   Did the doctor direct you to that pharmacy or direct you to

9    any pharmacy?

10   A.   No.

11   Q.   Did you go to a follow-up visit with the doctor?

12   A.   Yes.

13   Q.   I think you said earlier that you went for approximately 15

14   months to the doctor?

15   A.   Yes.

16   Q.   Before you went to your follow-up visits, did you have to

17   be drug tested?

18   A.   Yes.

19   Q.   How did that work?  Tell us how you gave drug sample or

20   urine sample.

21   A.   I go inside and I tell him I am here for urine.  They give

22   me the cup.  I go to the bathroom, do urine, bring it back and

23   hand it to them.

24   Q.   Would you do that at the same time going to see the doctor

25   or at a different time?

1    A.  A different time.

2    Q.  Approximately when in relation --

3    A.  Two weeks before your appointment.

4    Q.  Now, the second visit you went to on January 11, 2013, do

5    you recall that visit?

6    A.  Yes.

7    Q.  In addition to just seeing the doctor, did you have any

8    tests performed during that visit?

9    A.  Yes.

10   Q.  What kind of tests?

11   A.  Needles he put all over my legs, my back, and there were

12   like electrical, some white thing.

13        MR. MAZUREK:  If we could turn now to document DM1524,

14   which is also in the same exhibit, Government Exhibit 224.  If

15   we could just expand the header, the top portion of the page,

16   including the date seen.

17   Q.  Do you see on your screen, Ms. Torres, on the far

18   right-hand column four lines down it says date, January 11,

19   2013.  Is that about when you saw him in January of that year?

20   A.  Yes.

21        MR. MAZUREK:  If we can now expand the projection down

22   through findings, midway down the page, if we can highlight

23   under the objective or under the findings section, the fourth

24   line.

25   Q.  Right above findings, you see where the line says, EMG

1  detects which muscle, nerve damages, and what levels.  You see

2  that?  It's right above the word findings.  Is that the kind of

3  test that you remember being done on that day, an EMG?

4  A.  Yes.

5  Q.  Who performed that particular test?

6  A.  The doctor, Egbuna.

7  Q.  Did he have anyone assist him?

8  A.  I don't remember his name.

9  Q.  A man, a woman?

10 A.  A man.

11 Q.  He assisted the doctor with a machine in putting the

12 needles in to test your nerves?

13 A.  Yes.

14 Q.  After that test did the doctor explain the results to you?

15 A.  The following visit.

16 Q.  At the following visit.  In addition to having that test

17 performed, did he also ask you questions about how you were

18 doing on the medication at that time?

19 A.  Yes.

20 Q.  How was your pain at that point?

21 A.  It was like -- it was a little relief, but not, you know,

22 that good.

23 Q.  Did you begin taking the medication?

24 A.  Yes.

25 Q.  When you returned for a third visit, by that point did the

1    doctor explain the findings of the electrical test and nerve

2    test that you had done?

3    A.   Yes.

4    Q.   The previous visit.  And did he continue to prescribe the

5    same medication?

6    A.   Well, he brung it up.  I was getting two times a day.  Then

7    he brung it up three times a day.

8    Q.   On a subsequent visit he increased the prescription from

9    two times a day oxycodone to three times?

10   A.   Yes.

11   Q.   Did you continue to take the medication?

12   A.   Yes.

13   Q.   You said that you also attended physical therapy, is that

14   right?

15   A.   Yes.

16   Q.   Did you attend physical therapy at Dr. Mirilishvili's

17   office?

18   A.   Yes.

19   Q.   Approximately how many times?

20   A.   Three to four.

21   Q.   Now, did you always pay for your medical visits with Metro

22   Plus Medicaid?

23   A.   Only one time I paid cash.

24   Q.   You paid with Medicaid --

25   A.   At all times.

1    Q.  Except for one time.  Why did you pay cash for that one

2    time?

3    A.  Because they had cut off my insurance.

4    Q.  Why was that?

5    A.  Because of too much income coming in the house.

6    Q.  Were you able later to reapply and get new insurance?

7    A.  Yes.

8    Q.  That was Metro Plus?

9    A.  Yes.

10   Q.  After you were reinstated with the insurance, were you able

11   to continue to pay Dr. Mirilishvili's visits by insurance?

12   A.  Yes.

13   Q.  When you stopped going to Dr. Mirilishvili, when was that,

14   approximately?

15   A.  The last visit was March of '14.

16   Q.  Was there a reason that you stopped going?

17   A.  Because it started to affect my stomach really bad, and

18   sometimes when I would go there there is like too many patients

19   and he couldn't see me that day, so come back the next day.

20   Then I just got tired of going.

21   Q.  Then you started going seeing a different doctor?

22   A.  I went back to Lincoln for physical therapy.

23   Q.  You continue to take the pain medication today?

24   A.  No.  Now I'm on a different one.

25   Q.  Different pain medication?

1    A.   Yes.

2    Q.   And each time that you saw Dr. Mirilishvili, did he perform

3    an examination, questions, and check on how you were doing with

4    the medication?

5    A.   Yes.

6    Q.   That was true throughout for 15 months going to see him?

7    A.   Yes.

8              MR. MAZUREK:   I have nothing further, your Honor.

9    CROSS-EXAMINATION

10   BY MR. DISKANT:

11   Q.   Good afternoon, Ms. Torres.

12   A.   Good afternoon.

13   Q.   I just want to ask you a couple quick questions about the

14   chronology of events.  You said your accident was in 1996?

15   A.   Yes.

16   Q.   And you then got a referral from your doctor at Lincoln in

17   October of 2012, is that right?

18   A.   Not at Lincoln.

19   Q.   The doctor that you were seeing, your primary care doctor?

20   A.   Yes.

21   Q.   That referral was in October of 2012?

22   A.   Yes.

23   Q.   I want to focus on that time period there between 1996 and

24   2012.  Were you given any pain medication during that time?

25   A.   Yes.

1   Q.  Were you ever given oxycodone before?

2   A.  No.

3   Q.  When was the first time you got oxycodone?

4   A.  When I went to the doctor.

5   Q.  Dr. Mirilishvili?

6   A.  Yes.

7   Q.  You testified on direct examination that there were some

8   times when you didn't have insurance and you had to pay cash?

9   A.  Yes.

10  Q.  You said that happened just once?

11  A.  That I recall, just once.

12  Q.  Is it possible it happened more than once?

13  A.  Possible it may be way to get my insurance back, but I

14  don't remember.

15  Q.  You testified that one of the things that you are required

16  to do is to drop off a urine sample?

17  A.  Yes.

18  Q.  Did the doctor ever discuss the results of the urine sample

19  with you?

20  A.  No.

21       MR. DISKANT:  Ms. Joynes, if we can bring up

22  Government Exhibit 224, page 91.

23  Q.  Ms. Torres, you see where it says under the comments

24  section, test result is higher than the concentrations

25  typically observed for this drug in pain management population.

1    You see that?

2    A.  No.

3    Q.  Hold on.  First question is, do you see it on your screen?

4    A.  Yes.

5    Q.  Did the doctor ever discuss that issue with you?

6    A.  No.

7    Q.  See below it where it says a follow-up test should be

8    conducted after further assessment and counseling.  Do you see

9    that?

10   A.  No.

11   Q.  The question first is, do you see it?  You see it on your

12   screen there?

13   A.  Yeah.  The one that's highlighted.

14   Q.  Did the doctor ever talk with you about doing follow-up

15   testing?

16   A.  No.

17   Q.  You mentioned on direct examination that the reason you

18   stopped going to see Dr. Mirilishvili was because the office

19   was too crowded?

20   A.  Yeah.

21   Q.  Can you describe --

22   A.  And pain it started causing me in my stomach.

23   Q.  Let's go through those one by one.  Did you discuss the

24   pain in your stomach with the doctor?

25   A.  No.

1    Q.  Why not?

2    A.  Because I thought he was going to take them away from me

3    then.

4    Q.  Take the oxycodone away from you?

5    A.  Yes.

6    Q.  Let's talk about the crowds.  Tell us what you saw on a

7    day-to-day basis.

8    A.  Not all the time, but like if he was too packed, they would

9    tell me like, come tomorrow.  He can't see you.  The computer

10   went down.  It's like crowded.

11   Q.  That was a hassle for you?

12   A.  Yes.  I have to travel coming back an forth.

13          MR. DISKANT:  Nothing more.  Thanks.

14          MR. MAZUREK:  Very briefly, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. MAZUREK:

17   Q.  Ms. Torres, you said that sometimes someone would say they

18   can't see you today, come back tomorrow.  Who was that?  Do you

19   remember?

20   A.  I don't know him by name, but it was the tall, dark-skinned

21   guy.

22   Q.  But it wasn't the doctor?

23   A.  No.  He never seen me unless he called me in for a visit.

24          MR. MAZUREK:  I have nothing further.

25          THE COURT:  Anything else?

1      MR. DISKANT:  Not from the government, your Honor.

2      THE COURT:  Ma'am, thank you very much for coming

3  down.  We really appreciate it.  You are free to go.

4      (Witness excused)

5      THE COURT:  Call your next witness.

6      MR. MAZUREK:  The defense calls Chris Dillon.

7  CHRISTOPHER DILLON,

8      called as a witness by the Defendant,

9      having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. MAZUREK:

12  Q.  Good afternoon, Mr. Dillon.  Can you tell the jury where

13  you are employed?

14  A.  I'm currently employed at a company called Meridian

15  Bioscience.

16  Q.  What kind of company is that?

17  A.  They are a life science company that manufactures and sells

18  diagnostic tests for infectious disease.

19  Q.  What do you do for them?

20  A.  I'm the northeast regional sales manager.

21  Q.  Where were you employed in or around the time of the late

22  summer to fall of 2014?

23  A.  I was employed at AFTS Laboratories.

24  Q.  What did you do there?

25  A.  During that time I was the New York metro salesperson, but

1    I subsequently became the northeast manager prior to leaving.

2    Q.   What was AFTS Laboratories?

3    A.   They were a toxicology laboratory, specializing in what we

4    call medication monitoring.

5    Q.   Did they do urine drug tests?

6    A.   That's correct.

7    Q.   What were your duties as a sales representative at the

8    time?

9    A.   My duties were to seek out business opportunities, medical

10   practices, hospital clinics, anyone who would have need of the

11   testing service.

12   Q.   During the time period, late summer of 2014, were you asked

13   to contact a medical office and a doctor by the name of

14   Dr. Mirilishvili?

15   A.   Yes.

16   Q.   Tell us how that happened.

17   A.   The doctor had -- it was my understanding that the doctor

18   had seen the name of our lab listed in a preferred vendor

19   section of the Practice Fusion website.

20   Q.   Were you put in contact with him?

21   A.   Yeah.  He called the laboratory and then as the New York

22   person I was given the information and then I call the doctor's

23   office and set up an appointment.

24   Q.   At that time AFTS, what kind of laboratory was it?  Was it

25   a national lab, regional lab?

1  A.  By that time it was a national company.  AFTS Labs had been

2  bought by a company that later became known as Cordant Health.

3  We were the New York laboratory, but they had laboratories in

4  Colorado, Massachusetts, scattered around.

5  Q.  Did you eventually have a meeting with Dr. Mirilishvili

6  about AFTS services?

7  A.  I did.

8  Q.  Approximately when was that?

9  A.  Approximately the late summer of 2014, I believe.

10  Q.  Where did you have that meeting?

11  A.  At the doctor's office.

12  Q.  Can you describe the office?

13  A.  Yeah.  It was a first floor.  I don't want to say

14  storefront, but first floor office in an apartment building up

15  on East 162nd Street.

16  Q.  When you got to the office, did you notice any office

17  staff?

18  A.  Yes.  There was a gentleman that I had spoken to initially,

19  I believe his name is Damon, but then I met with the doctor.

20  Q.  Without getting into the details of that conversation, did

21  Dr. Mirilishvili end up retaining the services of AFTS Labs?

22  A.  Yes, he did.

23  Q.  What kind of services did AFTS begin to provide?

24  A.  The doctor would collect urine samples from his patients

25  and then he would test those samples for the presence of

1   particular medications.

2   Q.  What kind of medications in particular?

3   A.  In this particular instance it was opiates.

4   Q.  Can you tell us a little bit about how the account was set

5   up?

6   A.  Well, in most instances I meet with the doctor and I sell

7   him on our services in terms of the pickup and the report, how

8   the doctor receives his reports and so on.  One of the things

9   that we did was, we did customized test menus.  So he didn't

10  have to test for everything.  He could just test for something

11  specific if that's what he was interested in.  So having had

12  that conversation, he told me what he wanted to test for.  So I

13  submitted the form accordingly.

14  Q.  Did the issue of how the drug test would be paid for come

15  up?

16  A.  It came up only insofar as there is -- in my experience,

17  there were two types of -- forms of payment.  There is what

18  they called the third party, where the patient's insurance

19  would pay for the tests, and there were instances where the

20  patient would be considered a self-pay, either not choosing to

21  use their insurance or not having insurance.  They would pay

22  for the test directly.

23  Q.  Do you know whether for this particular account there were

24  both submissions by insurance companies and self-pays?

25  A.  Yeah, I believe so, yes.

1   Q.  How were the lab reports transmitted to Dr. Mirilishvili's

2   offices?

3   A.  Initially, when I set the doctor up, I set him up so he

4   would have access to our secure portal so that when patient's

5   reports were generated or when they were ready, the doctor

6   could log in and then view the reports of his patients.

7   Q.  You said initially.  Did that eventually change?

8   A.  Yes.  Subsequently we built what we call an interface,

9   business where our laboratory computer system speaks directly

10  to his electronic medical records.  So, therefore, the results

11  would drop right into that.

12  Q.  So that the report would go directly from the AFTS lab into

13  the Practice Fusion account for Dr. Mirilishvili?

14  A.  That's correct.

15  Q.  Before that you talked about a secured portal.  Can you

16  describe a little bit about what that means?

17  A.  It is a website that is connected to our lab information

18  system.  And so much of what happens in the lab is automated

19  from an information standpoint.  So once the toxicologist

20  reviews the report to check for quality, it gets put into our

21  portal, and it resides there where the doctor has the

22  opportunity to look at the report.

23  Q.  How would the doctor access that portal?

24  A.  Through a secure password, user name and password.

25  Q.  Once the account was set up, were there any particular

1    problems or issues that came up along the way that you recall?

2    A.  I mean, nothing out of the ordinary.  I mean, from time to

3    time the doctor would ask to speak to the toxicologist to get

4    an interpretation of a particular report.  Perhaps the office

5    might call and say, we are not going to be --

6          MR. DISKANT:  Your Honor, I am going to object to all

7    of this on lack of foundation.

8          THE COURT:  I'm so sorry.  Would you please read back

9    the question.

10          (Record read)

11          THE COURT:  I think that the question asks for a

12    foundation to be laid.  Go ahead and answer it.

13    Q.  As the sales rep, what were your responsibilities once the

14    account was set up?

15    A.  Once the account was set up, my responsibilities were just

16    in terms of customer service, that I would either ensure that

17    supplies were delivered, requisition forms and bags, the

18    samples, the cups, where the samples were put in the urine

19    cups.  And if the doctor needed to speak to the toxicologist he

20    may occasionally call me and say, have the toxicologist call

21    me.  And then I would relay that message.

22    Q.  During your time of supporting Dr. Mirilishvili's account,

23    do you recall of any specific problems or issues that had come

24    up during the time the account was opened?

25    A.  Beyond what I just described, no.

1    Q.  Were there any times when you needed to get in touch with

2    the toxicologist at the lab on behalf of the doctor?

3    A.  Well, as I said, I relayed the message that the doctor

4    wished to speak to the toxicologist, so in that sense, yes.

5              MR. MAZUREK:  If we could put on the screen what has

6    been already been admitted into evidence as GX209 and

7    specifically go to page labeled DM561.

8    Q.  Do you see this lab report on the screen?

9    A.  I do.

10   Q.  In your experience as customs service rep for AFTS, does

11   that appear to be a AFTS lab report?

12   A.  It does.

13   Q.  There seems to be a whole number of logos on the top of the

14   screen?

15             MR. MAZUREK:  If we could expand those.

16   Q.  On one of those logos it says:  AFTS labs, correct?

17   A.  Yes.

18   Q.  Can you just explain why there are four other different

19   logos on the screen.

20   A.  Well, as I indicated earlier, when I originally worked out

21   of this field, my job was with AFTS Laboratories, and they were

22   subsequently bought by a company called Sterling.  And they

23   together bought other laboratories in this business throughout

24   the country, and then consolidated after this time to become

25   Cordant Health Solutions.  It's all the same people.  They sort

 1    of put it all together and made one company out of it.

 2            MR. MAZUREK:  If we could just expand that section,

 3    the top part, specimen information.

 4    Q.  This report was for a collection dated October 21, 2014, is

 5    that correct?

 6    A.  Yes.  According to the report.

 7            MR. MAZUREK:  We can put that down and now put on the

 8    screen what's been already admitted into evidence as GX202 at

 9    DM73 and highlight the top half of the page.

10    Q.  This also has an AFTS Labs logo.  It's for a collection

11    date of September 11, 2014, but it looks different.  Is this

12    also an AFTS lab report?

13    A.  Yeah.  From what I remember of it, prior to the

14    consolidation of the companies, we had changed the look of our

15    reports along the way.  What specific date, I don't remember.

16    But when I started working for AFTS, that's what the lab

17    reports looked like, but they subsequently included the banner

18    with the other labs.

19            MR. MAZUREK:  If we can go back to the full page of

20    this exhibit, and highlight the testing section.  Or expand the

21    testing section.

22    Q.  Here you see on the left-hand column a series of opiates,

23    is that right?

24    A.  Yes.  Um-hum.

25    Q.  And this is the customized drug screening set of types of

1   drugs that AFTS tested on behalf of the doctor?

2   A.  I would assume that this represents the panel that the

3   doctor chose to test for, yes.

4   Q.  And were you the customer services rep throughout the time

5   that the account was opened?

6   A.  I was made the northeast regional manager in January of

7   2015.  I don't remember exactly when we stopped doing business

8   with the doctor, but probably for most of the time.

9   Q.  And during that entire time period the account you managed

10  and there were no additional problems that caused AFTS to

11  terminate?

12  A.  None that I'm aware of.

13          MR. DISKANT:  Objection.

14          THE COURT:  I'm sorry.  The objection is sustained.

15  Q.  During the time that you managed this account the account

16  remained open?

17  A.  As far as I know, yes.

18          MR. MAZUREK:  Nothing further, your Honor.

19          THE COURT:  Thank you.  You may inquire.

20          MR. DISKANT:  Thank you, your Honor.

21  CROSS-EXAMINATION

22  BY MR. DISKANT:

23  Q.  Good afternoon.

24  A.  Good afternoon.

25  Q.  You testified about meeting with the defendant to set up

1    his account?

2    A.  Yes.

3    Q.  Do you remember when that was?

4    A.  As I indicated earlier, I believe, my memory is somewhere

5    like late summer of 2014.

6    Q.  Did you go back after that to visit with the defendant?

7    A.  Yes.

8    Q.  How many times?

9    A.  I would guess maybe half a dozen times after that.

10   Q.  You testified on direct examination that you came and you

11   met with an employee and they would set you up with a doctor,

12   right?

13   A.  Um-hum.

14   Q.  The first thing that happened is you went through the

15   security guard at the front door, right?

16   A.  Yeah.  I don't recall that on every occasion, but I believe

17   there were one or two instances where there was someone at the

18   door.

19   Q.  A security guard, correct?

20   A.  Yes.

21   Q.  And once you went inside, going to that initial visit where

22   you set it up, you testified on direct examination that the

23   doctor only wanted to test for certain types of things, right?

24   A.  Yes.

25   Q.  In fact, the doctor only wanted to test for opiates,

1    correct?

2    A.   I believe so, yes.

3    Q.   So the doctor did not want to test for other forms of

4    illicit substances, correct?

5    A.   Yes.

6    Q.   You mentioned that you are now the northeast regional

7    manager for AFTS Labs?

8    A.   I am no longer that.

9    Q.   You were?

10   A.   Yes.

11   Q.   In your capacity did you have a sense of roughly how many

12   pain management practitioners AFTS catered to in the northeast?

13   A.   Well, the company had hundreds of customers, so we were

14   involved with all the major practices, outpatient clinics with

15   the hospitals and so on.  We dealt with a number of different

16   practices.

17   Q.   How many of them were you personally involved in setting

18   up?

19   A.   From the time I started with the company to the time I

20   became a manager, probably 35, 40 customers.

21   Q.   And were you aware of other customers who were only testing

22   for opiates?

23   A.   I don't recall a specific example.

24   Q.   You mentioned on direct examination that the doctor's

25   patients had two common ways of payments, one being self-pay

1   and the other being insurance.  What percentage of his patients

2   were self-pay?

3   A.  I can't answer that with any specificity.

4   Q.  Do you remember meeting with Mr. Mazurek or speaking with

5   Mr. Mazurek in preparation for your testimony?

6   A.  I do.

7   Q.  Do you remember discussing this issue with him?

8   A.  Somewhat, yes.

9   Q.  And do you remember indicating that about two-thirds of the

10  patients were self-pay patients?

11  A.  That's possible.

12  Q.  Is there something that might refresh your recollection?

13  A.  Sure.  Am I looking at the numbers in the middle of the

14  page?

15  Q.  Yes.  Does that refresh your recollection?

16  A.  Yes.

17  Q.  Fair to say that roughly two-thirds of the patients were

18  self-pay?

19  A.  Yes.

20          MR. DISKANT:  Nothing further.  Thank you.

21          THE COURT:  Anything else?

22          MR. MAZUREK:  Very briefly.

23  REDIRECT EXAMINATION

24  BY MR. MAZUREK:

25  Q.  Mr. Dillon, you were asked questions about the security at

1   the office?

2   A.   Um-hum.

3   Q.   When you visited the office, did it appear to be a medical

4   office?

5           MR. DISKANT:  Objection.

6           THE COURT:  I'm sorry.  The objection.  Grounds?

7           MR. DISKANT:  Lack of foundation for the question.

8   Appeared to be a medical office.

9           THE COURT:  The objection is sustained.

10  Q.   When you went to the office can you describe what the

11  office looked like?

12  A.   Yes.  It was -- as I said, it was around a corner on East

13  162nd Street on the first floor.  There was sort of glass, sort

14  of storefront looking glass.  I believe there was a ramp on one

15  portion leading to the door and there were steps on another

16  portion.  There was a call box so that you could get buzzed

17  into the practice.

18  Q.   And inside, once you got through the door?

19  A.   Inside there was a waiting room.  As you walked in, the

20  waiting area was primarily the right side of that large area.

21  The doctor's office was somewhere behind that.  And then were a

22  few examination rooms behind that and then there was a bathroom

23  around the corner.  Greeter desk would be to the left.  The

24  office desk.  Forgive me.

25  Q.   The number of times that you were there, what was it like

 1    inside in terms of the number of people?

 2    A.   It really depended.   There were times where I would be

 3    dropping off supplies before hours, office hours, or at the end

 4    of the day, so there was nobody there.   On one on or two

 5    occasions I went during office hours and there were many people

 6    there.

 7    Q.   As part of your job at AFTS, were you often visiting

 8    medical offices?

 9    A.   Yes.   That's primarily what I do.

10    Q.   In New York City?

11    A.   Um-hum.

12    Q.   Was this medical office any different from other offices

13    that you had visited?

14    A.   No.

15             MR. MAZUREK:   Nothing further.

16             MR. DISKANT:   Just briefly.

17    RECROSS EXAMINATION

18    BY MR. DISKANT:

19    Q.   Mr. Dillon, how many other offices were you escorted in by

20    the armed guard?

21             MR. MAZUREK:   Objection to the characterization of

22    armed.

23             THE COURT:   The objection is sustained.

24    Q.   How many other instances were you escorted in by the guard?

25    A.   In my entire life in medical sales in New York City?

1  Q.  Let focus on New York City and let's focus on your time

2  period as regional sales manager, for example.

3  A.  As regional sales manager, I did not have an experience

4  like that.  But just sort of generally speaking, in my

5  experiences as a medical salesperson in New York City, it

6  was -- I encountered offices that had security people.

7          MR. DISKANT:  Thank you.

8          THE COURT:  Anything else?

9          MR. MAZUREK:  No.

10         THE COURT:  Thank you, sir very much.  You may step

11 down.

12         (Witness excused)

13         THE COURT:  Call your next witness.

14         MR. MAZUREK:  Your Honor, the defense calls Dr. Carol

15 Warfield.

16         THE COURT:  Can I see counsel for one minute.

17         (Continued on next page)

18

19

20

21

22

23

24

25

G3EMMIR5                    Dillon

1              (At the side bar)

2              MR. MAZUREK:  Are you going to warn me?

3              THE COURT:  I want to put on the record my statement

4    that I have every expectation that you have told this witness

5    what the rules are.

6              MR. MAZUREK:  Yes, I have.

7              THE COURT:  I have no intention of saying anything to

8    her until she transgresses.

9              MR. MAZUREK:  Why are you so afraid?

10             THE COURT:  I am just putting it on the record.  I'll

11   treat her exactly the way I treated the other --

12             MR. MAZUREK:  Yes, your Honor.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

G3EMWAR5                    Warfield - direct

1           (In open court)

2     CAROL WARFIELD,

3           called as a witness by the Defendant,

4           having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MR. MAZUREK:

7     Q.   Good afternoon Dr. Warfield.

8     A.   Good afternoon.

9     Q.   You're a medical doctor?

10    A.   Yes.

11    Q.   Can you tell us a little bit about your credentials as a

12    medical doctor?

13    A.   Right now I'm an endowed professor at Harvard Medical

14    School.  I'm a pain management specialist.  And I've been at

15    Harvard for almost 40 years.  I ran the pain management center

16    there for about 20 years.

17    Q.   Let's start with your educational background.  Can you tell

18    us what that is?

19    A.   Sure.  I received a bachelor of science in mechanical

20    engineering degree at Tufts University in Boston and a bachelor

21    of arts in mathematics at Tufts University in Boston and then

22    went on to Tufts Medical School.  And after I graduated from

23    Tufts Medical School I did a year internship in medicine and

24    surgery at Newton-Wellesley Hospital outside of Boston.

25    Q.   Can you slow down.

1    THE COURT:  This poor man.

2    THE WITNESS:  Even for New York I know I talk too

3    fast.

4    A.   In any case, after my internship in medicine and surgery I

5    then went to Massachusetts General Hospital as a resident in

6    anesthesiology.  And I completed a residency there and at the

7    Beth Israel Hospital in Boston, which are both part of the

8    Harvard Medical School, residency in anesthesiology.  I then

9    did a follow-up ship at Harvard which encompassed pain

10   management and a few other aspects of medicine.  And I started

11   the pain management center at Harvard at Beth Israel Hospital

12   in 1980, and I have essentially been there ever since.

13   Q.   Have you ever been a clinician actually seeing patients?

14   A.   Yes.  I've seen patients all throughout my career.  I

15   stopped seeing patients two years ago and right now I'm writing

16   a third edition of one of my textbooks and I'm still a

17   professor at Harvard.  I'm doing a lot of teaching nationally

18   and internationally at the medical school, but I saw patients

19   from 1976 until two years ago.

20   Q.   And in what capacity?  For pain management?

21   A.   Well, I started out seeing patients as an anesthesiologist.

22   As I mentioned, in 1980, I started the pain management center

23   there.  At first it was a very new field and I started doing it

24   one or two days a week, then three days a week, then four.  And

25   then by the late 1980s, I was doing pain management full time.

1    Q.  You said you also had teaching responsibilities.  What are

2    those?

3    A.  Yes.  I teach the residents and medical students and pain

4    fellows at Harvard.  I also do a lot of teaching nationally and

5    internationally, and I'm invited to teach at other medical

6    schools and conferences and such.  I do quite a lot of teaching

7    now.

8    Q.  Are you also board certified?

9    A.  Yes.  I'm board certified in anesthesiology and in pain

10   medicine.

11   Q.  What does it mean to be board certified?

12   A.  Board certified means you need to do a certain amount of

13   education, certain number of years of residency, and then you

14   need to sit for an examination in the case of anesthesiology.

15   That's a written examination and then subsequently an oral

16   examination.  And the pain medicine boards are written boards

17   you need to pass the test.

18   Q.  And have you published articles for textbooks in the field

19   of pain management?

20   A.  Yes.  I published hundreds of articles in the field of pain

21   medicine, and I've published a number of textbooks, one of

22   which I understand is the most popular textbook for teaching

23   pain fellows across the country.  That's the one I'm doing the

24   third edition of right now.  It's called Principles and

25   Practice of Pain Medicine.  But I also wrote a number of other

1    textbooks about pain medicine, pain management.

2    Q.  Have you ever provided prior testimony in court relating to

3    the subject of pain management?

4    A.  Yes, I have.

5    Q.  Approximately how many times?

6    A.  I would say probably maybe 15, 17 times over the last 35

7    years.

8    Q.  And have any of those been criminal cases?

9    A.  Yes.

10   Q.  Have you also testified in civil cases?

11   A.  Yes.

12   Q.  And have you ever testified for the government?

13   A.  Yes.

14   Q.  When?

15           MR. MAZUREK:  Your Honor, at this time I am going to

16   offer Dr. Warfield as a, quote, designated opinion witness.

17           THE COURT:  You are the first person that has ever

18   done it.  Thank you so much.  We will accept Dr. Warfield as an

19   expert in the field of pain management medicine.  Feel free to

20   continue.  You all know what that means.  I'll tell you again

21   tomorrow.

22           MR. MAZUREK:  Thank you, your Honor.

23   Q.  As an expert witness, Dr. Warfield, you charge for your

24   services, is that correct?

25   A.  Correct.

1   Q.  You have done that again in this case, correct?

2   A.  Correct.

3   Q.  Approximately how much do you charge?

4   A.  I charge $500 an hour to review records and such and $750

5   an hour to come away from my practice for testimony or trial.

6   Q.  And have you been asked to review outside of court before

7   your testimony today a number of records in this case?

8   A.  Yes.

9   Q.  Approximately how many?

10  A.  I believe I reviewed 24 medical records.

11  Q.  About how many hours of work have you put in in that

12  review?

13  A.  A little over 20, I believe.

14  Q.  And also, in addition to those hours, have you spent time

15  with me to tell me your findings and explain your results to

16  me?

17  A.  Yes.  I've included that in a little over 20 hours.

18  Q.  Also, have we met in order to talk about your testimony

19  here today?

20  A.  Yes.

21  Q.  I am going to ask you some general questions about pain

22  management.  If we could start with you telling the jury, what

23  is chronic pain?

24  A.  Chronic pain, there are lots of different definitions for

25  chronic pain but essentially means pain that outlasts the

G3EMMIR5                      Warfield - direct

1  amount of time it's supposed to.  If you break a leg, for

2  example, we expect you to have pain for maybe a few months.

3  But if you have pain for a lot longer than that, then we call

4  it chronic pain.  Some people call it chronic pain if you have

5  pain for more than six months, any kind of pain.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G3F7MIR6                      Warfield - direct

1  BY MR. MAZUREK:

2  Q.  And does this differ from acute or cancer pain?

3  A.  Yes, acute pain is pain that you have immediately after an

4  injury or surgery.  So right after you have surgery, are you in

5  a hospital, or maybe for a few weeks afterwards that's acute

6  pain.  Or if you break your leg, that's acute pain; you have

7  pain for several weeks or maybe a few months after.  But that's

8  acute pain.

9        And cancer pain is different also.  Cancer pain is

10  pain related to cancer.  The tumor itself causes pain.

11  Q.  And in your practice as a pain management physician, what

12  type of pain does a pain management physician generally treat?

13  A.  All types of pain.

14  Q.  And for chronic pain, what are the typical types of sources

15  of chronic pain?

16  A.  Well, the most common type of chronic pain that we see in a

17  pain clinic is low back pain, because four out of five of you

18  sitting there today will have chronic back pain at some point,

19  it's that common.  So that's probably the most common type of

20  pain we see.

21        But we also see people with arthritis, and with joint

22  pain after injuries, and motor vehicle accidents with injuries,

23  and all sorts of types of pain.

24  Q.  What are some of the tools available to pain management

25  physicians?

G3E7MAR6                    Warfield - direct

1  A.  Well, there are medications, and there are a variety of

2  different types of medications that we use to treat pain, which

3  are pretty much the mainstay of pain treatment.

4        But there are also other treatments.  There are nerve

5  blocks.  There is Cortisone injections.  There are things like

6  acupuncture.  There are types of stimulation that are done with

7  electricity.  There are surgical techniques.  There are things

8  like physical therapy.  So a variety of different treatments.

9  Q.  Is medicine one of those treatments?

10 A.  Yes.

11 Q.  And are opioids used for chronic long-term pain management?

12 A.  Yes, definitely.

13 Q.  What are opioids?

14 A.  Opioids are medications that are similar to morphine.  They

15 are the best painkillers we have.  They have been around for

16 about 4,000 years.  And in my experience over the last 40 years

17 there have been lots of other drugs that have been introduced

18 that are supposed to be goods painkillers, but nothing is as

19 good as this class of medicines, the morphine class or the

20 opiate class of medicines.  They are the best pain relievers we

21 have.

22 Q.  And within that class of medicines, what are some of the

23 names of the medicines within that class?

24 A.  Well, there are medicines like codeine, medicines like

25 hydrocodone or Vicodin, medicines like Percocet or oxycodone.

1    And then there are medicines like morphine and methadone and

2    Fentanyl, Dilaudid.  Lots of different types of opioid pain

3    medicines.

4    Q.  And in your experience, how common is the use of opioid

5    treatment for long-term pain?

6    A.  It's quite common.

7    Q.  And has that practice of using opioids for chronic pain,

8    has that changed over the years?

9    A.  It's definitely changed over the years.  When I was

10   training back in the 1970s people used these medicines mainly

11   for cancer patients or for patients who just had surgery.

12          Then in the early 1990s the pain field got together

13   and decided, you know, that we have these medicines that we

14   know are the best painkillers we have, and why are we denying

15   patients who are suffering from pain these medications.  There

16   was a big, big push in the '90s to treat chronic pain problems

17   with these opioid medicines, and it became more and more common

18   for patients to be put on these medicines not just for a

19   fracture or a surgery or for terminal illness but for long-term

20   chronic pain, so it became very, very common and very

21   acceptable to use these medicines.

22   Q.  And is that still the case during the period relevant in

23   this time period for the indictment, 2012 to 2013?

24   A.  Yes, no question.

25   Q.  Is there an issue today in the medical community regarding

G3E7MAR6                    Warfield - direct

1    the undertreatment of pain?

2    A.  Oh, absolutely.  Pain is still very much under treated.

3    Q.  And is prescribing opioids for chronic pain, for long-term

4    chronic pain, is that within the usual course of medical

5    conduct for pain management physicians?

6    A.  Oh, absolutely, this is something that's very commonly done

7    for pain.

8    Q.  Are there pain management physicians who refuse to

9    prescribe opioids?

10   A.  Yes, there is a whole gamut of pain management physicians,

11   what they do with respect to opioids.  There are some who never

12   prescribe these drugs for their patients because they fear

13   governmental sanctions, or they just don't like them, or they

14   use other methods.  And there is a spectrum that goes all the

15   way up to physicians who use them very commonly for most of

16   their pain patients.

17          So, there are ways of treating pain, and there are

18   different medications and treatments you can use, and there are

19   different thoughts in the pain community about whether a doctor

20   will use these medications or not.  As I said, there are some

21   doctors who never use them, and then there are some doctors who

22   commonly use them, and it's all within the usual course of

23   medical practice.

24   Q.  And is prescribing oxycodone for long-term pain management,

25   is that within the usual course of pain management practice?

1    A.  Absolutely.

2    Q.  And within the spectrum of opioid treatments ranging from

3    weak, moderate to strong, where does oxycodone fit?

4    A.  It fits in the middle.  Weak opioids are things like

5    codeine and Vicodin, hydrocodone.  The very strong ones with

6    things like morphine and Fentanyl and Dilaudid, methadone.  And

7    in the middle are drugs like oxycodone.

8    Q.  When is long-term opioid treatment appropriate for

9    patients?

10   A.  Long-term treatment is appropriate for patients who have

11   long-term pain.  Again, it's one of the treatments we have in

12   our toolbox to treat long-term pain, and, as I said, no

13   question it is the most effective treatment that we have, so

14   for patients who are suffering long-term pain it's an

15   appropriate treatment.

16   Q.  Are you familiar with the term first-line medication?

17   A.  Yes.

18   Q.  What does that mean?

19   A.  First-line medication generally means the first treatment

20   you would use, the first medicine you would use to treat a

21   disease or a problem like pain.

22   Q.  And can oxycodone be used as a first-line medication for

23   patients with pain?

24   A.  Oh, absolutely.  It depends on how bad the pain is.  So,

25   for instance, you know, if you had a hang nail, it's unlikely

1    your doctor is going to prescribe oxycodone as the first-line

2    treatment, but if you broke your leg, it's very commonly used

3    as a first-line treatment.  And if you had chronic pain that

4    was moderate to severe, it wouldn't be uncommon to use it as a

5    first-line treatment.

6         So, what you use as a first-line treatment depends

7    certainly on the severity of the pain, but where the pain is

8    and what is causing it and lots of different things.

9    Q.  And is there a certain length of treatment that the pain

10   management physicians would give to someone suffering from

11   chronic pain using oxycodone?

12   A.  It can be years and years.  I have seen patients on these

13   medications for many, many years.

14   Q.  And how does a pain management physician determine what

15   dosage to prescribe a patient?

16   A.  Well, the best way to determine dosage is to find out what

17   dosage the patient has been on in the past.  That's usually the

18   most common way we determine what dosage a patient needs.

19        If someone says this is what I was on in the past and

20   this is what helped me, and I didn't have any side effects on

21   that dose, then that's usually the dose that we choose.

22   Q.  In your review of the approximately 24 files of Dr.

23   Mirilishvili's patients, were you able to determine what

24   percentage of them indicated a prior opioid tolerance?

25   A.  By far most of them.

G3E7MAR6                    Warfield - direct

1    Q.  And the term opioid tolerance, what does that mean to you?

2    A.  That means that if I put any of you on some opioid for a

3    long enough period of time, your body would get used to having

4    the drug around, and you would eventually need more and more of

5    it to give you pain relief.  So, as you are on these medicines

6    for long periods of time you generally need a higher dose and

7    you tolerate a higher dose.  That means you don't have side

8    effects with a higher dose like someone who never took the drug

9    before might have.

10   Q.  In your professional experience, is long-term opioid

11   treatment something that should be applied only after other

12   means have been exhausted?

13   A.  Not necessarily.  Sometimes it's the first-line treatment

14   and the best treatment.  In other cases there may be other

15   quicker fixes, there may be other things that you can do.  But

16   generally by the time a patient comes to a pain management

17   doctor they've already tried those quicker fixes.  If there was

18   some quick fix for their pain, they wouldn't be at a pain

19   clinic, they would be going to their regular doctor and getting

20   it fixed.  I don't know if that answers your question.

21   Q.  Well, let me ask you about the factors that I guess a

22   practicing pain management physician would apply in determining

23   whether a patient is appropriate for long-term oxycodone

24   treatment.  What are those factors?

25   A.  Well, the location of the pain, the severity of the pain

certainly, how long they've had the pain, what the diagnosis

is, what they think is causing the pain, although in a pain

center we don't always -- we're not always able to come up with

a specific diagnosis.

So, you know, those sorts of things:  The location, I

mentioned the severity, the quality of the pain.  What helped

the patient in the past, that's a very important thing.  If

they say this helped me but this didn't help me, you're

generally not going to give them a treatment that they already

tried and it didn't help them.

Q.  Are there standards that pain physicians work under in

their performance as a pain doctor?

A.  Yes.

Q.  And what are those generally?

A.  Well, there are a number of guidelines that have been

developed by some of the pain societies, and there have been

guidelines developed by the Federation of State Medical Boards,

and basically these guidelines say that if the doctor chooses

to use opioids to treat pain in a patient, there are certain

things the doctor should probably do.

Q.  What are those?

A.  Those include things like the doctor needs to see the

patient and take a history, ask the patient questions about

their pain.  The doctor needs to do a physical examination.

The doctor needs to be willing to send the patient for

1    referrals if he or she feels it's appropriate.  The doctor

2    needs to be willing to do things like urine drug testing if the

3    doctor feels it's appropriate.  The doctor needs to keep

4    medical records, document what drugs they are giving to the

5    patient.  The doctor needs to see the patient in follow-up at

6    various intervals.

7           These guidelines are kept very, very loose and very

8    nonspecific.  They essentially say what I just mentioned.  They

9    don't say you have to do this physical examination, and you

10   have to do this particular maneuver in a physical examination.

11   They basically say you need to do an appropriate physical

12   examination.  And that means what that doctor at that

13   particular time with that patient feels is appropriate.

14          The same thing with the history and the same thing

15   with urine drug screening.  It doesn't even require that you do

16   urine drug screening.  It just basically says that you need to

17   be open to doing those sorts of things.

18   Q.  Are there any laws or regulations that you know that limit

19   a pain physician to a certain or specific pill count to limit

20   what they can prescribe to a pain patient?

21   A.  Absolutely not.  There are no regulations that say a pain

22   doctor can only give this particular dose or this many pills or

23   whatever.  Again these guidelines are left purposely

24   nonspecific, because there are situations where you might want

25   to give more, situations where you might want to give less.

1    It's a judgment call on the part of the physician.  So there

2    are no regulation whatsoever that say you need to give this

3    dose, this dose is too much, this dose is too little.

4    Q.  Are there any laws or regulations that limit the length of

5    time a pain physician can keep a patient on long-term oxycodone

6    treatment?

7    A.  Absolutely no laws or regulations limiting the amount of

8    time I doctor can keep a patient on these drugs.

9    Q.  Are there any laws or regulations that limit the dosages of

10   oxycodone that may be prescribed for pain management?

11   A.  Absolutely no.

12   Q.  And to follow up on that, what is the correct dosage to

13   prescribe to a patient?

14   A.  Well, the correct dosage, we always teach our residents and

15   fellows is the dosage that works, so you can continue to

16   increase the dosage until you get one where the patient says

17   this is helping me.

18        Now, you know, it's often a very similar dose for many

19   patients, but it really is the dose that works.  There is no

20   teaching saying, you know, this dose is the right dose and this

21   dose is too much, or you should never give this dose, or you

22   should give this dose.  You need to give whatever dose works.

23   Q.  And can low dosages actually hurt a patient?

24   A.  Well, again if someone's pain is undertreated, definitely

25   that can hurt a patient.  Undertreatment of pain can cause all

1    kinds of problems, I mean depending on where the pain is.

2          I mean, first of all, if your pain is undertreated,

3    your heart beats faster, you can get high blood pressure when

4    you are in pain, and these things can cause lots of problems to

5    your heart.  You can have heart attacks because of severe --

6    because your pulse being too fast and your blood pressure being

7    too high when you are in a lot of pain.

8          If someone's pain is causing -- for instance if you

9    have pain in your back and it hurts every time you take a deep

10   breath, then people tend not to take deep breaths, they take

11   very shallow breaths, and it's been well documented that when

12   that happens you can get things like pneumonias.

13         And if it hurts too much when you try and move around

14   or try to walk around, and so you stay in bed all the time

15   because you are in pain, you can get blood clots in your legs

16   and such.

17         So, aside from the horrible suffering that people have

18   to go through, there are lots of good reasons that being in

19   pain can hurt your body, so there are many good reasons not to

20   undertreat pain and to give the right dose that will take the

21   pain away.

22   Q.  Now, for oxycodone, how would you rate, if you can, from

23   low, moderate to high daily dosage of 90 milligrams?

24   A.  I would say that's a moderate dose.

25   Q.  In your experience as a clinician as someone who treated

G3F7MIR6                    Warfield - direct

 1   patients, have you used higher than that?

 2   A.  Absolutely, I have used much higher than that in some

 3   patients.  Some patients need higher doses, and you have to

 4   give them whatever dose helps.  I mean I had a patient on 1500

 5   milligrams of morphine an hour who had pain.  So you may need

 6   huge doses depending on the patient.

 7   Q.  Now, are you familiar with the terms opioid dependence and

 8   addiction?

 9   A.  Yes.

10   Q.  Can you define what those are and whether they are

11   different?

12   A.  Well, these are very confusing terms.  A lot of people

13   think that if you say someone is opioid dependent that means

14   they're an addict.  It doesn't.  Addiction and dependence are

15   two totally different things.  You can be addicted without

16   being dependent, you can be dependent without being addicted.

17           Dependence just means that if I gave any of you

18   morphine or oxycodone or any of these drugs for a long period

19   of time, for several months, for example, your body would get

20   dependent on having it around.  That means that if I suddenly

21   stopped it, you would go through a withdrawal phenomenon.  You

22   would get sweaty, your pulse would get racy, abdominal pain.

23   It's not a nice thing to go through.  So dependence just means

24   that your body is so used to having it around that if you stop

25   it, you will go through withdrawal.

1          Addiction, on the other hand, is a psychiatric

2   diagnosis, it's the insatiable craving for which a drug addict

3   will do anything to get the drug, take the drug, hoard the

4   drug.  It's a totally different thing.

5          Someone can be addicted after one dose of heroin.

6   That person is not dependent.  Their body is not used to having

7   heroin around.  But they are addicted, they're craving it.

8          On the other hand, you can have someone who has been

9   dependent.  We have had cancer patients, for example, who have

10  been on these drugs for months and months and months, and

11  they're sent into our pain clinic to get a nerve block to take

12  the pain away, and as soon as we take the pain away we say, you

13  know, now, Mrs. Smith, you can't stop the medicine; you will go

14  through withdrawal.  And she is so happy not to have the nausea

15  and sedation that it gives her, she stops it, and she goes

16  through withdrawel, she's not addicted but she is dependent.

17         So, you can be dependent without being addicted; you

18  can be addicted without being dependent; or you could be both.

19  But it's very confusing because a lot of people think that if

20  someone has opioid dependence that means that they're an

21  addict.  Not true at all.

22  Q.  I'm going to ask you first about the dependency side of it,

23  opioid dependence.

24         As part of your preparing for your testimony today

25  have you reviewed testimony in this case from Dr. Gharibo?

1    A.  Yes.

2    Q.  OK.  And he was talking about in his testimony short-acting

3    an long-acting opioids.  Do you remember that?

4    A.  Yes.

5    Q.  First, can you tell us the difference between the two.

6    A.  Well, the opioids that are used for short-acting and

7    long-acting preparations are essentially the same opioids.

8    It's just that most of the opioids that we have, the ones that

9    have been around for a long period of time, last about four

10   hours, the pain relief you get from them is about four hours.

11           Over the past 15, 20 years some of the drug companies

12   have come up with long-acting preparations of these drugs.  So,

13   what it is is the pill, it's the same medicine, but the pill is

14   in kind of a time release form, so that you take one pill and

15   rather than just lasting for four hours it can last for 12

16   hours, even 24 hours, because it's in a preparation that slowly

17   releases the same medicine again.

18           So, you have oxycodone which lasts four hours if you

19   give it, and have you Oxycontin, which is also oxycodone, but

20   it's in a preparation that releases it over a period of time,

21   so it's a long-acting preparation.

22   Q.  So let's start with the short-acting oxycodone.  If you are

23   taking it three times a day, that means it's in your

24   bloodstream for how long?

25   A.  Well, these drugs are in your bloodstream for several days,

1   so if you are taking it three times a day, the pain relieving

2   effects last four sometimes six hours depending on the patient

3   but the drug is actually in your system for a lot longer than

4   that.

5   Q.  Dr. Gharibo testified about the rollercoaster effect of

6   being on short-acting opioids that a patient if they're only on

7   short-acting oxycodone taken three times a day, that they would

8   go through withdrawal symptoms before they would be taking

9   their next day's supplement.  Do you agree with that?

10  A.  No, that's ridiculous, people don't go through withdrawal.

11  I mean it's not at all uncommon to give these medicines three

12  times a day because often times people don't need them while

13  they're asleep, so often times they will have one in the

14  morning, one in the afternoon, one in the evening.  That's not

15  at all uncommon.  You don't go through withdrawal until at

16  least -- depending on the drug -- at least 24 hours, if not

17  more, after you stop the medication.  You don't go through

18  withdrawal -- you know, take a four hour drug and go through

19  withdrawal at the fifth hour.  No, it doesn't happen.

20  Q.  Now, if a pain physician relies almost exclusively on

21  short-acting oxycodone for his patients, is he acting within

22  the usual course of pain management practice?

23  A.  Absolutely.  I think more physicians prescribe the

24  short-acting than the long-acting.  One of the reasons is that

25  the long-acting, because they are newer drugs, tend to be much

 1    more expensive, so they're not used as commonly.  So I would

 2    say more commonly not just pain doctors but internists and

 3    other doctors typically prescribe the shorter-acting drugs like

 4    Percocet and those types of things than the long-acting drug.

 5    Q.  Now I'm go to ask you about addiction, the other side, the

 6    psychiatric effects that might apply.  Are there any

 7    regulations or restrictions that keep pain physicians from

 8    prescribing oxycodone to people who have had a history of drug

 9    abuse?

10    A.  Absolutely no regulations that say you can't prescribe to

11    people who have a history of drug abuse.  Because people who

12    have a history of drug abuse have pain also, and you need to

13    treat that pain.

14              So, you know, you often take that information into

15    account when you decide what drug to give them, or you decide

16    how much you're going to give them, how long you're going to be

17    on it.  You monitor those patients.  But there is absolutely no

18    regulations that say you cannot prescribe to patients who have

19    a history of abuse.

20    Q.  And in your experience, have you prescribed for people who

21    have had substance abuse problems?

22    A.  Absolutely, yes.

23    Q.  Have you come across in your practice and experience

24    occasions where patients try to fool the pain doctor in order

25    to receive pain medication?

G3E7M1R6                        Warfield - direct

1   A.   I have certainly personally been fooled.  And I think just

2   about every doctor who prescribes these drugs gets fooled at

3   some time or another, because the patients who want these

4   drugs, to abuse them or to sell them, get really really good at

5   faking the symptoms.  And, as I said, I think many of us have

6   been fooled, most of us have been fooled at some time or

7   another.  The only way you can absolutely guarantee that you

8   are never going to be fooled is to never prescribe those drugs,

9   and if you do that, then there are a lot of people suffering

10  who don't get the pain relief.

11  Q.   What are your duties as a doctor to investigate patients

12  who come before you looking for pain relief?

13  A.   We don't ever do any sort of investigation in terms of -- I

14  mean if a patient comes to me and says, doctor, I hurt my leg,

15  I was in a car accident six years ago and broke my leg, I don't

16  call up the police station to see if they were really in a car

17  accident and really broke their leg.

18          I mean we don't do investigation.  The patient tells

19  me what happened to them, where their pain is, I believe the

20  patient.  It's a doctor/patient relationship.  It's a matter of

21  mutual trust that you believe the patient.

22          You know, occasionally I might get medical records,

23  but I would say very rarely do I get medical records.  It's

24  more common to do that to see what the MRI showed or something

25  like that, not to check up on the patient to see if they're

1   telling you the truth.

2   Q.  And if a physician were to conduct background or

3   behind-the-scenes investigation of a patient, could that

4   negatively affect the physician/patient relationship?

5   A.  Of course.  Of course.  Again there has to be a certain

6   amount of trust.  We always teach our residents and fellows

7   that if the patient says they're having pain, they're having

8   pain.  You don't investigate to try and see do they really have

9   it, do they really have that accident, do they really have

10  this.  If someone says I'm in severe pain, they're in severe

11  pain, and you treat them like that.

12  Q.  Are you familiar with the concept of pain management

13  doctors using informed consent agreements or narcotics

14  responsibility agreements with patients?

15  A.  Yes.

16  Q.  What are these?

17  A.  Well, there are agreements that the patient and the doctor

18  sign.  Not everybody uses them, and there is no requirement

19  that the doctor uses them.  But many doctors use these

20  agreements just so that both the doctor and the patient

21  understand what the plan is.

22          So those agreements generally say, all right, we're

23  going to use this medication, you have to understand that here

24  are potential side effects of these medications, including

25  things like addiction, but they make you sleepy, they can make

G3F7MIR6                    Warfield - direct

1  you constipated, etc., etc., here are the side effects, and

2  here is how we're going to do this:  You have to come to me

3  once a month, and you are going to agree not to get drugs from

4  another doctor, and you are going to agree to go to this

5  pharmacy or one pharmacy, and if you don't do these things I

6  may stop medications.  Just so that both sides understand what

7  the responsibility of the doctor is and what the responsibility

8  of the patient is.  The patient agrees that they're going to

9  take the medicine the way the doctor prescribes it, etc.

10 Q.  Did you notice in your review of 24 of Dr. Mirilishvili's

11 patient files whether he used such agreements in his practice?

12 A.  Yes, he did.  He used these agreements and had these types

13 of agreements with his patients, no question, which is very

14 good practice.

15 Q.  And were the terms of these agreements that you reviewed,

16 were they the kinds of things that the pain management

17 community puts into these kinds of agreements?

18 A.  Yes.

19 Q.  Or recommends?

20 A.  Yes, the agreement he used was a very typical agreement

21 that we would use in a pain management scenario.

22 Q.  Now, are you also familiar with the use of urine screening

23 for pain management patients?

24 A.  Yes.

25 Q.  And tell us how urine screening is used in the course of a

G3E7MAR6                    Warfield - direct

1   pain physician's practice.

2   A.  Well, urine screening is very controversial and a very

3   confusing process.  It sounds kind of simple.  You know, it

4   sounds like you give a urine sample, and we test it to see if

5   the drug is in it.  It's far more complicated than that.

6          First of all, for example, if I as a doctor take a

7   urine sample, and I give it to my lab at the hospital, and I

8   say would you test this for opiates, it depends on the lab you

9   use in terms of what opiates it tests.  And many, many labs

10  don't test for oxycodone.  So there have been many situations

11  where a patient gets a lab test that says it's negative for

12  oxycodone, and that just meant that the lab didn't test for

13  oxycodone.  So it gets very confusing.

14         The other thing is we don't have a lot of training in

15  that area, so it's often very confusing to physicians in terms

16  of what these urine drug tests mean.

17         And I think most importantly, if someone is a drug

18  addict or someone is selling drugs, they know how to obviate

19  these drug tests.  You can go online and find all kinds of

20  directions about how to fake the drug tests.  They have these

21  hats you can buy that have a bladder in them that they put

22  somebody else's urine --

23             MS. CUCINELLA:  Objection.

24             THE COURT:  The objection is sustained.

25             Doctor, you are through answering the question.  We

1    need you to give concise answers to questions.  Thank you.

2              MR. MAZUREK:  I will move on.

3              THE COURT:  Thank you.

4    Q.  I want to talk about what information is conveyed on urine

5    screening lab reports.  Can you tell us generally what

6    information a doctor would be looking for on these reports?

7    A.  Well, the most common thing the doctor is looking for is

8    the drug you are prescribing there.  So that's the most

9    simplistic type of urine drug screening.

10             But you can ask for all sorts of things, you know, and

11   you may or may not want other information.  You may want to

12   know about metabolites, you may want to know about illicit

13   drugs, but the most important thing is the general one, is the

14   patient taking the medication that I prescribe.

15             So, there are lots of different types of tests, and

16   lots of different information that a doctor could ask for, and

17   some labs just generally give all of that information whether

18   you ask for it or not, others you have to specifically ask for

19   it.  Different labs do the tests differently, they have

20   different cut-offs.  It's a very confusing area, which is why

21   lots of doctors don't even use urine drug screens.

22   Q.  You just said a whole lot.  You mentioned that labs use

23   different cut-offs.  What does that mean?

24   A.  Well, when you send a urine sample out to test for a drug,

25   each company can only tell if there is a certain amount of drug

G3E7MIRG                    Warfield - direct

1   there.  So, let's say one company can only tell you if it's

2   positive if you have over 100 nanograms of that drug in the

3   urine; another company it might be 50 nanograms; another

4   company it might be 200 nanograms.  So, there has to be a

5   certain amount of oxycodone in the urine before the company

6   tells you whether it's considered positive or negative, and

7   that varies from company to company.  So, that often becomes

8   very confusing.

9           And what is also confusing is if they say it's

10  negative, does that mean it's negative in their lab?  It just

11  means that there was less than 200 nanograms, so it really was

12  positive, but it was just a low amount?  It's very, very

13  confusing in terms of how to interpret urine drug screens.

14  Q.  And in your experience are you looking to the concentration

15  levels that are indicated on lab reports to make any

16  determination about the quantity of drugs ingested?

17  A.  Personally I look and I teach our fellows you just look at

18  whether it's positive or negative.  The numbers of

19  concentrations are really very meaningless.  And there has been

20  some good data recently determining that these laboratories

21  really cannot tell you based on the concentration whether

22  someone was taking a really high dose of the drug or a low dose

23  of the drug.  Really all it tells you is it's positive or it's

24  negative.

25  Q.  And are there any requirements in the pain field for pain

1    physicians to screen for drugs other than those that they are

2    prescribing?

3    A.   Oh, absolutely not.  As I said, they're not even required

4    to use urine drug screens.  Basically the requirements say that

5    you should be willing to use a urine drug screen if you feel

6    it's appropriate for your particular patient.  So even doing

7    urine drug screens there is no law or requirement saying you

8    need to use them.

9    Q.   And what about in terms of guidelines or standards with

10   respect to when to administer the test, the timing of the

11   tests, are there any?

12   A.   No requirements about when you have to do the test, how

13   often, whatever.

14   Q.   Now, is there something in the lab report that a pain

15   doctor can rely on with respect to findings of specific gravity

16   or pH levels that might tell them whether a patient is trying

17   to get around the test?

18   A.   Well, again, this is another area which makes a urine drug

19   screen not just as simple as is it positive or is it negative.

20        What some of the labs report is the specific gravity

21   of your urine, and what that means is how dilute your urine is.

22   So they can tell did you drink a lot of water just before and

23   such, and they can tell the pH of the urine.

24        Again, these things get into things that are very

25   esoteric, and most doctors haven't been trained to do.

1   Laboratory doctors often can interpret these things.  But again

2   suffice it to say it's not as simple as is it positive or

3   negative for oxycodone.  It can be very, very confusing, which

4   is why a lot of doctors don't use them.

5   Q.  For example, could a doctor determine by specific gravity

6   findings whether it appears that the same urine is being used

7   for multiple patients?

8   A.  No, not necessarily.  I mean there is a small range of

9   specific gravity that humans have in their urine, so I mean

10   it's not uncommon for half of us to have the same specific

11   gravity in our urine.  It really just tells you how dilute the

12   urine is.  That's really what specific gravity, it tells you

13   whether the urine is dilute and whether this person had a lot

14   of water to drink.  And there are some diseases that make your

15   urine very dilute also.

16   Q.  Is it possible for someone who is not taking oxycodone for

17   a period of time, is it possible to get a positive result for

18   oxycodone by simply taking one pill or a portion of a pill

19   shortly before their urine drug test?

20   A.  Oh, sure.  You can take a tiny -- and that's another reason

21   why a lot of people don't use these urine drug screens, because

22   they know that if the drug addict wants to get a prescription

23   from you for, you know, 90 tablets, they sell 89 of them, and

24   the day before they come in for their urine drug test they take

25   a quarter of a tablet, they are going to test positive.

G3F7MAR6                          Warfield - direct

1    MS. CUCINELLA:  Objection.

2    THE COURT:  The objection is sustained.  Strike the

3  answer.  Please ask the question again and see if we can get an

4  answer to the question that's asked and not a speech.

5  Q.  Just yes or no, is it possible for a patient who has not

6  been taking the prescribed medicine during the course of

7  treatment but simply takes a portion of a pill a day or two

8  before the urine test to test positive?

9  A.  Yes, that would make the test positive.

10  Q.  Is it in your experience within the usual course of a pain

11  management practice for a physician to order urine drug

12  screening tests and not interpret them correctly?

13  A.  Yes, not at all uncommon.

14  Q.  Now, we have been talking a lot about the term the usual

15  course of conduct.  In your experience, doctor, what is outside

16  the course of pain management conduct?

17  A.  Well, as I mentioned earlier, to be inside the course of

18  practice you need to see the patient, have the doctor/patient

19  relationship, do a history, physical exam.  If you're not doing

20  that, then that's outside the usual course.

21      So, for example, if a patient -- or somebody comes up

22  to me at a cocktail party and says, oh, hi, I hear you're a

23  pain doctor, I have pain, can you give me some oxycodone,

24  that's not the usual course of medical practice.  I'm not that

25  patient's doctor; there is no relationship of a doctor and a

G3E7MIR6                  Warfield - direct

1    patient; and that's outside the usual course.

2         Or if a patient came to me in my office and said, you

3    know, my wife also has back pain; could you write her a

4    prescription?  That's not the usual course, because again I

5    don't have a relationship with that patient, I haven't done an

6    exam or history.

7         Or if the patient comes to me and says, you know,

8    doctor, I don't have any pain, I just like these drugs to get

9    high, would you write a prescription?  So I'm not writing that

10   prescription for a legitimate medical cause.

11        So there are all kinds of situations where it might

12   not be -- the doctor may not legitimately be practicing

13   medicine within the usual course of medicine but giving

14   prescriptions.

15        If the patient came in and said I don't really have

16   any pain but I just want to pay you some money for some

17   prescription drugs, you know, that's not in the usual course,

18   because again you don't have that relationship; you are not in

19   good faith treating the patient's pain.

20   Q.  Now, in this case, again you were asked to review a set of

21   Dr. Mirilishvili's files, approximately 24; is that correct?

22   A.  Correct.

23   Q.  What other documents or things did you review prior to your

24   testimony today?

25   A.  I reviewed the indictment, and I reviewed some documents

C3E7MIR6                          Warfield - direct

1   about the anticipated expert's testimony, and I reviewed Dr.

2   Gharibo's testimony.

3   Q.  Did you review any transcripts of recordings of patient

4   visits with Dr. Mirilishvili?

5   A.  Yes, I did, of Mr. Lantigua, I did review the transcripts

6   of several visits that he had with doctor -- that were recorded

7   with Dr. Mirilishvili.

8   Q.  Based on your review of this set of records, were you able

9   to form an opinion or a conclusion about Dr. Mirilishvili's

10  practice?

11  A.  Yes.

12  Q.  And what was that conclusion or opinion?

13  A.  May conclusion was that this was a medical practice; he was

14  practicing within the usual course of medicine, using judgment

15  to help patients with their pain.  It was a doctor's office and

16  a doctor's practice.

17  Q.  I'm going to ask you about some of those specific files.

18  Did you notice that whether Dr. Mirilishvili used electronic

19  medical records in his recordkeeping?

20  A.  Yes, he did.

21  Q.  And when I say electronic medical records, what does that

22  mean?

23  A.  Well, it means the medical records are computerized.  In

24  the old days we used to write everything out in handwriting,

25  and now we use computerized records.

G3F7MIRG                    Warfield - direct

1    Q.  Were there also handwritten notes?

2    A.  Yes.

3    Q.  Do you know or in your experience are there obligations or

4    rules regarding whether physicians need to keep two sets of

5    records if they're keeping both handwritten and they upload

6    them electronically?

7    A.  No, the obligation is that you keep records, and it can be

8    one or the other.  Or if you want to keep both, you could, but

9    there is no requirement that you keep both.

10   Q.  Would it be within the usual course of medical practice for

11   a physician not to keep the handwritten portion once they have

12   uploaded them electronically?

13   A.  Oh, absolutely, that's very common.

14   Q.  Are you familiar with the term electronic signatures in

15   electronic medical records?

16   A.  Yes.

17   Q.  What are those?

18   A.  Again, when you're doing the signature on the computer,

19   you're not like the old days just writing out your signature,

20   but you are putting a signature in electronically.

21   Q.  And what significance does that have with respect in the

22   medical field?

23   A.  Well, typically what is done is when I see a patient, for

24   example, I might take some notes and write down what is going

25   on while I'm talking face to face to the patient, not looking

1    at a computer screen but looking at the patient and writing

2    things down, and then at some later time I might dictate those

3    records, and then at some later time I look at that dictation

4    and I sign it, and it indicates that I agree with what the note

5    says.  So, it's a process.

6    Q.  Is it within the usual course of medical practice for

7    doctors to type in their own notes and not use dictation?

8    A.  Yes.

9    Q.  How much detail is required to be kept in medical records,

10   in your experience?

11   A.  There are no rules or regulations about how much detail

12   needs to be kept.  I mean obviously if you saw a doctor for

13   even just 15, 20 minutes, the doctor couldn't possibly write

14   down every little thing that was said during that period of

15   time.  So, I mean what is traditional, what is appropriate is

16   the doctor puts down what they think are the important points.

17   Q.  In your review of Dr. Mirilishvili's files, did you notice

18   that he kept some handwritten notes on Post-it notes?

19   A.  Yes.

20   Q.  Do you have an opinion as to whether keeping handwritten

21   notes on Post-its, is that within the usual course of conduct?

22   A.  Yes, you can keep your handwritten notes on any kind of

23   paper.  I don't think there is any requirement on what kind of

24   paper you keep your handwritten notes on.  Often times doctors

25   scribble down some stuff while they are seeing the patient on

G3E7MIR6                          Warfield - direct

1    some piece of paper, as I said, and then translate it into the

2    electronic medical record.

3    Q.  And do physicians typically use abbreviations in writing

4    their notes?

5    A.  Definitely.

6    Q.  And do these abbreviations have some kind of meaning for

7    doctors, in your formal training?

8    A.  No question, yes.

9    Q.  Now I'm going to ask you some questions regarding the types

10   of prescriptions that you noticed in Dr. Mirilishvili's files.

11   Did you notice whether he consistently prescribed non-opioid

12   medication in addition to opioid medication?

13   A.  Yes, he did.

14   Q.  And having reviewed those records, what kinds of non-opioid

15   medications did he prescribe?

16   A.  Well, he used a number of what we call non-opioid

17   medications for pain.  He used some medicines that are

18   anticonvulsants or medicines we use for seizures.  Because just

19   like a seizure is electrical activity in your brain, pain can

20   be caused by abnormal electrical activity in the rest of your

21   body.  So, we use these seisure medicines to treat pain,

22   especially nerve pain.  And he used Neurontin, Lyrica,

23   Gabapentin for seizures.  And we commonly use those in the pain

24   clinic.

25            He also used a non-opioid analgesic or non-opioid

1    painkillers, and those are drugs like Ibuprofin, like Advil and

2    Aleve, which you can get over the counter.  There are

3    prescription strengths of those kinds of drugs, Mobic, other

4    types of antiinflammatory drugs.  So, again it's good practice

5    to use these non-opioid painkillers in addition to the opioids.

6         He also used some muscle relaxants.  Those are very

7    useful drugs, especially for patients who have muscle spasm.

8    And lastly he used antidepressants on these patients.  Again we

9    use those for pain patients not because we think they are

10   depressed but because we know the same chemicals in the brain

11   that relay depression also relay pain, so we very commonly use

12   antidepressants to treat pain.

13        So he used this combination of medications that we

14   very typically use in pain medicine, which is very good

15   practice.

16   Q.  Were any of these medications not appropriate for the use

17   of treatment of pain?

18   A.  No, all of the medicines are very appropriate for the

19   treatment of pain.

20   Q.  And were all of these medications, are those the kinds of

21   medications you would find in the usual course of a

22   professional pain management practice?

23   A.  Absolutely, yes.

24   Q.  Now, did you notice in the doctor's files that he had

25   certain patterns of prescriptions?

G3E7MIR6                        Warfield - direct

1   A.   Yes.

2   Q.   And certain patterns of dosages that he generally

3   prescribed?

4   A.   Yes.

5   Q.   Did you have a chance to review Dr. Gharibo's testimony

6   from last week?

7   A.   Yes.

8   Q.   He testified that he believed that the dosages prescribed

9   between the oxycodone and the non-opioid medications were in

10  his words upside down.  Do you agree with that analysis?

11  A.   No, I don't agree with that.  I think again every doctor

12  has a different kind of combination of drugs and different

13  doses that they use.  It may not have been the combination that

14  Dr. Gharibo uses.  With all due respect, that's the way he does

15  it, but that isn't the way that everybody does it.  There are

16  lots of different combinations of drugs and lots of different

17  doses of these drugs that are used for a variety of reasons.  I

18  won't go into all of that, but lots of people do it very

19  differently.

20  Q.   Based on your evaluation of the 24 files, what is your

21  opinion with respect to the dosage levels that you found within

22  all of Dr. Mirilishvili's files?

23  A.   I think the dosage levels were very reasonable.

24  Q.   Are you familiar with the term opioid-sparing strategy?

25  A.   Yes.

1    Q.   What is that?

2    A.   Well, it means you use other drugs to try and keep the dose

3    of opiate low.  And those drugs are the ones I was just talking

4    about.  So you combine the opioid with things like these

5    seizure medicines, the antidepressants, the antiinflammatory

6    medicines, the muscle relaxants, because if you use them in

7    combination they can also relieve some of the pain and help you

8    keep the opioid dose low.  So they are called opioid-sparing

9    techniques.

10   Q.   So with respect to the non-opioids that were employed here,

11   do you have an opinion as to whether Dr. Mirilishvili was

12   employing an opioid-sparing strategy?

13   A.   Yes, that's what it was.

14   Q.   In your review of the files, did you notice whether Dr.

15   Mirilishvili used referrals out to other physicians, other

16   kinds of treatment?

17   A.   Yes, he did frequently.

18   Q.   Are there any requirements or rules that you are aware of

19   as to whether the specificity of that referral that Dr.

20   Mirilishvili failed to live up to?

21   A.   Absolutely not.  There are no requirements for how specific

22   a referral can be.  You can tell the patient -- sometimes a

23   doctor will say I want you to go see my friend the doctor who

24   is a neurologist, here is his name and number.  Other times

25   they say I think you probably should go see a neurologist,

G3E7MIR6                      Warfield - direct

1    maybe you should ask around and see if you can find someone.

2    Sometimes they say call this number at this hospital and get an

3    appointment with a neurologist.

4         I mean there is a wide range and variety of ways of

5    referring patients to outside doctors and referral people.

6    Again there are lots and lots of different ways of doing them,

7    all of which are appropriate.

8    Q.  Now, having reviewed the referrals that you saw in the 24

9    files, would you say that those referrals are within the usual

10   course of professional conduct?

11   A.  Absolutely.

12   Q.  In the review of the files, did you notice whether Dr.

13   Mirilishvili's practice used the treatment method of physical

14   therapy?

15   A.  Yes, frequently.

16   Q.  What did you notice about that?

17   A.  I noticed that he had some in-house physical therapists and

18   very commonly referred the patient to the physical therapist in

19   an attempt to help treat their pain with that method.

20   Q.  Is there any requirement in pain management practice to

21   have in-house physical therapist?

22   A.  There is no requirement, but it's very good practice to use

23   physical therapy in addition to the drugs.

24   Q.  Now, with respect to these referrals, in your experience

25   what happens if a patient doesn't follow through with a pain

1  doctor's referral?

2  A.  Again, there is a variety of responses the doctor can make.

3  There are lots of reasons why the patient wouldn't want to

4  follow through.  Sometimes they don't have insurance.

5  Sometimes they --

6          MS. CUCINELLA:  Objection.

7          THE COURT:  The objection is sustained.

8  Q.  What can a doctor do to try to get a patient to use the

9  referrals that he or she thinks the patient should take

10 advantage of?

11 A.  The doctor can encourage a patient.  They can say I really

12 think you need to go to this referral for this reason, you

13 know, it's going to help you.  So they can encourage the

14 patient.  They can't force the patient to do it.  It's the

15 patient's decision ultimately.

16 Q.  Now, did you review the recordings or at least the

17 transcripts of the recordings between patient visits between

18 Jose Lantigua and Dr. Mirilishvili?

19 A.  Yes.

20 Q.  And the information provided there, that included multiple

21 visits; is that right?

22 A.  Yes.

23 Q.  Approximately seven or so visits?

24 A.  Yes.

25 Q.  And was it important for you to read from the first visit

G3E7MIR6                    Warfield - direct

1    all the way to the final visit?

2    A.  Yes.

3    Q.  And why?  Why is that?

4    A.  Well, the thing I noted after going through those

5    transcripts is that there was a lot more that went on during

6    that visit than was in the notes, so there is a lot more

7    conversation.  As I said, it's impossible to put down

8    everything in a visit in a note, but there was a lot more that

9    went on in that visit, a lot more conversation, a lot more

10   discussion about physical examination, referrals, the

11   medications, etc., etc., than you could glean from just reading

12   the note.

13   Q.  And going back to the issue of the referrals, did you

14   review what Dr. Mirilishvili did in that instance with that

15   patient Mr. Lantigua on whether he followed through on

16   referrals and whether that was within the usual course of

17   conduct?

18   A.  Absolutely, he was very adamant about, you know --

19              MS. CUCINELLA:  Objection.

20              THE COURT:  Objection sustained.

21   Q.  Would it be important for you to know as a doctor to know

22   whether a patient had followed through on a referral in terms

23   of the course of ongoing treatment?

24   A.  Yes.

25   Q.  And is that one of the things that you found within the

G3F7M1R6                    Warfield - direct

1    transcripts of the Lantigua visits, that the doctor was acting

2    within the usual course?

3    A.  Yes.

4    Q.  Also with respect to your review of that particular patient

5    file, if a patient were to tell a pain management physician

6    that he has a scheduled surgery with an orthopedic surgeon,

7    would that be a factor in your determination on the course of

8    treatment?

9    A.  Yes, I think if an orthopedic surgeon scheduled surgery

10   with the patient, then that underscores the fact that the

11   patient has a bad pain problem, otherwise the surgeon wouldn't

12   be doing surgery.

13   Q.  And was that information that you found at least in the

14   Lantigua file that Dr. Mirilishvili had in making his treatment

15   plan for that patient?

16             MS. CUCINELLA:  Objection.

17             THE COURT:  I don't understand that question.  Ladies

18   and gentlemen, let me explain something.  This doctor is

19   eminently qualified to talk about her views on what is

20   appropriate medical practice, and you can use that information

21   for whatever you think it's worth.  She can't tell you what was

22   in Dr. Mirilishvili's head.  All right?  She can't do that.

23   She doesn't know what was in his head.  So, we want to be sure

24   that the questions are quite precise so that we don't stray

25   over that line.

1    MR. MAZUREK:  I will do better, your Honor.

2  Q.  With respect to the transcripts that you reviewed in the

3  Lantigua file, what were the things that you relied upon in

4  reaching your opinion?

5    MS. CUCINELLA:  Objection.

6    THE COURT:  Yes, it's an incomplete question.  With

7  respect to the transcripts that you reviewed what did you rely

8  on in reaching your opinion?  Your opinion about what?  I mean

9  it's a nonsense question.  I know it's the end of the day; it's

10  a long day.  Try again.

11    MR. MAZUREK:  I will.

12  Q.  Let me start with did you reach an opinion with respect to

13  after you reviewed the transcripts of the Lantigua patient

14  visits whether in those visits Dr. Mirilishvili acted within

15  the usual course of professional practice?

16  A.  Yes.

17  Q.  And what are the things that --

18    THE COURT:  What led you to that conclusion?

19    MR. MAZUREK:  Yes.  Thank you, your Honor.  Too many

20  words today.

21  A.  Well, I think what led me to that conclusion is that the

22  interaction was an interaction a typical doctor would have with

23  a typical patient, discussions about the pain, about if the

24  medication was helping the pain, if the patient was having any

25  side effects, if the patient followed through with the various

G3F7MAR6                          Warfield - direct

1    recommendations and referrals and, if so, what did the referral

2    or what did the orthopedic surgeon have to say, what are your

3    plans, how is the pain doing.  All of those things, they're the

4    typical kinds of things I would say to my patients, typical

5    questions, a physical examination, the patient is told walk on

6    your toes, do this, do that, so the typical interaction that a

7    doctor would have with a patient in the usual course of the

8    medical practice in seeing the patient monthly or so for

9    follow-up if the patient is on pain medication.

10   Q.  Now, what are some of the kinds of documents that you saw

11   in the doctor's files regarding diagnostic tests?

12   A.  Well, there were MRIs, there were electromyograms or EMGs,

13   and nerve conduction studies, which are studies of the nerves.

14   You know, those were the most common ones.  There were other

15   types of x-rays to determine pain.  There were urine drug

16   screens.

17   Q.  And did you notice MRI referrals or reports?

18   A.  Yes.

19   Q.  And in some of those MRI reports there were referrals to

20   pain management.  Do you remember seeing that?

21   A.  Yes.

22   Q.  Did that strike you as something that was unusual or was

23   outside the usual course of a practice?

24   A.  Certainly not outside the usual course of medical practice.

25   There are radiologists who do pain medicine, who do pain

G3E7MIR6                    Warfield - direct

1    injections.  I mean that wouldn't surprise me.  I wouldn't say

2    it's particularly common, but it's certainly not outside the

3    usual course of medical practice for a radiologist to refer.

4    Q.  In doing physical exams for a patient, are there any

5    requirement or rules for a pain management doctor to do that in

6    a certain way?

7    A.  No.  Again the rules are kept purposely vague and

8    nonspecific in that regard, because every doctor has their own

9    types of physical examination maneuvers that they use, and it

10   depends on the patient, the situation, the doctor.  And each

11   doctor has to individually decide when they see the patient

12   what maneuvers are appropriate.

13   Q.  In some of the specific files you reviewed, did you see

14   patients of Dr. Mirilishvili's that had some indications of

15   prior drug abuse?

16   A.  Yes.

17   Q.  Did you make a determination whether despite this fact it

18   was appropriate for the doctor to treat these patients with

19   oxycodone?

20   A.  Yes, there are absolutely no guidelines that say -- any

21   laws or anything that say a doctor can't prescribe these drugs

22   to patients with drug abuse.  Remember, people who have

23   problems with drug abuse also have pain.  A doctor has to make

24   a judgment call and decide whether it's appropriate for a

25   particular patient or not.

G3E7MIR6                    Warfield - direct

1    Q.  For example, one of the files you reviewed was for a

2    patient by the name of Antonio Pedraza; is that right?

3    A.  Yes.

4    Q.  Now, did this patient have any indication of prior drug

5    abuse?

6    A.  Yes.

7    Q.  What indications in that file made it -- or did you make a

8    determination that it was appropriate for the doctor to

9    prescribe oxycodone for Mr. Pedraza?

10   A.  Yes.  As I recall, Mr. Pedraza add a history of problems

11   with abuse but also had some severe pain problems.  He had had

12   a gunshot wound and abdominal knife wounds, and so he had some

13   real obvious reasons why he should be suffering from pain.  So

14   in these situations often times it is appropriate.

15           Again, there is no guideline or rule that says just

16   because someone has a history of abusing a drug in the past

17   that they don't deserve to get pain treatment.

18   Q.  Did you make note of any referrals that Dr. Mirilishvili

19   made that was consistent with the usual course of professional

20   practice for Mr. Pedraza?

21   A.  I don't recall specifically for Mr. Pedraza what he

22   referred.

23   Q.  If I were to show you your notes, might that help you?

24   A.  Yes, that would help me.  Sorry, it's hard to keep 24

25   patients straight in my head.

1        MR. MAZUREK:  Your Honor, may I approach?

2        THE COURT:  You may.

3        MR. MAZUREK:  I am showing the doctor what has been

4  premarked for identification as DM-900.

5        And, your Honor, if we could put on the screen what

6  has already been admitted into evidence as GX-221.

7        THE COURT:  Well, I thought you were showing this to

8  her to see if it would refresh her recollection.

9        MR. MAZUREK:  No, I'm putting another exhibit on the

10  screen.

11        THE COURT:  I understand, but there doesn't need to be

12  anything on the screen.  Let's start with refreshing her

13  recollection.

14  A.  May I answer?

15  Q.  Yes.

16  A.  Yes, he was referred to a psychiatrist, he was referred to

17  an orthopedic surgeon.

18        THE COURT:  I'm sorry.  Are you reading from those

19  notes, or do you recall that in your head?

20        THE WITNESS:  Well, these are my notes.

21        THE COURT:  I understand that, but you can't read

22  them; they are not in evidence.  You can see if they jog your

23  memory and then put them down.  That's just the rules.

24  A.  All right.  So he referred this patient to a psychiatrist.

25  He referred this patient to an orthopedic surgeon, to an

G3F7MIR6                    Warfield - direct

1    interventional pain doctor and to physical therapy.

2    Q.  And do you recall how the relationship ended between the

3    doctor and Mr. Pedraza?

4    A.  Yes, I recall that one of the things Dr. Mirilishvili

5    typically did was check the prescription monitoring program

6    records on his patients.  And when he checked -- and should I

7    explain what that is?  Does the jury know what that is.

8         The prescription monitoring program, whenever a doctor

9    writes a prescription there is a list -- whenever a patient

10   fills a prescription, that information goes into a central data

11   source, and so a doctor can go into the computer and see where

12   patients are getting prescriptions filled.

13        So, if you write a prescription for oxycodone, you can

14   into a computer and see if any other doctors have written

15   prescriptions for oxycodone in the last few weeks or whatever.

16        So he would routinely go into this prescription

17   monitoring program -- which is very good practice -- to see if

18   his patients got drugs from any other people they weren't

19   supposed to be getting drugs from.

20             (Continued on next page)

21

22

23

24

25

G3EMWAR7                     Warfield - direct

1   Q.  And what happened with respect to Mr. Pedraza?

2   A.  In the case of Mr. Pedraza, when he went into this

3   prescription monitoring program online he found that he had

4   received drugs from another doctor, which he had agreed not to

5   do, and so he dismissed and he discharged him from his

6   practice.

7   Q.  Are there any rules or regulations that govern pain doctors

8   with respect to what to do upon discharge with a patient?

9   A.  No.  Again, there are no guidelines, no rules, no

10  regulations.  It's done on an individual basis.  There are lots

11  of different ways one can handle it, but it's left up to the

12  individual doctor and their judgment.

13  Q.  Now, in the course of your review of the 24 files, did you

14  notice whether the doctor on occasion titrated the dosage of

15  oxycodone?

16  A.  Yes.

17  Q.  What does that mean?

18  A.  That means changed the dose up or down, depending on the

19  patient's response to the dose.  You might change it up if they

20  are not getting enough pain relief.  You might change it to a

21  lower dose if they are having a lot of side effects, for

22  example.

23  Q.  Do you remember specific patients where that took place?

24  A.  I remember Ms. Torres, the dose on her I believe was

25  titrated from twice a day to three times a day.  I think

 1   Mr. Brockman, I believe the dose was titrated in the other

 2   direction in that patient.

 3           So there were situations where Dr. Mirilishvili would

 4   start with a particular dose and for one reason or another

 5   might go up to a higher dose or might go down to a lower dose,

 6   and that's the appropriate thing to do, depending on the

 7   patient's response to the medication.

 8   Q.  On prescriptions are you familiar with the abbreviations

 9   BID and TID?

10   A.  Yes.

11   Q.  What do those mean?

12   A.  BID means twice a day.  TID means three times a day.

13   Q.  For those patients that started two times a day at 30

14   milligrams, they would be taking two pills per day, is that

15   right?

16   A.  Yes.

17   Q.  Are you familiar with any standards or guidelines with

18   respect to whether pain doctors should be telling doctors to go

19   to a single pharmacy in filling their oxycodone prescriptions?

20   A.  Yes.  It's very common in a standard agreement for us to

21   tell the patient to go to a single pharmacy to get all their

22   prescriptions filled at one pharmacy.  That's very common in

23   typical agreements.

24   Q.  Was that particular provision or term used in

25   Dr. Mirilishvili's consent agreement?

1    A.  Yes.

2    Q.  Is it within the usual course of practice for physicians to

3    give their patients their home or cell telephone number?

4    A.  Yes, maybe.

5    Q.  And what about giving pharmacists their personal numbers?

6    A.  Nothing wrong with that.  That's within the usual course of

7    practice.  If it's a pharmacist that you use very commonly,

8    sure.

9    Q.  Are there any regulations or rules regarding not receiving

10   cash payments for medical services?

11   A.  No, no regulations whatsoever about whether or not one can

12   take cash.

13   Q.  In some of the files did you notice that with respect to

14   the electronic records that sometimes the electronic signatures

15   were not done until months after the date of service?

16   A.  Yes.

17   Q.  Are there any rules or regulations that prevent a doctor

18   from completing their electronic signatures months after the

19   date of service?

20   A.  No.  There are some doctors who do it the same day.  There

21   are some doctors who don't sign the records for months.  It's

22   all within the usual course of practice.  There are just

23   different ways of doing things.

24   Q.  You mentioned in --

25              THE COURT:  Hang on.  How much do you have to go with

1    the doctor?

2         MR. MAZUREK:  Little bit more.  About 15 minutes.

3         THE COURT:  Can you guys hold out.  No.  We need to

4    have a short break.  Don't discuss the case.  Keep an open

5    mind.

6         (Jury not present)

7         THE COURT:  Jim told me that the jurors were dying.

8         MR. MAZUREK:  Just the jurors.

9         THE COURT:  Take five.  We will finish the direct

10   today.

11        MS. CUCINELLA:  No cross today.

12        THE COURT:  No.

13        (Recess)

14        (Jury present)

15        THE COURT:  Doctor, you are still under oath.

16        MR. MAZUREK:  Promise not much longer.

17   BY MR. MAZUREK:

18   Q.  Dr. Warfield, in your review of the patient files, did you

19   reach an opinion as to whether the fact that Dr. Mirilishvili

20   prescribed a 30 milligrams at either two or three times a day

21   of oxycodone, whether that was within the usual course of

22   professional practice?

23   A.  Yes, absolutely.

24   Q.  Now, with respect to the nonoxycodone prescriptions, I am

25   going to show you what's been admitted into evidence as

G3EMMIR7                     Warfield - direct

1   Government Exhibit 101 and Government Exhibit 104:  This is

2   some data as to the controlled substance prescriptions for

3   Dr. Mirilishvili from 2010 through 2014.  You see those?

4   A.  Yes.

5   Q.  And for the time period from 2010 through 2011, it

6   indicates that approximately 68 percent of Dr. Mirilishvili's

7   controlled substance prescriptions were oxycodone, correct?

8   A.  Yes.

9   Q.  And then in 2014 it went all the way up to 98 percent.  You

10  see that?

11  A.  Yes.

12  Q.  Now, during the period 2010 to '11, the controlled

13  substances that Dr. Mirilishvili was prescribing included a

14  substance called Lyrica?

15  A.  Yes.

16  Q.  What is Lyrica?

17  A.  Lyrica is an anticonvulsant.  The two anticonvulsants

18  typically used for pain are Lyrica and Neurontin.  Lyrica is

19  one of the anticonvulsants commonly used for pain.

20  Q.  In your review of files from Dr. Mirilishvili from 2012 to

21  2014, did you see much in terms of prescriptions for Lyrica?

22  A.  I recalled he prescribed a lot of Neurontin during that

23  period of time.

24  Q.  And what is your opinion as to the comparability between

25  Neurontin and Lyrica?

1  A.  Well, they are both anticonvulsant medicines that are

2  appropriately used for pain.  The big difference is that Lyrica

3  is a scheduled drug and Neurontin is not.  So Neurontin

4  wouldn't have shown up on this.

5  Q.  So Neurontin would not show up on a controlled substance

6  list?

7  A.  Correct.

8  Q.  And just to complete this, with respect to the files that

9  you reviewed, did you see Dr. Mirilishvili prescribing much

10 Lyrica during the time period 2012 to 2014?

11 A.  Not much.  I think there was some, but not much.  But quite

12 a bit of Neurontin.

13 Q.  Would there be any reason for a physician to prescribe both

14 Lyrica and Neurontin at the same time?

15 A.  You could.  There may be some reasons to do it, but

16 typically not.  Typically it's one or the other.

17 Q.  Is it outside the usual course of professional practice to

18 refer patients to a hospital as opposed to a specific practice?

19 A.  No, absolutely not.  You can refer to a hospital.

20 Q.  Is it outside the usual course to refer a patient, without

21 specifying the types of injections when referring to

22 interventional pain management?

23 A.  That's absolutely appropriate.  Many times the patients are

24 just referred to interventional pain management and they leave

25 the type of injection up to the interventional pain doctor.

 1   That's probably more common.

 2   Q.  Is it within the usual course of medical practice for a

 3   doctor to prescribe similar doses of medication for many of its

 4   patients?

 5   A.  No.  That's very common.

 6   Q.  Is it within the usual course of professional practice for

 7   a doctor to retain multiple drug labs for urine screening?

 8   A.  A doctor may use many different labs.  It's a perfectly

 9   normal thing to do within the usual course of medical practice.

10   Q.  With respect to the use of oxycodone in the 24 patient

11   files that you reviewed, do you have an opinion as to whether

12   Dr. Mirilishvili was acting within the usual course of

13   professional practice in those prescriptions for those 24

14   files?

15   A.  Absolutely.  Those prescriptions are absolutely within the

16   usual course of medical practice, something that a regular

17   doctor would do in his practice.

18             MR. MAZUREK:  I have nothing further.

19             THE COURT:  Why don't you ask a few questions.  We

20   will just get started.  Do a little bit of cross.  Then we will

21   break for the day.

22   CROSS-EXAMINATION

23   BY MS. CUCINELLA:

24   Q.  Good afternoon, Dr. Warfield.

25   A.  Hi.

1    Q.  I just want to make sure I understand your testimony today.

2    It's your position that the defendant was practicing medicine

3    when he issued thousands of oxycodone prescriptions to the

4    people who came to his clinic during the time of the

5    indictment, is that right?

6    A.  That's correct.

7    Q.  And that's your position based on the patient records that

8    you reviewed, is that right?

9    A.  Correct.  And my experience --

10            THE COURT:  Ok.

11   Q.  Since at least 2009 and really earlier, have there been a

12   number of resources available to doctors offering guidelines

13   about how to prescribe opiates.  Is that fair?

14   A.  Yes.

15   Q.  You are familiar with the CDC?

16   A.  I'm familiar with the CDC, yes.

17   Q.  What is it?

18   A.  It's the Center for Disease Control.

19   Q.  And this year the CDC put out a handy little flyer that

20   talks about some of the guidelines that go to opiate

21   prescribing, is that right?

22            MR. MAZUREK:  Your Honor, I object as outside the time

23   frame of the indictment.

24            THE COURT:  Overruled.

25   Q.  Is that right?  Are you familiar with that flyer?

 1          THE COURT:  Is it correct that the CDC did that,

 2   Doctor?

 3          THE WITNESS:  Just recently I believe, yes.

 4   Q.  That flyer, though, it references guidelines that have been

 5   around since 2009, 2011.  Does that sound right to you?

 6   A.  It does reference some guidelines that have been around.

 7   Q.  And in that flyer it goes through and it gives a list of a

 8   number of specific guidelines?

 9          MS. CUCINELLA:  May I approach, your Honor.

10          THE COURT:  You may.

11   Q.  I'm handing you what's been marked Government Exhibit 200.

12   And it lists on this flyer the American Pain Society, American

13   Academy of Pain Medicine Guidelines for the Use of Chronic

14   Opioid Therapy in Chronic Noncancer Pain, right?

15   A.  Yes.

16   Q.  And that's from 2009?

17   A.  Yes.

18   Q.  And the Utah State Clinical Guidelines on Prescribing

19   Opiates for Treatment of Pain?

20   A.  Yes.

21   Q.  That's also from 2009?

22   A.  Yes.

23   Q.  The Veterans Affairs Department of Defense Management of

24   Opiate Therapy for Chronic Pain?

25   A.  Yes.

1    Q.  That one is from 2010?

2    A.  Yes.

3    Q.  Washington State Agency Medical Director's Group

4    Interagency Guideline on Opiate Dosing for chronic Noncancer

5    Pain from 2010.

6    A.  Yes.

7    Q.  Canadian Guidelines for Safe and Effective Use of Opiates

8    for Chronic Noncancer Pain from 2011?

9    A.  Yes.  It references those.

10   Q.  American College of Occupational and Environmental Medicine

11   Guidelines for Chronic Use of Opiates?

12   A.  Yes.

13   Q.  New York City Department of Health and Mental Hygiene

14   Opiate Prescribing Guidelines?

15   A.  Yes.

16   Q.  American Society of Interventional Pain Physicians

17   Guidelines for Responsible Opiate Prescribing in Chronic

18   Noncancer Pain for 2012?

19   A.  Yes.

20   Q.  And then it takes all of these guidelines and it lists the

21   factors that all of them have in common, is that right?

22   A.  Yes.

23   Q.  And it talks about --

24   A.  I'm sorry.

25           THE COURT:  Yes or no question.

 1    A.  I guess the answer to that is no.  That's not --

 2              THE COURT:  That's not what it does.  Next question.

 3    Q.  It lists a common recommendation of elements found in all

 4    the guidelines, is that fair?

 5    A.  Common, yes, common found in the guidelines.

 6    Q.  And it includes that the guidelines say generally that a

 7    doctor who is prescribing opiates should do a physical exam,

 8    right?

 9    A.  Yes.

10    Q.  They should take a pain history?

11    A.  Yes.

12    Q.  Take a past medical history?

13    A.  Yes.

14    Q.  Take family and social history, right?

15    A.  Yes.

16    Q.  And they recommend that a doctor who is prescribing opiates

17    should consider all treatment options and weigh the benefits

18    and risks of opiate therapy, is that right?

19    A.  Yes.

20    Q.  And a doctor should use opiates when alternative treatments

21    are ineffective, is that right?

22    A.  Yes.

23    Q.  And they also state that a doctor prescribing opiates

24    should monitor pain and treatment progress with documentation,

25    is that right?

G3EMMIR7                    Warfield - cross

```
 1   A.  Yes.

 2   Q.  It also notes that a doctor should use greater vigilance

 3   when opiates are being prescribed in higher doses, is that

 4   fair?

 5   A.  Yes.

 6   Q.  You agree with all of that, right?

 7   A.  Yes.

 8   Q.  Now, Dr. Mirilishvili almost exclusively used opiates to

 9   treat pain in his patients, is that right?

10   A.  Yes.  I'm sorry.  He used many other medications.  He

11   didn't exclusively use opiates.  Is that the question?

12   Q.  That's fair.

13   A.  He used many types of treatments.

14   Q.  But almost all of his patients received opiates, is that

15   fair?

16   A.  In addition to other therapies, yes.

17   Q.  But they all received opiates, yes?

18   A.  Yes.

19   Q.  And there is almost no exceptions to that, is that true?

20   A.  Most of the patients received opiates, yes.

21   Q.  In your practice it's your position that you are not

22   actually an advocate of using opiates for chronic pain, is that

23   fair?

24   A.  I'm not an advocate of using them in our practice for a lot

25   of our patients because we have an interventional practice.
```

1    Q.  But you are not generally an advocate of using opiates for

2    chronic pain?

3    A.  I said in the past that I'm an advocate of using these, but

4    I do not widely use them in my practice.

5    Q.  You said you're an advocate for using these.  Do you recall

6    giving a presentation at the International Conference on

7    Opiates on June 7 through 9 of 2015?

8    A.  Yes.  I recall that very well.  I recall my last slide.

9    Q.  I think my question --

10             THE COURT:  The answer is either yes or no.  Don't say

11   anything else.

12   A.  Yes.

13   Q.  Do you recall that you had a slide in that presentation

14   where you said, I am not a big advocate of using opiates for

15   chronic pain?

16   A.  Yes.

17   Q.  Then you said, I'm a big advocate of a doctor's right to do

18   so?

19   A.  Correct.

20   Q.  You are not an advocate?

21   A.  No.  I'm not an advocate of using them in all of my

22   patients because I'm an interventional physician.

23   Q.  But that's not what the slide said?

24   A.  That is what it meant.

25   Q.  Not what it said though, fair?

 1   A.  That's what it says and that's what it meant.

 2   Q.  What it says is, I am not a big advocate of using opiates

 3   for chronic pain.

 4   A.  Because I'm an interventional --

 5            THE COURT:  Excuse me.  Did the slides say -- read it.

 6   Q.  I am not a big advocate of using opiates for chronic pain.

 7   A.  That's correct.

 8            THE COURT:  Fine.  Strike the rest of the testimony.

 9   Next.

10   Q.  Dr. Warfield, why aren't you an advocate in using opiates

11   for chronic pain?

12   A.  Because I'm an interventional physician and in my practice

13   we use mostly interventional, but I do prescribe --

14            THE COURT:  No.

15   Q.  You've also been involved with a textbook, Principles and

16   Practice of Pain Medicine.  Is that fair?

17   A.  That's correct.

18   Q.  There have been a couple of editions, is that right?

19   A.  Yes.

20   Q.  This one is the edition from 2004.

21   A.  Yes.

22   Q.  Right?

23   A.  Yes.

24   Q.  This textbook is in line generally with the things that we

25   just talked about, the guidelines for prescribing opiates?

1   A.   That textbook gives a lot of different opinions about

2   guidelines.

3   Q.   Generally, the guidelines we talked about would be found in

4   here, right?

5   A.   They may be, but, again, there are lots of different

6   opinions and the textbook reflects lots of different opinions

7   on guidelines.

8   Q.   And this edition is from 2004?

9   A.   I think 2004, 2005, something like that.

10  Q.   And this book also has in it chapters on setting up and

11  running a management clinic, is that right?

12  A.   Correct.

13  Q.   It talks about the importance of staff at a pain management

14  clinic, right?

15  A.   Yes.

16  Q.   And it talks about how in order to develop a pain

17  management center of excellence it requires a substantial

18  investment in time and personnel to develop the needed

19  resources to treat chronic pain?

20  A.   A center of excellence, correct.

21  Q.   Fair to say you've never met Damon Leonard?

22  A.   Who?

23  Q.   Damon Leonard.

24  A.   I don't know who that is.

25  Q.   But things in your book, this is for a clinic at Harvard,

1    but not necessarily for a clinic in Washington Heights.  Is

2    that fair?

3    A.  You've mentioned a center of excellence.

4              THE COURT:  Yes or no.

5    A.  Correct.

6    Q.  Dr. Warfield, you don't take cash in a treatment room in

7    your practice, do you?

8    A.  I personally don't.

9    Q.  It's not the first thing you do before you see a patient?

10   A.  Not personally in my practice.

11   Q.  But your position is that there is nothing illegitimate

12   about a doctor taking cash in a treatment room, correct?

13   A.  That's correct.

14   Q.  It's also your view that a doctor taking cash could help a

15   doctor avoid a criminal investigation, right?

16   A.  I don't know what you mean.

17   Q.  Taking cash instead of using insurance, that can help a

18   doctor avoid a criminal investigation, right?

19             MR. MAZUREK:  Objection.  Beyond the scope.

20             THE COURT:  Objection is overruled.

21   A.  I don't know what you mean.

22   Q.  I am going to direct your attention back to that

23   presentation we talked about earlier, the one you gave June 7,

24   2015?

25   A.  Yes.

1   Q.  Do you remember doing a slide on insurance companies?

2   A.  Probably, yes.

3   Q.  Do you recall presenting at that conference that insurance

4   companies are now more aggressive in evaluating documents.

5   They have higher utilization and increased costs, that there is

6   peer review and that many criminal cases started with an

7   insurance review.

8   A.  That's correct.

9   Q.  I wasn't finished.

10  A.  I'm sorry.

11  Q.  Do you remember presenting the slide?

12  A.  Yes.

13  Q.  Taking cash instead of insurance could help avoid a

14  criminal investigation.  Is that fair?

15          MR. MAZUREK:  Objection.

16          THE COURT:  The objection is sustained.  The objection

17  is sustained.  The question is stricken.  Move on.

18  Q.  Dr. Warfield, you've billed over $10,000 so far in

19  connection with your testimony today, is that right?

20  A.  Correct.

21  Q.  Going back to your testimony about the defendant's use of

22  opiates, you found the defendants prescribing patterns

23  legitimate.  Is that fair?

24  A.  Correct.

25  Q.  It's fair to say that the majority of the patient files

1    that you reviewed the doctor prescribed 90 pills of 30

2    milligrams of oxycodone, right?

3    A.  Correct.

4    Q.  It's your view, Dr. Warfield, that people react differently

5    to drugs, correct?

6    A.  They can.

7    Q.  It's your view that there is a tremendous variation in the

8    amount of medicine that a patient would need to relieve their

9    pain, correct?

10   A.  It can be.

11             THE COURT:  Is that your view, yes or no?

12             THE WITNESS:  Yes.

13   Q.  A couple of quick substantive questions.  A doctor who

14   believes his patient to be allergic to Percocet wouldn't

15   prescribe his patient oxycodone, right?

16   A.  That's not true.

17   Q.  Why not?

18   A.  Because the people who are allergic to Percocet are

19   sometimes allergic to the dye in it.  The brand name Percocet

20   tablets contain, I think it's a yellow dye that some people are

21   allergic to, so sometimes the oxycodone can be used in place of

22   Percocet.

23   Q.  If a patient told you that they were allergic to Percocet,

24   you need to ask that follow-up question about what it is in

25   Percocet they are allergic to.  Is that fair?

 1   A.  Patients don't usually know.  I guess the answer to your

 2   question, you can prescribe oxycodone to people who are

 3   allergic to Percocet.

 4   Q.  Without asking the follow-up question of what they are

 5   allergic to in Percocet, it's possible that you could run the

 6   risk of them being allergic to oxycodone because there is

 7   oxycodone in Percocet.  Is that fair?

 8   A.  No.  Because very, very few people are allergic to opiates.

 9   It's not something that's very allergenic.  It's not one of

10   those that are very allergenic.  It's typically the dye.

11   Q.  It's your view when it comes to pain management care in

12   elderly patients that a little goes a long way, right?

13   A.  Often.

14   Q.  And that an elderly patient should get one-half to

15   one-third of the usual adult dose of oxycodone, right?

16   A.  They may.

17   Q.  That's the general guideline.  Is that fair?

18   A.  It's an individual thing.

19   Q.  There is a chapter in your book, chapter 57, called Pain

20   Management in Elderly Patients.  Is it fair to say that that's

21   the advice you give in that book?

22   A.  I don't believe I wrote that chapter.  The chapter was

23   given.

24              THE WITNESS:  If I might explain, your Honor.

25              THE COURT:  No.  Actually you may not because there is

G3EMMIR7

 1   no question on the table.

 2   A.  No, I did not write that.

 3          THE COURT:  She did not write that.

 4   Q.  Are you aware if it's in the book with your name on it?

 5   A.  I edited the book.  I did not write that chapter.

 6   Q.  Are you aware that in that same chapter that it states that

 7   when using analgesics in the elderly you need to be compulsive

 8   about assessing pain and side effects?

 9   A.  I didn't memorize the chapter.  I would be surprised if it

10   says that, I guess if that's the question.

11   Q.  In the book it also says that it's mandatory to reassess

12   and adjust an analgesics within hours and days of prescribing

13   opiates to the elderly.  Does that sound right based on your

14   editing function of the book?

15   A.  It can be.  It's something that some folks do.  Again, I

16   didn't write that chapter.

17          MS. CUCINELLA:  Your Honor, I'm moving on to a new

18   topic.

19          THE COURT:  Let's take a break.  Folks, we will start

20   again tomorrow at a quarter of 10.  You all know what happens

21   when people don't show up at a quarter of 10.  We have to wait

22   a while.  Please, everybody, be here at a quarter of 10.  I

23   anticipate that the doctor's testimony will take some period of

24   time in the morning.  Do you have any additional witnesses?

25          MR. MAZUREK:  We do not.

 1          THE COURT:  We will see if the government is going to

 2   have any kind of a rebuttal case.  I anticipate that we will be

 3   beginning the closing arguments and probably you'll get the

 4   charge Wednesday morning first thing.

 5          Again, this is a hard work week.  I appreciate very

 6   much that you have to pay really, really careful attention this

 7   week.  Get a good night's sleep.  Relax tonight.  Don't discuss

 8   the case.  Keep an open mind.  You have not heard everything

 9   until you have heard the end of my charge.  I'll see you

10   tomorrow.

11          (Jury not present)

12          THE COURT:  I am going to have Jim e-mail you a

13   somewhat revised charge in line with the comments that you sent

14   in.  The defense's principal comment is the conscious avoidance

15   charge should not be made.  The government correctly points out

16   that in this circuit, for as long as I've been giving charges,

17   actual knowledge and conscious avoidance can indeed be charged

18   in the alternative.  And I must say there is plenty of evidence

19   in this case to support giving a conscious avoidance charge.

20   It will be given over the defendant's objection, but it will be

21   given.

22          We will talk more about the charge tomorrow.

23          MS. CUCINELLA:  Your Honor, can we just ask that the

24   witness be admonished that she is on cross and there should be

25   no --

1          THE COURT:  Correct.  Has she left?

2          MR. MAZUREK:  We won't talk to her.

3          THE COURT:  Don't talk to her.  I should have said

4   something before she left and I'm very sorry I did not.  But I

5   trust defense counsel not to talk to her.

6          MR. MAZUREK:  One other thing I wanted to put on the

7   record.  I'm very concerned, given the beginning of the cross

8   of this witness of this expert.  This is a criminal case and

9   it's not a medical malpractice case.  It's not about negligence

10  or gross negligence.

11         THE COURT:  I'm aware of that.  The words negligence

12  and malpractice have not crossed her lips.

13         MR. MAZUREK:  The words are not the end of the story.

14  It just seems like a lot of what this case has devolved into,

15  at least with respect to expert testimony and Dr. Gharibo did a

16  lot on direct, are talking about things that are so far afield

17  on a criminal case.  The standard is whether this doctor acted

18  as a drug dealer versus a medical doctor.  We are talking about

19  things about whether referrals were specific enough.  We are

20  talking about things about whether --

21         THE COURT:  I'm sorry, but I disagree with you,

22  Mr. Mazurek.  You are the one who opened this up on your cross

23  of Dr. Gharibo.

24         MR. MAZUREK:  I had to respond to his direct.

25         THE COURT:  That's fine.  You have your exception.  If

1    your client is unlucky enough to be convicted, you can take it

2    to the Second Circuit.

3         Both of you, from the getgo, announced that you were

4    putting on experts to talk about what was outside the bounds of

5    real medical practice.  It is the government's position that

6    this man set up an office and prescribed the same medication to

7    13,000 different people or 13,000 different times to thousands

8    of different people, regardless of their size, their weight,

9    their health history, their this, their that, and that was

10   outside the bounds of legitimate medical practice.  Their guy

11   says it was.  Your lady says that it wasn't.  And those

12   opinions about where the boundaries are in medical practice can

13   be probed.  They can be probed on cross-examination.

14        Now, I am not saying I would do what the government

15   seems like it's going to do on cross.  It might not be the way

16   I would choose to try the case.  But they can certainly ask

17   questions to probe where the boundary is between legitimate and

18   illegitimate medical practice.

19        MR. MAZUREK:  I just think it opens the door to the

20   kinds of things that there are different standards of care and

21   that it's almost as if the jury is hearing that because an

22   elderly person wasn't given dosages one to one and a third

23   times or below another average adult, the doctor is not

24   compulsive in determining side effects of a patient, that that

25   could be outside the course of professional conduct when we are

 1    talking about -- might not be the best standard of care that he

 2    had.

 3              THE COURT:  Ultimately the argument here, as I

 4    understand it --

 5              MR. MAZUREK:  It's not criminal.

 6              THE COURT:  Ultimately I understand the government's

 7    argument to be this man gave everybody who walked in the door

 8    exactly the same thing.  And here is an eminent physician from

 9    Harvard Medical School whose name is on the cover of a book.  I

10    don't care if she wrote the chapter.  I know what the argument

11    is going to be.  She put her name on the cover of a book and in

12    the book it says if you are dealing with a little old lady like

13    Ms. Medina, you don't give her as much as you give somebody

14    like Abraham Correa, a big burly young man.  And that's in her

15    book.  That's fair.  That's fair cross-examination of this

16    witness.  It just is.

17              MR. MAZUREK:  Judge, that might be, but I'm talking

18    about the details, the depths of the details that are going on.

19    And it becomes, was the doctor guilty of malpractice?  Should

20    he have --

21              THE COURT:  Could I say that she has asked no question

22    that does not respond to something that you elicited on direct.

23              MR. MAZUREK:  I didn't talk about the dosages of

24    elderly patients, allergies to Percocet.

25              THE COURT:  Excuse me.  She talked in gross terms

1    about how everything he did was just hunky dory, and the

2    government is perfectly free to poke holes in it.

3            MR. MAZUREK:  But only within a standard that is

4    outside the usual course of conduct.  We are talking about

5    really levels of standards of care.

6            THE COURT:  Redirect her.

7            MR. MAZUREK:  Your Honor has restricted me to talk

8    about standards of care.

9            THE COURT:  I didn't restrict you to talk about

10   standards of care.  On the contrary.

11           MR. MAZUREK:  We are not to talk about any other

12   standards because this case is not a civil case.

13           THE COURT:  I said you are not supposed to talk about

14   the malpractice standard of care.  You are not supposed to talk

15   about the best practices.  I said, you can't talk about best

16   practices.  This case isn't about best practices.  This is

17   about whether the doctor was operating outside the scope of

18   legitimate medical practice.  That's what I said.  And she

19   said, he was not.  And then, instead of sitting down, instead

20   of sitting down having gotten this eminent doctor to say that,

21   you proceeded to ask her about 250 questions about this aspect

22   of the legitimate practice and that aspect of legitimate

23   practice, and that opens the door to cross.

24           MR. MAZUREK:  That was to respond to what Gharibo had

25   already testified to.

 1          Judge, so I'm understanding, you are saying that I can

 2   redirect her on that within a usual course of medical practice

 3   there is a large scope of practice that goes from the Harvard

 4   medical level to the doctor who might be --

 5          THE COURT:  You tell this jury that the people in

 6   Washington Heights don't deserve to have a center of excellent

 7   standard of care.

 8          MR. MAZUREK:  That is not what I'm saying at all.  In

 9   fact, I'm saying, my defendant client should not be convicted

10   for being a bad doctor.  This is a criminal case.

11          THE COURT:  He will not be because my instructions

12   will be so clear, so clear, you cannot convict this man for

13   committing malpractice.  You cannot convict this man for using

14   not best practices.

15          MR. MAZUREK:  If they don't know what that is --

16          THE COURT:  You can only convict him if you conclude

17   that he was not really running a medical practice; he was

18   running a drug dealing operation.

19          MR. MAZUREK:  Shouldn't the jury then hear that there

20   are these levels of practice.  To hear at the end of the

21   case --

22          THE COURT:  There are good doctors, bad doctors, and

23   malpractice doctors?  No.  I'm sorry.  I don't see that there

24   is going to be any problem at the close of the day with this

25   because the jury is going to be told in no uncertain terms that

1    he can't be convicted for being a bad doctor.

2           MR. MAZUREK:  They are not being told the scope of

3    range of what that might mean.  It might mean not keeping

4    complete medical records.  What if they convict this man

5    because he didn't complete his medical records.  That's not

6    right.  And you can't just give an instruction without any

7    basis of facts and testimony.

8           THE COURT:  You have elicited from this doctor scags

9    of information about how every little thing he did was

10   perfectly within the bounds of a legitimate medical practice.

11   Don't say she can't cross on that.

12          MR. MAZUREK:  My point is, within that, because I'm

13   limited in terms of saying within the usual course of medical

14   practice, the jury might take that just general statement and

15   say exactly as you said, it's all hunky dory.  It's not all

16   hunky dory.

17          THE COURT:  I know what I would do on redirect.  I

18   would say, is it within the legitimate bounds of medical

19   practice to give a little old lady more than one and a half

20   times the pain medication that you would give to somebody else?

21   She is going to say yes.  You know she is going to say yes.  Is

22   it within the legitimate bounds of medical practice.

23          MR. MAZUREK:  But that is so misleading because even

24   as you are saying it are mocking it.

25          THE COURT:  On the contrary, I'm not mocking it.  I'm

1   saying that's the question I would ask if I, when I was a trial

2   lawyer, who never mocked my clients, had to do redirect in

3   opposition to this cross.  I'm saying that we don't have to get

4   the words malpractice or best practices into this case.  And I

5   forbade the use of the words malpractice or best practices

6   precisely because I don't know what the jury is thinking about,

7   malpractice or best practices.  Their job is to decide whether

8   a doctor who is actually practicing medicine would do what your

9   client did.  That's their job.  That's what they will be told

10   to do.  And they will not be given a charge on what constitutes

11   malpractice, nor will they get evidence about what constitutes

12   malpractice.

13            MR. MAZUREK:  I have my exception.

14            THE COURT:  You do.  See you in the morning.

15            (Adjourned to Tuesday, March 15, 2016, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

ADRIAN CASTRO

Cross By Mr. Gosnell . . . . . . . . . . . . .1090

MOLLY ROSEN

Direct By Ms. Cucinella  . . . . . . . . . .1095
Cross By Mr. Gosnell . . . . . . . . . . . .1105
ALTAGRACIA MEDINA

Direct By Mr. Mazurek  . . . . . . . . . .1127
Cross By Mr. Diskant . . . . . . . . . . .1140
ANNA TORRES

Direct By Mr. Mazurek  . . . . . . . . . .1147
Cross By Mr. Diskant . . . . . . . . . . .1165
Redirect By Mr. Mazurek  . . . . . . . . . .1168

CHRISTOPHER DILLON

Direct By Mr. Mazurek  . . . . . . . . . .1169
Cross By Mr. Diskant . . . . . . . . . . .1177
Redirect By Mr. Mazurek  . . . . . . . . . .1180
Recross By Mr. Diskant . . . . . . . . . . .1182
CAROL WARFIELD

Direct By Mr. Mazurek  . . . . . . . . . .1185
Cross By Ms. Cucinella . . . . . . . . . . .1240
GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 1005     . . . . . . . . . . . . . . . . .1097

 300     . . . . . . . . . . . . . . . . . .1098

 301 through 325, 328, 329, and 332  . . . . .1100