UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :

       - v. -                    :            (S1) 14 Cr. 810 (CM)

MOSHE MIRILASHVILI,        :

             Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America


Edward B. Diskant
Brooke E. Cucinella
Assistant United States Attorneys
       - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

      - v. -                               :              S1 14 Cr. 810 (CM)

MOSHE MIRILASHVILI,                    :

               Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM**

After a three-week trial, Moshe Mirilashvili (the "defendant"), was convicted for his role in orchestrating a massive, multi-year and multi-million dollar unlawful oxycodone distribution ring out of his sham "medical offices" on West 162nd Street in Manhattan.   As the trial evidence established, and the jury's verdict reflected, for more than two years, the defendant acted not as a medical doctor but as a drug dealer, writing identical prescriptions for large doses of oxycodone in return for cash fees.  In total, between January 2012 and his arrest in December 2014, the defendant wrote more than 10,000 medically unnecessary oxycodone prescriptions in return for cash.  As the trial evidence overwhelmingly established, this was not simply "bad medicine."  It was part of a carefully devised scheme that turned the defendant from a struggling, previously disbarred doctor, into a millionaire.

In seeking a sentence wildly below the bottom of the applicable Guidelines range, the defendant principally rehashes arguments made to—and necessarily rejected by—the jury, including extensive arguments about the credibility of Government witnesses and the alleged lack of evidence of the defendant's knowing participation in the charged conspiracy.  The defendant attacks his co-conspirators, including his former employees, blames the Government

2

for not "confront[ing] [the defendant] immediately with evidence of drug diversion," and even accuses this Court of treating him unfairly. Wholly absent from the defense submission is any true acknowledgement of wrongdoing or acceptance of responsibility for the magnitude of the defendant's criminal conduct, conduct that resulted in nearly 1 million oxycodone tablets being pumped onto the streets of New York in the few years leading up to the defendant's arrest and which contributed immeasurably to the rise of the opioid epidemic that has devastated lives and communities all over the country.

Because the defendant's crimes were both incredibly serious and long-running, because they involved his abuse of his medical license, and because the defendant continues to generally show a callous disregard for the harms his conduct caused, the Government respectfully submits, consistent with the recommendation of the U.S. Probation Department as set forth in its Presentence Investigative Report ("Probation" and the "PSR," respectively) that a substantial term of incarceration is appropriate for this defendant and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

## I. BACKGROUND

The following facts are taken principally from the Presentence Report and the trial evidence, as indicated herein:

The defendant was initially charged, along with ten co-defendants, with one count of conspiring to distribute narcotics by Indictment 14 Cr. 810 (CM), which was unsealed on December 11, 2014. (PSR ¶¶ 1-2.) The charge stemmed from the defendant's participation in a massive oxycodone distribution scheme, one which was centered at his purported pain management office located in upper Manhattan (the "Clinic"). While as detailed herein, the

scheme involved dozens of participants, including Clinic employees and drug traffickers who managed crews of "patients" sent into the Clinic to obtain medically unnecessary prescriptions, this defendant's participation – and his willingness to use his medical license to dole out prescriptions for large quantities of oxycodone – was essential to the scheme's success.  In total, between January 2012 and his arrest in December 2014, the defendant wrote 14,621 prescriptions for oxycodone 30-milligram tablets, substantially all of them for 90 pills each.  (GX 118, 104.)

### A.  The Trial

#### 1.  The Government's Evidence at Trial

Oxycodone is a highly addictive, prescription narcotic-strength opioid used to treat severe and chronic pain conditions.  As Dr. Christopher Gharibo, the Government's expert, testified at trial, oxycodone "an energizing feel good effect, I can do anything, I feel great" and this "psychoactive euphoric effect . . . can be abused, basically, and that can create dependence." (Tr. at 900).   As a result, oxycodone is "disproportionately abused, misused and diverted.  It's responsible for a large number of deaths, and it has a very robust excitatory effect, [a] feel good high type of effect that the addict enjoys, and that creates a high street value for it, that makes it valuable."  (*Id.* at 913.)

Beginning in at least 2012, this defendant seized upon the opportunity presented by the highly lucrative black market for oxycodone, agreeing to write prescriptions for large dosages of oxycodone for "patients" willing to pay cash.   As Abraham Correa testified at trial, as early as the summer of 2012, Correa learned from co-conspirator Raymond Williams, a/k/a "Obama," that Williams had "a guaranteed way of making money.  He had a doctor by the name of Moshe,, and we were guaranteed . . . to get oxycodone prescriptions."  (*Id.* at 322.)  Correa soon began

seeing the defendant as a cash-paying "patient" and, despite having no medical need for oxycodone (nor any history of taking opioids), received at his initial visit, the same prescription for 90 30-milligram oxycodone tablets that substantially all of the defendant's cash patients received. (*Id.* at 323.)

The core of the Government's evidence, however, focused on what happened next, namely the defendant's decision in the fall of 2012 to open his own medical offices – *i.e.*, the Clinic – on West 162nd Street in Manhattan. And as the Court heard, almost immediately, the Clinic began attracting large crowds of people who had traveled from all over the state (and country) to obtain a "guaranteed" oxycodone prescription from the defendant. The Court heard from a neighbor, Benjamin Lopez, who testified that almost immediately after the Clinic opened, neighbors began seeing "a large influx of people on 162nd Street trying to get in. . . . I saw a lot of cars double parked, sometimes even triple parked." (*Id.* at 60.) As Mr. Lopez further described, these crowds appeared to be "[p]atients trying to get in. And they had someone at the door which was basically allowing them to get in, or telling them to wait outside or wait by the avenue." (*Id.* at 63.)

The trial further evidence how the Clinic operated and, in particular, that it operated like no legitimate medical facility. The Court learned that the defendant hired his own patients – including Correa and Damon Leonard – as employees, not because they were remotely qualified to work in a medical office (which, of course, they weren't), but because they would be completely under the defendant's control. The defendant's office had a bouncer out front, but no nurses. The defendant required patients to submit paperwork ostensibly documenting their medical need for oxycodone, but routinely accepted documents that were patently and obviously fake. Indeed, the Government offered stacks of purported medical documents recovered from

the defendant's home in which names of patients had been visibly whited out or even taped onto an existing document.  (*E.g.*, GX 559, 560).   The Government also offered purported medical documents recovered from the defendant's home in which the patient name field was blank, strongly suggesting the defendant himself was involved in manufacturing these fake documents. (GX 559-A).

As the jury learned, while the defendant accepted some insurance patients, particularly during the early months of the conspiracy, the majority of his patients paid in cash, hundreds of dollars per appointment handed directly to the defendant in the treatment room at the beginning of the "patient" visit.   The defendant then conducted a cursory examination – one in which he took few, if any notes – and which invariably resulted in the same outcome, the issuance of a prescription for 90 30-milligram oxycodone tablets.  (*E.g.*, 1101, 1101-T).   In particular, and as part of the trial evidence, the Government offered a series of recordings of some of these patient visits during which the defendant asks seemingly appropriate questions (about physical therapy, for example, or surgery) but takes no notes of the answers and thus proceeds to ask the very same questions at visit after visit, all the while continuing to prescribe oxycodone.  *(E.g.*, GX 1102-05.)

And the jury learned that, as business boomed, the defendant quickly dropped insurance patients altogether in favor of cash patients, raising his fee from $200 to $300 per visit in June of 2014 and seeing no insurance patients at all for the last few months of the conspiracy.  (Tr. 129, 706, GX 117).  For example, on October 28, 2014, which was the subject of Count Three, the Government's evidence established that the defendant wrote 33 identical oxycodone prescriptions, each for 90 30-milligram tablets, and each in return for a $300 cash payment.  (GX 111).

The Government also called an expert, Dr. Christopher Gharibo, who testified to how the legitimate practice of pain management should work.  Dr. Gharibo testified, for example, to the need to collect a full patient history, to do a physical exam, and to review relevant prior studies. (Tr. at 892-94.)  Critically, as Dr. Gharibo made clear – and the defendant's expert, Dr. Carol Warfield did not dispute – legitimate pain management requires a great deal more than simply writing an identical prescription for every patient.   As Dr. Gharibo testified, for example, legitimate pain management requires making a diagnosis and then "treating the diagnosis in a comprehensive fashion, not be[ing] overly simplistic about treating it."  (*Id*. at 895).  Critically, because all patients have medical needs, Dr. Gharibo described a wide range of different treatments he uses to legitimately treat pain patients.  Dr. Gharibo added that, in his practice, "less than five percent" of his patients are receiving oxycodone, with the remaining 95 percent receiving some other form of treatment.  (*Id*. at 903).[1]

As part of his testimony, Dr. Gharibo also reviewed approximately a dozen of the defendant's patient files, all receiving oxycodone from the defendant.  In each instance, Dr. Gharibo identified fatal and obvious flaws, including that "there was no documentation of any kind, virtually" and what did exist "was grossly inadequate.  It didn't justify even [an] Acetaminophen prescription."  (*Id*. at 918)   There was also no documented attempt at identifying" the cause of the pain" but just a prescription for oxycodone.  (*Id.*)   Dr. Gharibo noted, as the jury learned, that many of the electronic files ostensibly maintained by the

---

[1] With respect to the defendant's practices, in particular, Dr. Gharibo also testified that a legitimate pain management doctor would not start a patient on oxycodone 30 milligram tablets, as the defendant frequently did, because for new patients who are "opioid naïve" a much lower dosage would be appropriate. (Tr. at 909).  Similarly, Dr. Gharibo testified that he had never received cash from a patient in a treatment room, never completed notes or medical charts weeks or even months after a patient visit, and never asked a patient if they were "a cop."   (*Id*. at 916-17.)

defendant were not only minimal in nature but were completed "from days to months to close to a year after the office visit took place." (*Id*. at 920).   Dr. Gharibo also noted the defendant's practice of prescribing oxycodone to patients "that are very high risk . . . . For example, patients with a history of heroin abuse, intravenous drug use, and cocaine abuse, so they're known addicts with high probability of a relapse that were walking out with a prescription for not just any opioid, not a low dose of an opioid, but oxycodone 30 milligrams." (Tr. at 921.)   Based on those facts, Dr. Gharibo concluded, "it clearly wasn't a medical practice that was occurring here." (*Id.*)

Finally, through DEA analyst Adrian Castro, the Government documented the changes in the defendant's prescribing habits from 2010 and 2011, before the onset of the conspiracy, and his arrest in 2014.   In particular, by reviewing the defendant's prescribing records, Analyst Castro was able to document for the jury how the defendant wrote fewer than 600 prescriptions for controlled substances in 2010 – and of those, just 15 prescriptions for oxycodone 30 milligram tablets – whereas by 2014, the defendant wrote 5,800 prescriptions for controlled substances, with 99 percent of those being for oxycodone 30 milligram tablets.  (GX 101, 103). Through Analyst Castro, the Government established that during the period of the charged conspiracy, the defendant wrote 14,621 oxycodone prescriptions, and of those, 10,233 were written in return for cash payments, resulting in a total 920,970 30-milligram oxycodone tablets being dispensed in return for cash.  (GX 118, 104).

Analyst Castro also detailed the financial benefits to the defendant from his participation in the conspiracy, showing, through a review of insurance records, how the defendant's percentage of cash patients skyrocketed starting in late 2012, resulting in the defendant's ability to reap millions of dollars from the Clinic.  Indeed, through Analyst Castro, the Government

offered evidence of the roughly $1.75 million in cash proceeds reaped from the Clinic the

defendant was storing in zip lock bags.  (GX 117, 5-E, 5-K.)

      2.  <u>The Defense Case</u>

      The defendant elected to put on a case and called three witnesses, Dr. Carol Warfield,

who was qualified as an expert, and two former patients, Altagracia Medina and Analisa Torres.

Contrary to the defendant's assertion in his sentencing submission, Ms. Torres was not a cash

patient.  To the contrary, as Ms. Torres testified, she paid the defendant with her insurance on all

but of one of her visits (when her insurance had been cut off).   (Tr. at 1163-64.)   Ms. Torres

further testified – entirely consistent with the testimony of Correa and Leonard about how

insurance patients were treated by the defendant – that she ultimately stopped seeing the

defendant because she would be told, upon arriving, that there were too many patients and she

couldn't be seen that day so she had to "come back the next day. . . . I just got tired of doing

that." (Tr. at 1164.)[2]  During her testimony, Ms. Torres also stated that the prescriptions Dr.

Mirilashvili had been writing her caused her stomach problems, which she didn't tell Dr.

Mirilashvili about for fear that he would stop prescribing the pills to her.  (Tr. at 1167-68.)

      By contrast, Medina was a cash patient and displayed all of the indicia of diversion

present with substantially all of the defendant's cash patients.   Medina, a petite elderly woman,

visited the defendant for the first time and was given a prescription for 30 milligram oxycodone

tablets.  Medina had insurance – and used it to fill the prescriptions at the pharmacy – but yet

chose to pay cash to see this particular doctor who also happened to be writing an identical

---

[2] For example, Correa testified that the defendant accepted "very limited" insurance
patients and had instructed his staff that "out of 40 patients he would only take five or six
insurances a day." (Tr. at 342.)  Leonard similarly testified that the defendant "only wanted to
see ten insurance patients per day.  Cash patients were different.  He wanted to see them in the
morning first. . . . He didn't want to see no insurance patients early in the morning, meaning the
start of the day." (Tr. at 705.)

oxycodone prescription for Medina's daughter, another cash patient. (Tr. 1139-40, 1141). According to her testimony, Mirilashvili referred Medina to physical therapy, but she didn't go, and the defendant apparently didn't follow up or ask any questions about how physical therapy was going. (Tr. at 1136-37.)  On cross-examination, Medina admitted that during the relevant time period, she also saw another corrupt doctor, Robert Terdiman, who has also since been convicted of operating a pill mill and writing medically unnecessary prescriptions in return for cash. *See United States* v. *Lowe*, 14 Cr. 055 (LGS) (Tr. at 1144-45.)  At no point, however, did the defendant apparently ever ask if Medina was obtaining oxycodone from another doctor.

Finally, the defendant called Dr. Warfield who testified on direct that there was a wide-variety of acceptable practices with respect to pain management practices, and, in her opinion, Dr. Mirilashvili had acted within that range and certainly had done nothing criminal (*See, e.g.,* Tr. at 1240).  On cross-examination, however, Dr. Warfield agreed with much of Dr. Gharibo's testimony about the day-to-day practice of a legitimate pain management doctor, conceding, for example, that there were common guidelines for the prescribing of opiates in effect during the period of the charged conspiracy, and that legitimate doctors should consider and exhaust alternative treatment methods before prescribing opiates.  (*E.g.*, *id.* at 1244-45.)  Dr. Warfield also agreed that oxycodone was a "highly addictive pain killer," one subject to abuse and one she does not frequently prescribe herself in her own practice or "center of excellence."  (*Id.* at 1245-48, 67.)  Additionally, Dr. Warfield conceded that people react differently to medications (based on size, age, etc.), and that there is typically "tremendous variation" in the dosage of medication individuals need treat their pain.  (*Id.* at 1251).

The Verdict

On March 17, 2016, the jury returned its unanimous verdict, convicting the defendant on all three counts.

**B.  The PSR and the Guidelines Calculation**

Consistent with the determination made by the U.S. Probation Department in its Presentence Report or "PSR," the Government believes the November 1, 2015 Guidelines apply in the following manner:

The base offense level applicable to the offense charged in the Indictment is U.S.S.G. § 2D1.1.  Pursuant to U.S.S.G. § 2D1.1(c)(1), the base offense level is 38 because the offense involved approximately 920,970 30-milligram oxycodone tablets which are equivalent to 185,115 kilograms of marihuana, or substantially more than the 90,000-kilogram threshold for an offense level of 38. (*Id.* ¶ 68.)

Pursuant to U.S.S.G. § 3B1.3, an additional two levels are added because the defendant used a special skill, his medical license, in a manner that significantly facilitated the commission of the offense.  (*Id.* ¶ 71.)  Accordingly, the defendant's total adjusted offense level is 40.  (*Id.* ¶ 73.)

The defendant has no criminal history and is thus in Criminal History Category I. (*Id.* 77-83.)  Accordingly, the defendant's applicable Guidelines range is 292 to 365 months' imprisonment.  (*Id.* at 24.)   The Probation Department has a recommended a Guidelines sentence of 292 months.  (*Id.*).

\*     \*     \*

In his submission, the defendant challenges the Probation Department's quantity finding, arguing that the Government's position, and the Probation Department's conclusion, that the

defendant should be held responsible for all of the oxycodone prescribed to cash "patients," is "wildly speculative and unproven" and "bears no relation to the trial evidence." (Def. Submission at 47.)  Instead, the defendant argues he should be held responsible for just a fraction of the pills attributed to his co-defendants as conditions of their plea agreements, thereby arriving at a total pill count of 29,493, an offense level of 34, not 40, and an applicable Guidelines range of 151 to 188 months' imprisonment. (*Id*. 49-50.)

The Government believes that the trial evidence provides abundant support for a finding, particularly under the preponderance of the evidence standard, *United States* v. *Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005), that the more than 10,000 identical oxycodone prescriptions the defendant wrote his cash-paying "patients" during the period of the charged conspiracy should be properly attributed to him for purposes of sentencing.[3]  As an initial matter, and as the Court is well aware – and the defendant overlooks in conducting his independent analysis – at sentencing, this Court is not limited to the conduct of named co-defendants, but may consider, as relevant conduct, "all acts . . . committed . . . by the defendant . . . that occurred during the commission of the offense of conviction."  U.S.S.G. § 1B1.3(a)(1)(A).  The notion that the Court should limit itself, thus, to quantities to which named co-conspirators pled guilty, is absurd.

Instead, the Government submits the key issue for this Court is to quantify the prescriptions for which the defendant "acted outside the usual course of medical practice, that he acted other than in good faith, and without a legitimate medical purpose" because each such

---

[3] As noted, the Court's finding here must be supported only by a "preponderance of the evidence."  Where, as here, quantity is not established by a drug seizure or where a seizure does not reflect the scale of the offense, both the Second Circuit and the Guidelines direct the Court to "approximate the quantity" involved in the offense.  *United States* v. *Blount*, 291 F.3d 201, 215 (2d Cir. 2002) (quoting U.S.S.G. § 2D1.1, cmt n.5)  "In making such an estimate, the court has broad discretion to consider all relevant information."  *Id.*

prescription would therefore constitute a part of the crimes of conviction.  (Tr. at 1459-60.)
Here, the Government believes that trial record establishes that with respect to all of the
prescriptions the defendant wrote in return for cash, the defendant was, at best, completely
indifferent, to the issue of whether there was a "legitimate medical purpose" for the drugs he was
prescribing.  Instead, the evidence established the defendant was writing an identical prescription
for every patient who paid his cash fee without regard to medical necessity, and therefore
"effectively ceased to act in good faith as a medical professional, but instead knowingly and
intentionally acted outside of the usual course of professional practice."  (*Id*. at 1461).  That was
the Government's theory at trial – it was the theory on which the Government asked the jury to
return its verdict and upon which the jury found proof beyond a reasonable doubt – and it was a
theory abundantly supported by the record.

    *First*, the Court saw the defendant's prescribing habits which in some respects speak
for themselves.  During the period the Clinic was in operation, the defendant was writing an
identical prescription for 90 30-milligram oxycodone tablets for essentially every patient who
paid his cash fee.  Not only was the defendant writing dozens of oxycodone prescriptions every
single day, but ninety-nine percent of those prescriptions were for the exact same thing,
oxycodone 30 milligram tablets, typically 90 tablets.  (GX 104).[4]  The Court heard from two
experts – including an expert retained by the defendant – that a legitimate medical practice
would include a wide variety of treatment options, with oxycodone being used only after other

---

[4] The Government readily concedes that some of these cookie cutter prescriptions,
particularly in 2012 and 2013, were written for insurance patients, and the Government believes
these many of these were equally illegitimate and that the Court could thus also include them in
its quantity finding.  However, because the Government's trial evidence and argument focused
primarily on the defendant's cash patients (and because inclusion of these additional
prescriptions would have no impact on the defendant's Guidelines calculation), the Government
is only asking the Court to consider, for present purposes, the overwhelming majority of these
prescriptions that were written in return for cash.

treatments had been exhausted, and as Dr. Gharibo testified expressly, no legitimate doctor prescribe the exact same dosage of the exact same pain medication to every patient.

*Second*, the Government extensive evidence about the day-to-day operation of the defendant's Clinic, evidence that established that throughout the duration of the conspiracy, the defendant was not acting with any good faith belief that he was engaged in a legitimate medical practice, but was instead acting as a drug dealer, accepting cash in return for prescriptions. Through two cooperating witnesses, for example, the Court learned that the defendant collected the cash himself, at the start of every patient visit; that the defendant had no medical staff, kept no records aside from the occasional post it, and was more concerned with whether a potential "patient" was "the police" than whether they had a legitimate need for pain medication (*E.g.*., Tr. at 382-83, 619); that a oxycodone prescription was "guaranteed" for Crew Chiefs like Abraham Correa who brought their "patients" to see the defendant (*id.* at 322); that there were numerous other "Crew Chiefs" or "bosses" bringing fake "patients" in to see the defendant (*id.* at 337, 345-46); and indeed that virtually every patient who got in the door was either working for a Crew Chief or paying the staff.  (*Id.* at 357).   Leonard's testimony on the defendant's complete indifference to medical necessity is particularly instructive:

> The doctor expected, the expectation of us at that time . . . he wanted 30 people per day . . . . [M]ost days after the end of the day, he would go, he would check his paperwork.  He look[ed] at his numbers and he'll have a problem with that.  If the number was under 30, he said something to you.  What's the problem today? Why are we seeing under what I asked you to do?
>
> And I'll explain to him, Doc, you threw some people out or some people didn't make it today.  He didn't want to hear that.  My job was and our job was at the time, I don't give a damn.  Call people, whatever it may be, call them, get them in here. . . . At that time, for me, all I cared about was giving him the numbers because ultimately I cared about my job.  So whatever made him happy, I did.

(*Id.* at 704.)

14

*Third*, the Court saw direct evidence of the blatant indicia of diversion the defendant intentionally overlooked in writing many of these prescriptions – and certainly many beyond just those written for the named co-defendants.  The Court saw, for example, dozens of medical records for the defendant's cash patients which were patently and visibly false and fraudulent on their face.  Government Exhibit 560, for example, reflects visibly doctored urinalysis reports recovered from the defendant's home for more than two dozen cash patients.   Every single one of these patients got an oxycodone prescription from the defendant, most of them prescriptions month after month after month.  The Court heard from Dr. Gharibo, who evaluated patient files for another dozen patients, and testified at length about the various problems present in each file before concluding that "it clearly wasn't a medical practice that was occurring here."  (Tr. at 921).   Through another Government witness, Joel Galanter, the Government offered evidence of another 31 patients (substantially all of them cash patients) whose urine samples were flagged for the defendant as indicative of fraud, and through Analyst Castro, the Government established that the defendant continued prescribing oxycodone to all but four of them.  (GX 109).   Finally, the Government offered dozens of the defendant's sham files from the Practice Fusion system which again support a finding that the defendant's practice, across the board, was fraudulent.  Clearly, the defendant's practice of writing medically unnecessary oxycodone prescriptions extended well beyond his named co-conspirators – it was the day-to-day conduct of the conspiracy.

In arguing against this enormous body of evidence, the defendant principally repeats arguments that were made to, and necessarily rejected by, the jury, including that the defendant was just "a bad doctor" who mistakenly "believed he could treat people with the same group of medicines for any pain condition presented to him, but that does not make him a criminal."  (Def.

Submission at 27.)  Indeed, the defendant goes so far as to attribute this prescribing practice not to a "criminal mind, but because he believed his routine was based on some prior learning he acquired somewhere along the arduous road between Soviet Georgia and the United States." (*Id.*).  This completely self-serving account is not only inconsistent with the jury's verdict, but it is entirely belied by the trial evidence.

Critically, Government Exhibits 101 and 102, which depict the defendant's prescribing habits in 2010 and 2011 (*i.e.*, the last year of the defendant's Probationary term following the reinstatement of his medical license, and the year immediately following it), make clear that the defendant was well aware of what the legitimate practice of medication and the legitimate use of pain medication looked like:



In 2010, for example, the defendant not only wrote substantially *fewer* prescriptions for controlled substances, but consistent with the descriptions of legitimate practice provided by both experts, his prescriptions had a wide variety.   Indeed, the defendant most typically prescribed much lower dosages of oxycodone, such as oxycodone 5 milligram tablets and oxycodone 10 milligram tablets.   Less than 3 percent of his prescriptions were for oxycodone 30 milligram tablets, the drug of choice for diverters and abusers because of its heightened potency and street value.

By contrast, by 2014, when the Clinic was open and 90 percent or more of his daily patients were paying cash, the defendant was not only writing 10 times as many prescriptions in total, but 99 percent of those prescriptions were for oxycodone 30 milligram tablets.





In making that drastic transition, the defendant wasn't relying on some misguided view of what constituted the legitimate practice of medicine.  He was instead entirely abandoning the legitimate practice of medicine in pursuit of profits – as the trial evidence also established, the defendant was earning just $45,000 a year practicing legitimate pain management in 2010.  (GX 114.)  By 2014, he was making well over twenty times that amount.

The second reason this Court should reject the defense argument that the defendant was just a "bad doctor" is that, as the Court knows from the defendant's prior disciplinary proceedings, this defendant had previously lost his license for doling out identical pain medication treatments to his patients.  As the Court may recall from the parties' pre-trial motions, in stripping the defendant of his license, the State Peer Review Board concluded:

> The patients came to the [defendant] with symptoms of pain and/or numbness which, in most instances, were treated by the [defendant] with nerve blocks or, in one case a steroid treatment.  The factual findings . . . for each patient concluded that the [defendant's] records for the initial patient history were inadequate and lacking in specified items of information essential for a history of a patient presenting these symptoms.  The [defendant] was found to have done an inadequate or inappropriate examination for the circumstances presented.  He was also found  . . . in his use of pain managing agents, [to have] addressed surface symptoms and not the possible underlying etiology of the patient's conditions.  He was also, in many instances, found not to have performed the appropriate follow-up to find the underlying etiology.

The state revoked his license because it concluded that the defendant, by simply using pain medication such as nerve blocks or a steroid treatment "only treated symptoms and never sought nor treated causes" which "*did not meet the acceptable standards of care*."[5]  Given that history, it simply blinks reality to suggest that this defendant could possibly have been operating under a

---

[5] Because the quoted documents from the State proceeding were attached to the Government's pretrial motions and are thus already a part of the record, they are not attached here as hell.  However, the Government will gladly provide the Court with additional copies of these materials if that would be of use.

good faith belief, during the period of the charged offense, that his conduct constituted a legitimate practice of medicine.

Alternatively, the defendant argues the Government's position is overly broad, and points to the two patients called as defense witnesses as examples of "legitimate" cash patients. However, as discussed above, only one of those witnesses, Medina, was a cash patient (Torres paid with insurance), and there are overwhelming indicia that Medina was not a legitimate patient, and that defendant certainly took no steps to determine whether or not she was one. Moreover, even if this to credit the theory that Medina was a "legitimate" cash patient – an aberration in the defendant's otherwise corrupt practice – that would not counsel in favor of the drug quantity pressed the defendant.  It would counsel in favor of subtracting Medina's prescriptions from the total drug quantity, a subtraction which would have no impact on the Guidelines calculation in this case.  It certainly does not undue the enormous body of evidence detailed above and reflecting the defendant's general practice throughout the course of the conspiracy charge of which he has now been convicted.

*     *     *

In sum, the trial evidence overwhelming establishing that the defendant's practice had nothing to do with the legitimate practice of medicine, and that the prescriptions the defendant was writing for cash were not part of any legitimate practice.  In other words, with respect to his daily practice of writing dozens of identical oxycodone prescriptions in return cash payments, the defendant had "effectively ceased to act in good faith as a medical professional."   That evidence therefore supports a finding by this Court that all of those prescriptions were part of the conspiracy charged and should be attributed to the defendant for purposes of sentencing.

## II. DISCUSSION

In light of the nature of the instant offense as well as the history and characteristics of this defendant, the Government respectfully submits that a substantial term of incarceration is appropriate and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.  Indeed, application of the Section 3553(a) factors in this case militate in favor of a sentence that includes a substantial term of incarceration:

*First*, a substantial term of incarceration is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A).   As the evidence at trial overwhelmingly demonstrated, the defendant intentionally set up his Clinic to operate as a cash-generating drug den.  Over the course of just a few years the defendant turned himself into a millionaire, not by working harder than the next guy, but abusing his medical license and minting oxycodone prescriptions.  In so doing the defendant ignored the highly addictive nature of the drug.  He turned a blind eye to the dangers of overdose and abuse.  And he abandoned his oath as a medical doctor to do no harm.

Over the course of the conspiracy, the defendant ceased operating as medical professional and instead began acting like a drug dealer.  He collected cash in the treatment room, and prioritized cash patients over insurance patients.  He took a bag filled with that cash home every night, and then stuffed it into zip lock bags that he stored in his closet or headboard.  He hired only individuals he knew were in on the conspiracy – staff wholly unqualified to work at a legitimate doctor's office – and collected "paperwork" so patently fraudulent on its face that even this defendant preferred not to keep it at the Clinic, but instead stored more securely in his home.

The harms caused by the defendant's conduct are, in some respects, immeasurable.  As the Court heard at trial, over the course of more than two years, the defendant destroyed a neighborhood, bringing violence and drug dealing into an otherwise quiet community.  He pushed nearly 1 million medically unnecessary oxycodone tablets into the street, fueling the additions of thousands (and potentially tens or even hundreds of thousands) of addicts.  And he did so because he didn't care – perhaps because the money or the power of running this operation was more important – and because he allowed himself to completely overlook the dangers of the drugs he was peddling to his cash-paying "patients."

A substantial sentence is thus warranted here to appropriately reflect the seriousness of the offense conduct.

*Second*, a substantial sentence is necessary to afford adequate deterrence.  *See* 18 U.S.C. § 3553(a)(2)(B).   With respect to specific deterrence, while the defendant cites his advanced age and lack of criminal history as counseling in favor of leniency, the Government finds concerning the defendant's lack of any genuine acknowledgement of the seriousness of his conduct or remorse for his crimes.  As noted above, the defendant's submission focuses far more on blaming those around him, on blaming Government witnesses, on blaming law enforcement, than on acknowledging any true responsibility for his crimes.  That the defendant continues to reject any responsibility for his crimes – crimes that were committed with the assistance of a medical license that the defendant had previously lost for similar conduct – strongly suggests that a far more substantial penalty is required to impress upon the defendant the seriousness of his conduct.

But equally important in a case like this is general deterrence.  According to the American Society of Addictive Medicine,[6] the misuse of prescriptions painkillers including oxycodone, has become a leading cause of annual emergency room visits and drug overdose deaths in the United States.  In 2014, nearly 40 percent of all drug-related overdoses were caused by prescription pain killers, or four times as many as those caused by heroin.   The prevalence of prescription pain medication in American homes – and thus the ready access to these drugs provided to children – has made oxycodone a drug of choice for teenagers, in particular.  In 2014, nearly half a million adolescents were reported to be "nonmedical users" of prescription pain medications, with 168,000 teenagers being addicted.

This epidemic starts – and should stop – with prescribing physicians, people like this defendant who alone contributed nearly 1 million oxycodone tablets to this nationwide problem.  Sending a strong message to the medical community that doling out prescriptions in return for cash is a crime, and one that will result in a substantial term of incarceration, is both necessary and appropriate in this case.

*          *          *

In seeking a substantial downward variance, the defendant makes a series of arguments, many of which have been addressed herein, but one of which warrants additional response.  Specifically, the defendant contends that the Government engaged in a form of "sentencing entrapment" by not arresting the defendant immediately, in the fall of 2014, or "confront[ing] Dr. Mirilashvili with its evidence" thereby "put[ting] him on notice of the possible crimes being committed."  (Def. Submission at 38-39.)  As the defendant goes on, this "failure" on the part of

---

[6] The statistics in the paragraph above come from the American Society of Addictive Medicine, 2016 Facts and Figures, available here: http://www.asam.org/docs/default-source/advocacy/opioid-addiction-disease-facts-figures.pdf (last visited September 21, 2016).

law enforcement "had a substantial impact on public health," because had law enforcement done more, they might have "prevented Dr. Mirilashvili from continuing to operate *with a criminal staff*." (*Id.* at 39) (emphasis added).

This argument borders on offensive and reflects the defendant's continuing and complete lack of responsibility for his own conduct. This defendant was "put . . . on notice" that his practice was dangerous and unusual and quite likely illegal repeatedly, by neighbors who complained to him from the outset about the crowds and the chaos. He was put on notice when, after being robbed in the Fall of 2013, he was questioned by the NYPD about his prescribing habits and the potential for diversion at his Clinic; and he was put on notice when he was robbed again in the Fall of 2014 and again questioned extensively by law enforcement about his Clinic, his staff, and the potential for diversion. The defendant was put on notice again when Tasheen Davis was stopped in New Jersey and questioned by law enforcement agents who then called the defendant – as the Court may recall, the defendant responded to being questioned about the legitimacy of the Davis prescription not by reexamining his practice but by hurriedly creating fake medical records for her in an attempt to paper over his crime.

This defendant didn't need to put on notice that his conduct was criminal, and it wasn't his "criminal staff" or any "failure" of law enforcement that "had a substantial adverse impact on public health." It was the conduct of this defendant that caused that substantial adverse impact and that fed the oxycodone epidemic for over two years.

### III.  CONCLUSION

For the foregoing reasons, the Government respectfully submits that a substantial term of incarceration here is appropriate and would sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated:  New York, New York
        September 21, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York

                              By:    ___/s/_____
                                        Edward B. Diskant
                                        Brooke E. Cucinella
                                        Assistant United States Attorney
                                        (212) 637-2294/2477