

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

Henry E. Mazurek
Wayne E. Gosnell, Jr.
mazurek@clayro.com
gosnell@clayro.com

September 27, 2016

By ECF

The Honorable Colleen McMahon
United States District Judge
United States District Court
500 Pearl Street
New York, New York 10007

    Re:    <u>United States v. Mirilashvili</u>, S2 14 Cr. 810 (CM)

Dear Judge McMahon:

    We write on behalf of defendant Moshe Mirilashvili in response to the government's sentencing memorandum. The Probation Department recommended a Guidelines sentence in this case of 292 months, or 24 years and three months of incarceration. Dr. Mirilashvili is 68 years old, and if he were sentenced to such a preposterous term of imprisonment, he would not be eligible for release until after his 89th birthday. Such a sentence is for all practical purposes a life sentence. The government, while coyly not committing to a recommended sentence to this Court, suggests it should sentence Dr. Mirilashvili "consistent with the recommendation of the U.S. Probation Department as set forth in its Presentence Investigative Report that a substantial terms of incarceration is appropriate for this defendant." (Gov. Sent. Mem., 3.) For the reasons summarized below and in Dr. Mirilashvili's sentencing memorandum, the Probation Department's recommendation should be rejected.

1. <u>The government's recommended base offense level is not supported by the trial evidence.</u>

    The government recommends that Dr. Mirilashvili's drug amount offense level should be calculated based upon the total number of cash-paying patients who visited Dr. Mirilashvili's clinic from November 2012 to December 2014, which translates to a base offense level of 38. (Gov. Sent. Mem, 12.) The government claims the Court has sufficient evidence from trial to make this finding by a preponderance of the evidence. (*Id.*)

    First, while the case law supports findings of drug quantities by preponderance of the evidence for purposes of Guidelines calculations (but below the statutory maximum penalties provided in the counts of convictions), the Second Circuit has directed sentencing courts to exercise caution in those cases where findings of relevant conduct "may result in a total term of

Hon. Colleen McMahon
September 27, 2016
Page 2 of 6

incarceration which is excessive, inappropriate, and unintended under the Sentencing Guidelines." *United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000) (citing dictum in *United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997) ("though the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed fact issues at sentencing, U.S.S.G. § 6A1.3, p.s., comment., we have ruled that a more rigorous standard should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence").

Second, the government's reliance on the mode of payment for prescriptions as the keystone for finding drug quantities attributable to Dr. Mirilashvili for distribution outside the scope of medical treatment or practice is not supported by the weight of the evidence. The government merely extrapolates from the prinicipal facts: (1) that a patient paid in cash, and not insurance, and (2) Dr. Mirilashvili prescribed "cookie cutter" prescriptions, to conclude that he knew or should have known that all of his prescriptions were being re-sold on the street. (Gov. Sen. Mem., 13.)[1]

The problem with this extrapolation is that it paints with too broad a brush. Dr. Mirilashvili's default prescription practice of issuing a 30-day supply of 90 30-milligram pills of oxycodone to people who complained of chronic pain was by itself not below a standard of care indicative of a drug dealer as opposed to medical practice. Indeed, Dr. Warfield confirmed this in her testimony. There was common agreement between both Dr. Warfield and Dr. Gharibo that prescribing opioids, and oxycodone in particular, was common practice for treatment of chronic pain. (*See* Warfield, Tr. 1194:  prescribing opioids "is something that's very commonly done for pain"). Indeed, Dr. Warfield testified that in the common course of professional conduct, pain doctors "absolutely" use oxycodone as a first-line medication for patients with pain. (*Id.* at 1195.) A sampling of 24 patient files from Dr. Mirilashvili's files revealed that "[b]y far most of them" indicated a prior opioid tolerance which made the 30 milligram dosage of oxycodone completely within the common course of medical treatment. (*Id.* at 1196-97.) Finally, Dr. Warfield also testified that a common, or default, prescription of 90 milligrams of oxycodone per day is a "moderate dose" that is not outside the usual course of professional practice. (*Id.* at  1201-02.) Thus, the identical nature of the oxycodone prescriptions (90

---

[1] The government also cites to the fact that Dr. Mirilashvili wrote fewer prescriptions for Oxycodone in 2010 and 2011 as compared to those he wrote in 2012, 2013, or 2014. But without context, the comparison between the two timeframes is misleading because it improperly suggests that Dr. Mirilashvili was engaged in the same type of medical practice throughout that entire period. That is simply not true. In 2010 and 2011, Dr. Mirilashvili worked at several general medical practices under the supervision of other physicians; his responsibilities were more akin to those of a general practice physician. None of those practices were pain management clinics that specialized in chronic pain management. The government's arguments at trial on this point misleadingly compared apples and oranges. However, Dr. Mirilashvili could not explain the difference in practices without "opening the door" to this Court's earlier ruling precluding prior medical disciplinary proceedings and findings against him.

Hon. Colleen McMahon
September 27, 2016
Page 3 of 6

milligrams per day) is not some touchstone of drug dealing. The trial testimony did not support this overbroad claim.

Further, the government's own expert Dr. Gharibo examined a statistical sampling of Dr. Mirilashvili's patient files and determined that his practices did not reveal an *absolute* pattern of drug dealing. For example, Dr. Gharibo testified that repeating the same prescription plan for patients who reported reduced pain after taking the prescribed medicine is not evidence consistent with "acting as a drug dealer," but "would be inappropriate" if continued at length as a high-risk treatment. (Gharibo, Tr. 982.) Of course, Dr. Mirilashvili is not being sentenced for "inappropriate" treatment, he is being sentenced for drug dealing.

After reviewing the recorded transcripts of Dr. Mirilashvili's visits with the confidential source "patient" Jose Lantigua, Dr. Gharibo also concluded that Dr. Mirilashvili's decision to continue the same treatment plan over several patient visits, based on Mr. Lantigua's answers to the doctor's questions about reduced pain, "could be" consistent with exercising medical judgment. (Gharibo, Tr. 986.)

Dr. Gharibo further conceded on cross-examination that Dr. Mirilashvili's repeated practice of making orthopedic or other patient referrals to a city hospital, as opposed to a specific group practice or individual doctor, "has nothing to do with being a drug dealer." (*Id.* at 998.) He testified that Dr. Mirilashvili's requirement of urine screen testing in his medical practice exceeded what was actually required by applicable medical guidelines for prescribing opiates at the time. (*Id.,* Tr. 1003.) In short, this testimony is inconsistent with an *absolute* practice of drug dealing, which the government urges the Court to accept for sentencing purposes.

During cross-examination, Dr. Gharibo testified that several of Dr. Mirilashvili's patient files indicated "inappropriate" usage of oxycodone based on Dr. Gharibo's standard of measuring the risk of addiction, but did not *ipso facto* indicate evidence of drug dealing. For example, for patient Pedraza, Dr. Gharibo admitted that the patient's multiple gun wounds and stabbing injuries identified in the file would be legitimate factors to be considered in prescribing opioids, even if in Dr. Gharibo's judgment the treatment he would prescribe would be different. (Gharibo, Tr. 1016.) The government presented no evidence that patient Pedraza did not take the medication to reduce pain from these multiple severe injuries, or more importantly, that Dr. Mirilashvili believed he was selling oxycodone pills to Pedraza for no medical reason at all.

Indeed, the Court is well aware of the significant medical injuries or physical ailments and disease suffered by many of the charged co-defendants in this case. All of these co-defendants were patients at Dr. Mirilashvili's practice and many of them confirmed their medical histories with corroborating independent medical files at sentencing. These defendants indicated that, while also diverting pills, they used the oxycodone to control pain. The government completely ignores these facts in asking the Court to sentence Dr. Mirilashvili for 100% of the pills prescribed to patients who paid in cash.

A survey of the patient co-defendants reveals the following medical conditions, all of which are consistent with a chronic pain diagnosis and opioid treatment:

Hon. Colleen McMahon
September 27, 2016
Page 4 of 6

- Carolyn Middleton:  Victim of a serious car accident in 2010.  As noted in her sentencing submission to the Court, Middleton "suffers from severe back pain and a[n] MRI report prepared on July 10, 2014 showed herniated discs at L3-L4, L4-L5, and L5-S1, with bilateral neural canal stenosis (or narrowing [of] the nerve passage.)" (Middleton Sent. Mem. at 4.)  She maintains that she "was legally prescribed Oxycodone for her pain." (Id.)  She was still being prescribed Oxycodone by doctors through sentencing.

- Kevin Frye:  Injured in 2012, lifting his step-father and his wheelchair up several flights of stairs.  Frye received surgery and was prescribed pain medication.  (Frye Sent. Mem. At 4.)

- Raymond Williams:  Injured in a car accident which required multiple surgeries on both knees, leaving him in permanent and constant pain.  At sentencing, William's counsel made clear that Williams was a "real patient in need of pain medication because he is in pain 24 hours a day." (Sent. Tr. at 6.)

- Tasheen Davis:  Victim of multiple car accidents, which resulted in back and neck injuries.  Her sentencing has been adjourned several times due to her medical condition and counsel's need to obtain long history of medical treatment.

- Ganeene Goode:  In end stages of renal disease.  Her kidney failures have required multiple surgical procedures and hemodialysis.

The problem throughout the government's prosecution of this case has been its conflating of a below-standard-of-care practice with drug dealing and criminal conduct.  It now wants this Court to sentence Dr. Mirilashvili on the basis that his entire practice was based on selling pills for cash.  The evidence simply did not match the government's overreaching claim.

For example, the government claims that one of the defendant's patient-witnesses, Altagracia Medina, evidenced "overwhelming indicia" that she was not a legitimate patient.  The "indicia" it cited to were Ms. Medina's trips to two pain doctors that the government ultimately prosecuted, Mirilashvili and Terdiman, *i.e.,* a self-fulfilling claim by the government.  (Gov. Sent. Mem., 10.)  The government also cited to the fact that Ms. Medina's appearance as a "petite elderly woman" presented credible evidence that Dr. Mirilashvili did not act as a doctor when he prescribed her 30-milligram tablets of oxycodone, because the dosages were too high for her weight and age. (*Id.* at 9.)  First, this issue was not the subject of testimony by the medical experts at trial.  Second, even assuming Dr. Mirilashvili did not take adequate account of Ms. Medina's weight and age in prescribing certain dosages of oxycodone, this evidence is woefully insufficient to show he believed, when prescribing these dosages, that he was acting outside the course of medical practice and simply selling her drugs.  Ms. Medina testified that she showed Dr. Mirilashvili real MRI reports of prior knee reconstruction surgery and a subsequent MRI of her other knee, which required similar surgery. (Medina, Tr. 1130-34.)  She told the doctor that she suffered from chronic knee pain and refused to have surgery on the second knee because of the pain and suffering she experienced in rehabilitation after her first

knee surgery. (*Id.*)  To conclude from this testimony that Dr. Mirilashvili was only prescribing Ms. Medina 30-mg. tablets of oxycodone as a drug dealer is plainly absurd.  Maybe the dosages were too high, but this is a standard of care issue that more appropriately belongs in a medical board proceeding or malpractice suit, not a criminal prosecution for violations of the Controlled Substances Act.

In sum, for the foregoing reasons and under circumstances where Dr. Mirilashvili was only admitted to a few public insurance plans and denied membership in all other private plans due to his prior medical disciplinary record, the mere fact that a patient paid in cash for an office visit is an insufficient marker to indicate that all of Dr. Mirilashvili's prescriptions were intended to further a drug dealing scheme and not issued within the practice of medicine.

> 2. <u>Any Sentence Approaching Probation Department's Recommendation is Disproportionate to Sentences Received by Co-Defendants and Other Similarly Situated Doctors Whose Conduct Did Not Cause Death</u>

Probation is advocating a sentence that is more than two-times longer than the most severe prison sentence issued by the Court to date in this case.  The Court imposed a ten-year sentence on Kevin Frye, who was a career narcotics offender in Criminal History VI, as compared to Dr. Mirilashvili, for whom this is his first offense.  The Court also sentenced co-defendant Dorian Avery, a career offender with prior convictions for robbery, gun and drug offenses, to a total term of eight years of imprisonment.   Thomas White, another prior offender and crew chief, received an 87-months sentence.

The co-defendants' cooperation and guilty pleas do not bridge the gap between the co-defendants' sentences and the 24+ year sentence recommended by the Guidelines and PSR.  Leonard and Javier received time served and probationary sentences.  Raymond Williams, an admitted street gang crew chief, received a 36-month sentence.  Given the length of these sentences, the government is really asking the Court to impose a heavy trial penalty that is inconsistent with the Sixth Amendment.

The DEA's most recent national listing (March 31, 2016) of criminal narcotics prosecutions and sentences imposed in cases of physician defendants reveals that 20-plus year sentences of incarceration have largely been limited to cases where the government has proven conduct that the doctor-defendant caused the death of his/her patients. (*See* Cases Against Doctors, DEA, Office of Diversion Control, March 31, 2016, at www.deadiversion.usdoj.gov.)  No evidence of that kind has even been alleged here, but the Probation Department's recommended sentence reaches those severe heights. Indeed, as indicated in our sentencing memorandum to the Court, the sentences of Drs. Stambler and Lowe, under more egregious facts than here, resulted in sentences of only 10 and 12 years respectively.

Hon. Colleen McMahon
September 27, 2016
Page 6 of 6

   Thus, to avoid an unwarranted sentencing disparity under 18 U.S.C. § 3553(a)(6), this Court should reject the Probation Department's recommendation and apply a substantial downward variance in Dr. Mirilashvili's sentence.

              Respectfully yours,

              /S/HEM

              Henry E. Mazurek
              Wayne E. Gosnell, Jr.
              *Counsel for Defendant Moshe Mirilashvili*

cc:  Edward B. Diskant (via ECF)
    Brooke Cucinella (via ECF)